# Exhibit 3

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

GEORGE MATTSON AND GNM ICBC,
LLC,

        Petitioners,

v.                              CASE NO.:

J.P. MORGAN SECURITIES, LLC,

        Respondent.

## BRIEF IN SUPPORT OF PETITIONERS' APPLICATION
## AND MOTION TO VACATE ARBITRATION AWARD

HASELKORN & THIBAUT, P.A.
Matthew N. Thibaut
Florida Bar No. 514918
mthibaut@htattorneys.com
359 S. County Road, Suite 101
Palm Beach, Florida 33480-4472
Tel: (561) 585-0000
Fax: (561) 833-4209

THE LAW OFFICE OF CRAIG KUGLAR, LLC
Craig H. Kuglar, Esq. (*Pro Hac Vice* Pending)
ck@kuglarlaw.com
931 Monroe Dr. NE Suite A-102-353
Atlanta, GA 30308
TEL (404) 432-4448
FAX (404) 393-8007

*Attorneys for Petitioners*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND..................................................4

    I.      The Investors Open Securities Accounts with JPMS ...............................4

    II.     JPMS's Customer Agreement Mandates Arbitration Before the Financial
            Regulatory Authority and Incorporates FINRA Rules of Arbitration into
            the Customer Agreement .........................................................................4

    III.    JPMS Notifies the Investors of an Investment Opportunity ....................5

    IV.    The Investors Enter into a Subscription Agreement with J.P. Morgan
            Investment Management .........................................................................8

    V.      Billions of Dollars in Value Vanish Within Months .............................10

    VI.    The Investors Initiate a FINRA Arbitration Against JPMS Only After
            JPMS Refuses to Compensate Them For their Losses in Jawbone ......12

    VII.   The FINRA Code of Arbitration Procedure Required JPMS Include Any
            Counterclaims Against the Investors in its Answer and Pay a Counterclaim
            Filing Fee .............................................................................................13

    VIII.  JPMS Does Not Assert Any Counterclaim Against the Investors in Their
            Answer .................................................................................................14

    IX.    The FINRA Code of Arbitration Procedure Required the Investors Provide
            a Written Answer to the Counterclaims Setting Forth Relevant Facts and
            Available Defenses ...............................................................................14

    X.      JPMS Never Made a Motion to Amend Its Answer So As To Assert Any
            Counterclaims ......................................................................................15

    XI.    The Panel Refuses to Issue Subpoenas to Third Parties With Relevant
            Evidence in Advance of the Hearing ....................................................15

    XII.   JPMS's Pre-Hearing Brief Submissions Make No Mention of Any
            Counterclaim, Did Not Request Damages, and Listed No Witnesses to
            Testify as to Damages ...........................................................................17

    XIII.  JPMS and Its Broker Relied Heavily on Due Diligence Conducted by
            Third Party JPMIM ..............................................................................18

XIV.   The Panel Expresses Its Disdain for the Investors' Case and Refuses to Hear Testimony from Two Separate Expert Witnesses at the Hearing ................21

XV.   The Panel Permits JPMS to Introduce Evidence at the Close of the Hearing in Support of a Counterclaim for Contractual Indemnity Over the Investors' Express Objection ..................................................................................22

XVI.   The Arbitration Award................................................................................23

ARGUMENT ...............................................................................................................24

I.   Legal Standard Applicable to Vacation of Arbitration Awards...........................24

   A.   Arbitrability of Disputes ........................................................24

   B.   Overstepping Authority/Exceeding Their Powers ....................................24

   C.   Refusal to Hear Relevant Evidence ..........................................................25

II.   The Arbitrators Violated 9 USC § 10(a)(3) By Refusing to Hear Relevant, Non-Cumulative Testimony from Third Parties and Experts ...............................25

III.   The Arbitrators Exceeded Their Authority by Permitting a Counterclaim to be Asserted at Hearing in Direct Violation of the Rules of the Arbitral Forum ...........................................................................................................34

IV.   The Arbitrators Did Not Have the Power to Impose Attorneys' Fees Against the Investors in the Absence of the Unasserted Counterclaim for Contractual Indemnity ............................................................................38

V.   The Arbitration Award Should be Vacated in Its Entirety ...................................40

CONCLUSION...........................................................................................................41

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*187 Concourse Associates v. Fishman*, 399 F.3d 524 (2d Cir. 2005)............................................37

*Am. Gen. Fin. Servs. v. Jape*, 291 Ga. 637, 638 (2012)................................................................24

*Ameriprise Fin'l Serv's, Inc. v. Brady,* 2018 WL 4344993, No. 18-10337 (D. Mass. Sept. 11, 2018) ................................................................................................................................39

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) ..............................24

*Beiard Indus. Inc. v. Local 2297, Int'l Union*, 404 F.3d 942, 946 (5th Cir. 2005)......................36

*CF Global Trading, LLC v. Wassenaar*, 2013 WL 5538659, No. 13-cv-766 (S.D.N.Y. Oct. 8, 2013) ....................................................................................................................39

*D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).................................................40

*Gulf Coast Industrial Workers Union v. Exxon Co., USA,* 70 F.3d 847, 848 (5th Cir. 1995) ......................................................................................................................25, 26

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492, 548 N.E.2d 903, 905 (1989)..........................................................................................................................35

*In re Colorado Energy Mgmt., LLC*, 981 N.Y.S.2d 44, 114 A.D. 3d 561 (1st Dep't 2014) ...37, 38

*Landmark Ventures, Inc. v. Insightec, Ltd.*, 63 F. Supp. 3d 343 (S.D.N.Y. 2014)......................39

*Perry v. Thomas,* 482 U.S. 483, 489 (1987) ..........................................................................1, 24

*PoolRe Ins. Co. v. Organizational Strategies, Inc.*, 783 F.3d 256, 262 (1st Cir. 2015) ...............36

*Robbins v. Day*, 954 F.2d 679, 685 (11th Cir. 1992)...................................................................25

*Smith v. Transport Workers Union of Am.*, 374 F.2d 372 (5th Cir. 2004)..............................36, 37

*Stichting Pensioenfonds ABP v Credit Suisse Grp. AG*, 38 Misc. 3d 1214(A), 966 N.Y.S.2d 349 (N.Y. Sup. 2012)......................................................................................29

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671-72 (2010) ..........................1, 24

*Tempo Shain Corp. v. Bertek, Inc.,* 120 F.3d 16, 20 (2d Cir. 1997) ........................................26, 27

**STATUTES**

9 U.S.C. § 10(a)(3) ...............................................................................................1, 24, 25, 26, 39

9 U.S.C. § 10(a)(4) ...............................................................................................1, 24, 36

Fla. Stat. Ann. § 517.211 ........................................................................................13, 17, 39

**OTHER AUTHORITIES**

FINRA Code of Arbitration Procedure Rule 12303 ...................................................13

FINRA Code of Arbitration Procedure Rule 12304 ...................................................14, 15

FINRA Code of Arbitration Procedure Rule 12309 ...................................................15

FINRA Code of Arbitration Procedure Rule 12512 ...................................................15

FINRA Code of Arbitration Procedure Rule 12514 ...................................................17

## PRELIMINARY STATEMENT

The Arbitration Award denying George Mattson and GNM ICBC, LLC's (the "Investors" or "Petitioners") claims against J.P. Morgan Securities, LLC ("JPMS" or "Respondent") in connection with $1,000,000.00 they lost investing (their entire investment) in a technology company called Jawbone upon the recommendation of JPMS, and imposing $275,000.00 in damages against the Investors, must be vacated.  The Federal Arbitration Act ("FAA") permits vacation if the court finds "[an] overstepping by the arbitrators of their authority."[1]  In vacating an arbitration award in a recent case, the Supreme Court explained that "an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator exceeded his powers" "when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice."[2]  An arbitration award likewise cannot stand "where the arbitrators were guilty of misconduct…in refusing to hear evidence pertinent and material to the controversy…"[3]

*First,* the Arbitrators are guilty of misconduct for refusing to hear evidence pertinent and material to the controversy.  The Investors alleged JPMS failed to conduct adequate due diligence into Jawbone prior to bringing it to the Investors' attention and that JPMS made material misrepresentations and omissions in its communications with the Investors about the potential investment.  Prior to the Arbitration, the Arbitrators refused to permit the Investors to subpoena key third party witnesses with direct knowledge of both topics, including JPMIM (an affiliate of JPMS), whose employees were personally involved in meetings and calls with the Investors prior

---

[1] "The FAA applies in state and federal courts to all contracts containing an arbitration clause that involves or affects interstate commerce."  *Perry v. Thomas*, 482 U.S. 483, 489 (1987).

[2] *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671-72 (2010).

[3] 9 U.S.C. § 10(a)(3).

to, during and after the deal, and the venture capital firm acting as the "lead investor" whose decision not to fully fund its commitment was a key issue at the Arbitration. The Arbitrators' refusal to hear relevant testimony continued unabated at the hearing. Hours into the Investors' case-in-chief, the Arbitrators refused to hear testimony from the Investors' expert witness on damages. The next morning, Arbitrator Chiodo was overheard by the Investors saying "I don't know how much more of this I can stand." Thereafter, the Arbitrators refused to accept testimony from the Investors' expert on due diligence. The testimony of these third-party witnesses and experts was relevant and non-cumulative of other evidence introduced by the Investors.

*Second*, the Arbitrators exceeded their powers in awarding JPMS damages pursuant to a contractual indemnity counterclaim that JPMS never asserted until the very end of the hearing. The FINRA Code of Arbitration Procedure (the "Rules"), incorporated into the parties' Arbitration Agreement, required JPMS plead counterclaims with its Answer and pay a filing fee. JPMS did neither. The Rules further mandated the Investors be given notice of counterclaims and afforded an opportunity to file a formal response setting forth affirmative defenses, which never happened. JPMS never requested nor obtained leave to amend its Answer to assert any counterclaim prior to the hearing. Despite all this, the face of the Award leaves no doubt that the Arbitrators awarded JPMS $200,000.00 pursuant to a contractual indemnity provision in a "Subscription Agreement dated May 27, 2014" that JPMS was not a party to and that the Investors did not sue on. JPMS based its last-minute request for attorneys' fees and costs solely on this unasserted counterclaim. The unasserted counterclaim had to be used by the Arbitrators as their basis for imposing damages against the Investors because neither the Arbitration Agreement nor the Rules gave the Arbitrators the power to assess attorneys' fees.

An analysis of the 263 FINRA awards issued in "customer" cases over the past six months yielded no other case in which investors suing a broker-dealer were required to pay the attorneys' fees of the broker-dealer.  The Investors submitted to FINRA arbitration safe in the knowledge that the Arbitration Agreement did not provide for fee shifting and that FINRA Rules do not give the Arbitrators any such power.  JPMS's failure to assert any counterclaim against the Investors further assured the Investors that a denial of claims would result "only" in the loss of their $1,000,000.00 investment.  In awarding attorneys' fees and costs to JPMS under the guise of the unasserted counterclaim, the Arbitrators strayed from interpretation and application of the agreement and effectively dispensed their own brand of industrial justice.

In their opposition, JPMS will no doubt seek to rehash the various legal arguments and defenses they presented to the Arbitrators at the hearing, evidentiary matters the Investors do not ask this Court to reconsider.  The FAA does not permit courts to second guess arbitrators' application of the evidence to the claims, and the Investors do not, by this motion, seek to "retry" the Arbitration.  The Arbitration was flawed not because of the result but because of the process the Arbitrators took to reach the result.  The Investors had a statutory and contractual right to (1) present relevant, non-cumulative evidence in support of their claim; and (2) to be given notice of and an opportunity to defend counterclaims raised in response to their claims.  The record demonstrates that the Arbitrators failed to follow these guidelines by which the Investors agreed to submit to arbitration.  The Award must therefore be vacated.

## <u>FACTUAL AND PROCEDURAL BACKGROUND[4]</u>

**I.    THE INVESTORS OPEN SECURITIES ACCOUNTS WITH JPMS**

At all times relevant to this dispute the Investors were customers of JPMS.[5]   Jasmine Abouzied ("Abouzied") was the Investors' broker of record at all relevant times.[6]  The Investors' account statements show that the Investors were high net worth investors with a wide range of securities including private equity and hedge fund investments.[7]

**II.    JPMS'S  CUSTOMER  AGREEMENT  MANDATES  ARBITRATION  BEFORE THE FINANCIAL REGULATORY AUTHORITY AND INCORPORATES FINRA RULES OF ARBITRATION INTO THE CUSTOMER AGREEMENT**

The  JPMS  customer  agreement  with  the  Investors  contained  a  binding  arbitration agreement (the "Arbitration Agreement") mandating arbitration at FINRA pursuant to the FINRA Code of Arbitration Procedure:

- "BY ENTERING INTO THIS AGREEMENT THE CLIENT AND J.P. MORGAN AGREE THAT CONTROVERSIES ARISING UNDER OR RELATING TO THIS AGREEMENT…SHALL  BE  DETERMINED  BY  ARBITRATION  AND  IN ACCORDANCE  WITH  THE  RULES  OF  THE  FINANCIAL  REGULATORY AUTHORITY ("FINRA") BEFORE AND ARBITRATION PANEL APPOINTED BY FINRA IN ACCORDANCE WITH ITS RULES[…]."

- "THE RULES OF  THE  ARBITRATION FORUM IN WHICH THE CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT." [8]

---

[4] The arbitration hearing was transcribed by a certified court reporter.  Relevant pages of the record cited herein are attached hereto as Exhibit A and cited as "Transcript, p. ___."
[5] Ex. A, Transcript, pp. 83-84.
[6] *Id.*
[7] *Id.*
[8] Ex. B.  All documents referenced and attached hereto were introduced and accepted into evidence at the arbitration.

The Arbitration Agreement did not provide for any "fee shifting" provision (in contravention of the "American Rule") requiring the losing party to pay the attorneys' fees or costs incurred by the prevailing party.

## III.    JPMS NOTIFIES THE INVESTORS OF AN INVESTMENT OPPORTUNITY

In May 2014, JPMS began notifying its securities customers, including the Investors, of a potential opportunity to make a direct investment in a private technology company called Jawbone. On May 14, 2014, Abouzied contacted Mattson by email "to discuss an investment opportunity."[9] Abouzied and Mattson had a call that same day to discuss the investment opportunity.

What was said on that call was a matter of dispute at the hearing.  Mattson testified:

> Mr. Mattson, we're at CX100.

A.    Okay.

Q.    And do you recognize this email?

A.    This is an email on May 14, 12:38 p.m. from Jasmine to me, asking if I had a few minutes to discuss an investment opportunity, referring to Jawbone.

Q.    And what was your response?

A.    Late this afternoon should work, 5:00 p.m., and we spoke at 5:00 p.m. that day.

Q.    And do you have a recollection of that call?

A.    Yes.

Q.    Tell us what your recollection is?

A.    My recollection is that it was a call that lasted 15 minutes or so minutes, 15 or 20 minutes.  I was in the backyard of my house here in Florida, I recall.  And what Jasmine described to me was that there was a unique opportunity to make an investment in a very exciting private tech company in an emerging space, the wearable space.

She explained this was a company that J.P. Morgan knew extremely well, having done many years of work for them raising capital.  That her partner Larry Unrein, who runs the private equity business at J.P. Morgan , was on the board and had been

---

[9] Ex. C.

affiliated with and associated with the company as an insider on the board for many, many years.

That they knew the company extremely well. That it was their opinion that this company was going to be the next hot IPO out of the tech sector and out of Silicon Valley in the wearable space. That this $250 million financing would be the last round of financing they needed before their IPO. That it was backed by blue chip investors, that J.P. Morgan had their own capital in it. And it was something she suggested was unique and something I should take a look at.

Q.     Did she tell you who else would be involved in this capital raise?

A.     She mentioned that there was going to be a lead investor by the name of Rizvi. She mentioned that J.P. Morgan had had many prior dealings and transactions with Rizvi. She mentioned that Rizvi and J.P. Morgan had co-invested in Twitter and a couple of other exciting tech investments that she referenced, that I don't recall the specific names at the time, but I do remember that Twitter reference.

She mentioned that they were a blue chip lead investor in transactions like this, and that essentially the capital that the private bank was going to be putting in would be going in alongside Rizvi, who would be negotiating the principal terms of the transaction on behalf of the investor group as the lead investor.

Q.     Were you told what the lead investor would be putting up in terms of their capital?

A.     175 million out of the 250.

Q.     How was that $175 million commitment described to you?

A.     As a commitment. I assumed based on how it was described that all the money was going to close simultaneously and all the money was going in at the same time. I assumed it was a $250 million close, of which Rizvi would be closing 175 on the same terms. That was the description that was given.

Q.     Was it ever described as an option?

A.     No. It was never described as an option. In fact, when I later learned a few short months later that they had not raised $250,000 but had raised $176 million, I asked why, how that could have happened, particularly given that the amount of capital a private company that's cash flow negative raises is an extremely important fact. More is better when you need cash to grow. Less is dangerous.

And when I asked how it was that it didn't come in at 250, Larry Unrein on a call with Jasmine and I told me that Rizvi didn't come in. And I said, what do you mean Rizvi didn't come in. [10]

---

[10] Ex. A, Transcript, pp. 86-89.

JPMS's broker, Jasmine Abouzied, testified that in her fourteen years of dealing with Mattson as a client she had "found Mr. Mattson to be an honest person"[11] and that she didn't "recall the details of the call."[12]  Despite not recalling the details of the call Abouzied testified positively as to what she did and did not say on that call:

A.     I don't recall the details of the call.  I would have stayed -- I would have been very -- I am very -- I follow the rules.  I'm a rule follower, and whatever I was allowed to share, I would have stayed tight to that.  I don't recall the details of the call. This was four years ago.

Q.     Mr. Mattson testified that he does recall the call clearly, didn't he?

A.     I think so. I don't remember.  We've talked a lot over the last two days or 24 day-and-a-half.

Q.     Your testimony here today is that on that call, you never said anything along the lines of it being a hot company that was going public soon?

A.     I absolutely did not say that.

Q.     Or that this was expected to be the last round of financing before the IPO?

A.     I would never say such a thing.

Q.     Or that J.P. Morgan, as an entity, had a long relationship with Jawbone?

A.     I was familiar with J.P. Morgan in 10 previous rounds, which was disclosed in the Offering Memorandum, that they had made previous investments in Jawbone.  That was information known to me.

Q.     Did you ever, in any call, tell Mr. Mattson that someone from J.P. Morgan was on the board of Jawbone?

A.     No. I actually remember the details around the board conversation. Larry had hoped he could join the board -- and I don't recall dates around -- I don't know which call. This was probably the May call in '15, but I don't know.[13]

Abouzied also testified, after stating that she did not have a recollection of calls more than four years prior, "with a hundred percent certainty" that she never provided information to any of

---

[11] Ex. A, Transcript, p. 350.
[12] Ex. A, Transcript, p. 396
[13] Ex. A, Transcript, pp. 396-397.

her securities customers she contacted about Jawbone that "Jawbone was a hot company that was looking to go public soon."[14]

Mattson testified that these representations were made in the presence of others at J.P. Morgan including Larry Unrein, the head of J.P. Morgan's private equity division.[15]

## IV.   THE INVESTORS ENTER INTO A SUBSCRIPTION AGREEMENT WITH J.P. MORGAN INVESTMENT MANAGEMENT

In June 2014, the Investors acted on JPMS's recommendation by investing $1,000,000.00 in Jawbone through Digital Growth Co-Investment 2, L.P. ("Digital Growth"), a single purpose vehicle created by J.P. Morgan whose sole purpose was to provide an opportunity for JPMS's securities customers to make an investment in Jawbone.  The Investors applied to become an investor in Jawbone pursuant to a "Subscription Agreement."  The Subscription Agreements, dated May 27, 2014, were entered into between the Investors and J.P. Morgan Investment Management ("JPMIM").[16]

JPMS was not a party to the Subscription Agreement.  The Subscription Agreement contained a laundry list of thirty-three separate paragraphs wherein the Investors represented and warranted a host of factual matters such as the fact that the "Interests in the Partnership have not been and will not be registered under the U.S. Securities Act of 1933," that the Investors were not "an ERISA Investor or Plan Investor," that the Investors will conduct its business affairs…in a manner such that it will be able to honor its obligations under this Subscription Agreement."[17]

These warranties and representatives were intended to ensure JPMIM that the Investors were eligible to participate in the investment.  The Subscription Agreements contained a

---

[14] Ex. A, Transcript, p. 416.
[15] Ex. A, Transcript, pp. 120-125.
[16] Exs. D-E.
[17] *Id.*, pp. 2-14.

contractual indemnity provision designed to protect JPMIM in the event these representations and warranties were untrue:

> 12.    Except as otherwise agreed to in writing by the Partnership, the Investor will indemnify and hold harmless **each Covered Person and the Partnership** against any losses, claims, damages or liabilities to which any of them may become subject arising out of or based upon any false representation or warranty, or any breach of or failure to comply with any covenant or agreement, made by the Investor in this Subscription Agreement, the SIF or the Investor Certifications, or in any other document furnished to the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates by the Investor in connection with the offering of the Interests.   Except as otherwise agreed to in writing by the Partnership, the Investor will reimburse each Covered Person and the Partnership for their reasonable legal and other expenses (including the reasonable cost of any investigation and preparation) as they are incurred in connection with any action, proceeding or investigation arising out of or based upon the foregoing.   The indemnity and reimbursement obligations of the Investor under this Section 12 shall survive the Investor's admission  as a limited partner of the Partnership and shall be in addition to any liability which the Investor may otherwise have (including, without limitation, liability under the Partnership Agreement), and shall be binding upon and inure to the benefit of any successors, assigns, heirs, estates, executors, administrators and personal representatives of each Covered Persons and the Partnership.[18]

"Covered Person" is not defined in the Subscription Agreements.  The "Partnership" was the single purpose entity created by JPMIM known as "Digital Growth Co-Investment 2, L.P."[19]

The Subscription Agreements between the Investors and JPMIM included a forum selection clause requiring that "any judicial proceeding involving any dispute…arising out of or relating to this Subscription Agreement" be brought in Delaware courts.[20]  Therein, the parties also agreed to a waiver of jury trial.[21]  The Subscription Agreement did not contain a "fee shifting" provision requiring a losing party to reimburse attorneys' fees incurred by the prevailing party in a suit arising out of the Subscription Agreement.

---

[18] *Id.*, p. 18 (emphasis added).
[19] *Id.*, p. 1.
[20] *Id.*, pp. 20-21.
[21] *Id.*

JPMIM accepted the Investors' application to invest. The Investors transferred funds totaling $1,000,000.00 on June 6, 2014.[22]

## V.   BILLIONS OF DOLLARS IN VALUE VANISH WITHIN MONTHS

Less than a year later, on May 1, 2015, Abouzied notified the Investors of a conference call with Larry Unrein of JPMIM to discuss the Jawbone investment. The agenda for the "Update Call" notified the Jawbone investors, among other things, that:

- "Jawbone completed an Initial close on Series 6 Preferred shares in Q2 2014. The Series 6 round was anticipated to be a total of $250 million, but in the second half of 2014, the lead investor in the round (Rizvi Traverse) <u>failed to fund</u> its $150 million commitment."

- "The fact that the Company did not raise the entire anticipated $250 million of funding, combined with operational challenges resulted in a need for significant additional funding in the first half of 2015."

- "The issuance of the Series 7 Preferred has impacted all existing investors in Jawbone." [23]

Upon receipt of this update, Mattson emailed Abouzied, noting "I am concerned about the level of initial and ongoing diligence jpm has been doing on the investment…and given the structure individual investors really can't do it for themselves…that's why jpm was paid fees…".[24] In response, Abouzied explained that she "didn't want you to be concerned here. JPM is invested in Jawbone through one our Digital Growth funds and as a result has been watching the investment very closely…I do want to do all I can to put your mind at ease if I can."[25] Mattson testified that in telephone conversations with JPMS and JPMIM, JPMIM's lead dealmaker on the Jawbone investment, Larry Unrein, admitted "that he did not understand the nature of Rizvi's commitment

---

[22] Ex. A, Transcript, pp. 114-115.
[23] Ex. F (Emphasis supplied).
[24] Ex. G.
[25] *Id.*

and that the Investors' money should not have been sent to Jawbone until the full Rizvi commitment had been received.[26]

Mattson also testified that Unrein agreed to look into potential legal action against Rizvi:

So in the aftermath of the investment ultimately going to zero, I had several calls with the two people I spoke with at J.P. Morgan about this, those two people being Jasmine and Larry Unrein, and we had a very open and – discussion about, you know, what happened, what happened, how did this happen, how does this happen. And how did the company run out of money. How did Rizvi not fund? And again it was repeated. Rizvi wasn't good for it. I said, so they reneged on a commitment? Yes, they reneged on a commitment. I said, well, if a firm renegs on a commitment and then the result of that or the outcome is that the company goes bankrupt, don't you have recourse against Rizvi on behalf of your investors? I mean, have you looked at whether you have recourse, J.P. Morgan, against Rizvi on behalf of your investors who lost all their money? And the response I got was, you know, that's a good point. We -- it was a commitment, and so we should look at that, and we will get back to you on that, because maybe we do have recourse against Rizvi.[27]

At the Arbitration, JPMS argued that the deal documents made it clear that Rizvi's commitment was a pure "option" and that Mattson should have known this from day one. The Arbitrators refused to permit Mattson to subpoena JPMIM to appear at the Arbitration, thus preventing Mattson from showing through JPMIM that even after the deal was completed he was still being told (as he had from the beginning), that Rizvi was committed to funding the entirety of its $150 million commitment.

The Investors' investment in Jawbone was valued in May 2014 at $3 billion.[28]  Just ten months later, Jawbone raised emergency funding from Blackrock at a valuation of only $2.07 billion that severely impacted the previous investors.[29]  This down round of financing for a private technology company had the predictable effect of creating a downward spiral in which customers, existing and prospective investors, and employees lost confidence in Jawbone and its prospects.

---

[26] Ex. A, Transcript, p. 129.
[27] Ex. A, Transcript, pp. 128-129.
[28] Ex. H.
[29] Ex. F.

As set out in the conflict of interests, during this time, various entities within J.P. Morgan, including JPMS and JPMIM, had been and continued to play various roles for the company, including lending money to the CEO for the purchase of a house, putting JPMS customers in Jawbone, putting JPMIM private equity investors in Jawbone, raising a new JPMIM fund on the back of strong market to market performance based on Jawbone, purportedly served on the Board of Directors of the Company, seeking to serve as underwriter on its IPO.  One of the questions at issue in Mattson's case was the degree to which JPMS was fulfilling its obligations as a broker-dealer to protect its securities customers' investments in securities it placed.  Within eighteen months of the first down round, the Investors' $1,000,000.00 investment it was valued at zero.[30] The magnitude of value destruction in the Jawbone case is unprecedented, with $3 billion of value vanishing in less than two years, making Jawbone the second largest tech failure in history.

## VI.   THE INVESTORS INITIATE A FINRA ARBITRATION AGAINST JPMS ONLY AFTER JPMS REFUSES TO COMPENSATE THEM FOR THEIR LOSSES IN JAWBONE

The record shows that the Investors became increasingly concerned that JPMS mishandled the Jawbone transaction and specifically that JPMS had (1) not conducted adequate due diligence into Jawbone prior to bringing the investment to their attention; and (2) made material misrepresentations and omissions in their communications with the Investors.  The Investors requested JPMS take some action for the sake of themselves and the other JPMS Private Bank customers who had been induced to invested in Jawbone and lost the entirety of their investment, and even met in person with the CEO of JPMS, who refused to provide the Investors or any other customers with any compensation for the losses they had sustained.[31]

---

[30] Ex. A, Transcript, p. 128.
[31] Ex. A, Transcript, p. 175.

Thereafter, the Investors initiated a FINRA arbitration by filing a Statement of Claim and Uniform Submission Agreement with the FINRA Director of Dispute Resolution on July 26, 2017 in accordance with FINRA Code of Arbitration Procedure Rule 12302 ("Filing and Serving an Initial Statement of Claim").[32]   Therein, the Investors alleged that JPMS failed to properly conduct due diligence and made misrepresentations which induced the Investors to invest $1,000,000.00 in Jawbone.[33]   In addition to the return of their $1,000,000.00 investment, the Investors requested the Arbitrators award them "Attorneys' fees pursuant to Fla. Stat. Ann. § 517.211."[34]   The Investors paid FINRA the required filing fee of $1,725.00 at the time of the filing.

## VII.   THE FINRA CODE OF ARBITRATION PROCEDURE REQUIRED JPMS INCLUDE ANY COUNTERCLAIMS AGAINST THE INVESTORS IN ITS ANSWER AND PAY A COUNTERCLAIM FILING FEE

FINRA Code of Arbitration Procedure Rule 12303, expressly incorporated into the Arbitration Agreement, required JPMS file a written Answer to the Statement of Claim and assert any counterclaims against the Investors therein:

12303. Answering the Statement of Claim

(a) Respondent(s) must serve each other party with the following documents within 45 days of receipt of the statement of claim:

(1) Signed and dated Submission Agreement; and

(2) An answer specifying the relevant facts and available defenses to the statement of claim.

The respondent may include any additional documents supporting the answer to the statement of claim. Parties that fail to answer in the time provided may be subject to default proceedings under Rule 12801.

(b) **The answer to the statement of claim may include any counterclaims against the claimant**, cross claims against other respondents, or third party claims,

---

[32] Ex. I.
[33] Ex. J, pp. 8-11.
[34] *Id.*, p. 14

specifying all relevant facts and remedies requested, **as well as any additional documents supporting such claim**. If the answer contains a third party claim, the respondent must serve the third party with the answer containing the third party claim and all documents previously served by any party, or sent to the parties by the Director, by first-class mail, overnight mail service, overnight delivery service, hand delivery, email or facsimile, and must file proof of service with the Director through the Party Portal except as provided in Rule 12300(a)(2). The respondent must file the third party claim with the Director through the Party Portal except as provided in Rule 12300(a)(2).

<div align="center">*        *        *</div>

(d) **If the answer to the statement of claim contains any counterclaims, cross claims or third party claims, the respondent must pay all required filing fees.**[35]

## VIII.    JPMS DOES NOT ASSERT ANY COUNTERCLAIM AGAINST THE INVESTORS IN THEIR ANSWER

JPMS filed a twenty-three page Answer on November 21, 2017.[36]   Therein, JPMS disclaimed any duty to have conducted due diligence prior to bringing the Jawbone investment to the Investors' attention.[37]   Nowhere in the Answer, however, did JPMS assert any counterclaim against the Investors.   Nor did JPMS pay, or FINRA staff direct JPMS to pay, any counterclaim filing fees, because no counterclaim was asserted.   The Award does not reflect the filing of any counterclaim or motion to amend the answer to file a counterclaim.[38]

## IX.    THE FINRA CODE OF ARBITRATION PROCEDURE REQUIRED THE INVESTORS PROVIDE A WRITTEN ANSWER TO THE COUNTERCLAIMS SETTING FORTH RELEVANT FACTS AND AVAILABLE DEFENSES

FINRA Code of Arbitration Procedure Rule 12304, expressly incorporated into the Arbitration Agreement, mandated the Investors provide a written answer to any counterclaims within 20 days setting forth "the relevant facts and available defenses to the counterclaims":

---

[35] Ex. K (Emphasis supplied).
[36] Ex. L (attached without internal exhibits).
[37] *Id.*, pp. 14-15.
[38] Ex. I.

12304. Answering Counterclaims

(a) Except as provided in Rule 12300(a)(2), a claimant must serve any answer to a counterclaim on each other party through the Party Portal within 20 days of receipt of the counterclaim. At the same time, the claimant must file the answer to the counterclaim with the Director.

(b) The answer must include the relevant facts and available defenses to the counterclaim. The claimant may include any additional documents supporting the answer to the counterclaim.[39]

The Investors were not given an opportunity to file an Answer or provide the Arbitrators with relevant facts and available defenses because no counterclaims were asserted by JPMS.

## X.   JPMS NEVER MADE A MOTION TO AMEND ITS ANSWER SO AS TO ASSERT ANY COUNTERCLAIMS

FINRA Code of Arbitration Procedure Rule 12309, expressly incorporated into the Arbitration Agreement, set forth the mechanism for JPMS to seek leave to amend its Answer so as to add a counterclaim against the Investors:

Once a panel has been appointed, a party may only amend a pleading if the panel grants a motion to amend in accordance with Rule 12503.  Motions to amend a pleading must include a copy of the proposed amended pleading. If the panel grants the motion to amend, the amended pleading does not need to be re-served on the other parties, the Director, or the panel, unless the panel determines otherwise.[40]

The Record shows that JPMS never made any such motion.  Thus, at no time did JPMS assert counterclaims against the Investors in accordance with the FINRA Code of Arbitration Procedure.

## XI.   THE PANEL REFUSES TO ISSUE SUBPOENAS TO THIRD PARTIES WITH RELEVANT EVIDENCE IN ADVANCE OF THE HEARING

On January 23, 2018, the Investors made a motion pursuant to FINRA Code of Arbitration Procedure Rule 12512 to issue subpoenas to Aliphcom, Inc. (d/b/a Jawbone) (the "Company");

---

[39] Ex. M.
[40] Ex. N.

Rizvi Traverse Management, LLC ("Rizvi"); and J.P. Morgan Investment Management, LLC ("JPMIM"), Digital Growth Co-Investment 2, LLC, and Digital Growth Co Investment 2, LP (the other J.P. Morgan entities involved in raising capital for Jawbone).[41]   The draft Subpoenas presented to the Panel by the Investors requested the Arbitrators command the witnesses "to appear…as a witness at the hearing."[42]

JPMS objected to the issuance of all of the proposed subpoenas.  On February 23, 2018, the Arbitrators purported to overrule JPMS's objections, but instructed Investors to revise the Subpoenas so that the witnesses could only be required to produce documents in advance of the arbitration hearing.[43]  In response, the Investors notified the Arbitrators that the federal circuits in which all of the third parties resided specifically hold that Arbitrators do not have the power, under the Federal Arbitration Act, to compel third parties to produce documents in advance of an arbitration, and that the changes requested by the Chair would result in the issuance of subpoenas invalid on their face during a conference call.  On April 9, 2018, the Arbitrators insisted the Subpoenas be issued as directed and signed Subpoenas unenforceable under the Federal Arbitration Act.[44]  Three of the five third parties filed written objections with the Arbitrators upon receipt of the subpoenas.  On May 22, 2018, the Arbitrators issued an Order sustaining the objections to the subpoenas they had issued.[45]

---

[41] Ex. O.
[42] *Id.*
[43] Ex. P.
[44] Ex. Q.
[45] Ex. R.

## XII.   JPMS'S PRE-HEARING SUBMISSIONS MAKE NO MENTION OF ANY COUNTERCLAIM, DID NOT REQUEST DAMAGES, AND LISTED NO WITNESSES TO TESTIFY AS TO DAMAGES

FINRA Code of Arbitration Procedure Rule 12514, expressly incorporated into the Arbitration Agreement, required JPMS to exchange all documents they intended to use and identify all witnesses they intended to call at the hearing and precluded the use of any documents or witnesses not identified in accordance with Rule 12514:

12514. Prehearing Exchange of Documents and Witness Lists, and Explained Decision Requests

(a) Documents and Other Materials
At least 20 days before the first scheduled hearing date, all parties must provide all other parties with copies of all documents and other materials in their possession or control that they intend to use at the hearing that have not already been produced. The parties should not file the documents with the Director or the arbitrators before the hearing.
(b) Witness Lists
At least 20 days before the first scheduled hearing date, all parties must provide each other party with the names and business affiliations of all witnesses they intend to present at the hearing. All parties must file their witness lists with the Director.
(c) Exclusion of Documents or Witnesses
Parties may not present any documents or other materials not produced and or any witnesses not identified in accordance with this rule at the hearing, unless the panel determines that good cause exists for the failure to produce the document or identify the witness. Good cause includes the need to use documents or call witnesses for rebuttal or impeachment purposes based on developments during the hearing. Documents and lists of witnesses in defense of a claim are not considered rebuttal or impeachment information and, therefore, must be exchanged by the parties.[46]

The Investors listed their counsel, Craig H. Kuglar, Esq., as a witness with respect to their request for statutory attorneys' fees requested pursuant to Fla. Stat. Ann. § 517.211 and identified "records relating to fees and expenses" as documents they intended to present at the hearing.[47]

---

[46] Ex. S.
[47] Ex. T.

JPMS, on the other hand, did not list any witness with respect to any counterclaim or claim for fees and expenses.[48]

The parties were permitted, but not required, to file a pre-hearing brief with the Arbitrators. JPMS filed a thirty-seven-page pre-hearing brief on August 28, 2017.[49]  Therein, JPMS made no mention of any counterclaim.  Nor in any of the thirty-seven pages did JPMS suggest it would be seeking attorneys' fees or costs against the Investors.  Its conclusion read simply that "[f]or the foregoing reasons, as well as from the evidence to be presented at the hearing, Investors' claims should be denied in full."[50]

## XIII.  JPMS AND ITS BROKER RELIED HEAVILY ON DUE DILIGENCE CONDUCTED BY JPMIM

At the arbitration, the Investors presented testimony from Peter Flynn, a well-respected industry expert, showing that both JPMS and its broker, Abouzied had a duty to conduct reasonable due diligence into Jawbone prior to bringing the investment to the Investors' attention.[51]  Abouzied acknowledged that she brought the potential investment in Jawbone to the Investors' attention on May 14, 2014.[52]  She also admitted that she had not personally reviewed any information about Jawbone prior to contacting the Investors:

> Q.    Other than the suitability-type requirements for this, what specific documents about this deal or Jawbone or the Jawbone deal did you review before bringing it to Mr. Mattson's attention?
>
> A.    I personally did not review anything. That was not my job. That was not my job.[53]

---

[48] Ex. U.
[49] Ex. V (attached without internal exhibits).
[50] *Id.*, p. 37.
[51] Ex. A, Transcript, pp. 479-489.
[52] Ex. A, Transcript, p. 392.
[53] Ex. A, Transcript, p. 374.

Abouzied was adamant that she was "not in due diligence, that her "job was to introduce this investment in a brokerage account" and deferred to the due diligence teams at JPMS <u>and</u> JPMIM:

> A.    This specific program, we were serving as placement agent. In this regard, I relied on my partners. We have two diligence teams in the J.P. Morgan private bank. Larry has his own diligence team. I was told the diligence was done.[54]

Abouzied noted that a representative of JPMS's due diligence team, Joshua Helfat, would be testifying as to the due diligence conducted by JPMS:

> A:    In 2014, the program existed, and there was a level of due diligence that our private equity team did.  That wasn't my job to do.  That's their job to do.  You can ask Josh Helfat later this week what the level was of due diligence that they did on this program.[55]

Mr. Helfat testified that JPMS's due diligence into Jawbone was led by Eliott Lepofsky and Ari Zelman, both of whom left JPMS subsequent to the Jawbone transaction.[56]  Helfat was not responsible for JPMS's due diligence effort into Jawbone.[57]  Nevertheless, he testified from a review of firm records as to the due diligence efforts JPMS contended it did undertake prior to making the recommendation.  This testimony confirmed that JPMS's due diligence department first became aware that JPMS would be considering a deal permitting its securities customers to participate in a direct investment in Jawbone on April 14, 2014.[58]  Thus, all due diligence performed by JPMS took place in the short period between April 14, 2014 and early May 2014.[59] The documents provided prior to the Arbitration and testimony at the Arbitration confirmed that the due diligence performed by JPMS consisted of four one hour screening committee meetings in

---

[54] Ex. A, Transcript, p. 368.
[55] *Id*.
[56] Ex. A, Transcript, p. 689.
[57] Ex. A, Transcript, pp. 689-690.
[58] Ex. A, Transcript, p. 703.
[59] Ex. A, Transcript, pp. 702-703.

which Jawbone was one out of eight companies on the agenda (representing on average 8 minutes of discussion per company).[60]  Further, JPMS's due diligence witness testified that JPMS did not meet with Jawbone management in person.[61]  Customary due diligence on a private company includes financial due diligence, tax due diligence, legal due diligence, Intellectual Property due diligence, competitive due diligence, industry due diligence, and the retention of various experts.[62] JPMS's due diligence witness admitted JPMS did none of these and instead sought to shift the duty to its customers, contrary to well-established regulations prohibiting a broker-dealer from disclaiming its duty.  Despite the determination of the Arbitrators, the testimony confirmed the Investors' belief that inadequate due diligence was performed and that material misrepresentations were made.

On cross examination, in attempting to explain the absence of a due diligence file, JPMS's due diligence witness pointed to JPMS's reliance on due diligence previously performed by Larry Unrein's team at JPMIM:

> Q.      Why did your term at JPMS care about how JPMIM did its own diligence? Why did you care about that?
>
> A.      One of the key things we underwrite in fund managers is their investment process, how do they evaluate opportunities, do they have a strong process, does that process yield strong results. This is an important part of our diligence.[63]

This testimony was consistent with JPMS's pre-hearing submissions, which explained that JPMIM relied on due diligence previously conducted by JPMIM:

> As a threshold matter, the [JPMS] MPV Screening Committee permitted only investments that come from known and trusted sponsors.  In Jawbone's case, the sponsor was J.P. Morgan Investment Management, Inc. ("JPMIM")- a sponsor on which JPMS had done substantial due diligence and with whom it had worked for

---

[60] Ex. A, Transcript, p. 938.
[61] Ex. A, Transcript, p. 764.
[62] Ex. A, Transcript, pp. 762-764.
[63] Ex. A, Transcript, p. 817.

years.  JPMIM had done its own substantial due diligence on Jawbone because, in one of the private equity funds that it managed, JPMIM had made substantial investments in Jawbone in 2011, 2012, and 2013- and it was adding to that investment in the Series 6 round.[64]

In spite of all this, the Investors were not permitted to Subpoena JPMIM.  The Investors did obtain documents from JPMIM prior to the Arbitrators' Order sustaining their objections to the Subpoena (which they had limited to documents and not appearance at the hearing).   Nowhere in those documents did JPMIM produce any due diligence files showing due diligence JPMIM had done on Jawbone from the previous financing rounds in 2011, 2012 or 2013.  The Arbitrators therefore permitted JPMS to claim reliance on work performed by JPMIM while at the same time prohibiting the Investors from obtaining and/or cross examining JPMIM about this work.

## XIV.  THE PANEL EXPRESSES ITS DISDAIN FOR THE INVESTORS' CASE AND REFUSES TO HEAR TESTIMONY FROM TWO SEPARATE EXPERT WITNESSES AT THE HEARING

The Investors identified three expert witnesses they intended to call as witnesses at the hearing specifying the particular areas of expertise they intended to cover.[65]  Expert testimony was necessary because JPMS specifically (1) disclaimed any duty to conduct due diligence on the investment; and (2) nevertheless argued that its due diligence was sufficient.[66]  The Investors identified a regulatory expert to testify as to the existence of the duty, an industry expert to testify as to the due diligence conducted by broker-dealers prior to making an investment available to its customers, and a damages expert to testify as to the total damages sustained by the Investors.[67]

The Arbitrators' lack of patience with the Investors' case was on full display only hours into the Investors' case-in-chief when the Arbitrators refused to hear testimony from the Investors'

---

[64] Ex. V, p. 8.
[65] Ex. T.
[66] Ex. V, pp. 3, 5, 7-8.
[67] Ex. T.

expert witness on damages. [68]  The next morning, Arbitrator Chiodo was overheard saying "I don't know how much more of this I can stand." [69]  Thereafter, the Arbitrators refused to listen to the testimony from the Investors' industry expert who was to testify as to the typical due diligence conducted by FINRA member firms prior to bringing an investment to their customers' attention. [70] This testimony was not duplicative of the regulatory expert who testified as to the duty generally but specifically disclaimed having been asked to make any expert conclusions with respect to the actual due diligence conducted by JPMS and whether that due diligence was reasonable, and the Arbitrators did not indicate that they found the testimony to be irrelevant or cumulative. [71]

## XV.   THE PANEL PERMITS JPMS TO INTRODUCE EVIDENCE AT THE CLOSE OF THE HEARING IN SUPPORT OF A COUNTERCLAIM FOR CONTRACTUAL INDEMNITY OVER THE INVESTORS' EXPRESS OBJECTION

At the conclusion of the hearing, JPMS's counsel requested that he be permitted to introduce evidence as to JPMS's attorneys' fees and costs incurred. [72]  JPMS argued that they were requesting attorneys' fees and costs pursuant to the contractual indemnity provision located in the Subscription Agreement between the Investors and JPMIM. [73]  The Investors objected stating "[T]o the extent that that was an attempt to assert a contractual indemnity counterclaim, I would object to that.  There was no counterclaim filed in this case, nor was one asserted..." [74]  The Arbitrators overruled the Investors' objection, noting that "I know it's kind of a contractual prevailing party clause.  But, okay, your objection is noted." [75]  The Subscription Agreements were one of the many

---

[68] Ex. A, Transcript, p. 542.

[69] Ex. W.

[70] Ex. A, Transcript, p. 921.

[71] *Id.*

[72] Ex. A, Transcript, pp. 999-1000.

[73] *Id.*

[74] Ex. A, Transcript, p. 1003.

[75] *Id.*

exhibits JPMS attached to its Answer (totaling 372 pages in all).  However, nowhere in the Answer did JPMS assert a counterclaim for contractual indemnity under the Subscription Agreement.

## XVI.   THE ARBITRATION AWARD

FINRA served the parties with the Arbitration Award on October 1, 2018.[76]  Therein, the Arbitrators affirm that the Investors filed a Statement of Claim on or about July 26, 2017 and that JPMS filed a Statement of Answer on November 21, 2017.[77]  The Arbitrators confirmed that "in the Statement of Answer, [JPMS] denied the allegations made in the Statement of Claim and asserted various affirmative defenses."[78]  The Arbitrators noted that "in the Statement of Answer, [JPMS] requested denial of the Statement of Claim, with prejudice; attorneys' fees; costs; and such other and further relief deemed just and proper by the Panel."[79]

In the section styled "Other Issues Considered and Decided," the Arbitrators "acknowledge[d] that they have read the pleadings and other materials filed by the parties" and noted that the Panel granted two motions to strike expert witnesses made during the hearing."[80]  The Arbitrators denied the Investors' claims "in their entirety."[81]  The Arbitrators required the Investors "pay to [JPMS] the sum of $200,000 in attorneys' fees pursuant to the terms of the Subscription Agreement dated May 27, 2014."[82]  The Arbitrators further ordered the Investors to "pay to [JPMS] the sum of $75,000.00 in costs" and $12,575.00 in hearing session fees.[83]

---

[76] Ex. I, p. 5.
[77] *Id.*, p. 1.
[78] *Id.*
[79] *Id.*, p. 2.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*

<u>**ARGUMENT**</u>

I.    **LEGAL STANDARDS APPLICABLE TO VACATION OF ARBITRATION AWARDS[84]**

    A.    **Arbitrability of Disputes**

The United States Supreme Court has repeatedly stressed that "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."[85]  "This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration."[86]  "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.[87]

    B.    **Overstepping Authority/Exceeding Their Powers**

The Federal Arbitration Act ("FAA") permits vacation if the court finds "[an] overstepping by the arbitrators of their authority."[88]  In vacating an arbitration award in a recent case, the Supreme Court explained that "an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator exceeded his powers" "when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice."[89]

---

[84] The Arbitration Agreement contains a New York choice of law provision.  Ex. B.  This brief addresses issues arising under the Federal Arbitration Act and will therefore cite relevant federal authorities apply the FAA.

[85] *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986).

[86] *Id.* at 648-649.

[87] *Id.*

[88] 9 U.S.C. § 10(a)(3).  "The FAA applies in state and federal courts to all contracts containing an arbitration clause that involves or affects interstate commerce."  *Am. Gen. Fin. Servs. v. Jape*, 291 Ga. 637, 638 (2012) (citing *Perry v. Thomas,* 482 U.S. 483, 489 (1987)).

[89] *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671-72 (2010).

C.     **Refusal to Hear Relevant Evidence**

The FAA likewise permits vacation "where the arbitrators were guilty of misconduct…in refusing to hear evidence pertinent and material to the controversy…"[90]

## II.    THE ARBITRATORS VIOLATED 9 U.S.C. § 10(a)(3) BY REFUSING TO HEAR RELEVANT, NON-CUMULATIVE TESTIMONY FROM THIRD PARTIES AND EXPERTS

The FAA permits vacation "where the arbitrators were guilty of misconduct…in refusing to hear evidence pertinent and material to the controversy…"[91]  This does not mean that every failure to receive relevant evidence constitutes misconduct which will require vacation of an arbitration award.  A court "may vacate an arbitrator's award under 9 U.S.C. § 10(a)(3) only if the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties and denies them a fair hearing.  Further, an arbitration award must not be set aside for the arbitrator's refusal to hear evidence that is cumulative or irrelevant."[92]  The facts of the *Robbins* case are illustrative.  There, the Eleventh Circuit held that the arbitrator did not engage in misconduct in refusing to hear testimony where the party requesting the testimony had previously represented that the testimony "was 'unimportant' to their case and that if given would only provide cumulative evidence."[93]

Courts do not hesitate to vacate an arbitration award, however, where arbitrators refuse to hear testimony that <u>is</u> relevant and non-cumulative.  In *Gulf Coast Industrial Workers Union v. Exxon Co., USA*,[94] a dispute under a collective bargaining agreement pertaining to whether Exxon had just cause to terminate a union employee for refusing to consent to a drug test, the Fifth Circuit

---

[90] 9 U.S.C. § 10(a)(3).

[91] *Id.*

[92] *Robbins v. Day*, 954 F.2d 679, 685 (11th Cir. 1992).

[93] *Id.*

[94] 70 F.3d 847, 848 (5th Cir. 1995).

affirmed the vacation of an arbitration award.  In doing so, the Fifth Circuit explained that while "judicial review of an arbitration award is extraordinarily narrow," a case involving a refusal to hear evidence "fits squarely into one of those grounds."[95]  It went on to hold that the arbitrator's refusal to accept the evidence constituted misconduct warranting vacation of the award.

The Second Circuit's decision vacating an arbitration award in *Tempo Shain Corp. v. Bertek, Inc.*,[96] is directly on point with this case.  There, Bertek asserted a counterclaim for fraudulent inducement pertaining to various statements allegedly made to its former President whom it intended to call at the hearing.[97]  The former President was unavailable to testify at the hearing due to his wife's illness.[98]  The arbitrators refused to postpone the hearing holding that the evidence would be cumulative of other evidence already presented at the hearing and later issued an award against Bertek.  In reversing the district court's denial of Bertek's motion to vacate, the Second Circuit explained:

> We find that there was no reasonable basis for the arbitration panel to determine that Pollock's omitted testimony would be cumulative with regard to the fraudulent inducement claims. Said differently, the panel excluded evidence plainly "pertinent and material to the controversy," 9 U.S.C. § 10(a)(3). The panel did not indicate in what respects Pollock's testimony would be cumulative, but stated that there were "a number of letters in the file" and that Pollock was "speaking through the letters [he wrote], and the reports he[ ] received."
>
> \*       \*       \*
>
> While the letters and reports might have been sufficient to represent what Pollock would have testified to in rebuttal of Neptune's breach of contract claims, which we do not decide, there is nothing to suggest that Pollock's intended testimony concerning appellees' fraudulent inducement claim and Bertek's counterclaim for fraudulent inducement was addressed by the documents admitted into evidence.
>
> \*       \*       \*

---

[95] *Id.* at 850.
[96] 120 F.3d 16, 20 (2d Cir. 1997).
[97] *Id.* at 17.
[98] *Id.* at 17-18.

Because Bertek's alleged misrepresentations were not documented, appellees' unsupported oral testimony concerning such representations was unrebutted because Pollock, who allegedly made the representations on Bertek's behalf, was not allowed to testify, and he is the only person who could have done so.[99]

Here, as in *Bertek*, the Arbitrators refused to hear testimony from not one but <u>five</u> separate witnesses each of whom had relevant, non-cumulative evidence relating to the two main claims asserted by the Investors, including:

## Jawbone – The Investment

The Investors made their investment in Jawbone in reliance on misrepresentations made to them by JPMS.  Jawbone's management had unique insight into the due diligence conducted (or not conducted) by JPMS and/or the various entities JPMS claimed it relied upon to conduct due diligence on its behalf.  In addition, the testimony showed that Mattson and other investors were afforded the opportunity to participate in at least one conference call with the CEO of Jawbone prior to making their investment.  Despite this, the Panel refused to permit the Investors to call any representative from Jawbone – the company in which they were investing $1,000,000.00, to testify at the Arbitration.

## Rizvi Traverse Management LLC ("Rizvi") – The "Heart of" The Investors' Claim

In the capital raise at issue, Jawbone was seeking to raise $250 million from a number of investors.  As is customary, one venture capital firm, Rizvi Traverse Management, LLC served as the "lead investor" and signed a non-binding summary of terms the "Term Sheet" along with Jawbone, that served as the template for all investors including the customers of JPMS including the Investors.[100]   The Term Sheet provided for Rizvi to be reimbursed up to $75,000 for the

---

[99] *Id*. at 20.
[100] Ex. H.

reasonable costs of its due diligence into Jawbone. In the Term Sheet, Rizvi agreed to fund $25 million at closing "and up to an additional $150 million that will be funded either directly through Rizvi or related LP relationship.  It is anticipated that this additional funding will occur within a month or two following the initial closing, but Rizvi may invest the $150 million for up to 6 months."[101]

Rizvi was mentioned numerous times in the Investors' Statement of Claim.  The Investors alleged they were told as a fact that Rizvi "was an experienced blue chip investor in high tech startups (including Twitter) and had done its due diligence into Jawbone" and that "Rizvi alone had committed to invest $175 million."[102]  The Investors further alleged that these representations were false and misleading when made in May 2014.  Rizvi was also relevant to the Investors' claim against JPMS for failing to conduct due diligence.  In their Statement of Claim, the Investors alleged that had JPMS "conducted a reasonable investigation, it would have discovered, at a minimum," "the reasons for Rizvi's decision to back out of its position as lead investor."

As noted in Section XI, *Supra*, the Arbitrators denied the Investors' request to issue a Subpoena to command a representative of Rizvi to attend the hearing.  The Investors sought to obtain testimony from Rizvi demonstrating that Rizvi found information during their due diligence review into Jawbone that JPMS should have similarly located.  The Investors also sought to obtain testimony demonstrating that JPMIM knew or should have known, in May 2014, that Rizvi had decided not to fund or were considering not funding the remainder of its $150 million commitment - at the same time JPMS and JPMIM were telling the Investors on joint telephone calls that they expected Rizvi to fund this commitment.

---

[101] *Id.* p. 1.
[102] Ex. J, p. 5.

The relevance of Rizvi cannot be denied.  At the arbitration hearing, Rizvi was mentioned no less than 315 times in the transcript.  At no time did JPMS contend Rizvi was irrelevant to the case.  To the contrary, in their opening statement JPMS said "**The heart of his [Mattson's] claim is about Rizvi.**"[103]  After the deal went bad, Larry Unrein of JPMIM explained that Rizvi "failed to fund its $150 million commitment," and the "fact that [Jawbone] did not raise the entire anticipated $250 million of funding, combined with operational challenges resulted in a need for additional capital" which had impacted (*i.e.* diluted) all previous investors including the Investors.

During its cross examination of Mattson, JPMS questioned Mattson extensively on his understanding of the Rizvi obligation and communications that were made to him by JPMS about Rizvi as set forth in the various legal deal documents.[104]  In its closing, JPMS contended that the Investors' claims failed because the deal documents specifically disclosed that Rizvi was not obligated to fund the remainder of its $150 million commitment.  However, the claim being made was that JPMS knew or should have known, when they provided him with these documents, that Rizvi had already decided not to fund its remaining commitment.  This information was not in Mattson's personal knowledge, and supported fraud/misrepresentation claims irrespective of the language in the offering documents.[105]

The testimony of a Rizvi representative would not have been cumulative of any other witness.  No other witness testified as to (1) the communications between Rizvi and the JPMIM lead dealmaker Larry Unrein; or (2) the information learned by Rizvi during its due diligence that led it to decide not to fund the remainder of its $150 million commitment.  At the hearing he made

---

[103] Ex. A, Transcript, p. 60.
[104] *See, e.g.*, Ex. A, Transcript, pp. 186-212.
[105] *See, e.g., Stichting Pensioenfonds ABP v Credit Suisse Grp. AG*, 38 Misc. 3d 1214(A), 966 N.Y.S.2d 349 (N.Y. Sup. 2012) (general disclosure language in offering documents do not insulate a defendant from liability where the defendant has knowledge of its falsity.)

29

it clear that he "was never offered the opportunity to speak to Rizvi" because "all of my diligence was being done through and under the parameters established by J.P. Morgan, and one of those parameters was not an offer to call Rizvi."[106]  The Arbitrators permitted JPMS to use Rizvi as a shield and a sword – they allowed JPMS to delve into the Rizvi commitment *ad nauseam* only as to the terms set out in the deal documents in May 2014 without permitting the Investors to show, through testimony, that JPMS knew in May 2014 that Rizvi was not funding its entire commitment.[107]

**JPMIM (Larry Unrein) – The J.P. Morgan Deal Maker**

JPMIM, as noted throughout, was the investment advisor to the single purpose vehicle and had previously led a number of other investments in Jawbone.  Even though JPMIM and JPMS are controlled by "J.P. Morgan," JPMS made pains to explain that JPMS and JPMIM were different entities, and that its key employee, Larry Unrein, "works for the investment advisor, not us, a different JPM entity."[108]  Despite having common ownership with JPMS, JPMIM retained its own counsel and objected to appearing at the hearing.  As noted above, the Arbitrators denied the Investors' request to command a JPMIM representative to appear at the arbitration.

JPMIM, like Rizvi, featured extensively at the hearing, appearing as it does no less than 90 times in the transcript.  During Mattson's direct examination, counsel for JPMS repeatedly objected to Mattson testifying as to what Unrein said on various phone calls, noting:

> MR. NAGY:  Excuse me.  At this point, I want to note my objection.  If you want to hear it, so be it, but I just want to point out we had this whole issue -- I would love to call Larry Unrein and put him on the stand here.  Not going to happen because they didn't sue him. Now we're hearing all about what Larry said.  So if he would, at a minimum, at least

---

[106] Ex. A, Transcript, p. 229.
[107] *See, e.g.,* Ex. A, Transcript, pp. 186-212.
[108] Ex. A, Transcript, p. 77.

identify who is speaking, Larry or Jasmine, as you've already asked him. So you have my objection noted for the record.[109]

Having succeeded in preventing him from appearing, counsel for JPMS had the audacity to suggest that he would "love to call Larry Unrein and put him on the stand here." The investors really would have loved to put him on the stand but were prevented. He would have had unique, non-cumulative knowledge of the communications between Mattson and his broker giving rise to the misrepresentation claims. Mattson testified, with respect to his alleged misrepresentations:

> Q.   You testified yesterday extensively that you were on a phone call involving both Larry Unrein and Jasmine Abouzied where you were told about a commitment of 175 million for Rizvi and also a commitment of 250 total for the financing. Do you recall that, sir?
>
> A.   Yes. Just to clarify it was multiple phone calls in which those same two points were made repeatedly, yes.
>
> Q.   And Jasmine and Larry, those two people were on those calls?
>
> A.   That's correct.[110]

As noted above, there was substantial disagreement between Mattson and Abouzied as to what was said on those phone calls. Mattson had a right to obtain testimony from the other key witness who was present on these phone calls, but the Arbitrators refused.

**The Investors' Damages Expert**

At the hearing, the Arbitrators refused to hear expert testimony supporting the Investors' damages. There can be no disputing the relevance of this testimony. Nor was it cumulative of any other testimony. Mattson and Abouzied testified as to the total amount of the initial investment in Jawbone.[111] The Investors also showed JPMS statements listing the beginning and ending values of their investment. In the Statement of Claim, however, the Investors requested all damages

---

[109] Ex. A, Transcript, p. 130.
[110] Ex. A, Transcript, p. 278.
[111] Ex. A, Transcript, pp. 93, 412-413.

including management fees and other expenses and pre-judgment interest.  The Investors' expert witness intended to present the Arbitrators with the full panoply of damages sustained by the Investors.  The Investors' expert witness testified that she has been an expert since 1999.  She stated she had been retained more than 400 times and testified more than 30 times, never having been challenged.[112]  JPMS's counsel objected on the grounds that she was only doing "arithmetic for which expert testimony is not appropriate or necessary" and that she was not qualified "to testify about expected value when it comes to private equity in a single-company investment."[113]  Finally, counsel said they objected because all she had done is "inputted numbers provided to her by counsel and put them into this table to get her end result."[114]  None of these objections had any merit, seeing as how the purpose of any expert damages witness is to "do arithmetic" and "input numbers" to get an "end result."  Further, JPMS's objections to her experience with "expected value" of the Investors' private equity investments <u>was</u> an issue that she was never even proffered to discuss.

In refusing to hear this testimony, the Arbitrators claimed simply that she was not "qualified as for the matters that she was going to testify for…" despite her more than 20 years of experience and having never been disallowed to testify as an expert witness.[115]

**<u>The Investors' Broker Dealer Due Diligence Expert</u>**

The Panel also refused to hear testimony from the Investors' broker-dealer due diligence expert.  He testified that he had a vast amount of experience including working with a team that did product due diligence for the "largest independent broker-dealer in the United States."[116]  After

---

[112] Ex. A, Transcript, p. 530.
[113] *Id.*, p. 531.
[114] *Id.*, p. 542.
[115] *Id.*
[116] *Id.*, p. 881.

JPMS objected to his qualifications, counsel for the Investors noted that "[t]he industry standard and methodologies by which those products are approved is not something that most laypersons would have knowledge of, and, therefore, his testimony is helpful to the panel to establish what a due diligence – reasonable basis due diligence examination of any product should look like at a minimum."[117]

The crux of JPMS's objection to the due diligence expert was that various firms at which he had worked had been the subject of various disciplinary fines and actions. Despite the fact that none of these had anything to do with due diligence, that none of them personally named or referenced the expert, and despite the fact that the issues referenced are common to any FINRA broker-dealer (JPMS not being an exception), the Panel refused to permit him to testify. On the other hand, the Arbitrators did permit JPMS's expert witness, a former FINRA regulator, testify that "J.P. Morgan did adequate due diligence to make a determination that it was suitable for some investors"[118] even though he had never performed due diligence at a FINRA broker dealer.[119]

Finally, this testimony was not cumulative of the Investors' other industry expert, Peter Flynn, who was permitted to testify. Flynn specifically testified that he was brought to testify only as to whether JPMS and Abouzied had a duty to conduct due diligence and was not asked to testify as to whether the due diligence conducted by JPMS and Abouzied met the standard.[120]

Here, as in *Bertek*, the Arbitrators refused to hear testimony from witnesses that had unique, non-cumulative information relevant to the claims being presented by the Investors. Their refusal cannot be said to have been caused by a lack of time or the Investors' failure to present their case

---

[117] Ex. A, Transcript, pp. 920-921.
[118] *Id.*, p. 570.
[119] *Id.,* pp. 544-546.
[120] *Id.,* pp. 505-510.

expeditiously so as to conform to the hearing dates agreed to by the parties.  Indeed, on Wednesday of the hearing week (the same day the Panel refused to hear testimony from the Investors' damages expert) the hearing ended in the early afternoon (1:46 p.m.) because no witnesses were available. Similarly, the Arbitration concluded early on Friday morning with nothing but closing arguments having been presented to the Arbitrators that day.[121]  The Investors had a contractual right to an arbitration proceeding in keeping with the FAA and FINRA Code of Arbitration Procedure, a right which was trounced by these Arbitrators.  For this reason, the Award must be vacated in its entirety.

## III. THE ARBITRATORS EXCEEDED THEIR AUTHORITY BY PERMITTING A COUNTERCLAIM TO BE ASSERTED AT HEARING IN DIRECT VIOLATION OF THE RULES OF THE ARBITRAL FORUM

Permitting JPMS to spring an unasserted counterclaim on the Investors at the close of the Arbitration was the height of unfairness.  By doing so, the Arbitrators failed to give the Investors the opportunity to present affirmative defenses- a right enshrined in the FINRA Rules – and were snookered into believing they had a right to "shift fee" under this agreement, which they did not.

The Subscription Agreements, which were between the Investors and JPMIM contained a contractual indemnity provision designed to protect JPMIM in the event these representations and warranties were untrue:

> 12.    Except as otherwise agreed to in writing by the Partnership, the Investor will indemnify and hold harmless **each Covered Person and the Partnership** against any losses, claims, damages or liabilities to which any of them may become subject arising out of or based upon any false representation or warranty, or any breach of or failure to comply with any covenant or agreement, made by the Investor in this Subscription Agreement, the SIF or the Investor Certifications, or in any other document furnished to the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates by the Investor in connection with the offering of the Interests.  Except as otherwise agreed to in writing by the Partnership, the Investor will reimburse each Covered Person and the Partnership for their reasonable legal and other expenses (including the reasonable cost of any investigation and preparation) as they are incurred in connection with any action,

---

[121] Ex. A, Transcript, pp. 680, 1006.

proceeding or investigation arising out of or based upon the foregoing.  The indemnity and reimbursement obligations of the Investor under this Section 12 shall survive the Investor's admission  as a limited partner of the Partnership and shall be in addition to any liability which the Investor may otherwise have (including, without limitation, liability under the Partnership Agreement), and shall be binding upon and inure to the benefit of any successors, assigns, heirs, estates, executors, administrators and personal representatives of each Covered Persons and the Partnership.[122]

Had the Investors been given the opportunity to defend this claim, which they were not, they would have shown this standard indemnity provision is not a "fee shifting" agreement as to suits between the parties to the contract, but rather pertains to reimbursement in the event the Covered Persons were required to pay damages on a third-party claim.  As one New York court explained in examining similar language in an indemnity contract:

> The clause in this agreement does not contain language clearly permitting plaintiff to recover from defendant the attorney's fees incurred in a suit against defendant. On the contrary, it is typical of those which contemplate reimbursement when the indemnitee is required to pay damages on a third-party claim.  It obligates defendant to "indemnify and hold harmless [plaintiff] * * * from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees" arising out of breach of warranty claims, the performance of any service to be performed, the installation, operation and maintenance of the computer system, infringement of patents, copyrights or trademarks and the like.

> All these subjects are susceptible to third-party claims for failures in the installation or operation of the system.  None are exclusively or unequivocally referable to claims between the parties themselves or support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract.[123]

Likewise, the Investors were not given the chance to demonstrate that the term "Covered Person" was not defined anywhere in the Subscription Agreement and therefore it was not established that JPMS (which was not even a party to the Subscription Agreement) was entitled to any protection under this indemnity provision.

---

[122] Ex. A, Transcript, p. 18 (Emphasis supplied).
[123] *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492, 548 N.E.2d 903, 905 (1989).

In overruling the Investors' objection, the Arbitrators suggested the Subscription Agreement was some "kind of a contractual prevailing party clause."[124]  As explained in detail above, it was no such thing.  There was no contractual prevailing party clause in ANY contract between the Investors and JPMS.

"It is well-established that courts may set aside awards when the arbitrator exceeds his contractual mandate by acting contrary to express contractual provisions."[125]  In *PoolRe*, the First Circuit Court of Appeals recently affirmed a District Court's vacation of an arbitration award.  There, the relevant arbitration agreement required the disputes be submitted to "ICC arbitration before an arbitrator selected by the Anguilla, B.W.I. Director of Insurance."[126]  An arbitrator was appointed in a manner contrary to this agreement and the arbitrator conducted the arbitration pursuant to the Rules of the American Arbitration Association.  In affirming the district court's vacation, the First Circuit confirmed that by "act[ing] contrary to the express arbitrator- and forum-selection clauses in the arbitration agreements to which PoolRe was a party, we affirm the district court's holding that [the arbitrator] exceeded his authority under 9 U.S.C. § 10(a)(4)."[127]

Federal courts routinely vacate arbitration awards where the arbitrators failed to follow the procedures set forth in the arbitration agreement.  In *Smith v. Transport Workers Union of Am.*,[128] the Fifth Circuit affirmed the vacatur of an arbitration award holding that an arbitration panel lacked the power to modify its award one month after issuing the initial decision.  There, the arbitration agreement among the parties forbade the correction by the arbitrators more than three

---

[124] *Id.*

[125] *PoolRe Ins. Co. v. Organizational Strategies, Inc.*, 783 F.3d 256, 262 (1st Cir. 2015) (citing *Beiard Indus. Inc. v. Local 2297, Int'l Union*, 404 F.3d 942, 946 (5th Cir. 2005)).

[126] *Id.* at 263.

[127] *Id.* at 265.

[128] 374 F.2d 372 (5th Cir. 2004).

days after the award.[129]  The Fifth Circuit concluded that a correction by the arbitrators thirty days after the award "was beyond the reach of the arbitrators' power."[130]

Similarly, in *187 Concourse Associates v. Fishman*,[131] the Second Circuit affirmed the vacation of an arbitration award where the arbitrator went beyond the powers set forth in a collective bargaining agreement.  The parties' agreement limited the issues to whether an employee was fired with just cause and, if not, what the remedy would be.[132]  There, the arbitrator determined that there was just cause to terminate the employee (which should have ended the analysis) but went on to fashion an alternative remedy whereby the employee was reinstated during a six-month probation period.[133]  There, as here, the arbitrator fashioned a remedy that was in violation of the rules set out by the parties in their agreement.  Here, the parties' contracted Arbitration Agreement required each party to follow FINRA Code of Arbitration Procedure.  Like the arbitrator in *Fishman*, the Arbitrators here strayed beyond the agreement and permitted JPMS to assert a counterclaim at the conclusion of the hearing.  In doing so they fashioned a remedy in violation of the rules set out by the parties.

A similar situation arose in *In re Colorado Energy Mgmt., LLC*,[134] wherein the New York Appellate Division affirmed the vacation of an arbitration award, holding that the arbitrator exceeded his power by ruling "on issues not presented to them by the parties."[135]  There, the court found that "the arbitration demand, pre-hearing motion practice and [pre hearing decision on a motion to dismiss] make it clear that gross negligence was the only claim by LPP that was

---

[129] *Id*. at 375.
[130] *Id*.
[131] 399 F.3d 524 (2d Cir. 2005).
[132] *Id*. at 527.
[133] *Id*. at 526.
[134] 981 N.Y.S.2d 44, 114 A.D. 3d 561 (1st Dep't 2014).
[135] *Id*. at 46, 563.

presented to [the Arbitrator] for a hearing."[136]  The Arbitrator ruled that the damages "were not the result of gross negligence" but were the result of a breach of contract.

Here, as in *Colorado Energy*, the Arbitrators ruled on a claim that was not presented to them by the parties.  JPMS's failure to assert a counterclaim, pay a counterclaim filing fee, or move to amend its Answer to assert a counterclaim at any time make it clear that no such counterclaim was presented to them by the Parties.  The face of the Award leaves no doubt that the Arbitrators awarded JPMS $200,000.00 pursuant to the contractual indemnity provision in "the Subscription Agreement dated May 27, 2014."  The contractual indemnity counterclaim pursuant to which the Panel awarded JPMS $200,000.00 in damages was not properly before the Arbitrators. Therefore, the Arbitrators exceeded their authority in awarding JPMS $200,000.00 in damages on this claim.

## IV.     THE ARBITRATORS DID NOT HAVE THE POWER TO IMPOSE ATTORNEYS' FEES AGAINST THE INVESTORS IN THE ABSENCE OF THE UNASSERTED COUNTERCLAIM FOR CONTRACTUAL INDEMNITY

The face of the Arbitration Award leaves no doubt that the Arbitrators used the unasserted contractual indemnity counterclaim to award JPMS damages for attorneys' fees.  The contractual Arbitration Agreement between the parties did not contain a fee shifting provision.  The FINRA Code of Arbitration Procedure, incorporated by the parties therein, does not contain any provision specifically granting Arbitrators the power to impose attorneys' fees.  To the contrary, FINRA Rule 12902(c) provides "In its award, the panel must also determine the amount of any costs and expenses incurred by the parties under the Code or that are within the scope of the agreement of the parties, and which party or parties will pay those costs and expenses."  This is in contrast to the rules of some other arbitral forums whose rules expressly grant arbitrators the power to shift

---

[136] *Id.*

attorneys' fees against a losing party.  For instance, in *Landmark Ventures, Inc. v. Insightec, Ltd.*,[137] the court held that an arbitrator "had clear authority to award attorneys' fees and costs" where "Article 37 of the ICC Rules authorizes the Arbitrator to award costs, including attorneys' fees."

Nor did the Investors impliedly amend the contractual Arbitration Agreement by their conduct at the arbitration.  Courts have affirmed awards of attorneys' fees in cases brought under the FINRA Code of Arbitration Procedure where both parties make a general request for attorneys' fees that can be taken to reflect a shared intention to authorize an arbitrator to award such fees.[138] Here, in contrast, the Investors specifically limited their request for attorneys' fees in their Statement of Claim as being pursuant to Fla. Stat. Ann. § 517.211.  Nowhere in their pleadings or at the hearing did they expressly consent to authorize the Arbitrators to award such fees under any non-statutory basis so as to permit the Arbitrators to engage in fee-shifting willy-nilly.

The recent decision in *Ameriprise Fin'l Serv's, Inc. v. Brady*[139] is instructive.  There, the court held that FINRA arbitrators exceeded their authority, in violation of 9 U.S.C. § 10(a)(3), by awarding attorneys' fees against a losing party.  The agreement there, as in this case, did not provide for a fee shift in the event the prevailing party lost.[140]  And there, as here, the losing party's request for attorneys' fees pursuant to statute was not taken to "reflect a shared intention to authorize an arbitrator to award such fees."[141]

---

[137] 63 F. Supp. 3d 343 (S.D.N.Y. 2014).
[138] *See, e.g.*, *CF Global Trading, LLC v. Wassenaar*, 2013 WL 5538659, No. 13-cv-766 (S.D.N.Y. Oct. 8, 2013) (affirming award of attorneys' fees where parties included general request for attorneys' fees in statement of claim, answer, pre-hearing briefs and at hearing).
[139] 2018 WL 4344993, No. 18-10337 (D. Mass. Sept. 11, 2018).
[140] *Id.* at *8.
[141] *Id.*

An analysis of all 263 FINRA awards issued in "customer" cases over the past six months yielded no other case in which investors suing a broker-dealer were required to pay the attorneys' fees of the broker-dealer.  The Investors submitted to a FINRA arbitration safe in the knowledge that the Arbitration Agreement did not provide for fee shifting and that FINRA Rules do not give the Arbitrators any such power.  JPMS's failure to assert any counterclaim against the Investors further assured the Investors that a denial of claims would result "only" in the loss of their $1,000,000 investment.  In awarding attorneys' fees and costs to JPMS under the guise of the unasserted counterclaim, the Arbitrators strayed from interpretation and application of the agreement and effectively dispensed their own brand of industrial justice.

## V.      THE ARBITRATION AWARD SHOULD BE VACATED IN ITS ENTIRETY

In reviewing an arbitration award, a court "can confirm and/or vacate the award, either in whole or in part."[142]  The entirety of the Arbitrators' decisions throughout the case, including (1) their refusal to subpoena key third party witnesses to appear at the hearing; (2) their refusal to hear testimony from two separate expert witnesses; (3) their stated disdain for the Investors' presentation uttered during their case-in-chief; and (4) the Arbitrators' improper use of an unasserted counterclaim to impose fee shifting even though the Arbitration Agreement did not so provide, constitute gross misconduct.  At a minimum, the Arbitration Award should be vacated as to the imposition of any damages, costs or fees imposed against the Investors.  However, the Investors respectfully submit that the proper result is for the Award to be vacated in its entirety.

---

[142] *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).

## CONCLUSION

Judicial review of arbitration awards, while limited in nature, ensures that the arbitration process is fundamentally fair to all parties involved.  The process here was fundamentally unfair. The Arbitration Award must therefore be vacated.


Respectfully submitted this 1st day of November, 2018.


**HASELKORN & THIBAUT, P.A.**


　　　/s/ Matthew N. Thibaut
Matthew N. Thibaut
Florida Bar No. 514918
mthibaut@htattorneys.com
359 S. County Road, Suite 101
Palm Beach, Florida  33480-4472
Tel: (561) 585-0000
Fax: (561) 833-4209

**LAW OFFICE OF CRAIG KUGLAR, LLC**

Craig H. Kuglar, Esq. (*Pro Hac Vice* Pending)
ck@kuglarlaw.com
931 Monroe Drive NE, Suite A102-353
Atlanta, Georgia  30308
Tel: (404) 432-4448
Fax: (404) 393-8007

*Attorneys for Petitioners*

# EXHIBIT A

Page 1

1    BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY
                    DISPUTE RESOLUTION

2
                    FINRA NO.:  17-01969

3

   IN THE MATTER OF THE ARBITRATION
4  BETWEEN
5  GEORGE MATTSON AND GNM ICBC, LLC,
6
                    Claimants,
7  vs.
8  J.P. MORGAN SECURITIES, LLC,
9                  Respondent.
   _____/
10
11
12         TRANSCRIPT OF ARBITRATION PROCEEDINGS
13
14              VOLUME 1 (Pages 1 - 274)
15
16    DATE TAKEN:  September 17, 2018
      TIME:         9:30 a.m. - 4:50 p.m.
17    PLACE:        FINRA
                    5200 Town Center Circle
18                  Boca Raton, FL
19
20      This cause came on to be heard at the time and
   place aforesaid, when and where the following
21  proceedings were stenographically reported by:
22              Kimberly Fontalvo, RPR, CLR
             Realtime Systems Administrator
23
24
25

1   Then.

2       He says, look, I was told six things, six

3   things that tricked me, that defrauded me into

4   making this investment.  Let's just read a few

5   of them.  Jawbone was a hot company.  Jawbone

6   was hot.  It was going to go public in one to

7   two years.  That tricked him.

8       That Jawbone was going to be the winner.

9   You see it's in quotes there, the "winner" in

10  the wearable tech space, as it had the best

11  technology which was IP protected.

12      This is all -- by the way, these are all

13  on phone calls.  These are those phone calls

14  you heard his Counsel mention, his Counsel said

15  he remembers that phone call so well.  That's

16  what we're reading here.  Three statements

17  about Rizvi, three of them.  The heart of his

18  claim is about Rizvi, and the documents you are

19  going to see make that a very simple claim to

20  resolve because the documents tell you exactly

21  what Rizvi is going to do.

22      He goes on that 300 million would carry

23  Jawbone through the IPO.  His Counsel said 250.

24  I don't know if maybe he doesn't remember it so

25  well, but I heard 250.  It was at 9:58 a.m.  I

1    mentioned one document that I want address now,

2    too, since he brought it up.  He showed you a

3    board.

4        I thought this one might come up.  Here it

5    is.  Counsel showed you this and said this is

6    an internal call.  Remember he mentioned

7    April 2017, there's an internal call.  I want

8    you to remember that event, too.

9        Now, I said before, before and after.

10   April 2017 is obviously after.  What happens

11   after?  This is a March 2017 call.  This is our

12   document.  He put it up.  He said, gosh, look

13   what happens.  Says, "Conference call with

14   client.  Client reiterated why his investment

15   was invested prior to funding the main

16   investor.  Meanwhile, main investor backs out

17   altogether.  PM Larry Unrein acknowledged and

18   agreed with the client's concern."

19       And that sentence, that's the one he

20   wanted you to see.  He wanted you to see that

21   someone here agreed with Mr. Mattson's concern.

22   That gentleman was Larry Unrein.  He works for

23   the investment advisor, not us, a different JPM

24   entity.

25       Now, we're going to hear a lot of

1    companies, the industrial sector, and so when they
2    have industrial opportunities, they sometimes want
3    to talk to me about those opportunities to see if
4    there's ways I can help them.
5         Q.   When did you become a customer of
6    J.P. Morgan Securities?
7         A.   I became a customer of J.P. Morgan after
8    my departure from Goldman Sachs.  While I was at
9    Goldman Sachs, I was not allowed to or, at a
10   minimum, it was strongly discouraged to have assets
11   elsewhere, and so I didn't.
12        Jasmine Abouzied had left Goldman Sachs a
13   few years before my retirement, and when I retired
14   from Goldman Sachs, I reestablished contact with
15   Jasmine and she reached out to me, and I ended up
16   opening an account and, over the ensuing years, did
17   quite a bit of business there and moved a fairly
18   significant portion of my assets over from Goldman
19   Sachs.
20        Q.   What type of investments were the
21   investments you were making through J.P. Morgan
22   Securities primarily?
23        A.   So, the first part of my relationship with
24   J.P. Morgan was just around the general commercial
25   banking, so checking, savings, you know, mortgages,

Page 84

1   that type of activity.  And then on the securities

2   side or on the investing side, most of what Jasmine

3   and I talked about over those years was what they

4   referred to as their alternative investments

5   platform.

6         J.P. Morgan private bank, J.P. Morgan

7   Securities has a very large alternative investments

8   platform somewhat distinct from what Goldman Sachs

9   was offering, so it was different, and the thought

10   at the time complementary to what I was doing.  And

11   that alternative investment platform consisted of a

12   large number of private equity funds and hedge funds

13   that were "approved to be on their platform."

14         And what was described to me that approved

15   to be on their platform meant that they had done an

16   extensive amount of due diligence, they had a robust

17   due diligence team.  And for each of those

18   investments that I made over the years, and there

19   were at least eight or ten separate investments over

20   those two or three years, I paid a second layer of

21   fees and placement fee, and it was explained to me

22   that that was really to support the infrastructure

23   of due diligence, monitoring, and so forth.

24         Most of those investments were in the

25   alternative investment space that I did with

1               Mr. Mattson, we're at CX100.

2          A.    Okay.

3          Q.    And do you recognize this email?

4          A.    This is an email on May 14, 12:38 p.m.

5     from Jasmine to me, asking if I had a few minutes to

6     discuss an investment opportunity, referring to

7     Jawbone.

8          Q.    And what was your response?

9          A.    Late this afternoon should work,

10    5:00 p.m., and we spoke at 5:00 p.m. that day.

11         Q.    And do you have a recollection of that

12    call?

13         A.    Yes.

14         Q.    Tell us what your recollection is.

15         A.    My recollection is that it was a call that

16    lasted 15 or so minutes, 15 or 20 minutes.  I was in

17    the backyard of my house here in Florida, I recall.

18    And what Jasmine described to me was that there was

19    a unique opportunity to make an investment in a very

20    exciting private tech company in an emerging space,

21    the wearable space.

22              She explained this was a company that

23    J.P. Morgan knew extremely well, having done many

24    years of work for them raising capital.  That her

25    partner Larry Unrein, who runs the private equity

Page 87

1    business at J.P. Morgan, was on the board and had

2    been affiliated with and associated with the company

3    as an insider on the board for many, many years.

4            That they knew the company extremely well.

5    That it was their opinion that this company was

6    going to be the next hot IPO out of the tech sector

7    and out of Silicon Valley in the wearables space.

8    That this $250 million financing would be the last

9    round of financing they needed before their IPO.

10   That it was backed by blue chip investors, that

11   J.P. Morgan had their own capital in it.  And it was

12   something she suggested was unique and something I

13   should take a look at.

14       Q.   Did she tell you who else would be

15   involved in this capital raise?

16       A.   She mentioned that there was going to be a

17   lead investor by the name of Rizvi.  She mentioned

18   that J.P. Morgan had had many prior dealings and

19   transactions with Rizvi.  She mentioned that Rizvi

20   and J.P. Morgan had co-invested in Twitter and a

21   couple of other exciting tech investments that she

22   referenced, that I don't recall the specific names

23   at the time, but I do remember the Twitter

24   reference.

25           She mentioned that they were a blue chip

1    lead investor in transactions like this, and that
2    essentially the capital that the private bank was
3    going to be putting in would be going in alongside
4    Rizvi, who would be negotiating the principal terms
5    of the transaction on behalf of the investor group
6    as the lead investor.
7          Q.   Were you told what the lead investor would
8    be putting up in terms of their capital?
9          A.   175 million out of the 250.
10         Q.   How was that $175 million commitment
11   described to you?
12         A.   As a commitment.  I assumed based on how
13   it was described that all the money was going to
14   close simultaneously and all the money was going in
15   at the same time.  I assumed it was a $250 million
16   close, of which Rizvi would be closing 175 on the
17   same terms.  That was the description that was
18   given.
19         Q.   Was it ever described as an option?
20         A.   No.  It was never described as an option.
21   In fact, when I later learned a few short months
22   later that they had not raised $250,000 but had
23   raised $176 million, I asked why, how that could
24   have happened, particularly given that the amount of
25   capital a private company that's cash flow negative

                                                        Page 89

1    raises is an extremely important fact.  More is

2    better when you need cash to grow.  Less is

3    dangerous.

4              And when I asked how it was that it didn't

5    come in at 250, Larry Unrein on a call with Jasmine

6    and I told me that Rizvi didn't come in.  And I

7    said, what do you mean Rizvi didn't come in?

8              MR. NAGY:  Objection.  I want to point out

9         Larry Unrein, not a party, doesn't work at

10        JPMS, and I think this came up with the

11        subpoena.  You may recall, Ms. North, he tried

12        to bring Larry Unrein down here, chose not to

13        sue his firm.  After thinking about it, chose

14        not to sue them.  They're not a party, so he

15        doesn't get the benefit of a party statement.

16        It's not a party statement.

17             CHAIRPERSON NORTH:  I'll sustain the

18        objection as to what Mr. Unrein said.

19             THE WITNESS:  Even if Jasmine was on the

20        same phone calls?

21      BY MR. KUGLAR:

22        Q.   If you would look at exhibit -- the next

23    exhibit, which is 101 --

24        A.   Yes.

25        Q.   101 and 102 -- 101 is the signature page

Page 93

1   reasonable investor due diligence.

2          Which means you take the time to

3   understand the industry, understand the company,

4   understand the security that you are buying, and a

5   chance to ask basic questions.

6          But I assumed that J.P. Morgan Securities

7   had done the detailed, in-depth due diligence that's

8   inevitably required in an investment of this type.

9          Looking at a data room is not due

10  diligence.  That's access to information.  And the

11  idea that investors, particularly me as a $1 million

12  investor, in a $250 million transaction, I didn't

13  have an ability -- none of the investors had an

14  ability to do independent due diligence.

15         To the contrary, all of the due diligence

16  was dependent on going to and through J.P. Morgan

17  Securities.  I was not offered and did not have

18  access -- independent access to management.  I did

19  not have independent access to visit the facilities,

20  to meet their people, to assess their patents,

21  assess their financial condition.  None of those

22  opportunities were available.

23         I thought I was doing, and what I thought

24  every investor in that transaction was doing was

25  reasonable investor due diligence which is quite

```
                                            Page 106
1        A.    Yes.
2        Q.    Did you consult a financial advisor?
3        A.    I did.  I was consulting Jasmine on the
4   transaction, the only financial advisor that had any
5   knowledge of the transaction and the one who
6   introduced me to it.
7        Q.    At the time and prior to coming here
8   today, have you had a chance to review this offering
9   document carefully?
10       A.    Yes.
11       Q.    Have you been able to locate in this
12  document the disclosure that J.P. Morgan Securities
13  would not be performing due diligence on your
14  behalf?
15       A.    No.
16       Q.    The offering memo references the term
17  sheet involved in this deal, correct?
18       A.    Yes.
19       Q.    And if you would turn to CX144, do you
20  recognize this document?
21       A.    Yes.
22       Q.    If you look at the last two pages, there's
23  some signatures.  Whose signatures do you see on
24  here?
25       A.    I see the signature of Hosain Rahman, the
```

Page 114

1    transactions executed through J.P. Morgan Securities

2    LLC, JPMS, see portfolio and activity detail"?

3         A.   Yes.

4         Q.   And on page 6781, who is listed as the

5    broker on this account?

6         A.   Jasmine Abouzied.

7         Q.   And on page 6815 --

8         A.   Yep.

9         Q.   -- is there an entry related to this

10   transaction there?

11        A.   Yes, in the middle of the page it says

12   "Morgan Private Ventures, Jawbone MPV clients only,

13   Jawbone, Morgan Private Ventures commitment position

14   J.P. Morgan Chase bank trade," and it's $500,000

15   position.

16        Q.   What's the date there?

17        A.   June 6.

18        Q.   That's consistent with your understanding

19   of when you were actually invested or when the money

20   was committed?

21        A.   Yes.

22        Q.   And then if we -- that's the -- in a

23   section titled "Portfolio Activity Detail," right?

24        A.   Yes.

25        Q.   And then if we go up to page 6809 on the

1   J.P. Morgan account statement, was this Jawbone

2   investment reflected on your J.P. Morgan Securities

3   account statements?

4        A.   Yes.  It says Morgan Private Ventures,

5   Jawbone MPV, 500,000.

6        Q.   If you would take a look at Exhibit

7   CX54 --

8        A.   Yep.

9        Q.   -- do you know what this is?

10       A.   This is a brokerage statement for the same

11  period of time, June 2014, for GNM ICBC, LLC.

12       Q.   Turn, please, to JPMS5960.

13       A.   Yes.

14       Q.   Do you see where it says "Morgan Private

15  Ventures"?

16       A.   Yes.

17       Q.   What's your understanding as to what that

18  entry is?

19       A.   That's the investment of $500,000 into the

20  Jawbone entity via Morgan Private Ventures on behalf

21  of GNM ICBC, LLC.

22       Q.   How did the discount of the placement as

23  you requested come about?

24       A.   Well, I had -- as I mentioned earlier, I

25  had made eight or ten or 12 private investments in

```
 1      A.   I can't recall if I participated in the

 2   actual call or listened to a replay or got the

 3   slides, but I got an update on the call.  I believe

 4   it was a replay.

 5      Q.   Did you speak with Ms. Abouzied about this

 6   call?

 7      A.   The conversation I am referring to that I

 8   had with Ms. Abouzied and Mr. Unrein was separate

 9   from the call.

10      Q.   Tell us about that conversation.

11      A.   That was the conversation --

12           MR. NAGY:  Same objection.  As long as

13      he's specifying who is speaking, is it Larry or

14      Jasmine, so we know it's not confusing.  If

15      it's Larry, I have the same objection.

16           CHAIRPERSON NORTH:  If you could just tell

17      us what you recall of who told you what at that

18      call, that would be helpful.

19   BY MR. KUGLAR:

20      Q.   The question is, who told you what on that

21   call?

22      A.   Okay.  Well, it was a three-person call.

23   Me and Jasmine and Larry, all three of us were

24   talking.  It was a three-way conversation.  And I

25   will try to remember exactly who said what.
```

1            Jasmine arranged the call and asked Larry

2    to participate in the call, Jasmine asked Larry, in

3    order to speak to some of the questions pertaining

4    to the update on the investment.

5            So Craig, I think, you were asking me what

6    update I got on the investment.  Some of that update

7    came from Jasmine, most of it came from Larry

8    because that was his position at J.P. Morgan.  It's

9    hard to tell you what happened on the call if I'm

10   not allowed you to tell you what Larry said.  Are we

11   going to --

12           CHAIRPERSON NORTH:  You just said that

13       Larry was a representative of J.P. Morgan.

14       A.   He works for J.P. Morgan Bank, a separate

15   division, the investment management division.  But

16   he works for J.P. Morgan.  And he was described --

17   he was put out to me by Jasmine as her partner

18   working on this investment.

19           CHAIRPERSON NORTH:  Okay.  I will allow

20       him to testify.

21           MR. NAGY:  I just want to note it's a

22       separate entity, legally separate, and also

23       it's an entity they chose not to sue.  We had

24       this issue come up before.  If they wanted to

25       bring Larry, they could have, but they didn't.

1        So since it's not a party, we briefed this

2        whole issue, I object for that reason.  This is

3        a separate entity.  It's not us, it's not our

4        statement.  I think just as you ruled before, I

5        think it should be the same ruling.

6              CHAIRPERSON NORTH:  We'll take that into

7        consideration, but we'll allow him to testify

8        as to what he recalls about that conversation.

9              MR. NAGY:  Okay.

10       A.    So as I was saying, the call happening a

11   few short months the initial investment raised some

12   very alarming and surprising issues.  They were

13   having problems delivering their product, they were

14   having problems getting the product on to customer

15   shelves for the all-important Christmas selling

16   season.  They were having some instability in the

17   management team, people might or might not be

18   leaving.  And quite alarmingly, they were "needing

19   to go out and raise some more money."

20             So I said, well, what happened to the 250?

21   How could you have burned through 250 in such a

22   short period of time?

23             And the answer that came back was, well,

24   we didn't raise 250, we raised 176.

25             And I said, but the transaction was for

1  250, so how did you end up not raising 250?

2         And the answer that came back was, well,

3  Rizvi didn't come into the deal.

4         And I said, how can that be?  Wasn't it a

5  firm commitment?  Weren't they supposed to come into

6  the deal?

7         And the answer was they weren't good for

8  it.

9         I said, so they reneged?

10        Yes, they reneged.

11        I said, okay.  And immediately the

12 totality of those four points that were made on that

13 call caused me to realize, immediately, that this

14 investment was in trouble.

15        And as it turned out, the company

16 subsequently, very shortly thereafter, had to raise

17 significant additional capital at a significant

18 discount to the valuation at which I and other

19 investors had invested only a few short months ago.

20        And in my experience, and the reason I was

21 so concerned, you know, the death nail of many

22 companies in the private sector of financing,

23 particularly the tech sector, is when they have to

24 go do a down round.  Down round.

25        And I saw a down round coming.  I saw a

Page 124

1   company that was going to be a distressed, desperate

2   company going to look for financing.  And they

3   ultimately ended up financing from BlackRock at a

4   50 percent, roughly, 45 percent discount less than a

5   year later to the valuation at which we had

6   invested.

7          And at that point, I felt like we were in

8   a spiral that turned out to be a spiral that went to

9   zero.  Because when you end up in that down round,

10  it's really a vote of confidence.  It's a vote of

11  confidence on the company.  Management team members

12  who have option packages underwater start finding

13  better opportunities.  Customers worry that the

14  products they're putting on their shelves won't be

15  around because the company just financed a down

16  round.

17         So that cycle started, and my awareness of

18  that cycle was starting occurred just a few months

19  after the initial financing.  And it immediately

20  raised concerns in my mind about whether J.P. Morgan

21  really knew this company as well as they had

22  represented they knew it, given their long history.

23         And I started to really worry that -- if

24  the appropriate amount of work had been done by

25  J.P. Morgan, the types of problems they were having,

1    product, customer, technology, intellectual

2    property, these are things that one normally finds

3    out in a robust due diligence process.

4      BY MR. KUGLAR:

5        Q.   What happened next after that call in

6    September 2014?

7        A.   The company's problems continued to

8    magnify around the product and around the lack of

9    customer -- shelf space with key customers, like

10   Best Buy.  They did end up losing several of their

11   top executive team, members of their executive team,

12   and started an urgent search to find a new leader

13   for the company.

14            They did raise capital early in 2015 in

15   April from BlackRock on distressed terms,

16   liquidation preference at the top of the capital

17   structure, valuation half of what we had come in at,

18   and that was really -- that's the mark.  That's the

19   mark that things are going in the wrong direction

20   quickly.

21            So that was the next thing that happened.

22        Q.   And then in terms of your communications

23   with J.P. Morgan, what came next?

24        A.   I was having periodic update calls,

25   getting updates on management recruiting, on product

1   company.  I believe there was a subsequent round, if
2   I'm not mistaken, that involved liquidity investment
3   authority.  But at that point, they were looking to
4   get money from anywhere and everywhere at any cost.
5   And we were in a down spiral.  And it started, very,
6   very, very quickly after my investment closed.
7           It's very difficult to lose $3 billion of
8   value in two years.  In fact, I'm not sure it's ever
9   been done before, but that's what happened here.
10      Q.   And then what ultimately happened to your
11  investment?
12      A.   There was call late in 2016 in which
13  J.P. Morgan, represented by Mr. Unrein, told
14  investors that the investment will be written down
15  to zero and that in order to facilitate the LP's tax
16  planning needs, they would try to get that
17  write-down to zero in December of '16 rather than
18  letting it lead into '17.  And the investment was
19  written to zero in December of 2016.
20      Q.   Did you have any other communications with
21  J.P. Morgan Securities after that investment was
22  written down?
23      A.   I did.
24      Q.   Tell us about those.
25      A.   So in the aftermath of the investment

```
                                                 Page 129
```

 1    ultimately going to zero, I had several calls with

 2    the two people I spoke with at J.P. Morgan about

 3    this, those two people being Jasmine and Larry

 4    Unrein, and we had a very open and -- discussion

 5    about, you know, what happened, what happened, how

 6    did this happen, how does this happen.  And how did

 7    the company run out of money.  How did Rizvi not

 8    fund?

 9              And again it was repeated.  Rizvi wasn't

10    good for it.

11              I said, so they reneged on a commitment?

12              Yes, they reneged on a commitment.

13              I said, well, if a firm renegs on a

14    commitment and then the result of that or the

15    outcome is that the company goes bankrupt, don't you

16    have recourse against Rizvi on behalf of your

17    investors?  I mean, have you looked at whether you

18    have recourse, J.P. Morgan, against Rizvi on behalf

19    of your investors who lost all their money?

20              And the response I got was, you know,

21    that's a good point.  We -- it was a commitment, and

22    so we should look at that, and we will get back to

23    you on that, because maybe we do have recourse

24    against Rizvi.

25              And so that call ended.  And then there

                                                    Page 130

1    was a subsequent call on which I was told that there

2    was no recourse.

3              MR. NAGY:  Excuse me.  At this point, I

4         want to note my objection.  If you want to hear

5         it, so be it, but I just want to point out we

6         had this whole issue -- I would love to call

7         Larry Unrein and put him on the stand here.

8         Not going to happen because they didn't sue

9         him.

10             Now we're hearing all about what Larry

11        said.  So if he would, at a minimum, at least

12        identify who is speaking, Larry or Jasmine, as

13        you've already asked him.  So you have my

14        objection noted for the record.

15             CHAIRPERSON NORTH:  Okay.  To the best of

16        your ability, please tell us who was making

17        these various statements, if you can.

18        A.   Sure.  The call I'm now referring to did

19   not include just Larry and Jasmine.  It included an

20   attorney from J.P. Morgan whose name was mentioned

21   earlier.  I believe it was Mr. Cohen, if I recall,

22   and it was on that call that I was told for the

23   first time in words that there was no recourse

24   against Rizvi because they didn't have an obligation

25   to fund.  It was merely an option.

Page 175

1    that phone call?

2         A.    I may have.  I didn't keep the notes

3    probably.  But I wrote some things down on some of

4    those calls, yes.

5         Q.    You didn't produce any of those notes in

6    this litigation, did you, sir?

7         A.    I don't have notes.

8         Q.    You don't have the notes?

9         A.    No.

10        Q.    In April 2017 after Jawbone does badly,

11   you are in a meeting in New York with Kelly Coffey,

12   I think you testified about this, and with Jasmine,

13   right, sir?

14        A.    Yes.  I had a meeting can Kelly Coffey and

15   Jasmine.

16        Q.    Kelly Coffey was and is Jasmine's ultimate

17   boss, right?

18        A.    She's her boss.  I don't know if she's her

19   ultimate boss, but yeah.

20        Q.    At the meeting, you did not say to Kelly

21   Coffey:  Kelly, Jasmine made all these statements on

22   the phone and she lied to me?  You didn't say that,

23   right?

24        A.    Specifically that, or in the context of a

25   broader narrative about everything J.P. Morgan had

1    statements made by J.P. Morgan with regard to the

2    $175 million were unambiguous.

3         Q.    Not my question.  My question was, if I

4    read the documents -- not asking about phone calls

5    now, I'm asking about documents.  If I, as an

6    investor, read those documents like you swore you

7    did, if I carefully read them, I will know that

8    Rizvi may not invest 175 million.  Isn't that a

9    fact?

10        A.    No.  In my mind, that is not a fact.

11        Q.    Let's go through them together, then.  I

12   want to show you first Exhibit 26.  Now let's start

13   on this exhibit.  This is the Rizvi term sheet.

14   Your lawyer showed us that Hosain Rahman, the CEO of

15   Jawbone, signed it and that this guy from Rizvi

16   signed it.  Do you recall that?

17        A.    Yes.

18        Q.    I want to show you the very first thing at

19   the top -- you read this document three times.  Do

20   you recall that?

21        A.    Yes.

22        Q.    You relied on this document in making your

23   investment decision?

24        A.    Yes.

25        Q.    I think I heard you testify this document

1    is the one that makes it clear that it's going to be
2    175 million.  Is that right?
3         A.   This is the document that makes it clear
4    it's going to be 250.
5         Q.   250?
6         A.   See the 250?
7         Q.   You understood that to be a binding
8    obligation?
9         A.   Where it says financing of 250, I just
10   understood that to be a binding obligation and a
11   material term of the deal.
12        Q.   Patrick, blow out for me the title in the
13   first paragraph.  And put in yellow for me, Patrick,
14   second line from the word "this" to the next line
15   the word "obligation."
16             Mr. Mattson, did you read the first
17   paragraph in this term sheet when you reviewed it
18   three times?
19        A.   Yes.
20        Q.   It says right there, does it not, sir,
21   that the following is a summary of key terms.  It
22   goes on and then it points out specifically, this
23   term sheet is not intended to create any binding
24   obligation.  Isn't that true, sir?  Paragraph 1.
25   Isn't that true?

1      A.    So nothing in this term sheet needed to be

2   true because of that sentence?  Is that what you're

3   asking me?

4      Q.    I'm asking you, does it say right there

5   that it's not intended to create any binding

6   obligation?  Isn't that right?

7      A.    No, I don't believe that's right, because

8   if this term sheet is attached to a subscription

9   document and an offering document that I signed, it

10  becomes binding on me, it becomes binding on the

11  transaction.

12          So if it says financing of $250 million,

13  it seems to me that it is incumbent upon the firm to

14  raise $250 million.  If you're not going to raise

15  $250 million, you have an obligation to go back to

16  your investor and inform them that you did not raise

17  $250 million.  It's called reconfirming and

18  recirculating in the securities business.

19          So if they didn't reconfirm orders and

20  they did not recirculate.  I read financing of

21  $250 million.  It's a flat statement.  That's what I

22  read.  How I interpret Rizvi's participation where

23  it says up to 175 and where I've been told it's

24  going to be 175 in the context of a $250 million

25  offering that turned out to not be, I will grant you

```
 1   is rather confusing with the benefit of hindsight.
 2         Q.    Are you done?
 3         A.    Yes.
 4         Q.    Okay.
 5         A.    Hope I answered your question.
 6         Q.    No.  Do you remember it?
 7         A.    You asked me if I realized this was
 8   nonbinding.  The answer is I did not realize that
 9   was nonbinding because this is the term sheet on
10   which I invested.  Did I see a different term sheet
11   than this at any point that was binding?
12         Q.    I'm going to try to ask the questions, if
13   that's okay with you.  And my question was this:  It
14   says in paragraph one that the term sheet is not
15   intended to create any binding obligations.  It says
16   that, doesn't it?
17         A.    It does say that.  So why was it signed?
18         Q.    Again, I'm going to try to ask the
19   questions.
20         A.    I'm sorry.  I'm really trying to work with
21   you, but I'll try to answer the direct questions.
22         Q.    We're in agreement some of this does not
23   make sense.  Right?  Right there, paragraph one, you
24   were told the term sheet is not intended to create
25   any binding obligations.  We agree it says that?
```

1    A.   Yes, the term sheet says it's not

2    intended, despite the fact it's signed by the

3    company and signed by Rizvi, to create any binding

4    obligations.

5    Q.   While you were at Goldman Sachs as a

6    partner for ten years, isn't it true Goldman entered

7    into hundreds, if not thousands, of term sheets that

8    were not binding?  Doesn't that happen all the time?

9    A.   Yes, but we didn't raise capital on them.

10   Q.   All right.  So you had prior to this on

11   many occasions seen nonbinding term sheets, right,

12   sir?

13   A.   Yes, but I never invested on a nonbinding

14   term sheet.

15   Q.   Now, you have mentioned a couple of times

16   $250 million.  I hear you say it should be binding.

17   Do you remember that list, those offering documents

18   of 12 documents we talked about earlier?  If I look

19   in every one of those documents, including the stock

20   purchase agreement, the one that lays it all out and

21   is binding, I'm not going to find anything that says

22   we promise we're raising 250 million.  It's not

23   there, isn't that a fact?

24   A.   The fact is that term sheet doesn't say

25   financing up to $250 million.  This term sheet says

1   financing of $250 million.  And if this term sheet

2   said financing of up to $250 million, I agree with

3   you it would have been a lot more clear.

4       Q.   There is no document, not the stock

5   purchase agreement, not the offering memo, no

6   document that says we promise we're raising 250?

7       A.   I don't know the answer as to whether

8   there's any document that says that.  We'd have to

9   go through and research all the documents to see if

10  any of them say that.  I don't know that.

11      Q.   There's one that says something different.

12  I'll show it to you in about five minutes.  Let's go

13  to the section on Rizvi.

14           Let's put in yellow, please, the words "up

15  to" in the first line, the words "up to" in the

16  third line, and then there's a sentence starting at

17  about line 6 that says "it is anticipated."  And I

18  want to put that sentence up to the word "closing."

19           Now with respect to Rizvi, specifically,

20  this document doesn't promise Rizvi is going to do

21  175 million.

22           Do you see that, sir?

23      A.   Yes.  This document doesn't.

24      Q.   We can agree that provision right there

25  does not bind Rizvi to 175 million, right?

```
                                              Page 192
 1        A.    No, I believe this document binds the 250,
 2    but it's open-ended on the 175 in this document, not
 3    in other communications.
 4        Q.    So we have a clear record here, make sure
 5    we're on the same page, that provision does not bind
 6    Rizvi to invest 175 million.
 7        A.    This provision in this document, I would
 8    agree with you, does not bind Rizvi to invest
 9    175 million in this document.
10        Q.    Now, you testified whether Rizvi would or
11    wouldn't do 175 was something that mattered to you?
12        A.    Absolutely it mattered.  They were the
13    lead investor.  They were the investor with the
14    history.  They were the blue chip investor with the
15    experience.  It would have been quite alarming if
16    they had chosen not to.  So it mattered a lot.
17        Q.    You were told in this document something
18    special about Rizvi.  You were told you see it right
19    there, it is anticipated that this additional
20    funding will occur within a month or two following
21    the initial closing.
22              Do you see that, sir?
23        A.    Yes.
24        Q.    I want to understand if Rizvi mattered to
25    you in 2014 like it does today, let's start here
```

Page 193

1    with the initial closing.  That additional closing

2    happened on March 28.  You were told that in

3    writing.  Do you recall that?

4          A.    Sorry.  Repeat that.

5          Q.    The initial closing that happened on

6    March 28, 2014, you were told that in writing.  Do

7    you recall it?

8          A.    I don't recall knowing at the time that

9    they had closed the 25 million on March 28.  I saw

10   that on your chart earlier today.  I take your word.

11   I'm sure it's there.  I don't know that, but --

12         Q.    You will agree with me you were told that

13   in writing in May 2014, that it was March 28?

14         A.    I didn't -- there were thousands of pages.

15   I might have missed that date.  I don't remember

16   seeing it.

17         Q.    Leave that up because this is very

18   important.  Leave that up and go to Exhibit 38,

19   which is the stock purchase agreement, and take us

20   to page 33 and just give us the date, the initial

21   closing date when Rizvi does its 25 million.  Make

22   that smaller.  Put it down.

23               You read the stock purchase agreement?

24         A.    Yes.

25         Q.    Initial closing, March 28.  Take us back,

1   if you could -- you can leave March 28 up there, but

2   take us back to that Rizvi provision.  And put in

3   yellow for us "it is anticipated" through the word

4   "closing" in yellow.

5           Mr. Mattson, in 2014, you're told Rizvi

6   anticipated -- Rizvi, this investor you care

7   about -- it's anticipated it's going to do the

8   additional funding within the month or two after the

9   initial closing.

10          Do you see that?

11      A.   Yes.

12      Q.   What is one month after March 28, 2014?

13      A.   April.

14      Q.   April 28, 2014?

15      A.   Uh-huh.

16      Q.   What's two months after March 28, 2014?

17      A.   May.

18      Q.   May 28.  You signed your subscription

19   agreement on May 27, 2014, right?

20      A.   Yes.

21      Q.   Before you did that, you didn't ask

22   anybody, hey, Rizvi, I care a lot about them, and I

23   see it's anticipated they're going to do the

24   additional funding by either April 28 or May 28,

25   please tell me, did that happen before I sign.  You

1    didn't do that then, did you?

2        A.    I absolutely did.

3        Q.    You did?

4        A.    Yes, I did.

5        Q.    You called someone and said:  Did they do

6    this?

7        A.    I called someone and I confirmed that

8    Rizvi was in for 175 firm, and the answer I got was

9    yes.  On multiple occasions, on multiple phone calls

10   with Jasmine and Larry.

11       Q.    So let's go through it.  Who did you call

12   before you signed on May 27 to confirm that point?

13       A.    Jasmine and Larry.  I didn't even have to

14   call.  It was in every conversation they had with

15   me.  Every conversation they had with me, Rizvi is

16   in for 175.  Not Rizvi may be in for 175.  Not Rizvi

17   has an option to be in for 175.  Not Rizvi invested

18   25 million on March 28 and they said in the thing

19   two months, so on May 28, you need to start

20   wondering.  None of those conversations actually

21   occurred.

22              The only actual conversation that occurred

23   around this topic was a conversation in which -- as

24   a matter of fact, it was communicated that Rizvi was

25   investing 175 million.  When I saw a disparity

1    between that and what it says in the document, the

2    nonbinding document, as you point out, I presumed

3    that what I was being told by J.P. Morgan was

4    accurate.

5          Q.   Are you done?

6          A.   Yes.

7          Q.   Okay.  "I didn't even" -- I'm reading what

8    you just said.  "I didn't have to have a call.  It

9    was in every conversation they had with me.  Not

10   Rizvi might be in.  Not Rizvi might be in.  I didn't

11   need to have that."

12         A.   There was no special call to confirm that

13   Rizvi was in.

14         Q.   That was my question.

15         A.   Because it was implicit and communicated

16   in every call.  It was part of the fundamental

17   conversation about the deal on every call.  It

18   wasn't in one call.  There wasn't one call about

19   whether Rizvi was in.  Because Rizvi was always in.

20   They were always in, from the first call I got from

21   Jasmine through every call.  Through the calls in

22   2015 when Larry Unrein and Jasmine still thought

23   that was Rizvi was supposed to be in for 175.  Why

24   would I have known differently if the people running

25   the deal didn't know differently?

                                                    Page 197

1         Q.   I want to make sure we got it.  I thought
2    I heard you start off by saying the opposite.  You
3    didn't, based on this document and those anticipated
4    dates, call to confirm again?
5         A.   I did not separately pick up the phone to
6    ask why this document says this and why have you
7    told me six times, ten times that Rizvi is in for
8    175.
9              As a matter of fact, it was never even
10   suggested that it might not be the case.  Never even
11   suggested.  And if the lead investor doesn't want to
12   invest, my question is, why do I want to invest.
13        Q.   Okay.  Now, there's also another date
14   there, Rizvi had up to six months.  Can you put that
15   in yellow for us, please.  Similarly, in September,
16   that deadline Rizvi had, September 28, that's six
17   months after March 28, we agree on that?
18        A.   Yes.
19        Q.   Similarly, in September, you didn't pick
20   up the phone and say did Rizvi actually do this
21   within the six months?  That did not happen, right?
22        A.   I had a call after September 28, as I
23   communicated earlier, on which, among other problems
24   that probably would have turned up in diligence, it
25   was communicated to me that Rizvi didn't invest and

```
                                        Page 198
 1   that the deal was underfunded.
 2       Q.   Not my question, sir.  I simply want --
 3       A.   I did not make a separate call to ask
 4   whether Rizvi invested.
 5       Q.   There's another document that speaks in
 6   great detail about what Rizvi's obligations are.  I
 7   want to show you that one.  It's Exhibit Number 38.
 8            I don't know how long we've been going,
 9   but if you all are okay, I'm going to keep going. if
10   you all are not, I'll stop.
11            CHAIRPERSON NORTH:  Why don't we go
12        another 15 minutes, and then we can take a
13        break at 3:30.
14     BY MR. NAGY:
15       Q.   Exhibit 38, this is the stock purchase
16   agreement.  This is one of the documents that you
17   read; is that right, sir?
18       A.   Yes.
19       Q.   It actually talks about the sale of stock.
20            Do you see that?
21       A.   Yes.
22       Q.   If we could, on page 1, Patrick, I want
23   you to blow out -- there's three sections here, it
24   starts with "recitals," then there's a paragraph, I
25   want that one.  And then there's a section called
```

Page 199

1    1.2 that starts on the bottom and goes to the next
2    page.  I want that whole section 1.2.
3               (Discussion off the record.)
4      BY MR. NAGY:
5         Q.   I need the rest of 1.2 which is on the
6    next page.  You beat me to it.  That's what I would
7    like in yellow.  No, you almost had it, buddy.  Go
8    back and put the recitals in that first paragraph.
9    There you go.  That looks good.
10              Now, this document, Mr. Mattson, it laid
11   out obligations of various parties and also
12   opportunities of various parties to buy stock.
13   Generally that's what it did.  Would you agree?
14        A.   Yes.
15        Q.   Now, this one here, you can see at the
16   very beginning it says, "The company has authorized
17   the sale and issuance of an aggregate of 23 million
18   and change shares."  Do you see that?
19        A.   Yes.
20        Q.   The company you understood to be Jawbone,
21   right?
22        A.   Yes.
23        Q.   Then there's a price you can see of
24   11.26756 per share.
25              Do you see that?

Page 200

1      A.    Yes.

2      Q.    And if I take a calculator and multiply

3   those two, I'm going to see the company authorized

4   the sale of $270 million exactly in stock.

5           Do you see that?

6      A.    Yes.

7      Q.    Now, the company is not saying to anybody

8   here, I promise I'm going to sell every share.  It's

9   simply saying, this is what's been authorized; do

10  you agree?

11     A.    In this document, which is a share

12  authorization document, that's what they're saying,

13  yes.

14     Q.    Now, if I take a look on the next page,

15  page 2, Patrick, the company tells us how much time

16  these $270 million worth of shares will be up for

17  sale.  Blow Section 2.2A, please.  Let's put in

18  yellow, please, if we could, "may" on the third line

19  all the way on the right, the last word on line 3,

20  "may," next line "up to," then put in yellow as well

21  the first line in A, "at any time on or before the

22  200th day."  Put that in yellow, please.

23          After Rizvi's 25 million, the company was

24  able to sell the remaining -- let me do the math in

25  my head here -- 270 million minus 25, right, so

                                        Page 201

1    roughly $245 million worth of shares all the way

2    through October, the 200th day following March 28.

3              Do you see that?

4        A.    Yes.

5        Q.    And it might sell some of -- all of that

6    stock, right?  That might happen.  But it might sell

7    less than all of that stock?  That might happen,

8    too, right?

9        A.    That's what it says in this agreement,

10   which is in conflict with the term sheet, yes.

11       Q.    Now, the term sheet, I think we agreed a

12   moment ago, the term sheet also didn't say, we

13   promise it's going to be 250.  It said this is not

14   legally binding; isn't that right, sir?

15       A.    No.  It said financing of 250 million, and

16   then there was an umbrella statement that nothing in

17   the term sheet which investors were supposed to rely

18   on was binding.

19       Q.    It wasn't everything.  There were some

20   binding portions of the term sheet; isn't that

21   right, sir?

22       A.    I'm not sure I understand your question.

23   Which portions?

24       Q.    Go back to the term sheet.  There are some

25   binding portions of it.

1      A.    First paragraph said everything was

2   nonbinding.

3      Q.    No, it didn't.  Let's read it.

4      A.    Okay.

5      Q.    Take us back, if we could -- the term

6   sheet is 26.

7      A.    Confidentiality and exclusivity.  Okay.

8      Q.    On the very first paragraph, you see --

9   blow that out for us, please, Patrick.  Now, it says

10  there, as we saw, the term sheet is not intended to

11  create any binding obligation on the part of any

12  party.

13         Do you see that?

14     A.    Yes.

15     Q.    Then it says, no legal obligation with

16  respect to the matters contemplated hereby until

17  mutually definitive documents relating thereto are

18  executed.

19         Do you see that?

20     A.    Yes.

21     Q.    Those mutually definitive documents that

22  were executed include that stock purchase agreement

23  I showed you; isn't that right?

24     A.    Yes.  Where is the term sheet that was

25  definitive?  Was there a term sheet that was

1   definitive subsequent to this?

2        Q.   It's referencing there the definitive

3   documents.  Those are the other ones in that list of

4   12 things you said you read, the offering documents.

5             Let me show you there's another section

6   here -- I mentioned this document does have some

7   binding provisions.  Go to, Patrick, the page ending

8   in 216.  It is, for your purposes, PDF page 5.  And

9   blow out the last paragraph there, Patrick, on the

10  bottom last paragraph.  Put in yellow for us there

11  is one, two, three, four, and then put in

12  "exclusivity, confidentiality, expenses, governing

13  law," put those in yellow.  And then put in yellow

14  for me "intended to be binding."

15            This term sheet, sir, like, many of the

16  hundreds of Goldman Sachs term sheets, has binding

17  and nonbinding parts.

18            Do you see that?

19        A.   Yes, I see that.

20        Q.   Now let's go back, if we could, please,

21  Patrick, to the stock purchase agreement that we

22  were looking at.  Do you need the exhibit number

23  again, buddy?  That's 38.

24            Now, in the stock purchase agreement, the

25  rights and obligations of the parties with respect

1  to the amount of stock being sold was definitive and
2  was set forth in writing and it was signed, right,
3  sir?
4      A.   Sorry, could you repeat the question.
5      Q.   Sure.  We saw reference a moment ago in
6  the term sheet to documents -- definitive documents
7  will be -- ultimately will be signed.  Remember that
8  in paragraph one?
9      A.   Yes, absolutely.
10      Q.   This stock purchase agreement, that's the
11  definitive binding agreement that was referenced
12  there; isn't that right?
13      A.   It's a definitive binding document.  It's
14  not the only definitive binding document in the
15  transaction.  Is that what you're suggesting?
16      Q.   No, I'm suggesting it's the relevant one.
17  It's the one that says, here's how much money we're
18  going to raise and here are the terms on which we're
19  going to raise it.  Would you agree with that?
20      A.   Yes, that is what it describes in
21  contradiction with the term sheet which indicated
22  otherwise.
23      Q.   Okay.  Now, that definitive document with
24  respect to rights and obligations, this stock
25  purchase agreement, I want to show you one section

1   of it before we break here, because it talks real

2   specific about Rizvi.

3            Patrick, take us to page 2, and I'm going

4   to need some help from you, Patrick, I want to see

5   Section 2.2C, it starts on the bottom of page 2, and

6   it ends on the top of page 3.  Put in yellow for me

7   with respect to this section, Patrick, I would like

8   the word -- third line, the word "right" in line 3,

9   the words "up to" in that same line, and then go

10  down two lines and at the end towards the right

11  there, there's the words "not intend."  Put those in

12  yellow.

13           In the definitive agreement, Mr. Mattson,

14  you were told Rizvi might buy up to 175 million

15  total, right, sir?

16       A.   Yes.

17       Q.   And you were also specifically told in

18  unambiguous language that it might not; isn't that

19  right?

20       A.   Yes, in contradiction to every other oral

21  conversation.

22       Q.   One other thing you were told, sir, about

23  Rizvi -- let me ask you this:  One of the things you

24  were upset about, sir, is you were not told, at

25  least you don't recall it, that your money would be

Page 206

1   put in potentially before Rizvi put in its money.

2   Do you recall saying that?

3        A.   I recall saying that I was surprised my

4   money went in as part of a round that was less than

5   $250 million.  And that my -- surprised my money

6   went in before Rizvi's money went in.  And my

7   expression of surprise was shared by the

8   representatives at J.P. Morgan who heard me

9   communicate that point, yes.

10       Q.   Talking about a phone call?

11       A.   Look, it's really inconvenient, but a lot

12  of phone calls and a lot of information gets

13  communicated on the telephone.  It's very

14  inconvenient because there are legal documents, but

15  phone calls matter.  And, yes, it was on a phone

16  call.

17       Q.   You were told in writing, not on a phone

18  call, but in writing, when your money was going in.

19  Isn't that true, too?

20       A.   I was not told exactly when my money was

21  going in.  I funded, I signed the document on May 27

22  or 28, as you indicated.  I think my money went in

23  sometime in June.  And it was not communicated to me

24  exactly when the money was going in nor -- and this

25  is an important point -- was it communicated that

1    was money was going in in an amount less than 250.

2    I, frankly, would have expected a call to tell me

3    the raise was less than 250.  Never got that call.

4         Q.    You were told -- you were told Rizvi's

5    money didn't have to go in until September.

6              Do you see that right in front of you?

7         A.    Orally, I was told it was.

8         Q.    Not my question.  Do you see in writing

9    what you were told right in front of you --

10        A.    In writing, I was told --

11        Q.    Hold on a second, sir.  Please let me

12   finish my question.

13             You were told in writing, it's right in

14   front of you right now, Rizvi's money may not go in

15   until September or at all; isn't that true?

16        A.    In writing, I was told that Rizvi's money

17   may not go in at the same time as mine.  But I was

18   not told that orally; I was told opposite.

19        Q.    I'm not asking now about phone calls.  I'm

20   asking about what you were told in writing.

21        A.    I'm answering completely.  I'm going to

22   answer it completely.  I'm not going to cut the

23   answer off.

24        Q.    I'm not cutting the answer off.  My

25   question is about what you were told in writing.

1   And in writing, what you were told was Rizvi's money

2   may not go in at all, right?

3          A.   In writing, it says here that it may not

4   go in at all.

5          Q.   Okay.  And were you also told Rizvi, if it

6   was going to invest -- we saw it before -- it's

7   either going to happen in April, May or by

8   September, right, sir?

9          A.   Yes.

10         Q.   But you were told in writing as well your

11  money was going to go in shortly after May 30.

12  Weren't you told that in writing?

13         A.   Not sure what -- A, I don't recall that.

14  B, I don't know what the word "shortly" means.

15         Q.   Let me show it to you.  Let's go to the

16  offering memo, please, Patrick.  Take us to page 12,

17  please.  Blow out the title.  We're in a section

18  called Summary of Principal Terms.

19              Mr. Mattson, you read the principal terms

20  of the deal before you agreed to invest in it,

21  right?

22         A.   Yes.

23         Q.   Patrick, take us to page 19 in this

24  section and blow out -- there's a section called

25  Investment Period.  Give us the first four lines of

```
 1    that.  Put in yellow for me line 2 from the word
 2    "invest" to the word "commitments."  Line 3 from the
 3    word "in" through the number "6."
 4              You see here, sir, you were told in
 5    writing it's anticipated that the partnership will
 6    draw down and invest the aggregate capital
 7    commitments to the partnership in Series 6 of
 8    Jawbone shortly following the initial closing of the
 9    partnership.
10              Do you see that?
11        A.   Yes.
12        Q.   Give me on page 21 where we're told when
13    that initial closing is going to happen.
14              You were told, sir, in writing the money
15    would be funded into Series 6 shortly after May 30,
16    and that's exactly what happened; isn't that right?
17        A.   Yes, and my understanding is that the
18    money was being gathered to be available for the
19    closing, and when all the money was gathered,
20    including Rizvi's money, it would all close
21    together.
22              I don't find that statement in conflict
23    with the belief that all the money was going to be
24    funded together once all the money was collected.
25              What I thought was happening was my money
```

```
                                        Page 210
 1    was being collected, it was going to sit in an
 2    account and wait for the closing, and when all the
 3    other money, importantly the Rizvi money, was
 4    collected, it would all be funded at a single close.
 5    That was my understanding and impression.
 6         Q.   Patrick, give us Exhibit 131, please.  I
 7    think we can make this one our last exhibit for this
 8    period here.
 9              Exhibit 131, sir, is an email chain
10    between yourself and Ms. Abouzied.  You received a
11    capital call notice in June, sir.
12              And, Patrick, would you blow out for us on
13    page 1 that bottom email there just so we can see
14    it, and then take us to -- if we could, Patrick, put
15    that down.  Take us to page 1.  On the top,
16    Mr. Mattson forwarded -- it's the middle email.  I
17    believe he forwards this capital call email to
18    Jasmine.  Middle email.  It's right here.  Can you
19    put in yellow for me, if you could, the word
20    "margin," just the word "margin" in yellow.
21              Now, sir, you -- in June, you funded your
22    capital call.  Do you recall that?
23         A.   Yes.
24         Q.   And you did that not with money you had,
25    you borrowed money to buy your interest in Jawbone,
```

Page 211

1   right?

2        A.    Yes.

3        Q.    And then you see on the bottom there you

4   joke with Jasmine about the Rangers.

5              Do you see that?

6        A.    Yes.

7        Q.    But you do not ask in this email and you

8   didn't ask that day, by the way, did Rizvi fund.

9   That didn't happen?

10       A.    I had no reason to ask that.  I had been

11  told it was going to be 175 of $250 million

12  investment, so I assumed whenever they were calling

13  the capital in funding, it was based on 250 and 175

14  because that's what I've been told.

15       Q.    When you read the documents, sir, you

16  didn't pick up the phone and go, guys, these

17  documents, they are just different from the phone

18  calls, explain the difference to me.  Did that ever

19  happen?

20       A.    The document indicating that Rizvi has two

21  to six months to invest from March 28 is not

22  inconsistent with the idea that they would have

23  closed and funded with Rizvi's money in June.  It

24  was never suggested to me Rizvi wasn't funding.  It

25  was never suggested to me the deal was going to be

Page 212

```
 1    than 250.  It was never suggested to me there were
 2    going to be multiple closings in our discussions.
 3    So I assumed my money was going in, Rizvi's money
 4    was going in, all the other investors' money was
 5    going in, the deal was closing with 250 and 175 from
 6    Rizvi.
 7              I had no reason to ask because it was
 8    entirely consistent with everything I had understood
 9    was taking place.
10              CHAIRPERSON NORTH:  Off the record.  Come
11         back in about ten minutes.  3:40.
12       (Recess was held from 3:31 p.m. until 3:43 p.m.)
13              CHAIRPERSON NORTH:  Let's go ahead and go
14         back on the record.
15      BY MR. NAGY:
16         Q.   Mr. Mattson, right before our break, you
17    said it was never suggested to me there were going
18    to be multiple closings in our discussions.  Do you
19    recall saying that, sir?
20         A.   Yes.  I was under the clear belief that
21    the closing I was going to be part of was going to
22    be $250 million and it was going to include
23    $175 million from Rizvi.
24         Q.   Can we go back to Exhibit 38, please.
25    Patrick, go to page 2 and blow out for me Section 2,
```

Page 229

1      Q.    Did you ever --

2      A.    -- on it.

3      Q.    Did you ever pick up the phone and call

4    Rizvi at any point in time in 2014?

5      A.    I was never offered the opportunity to

6    speak to Rizvi and I never spoke to Rizvi.  All of

7    my diligence was being done through and under the

8    parameters established by J.P. Morgan, and one of

9    those parameters was not an offer to call Rizvi.

10     Q.    Now, are you familiar with an entity

11   called GS Direct?

12     A.    Goldman Sachs Direct?

13     Q.    Yes.

14     A.    I'm familiar with it, yes.

15     Q.    Does it do good due diligence before it

16   makes investments?

17     A.    I'm not familiar enough with GS Direct to

18   know what their due diligence practices are, and I'm

19   not sure how relevant they are to this case.

20     Q.    Isn't it a fact, sir, that your own former

21   partners became major investors in Jawbone in 2013?

22     A.    I don't know.

23     Q.    Can we put up Exhibit 37.  Go to page 4

24   and blow out the paragraph about GS Direct, please.

25           According to this, sir, one of the deal

Page 275

1    BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY
                    DISPUTE RESOLUTION

2

                    FINRA NO.:  17-01969

3

     IN THE MATTER OF THE ARBITRATION
4    BETWEEN

5    GEORGE MATTSON AND GNM ICBC, LLC,

6

                    Claimants,

7    vs.

8    J.P. MORGAN SECURITIES, LLC,

9                    Respondent.
     _____/

10

11

12           TRANSCRIPT OF ARBITRATION PROCEEDINGS

13

14               VOLUME 2 (Pages 275 - 521)

15

16     DATE TAKEN:  September 18, 2018
       TIME:          9:30 a.m. - 4:45 p.m.
17     PLACE:         FINRA
                      5200 Town Center Circle
18                    Boca Raton, FL

19

20       This cause came on to be heard at the time and
     place aforesaid, when and where the following
21   proceedings were stenographically reported by:

22               Kimberly Fontalvo, RPR, CLR
               Realtime Systems Administrator

23

24

25

Page 278

1           CHAIRPERSON NORTH:  All right.  We're
2       ready to go ahead and commence day two.  I
3       believe, Mr. Nagy, you were still
4       cross-examining Mr. Mattson.
5           MR. NAGY:  Yes, thank you.
6               CONTINUED CROSS EXAMINATION
7    BY MR. NAGY:
8       Q.   You testified yesterday extensively that
9    you were on a phone call involving both Larry Unrein
10   and Jasmine Abouzied where you were told about a
11   commitment of 175 million for Rizvi and also a
12   commitment of 250 total for the financing.  Do you
13   recall that, sir?
14      A.   Yes.  Just to clarify it was multiple
15   phone calls in which those same two points were made
16   repeatedly, yes.
17      Q.   And Jasmine and Larry, those two people
18   were on those calls?
19      A.   That's correct.
20      Q.   Okay.  Great.  Now, you, sir, since your
21   retirement, you've still been fairly busy?
22      A.   Yes.  I try to stay busy.
23      Q.   And Larry Unrein is the head of the
24   private equity, one of -- a very successful private
25   equity group; would you agree with that?

```
                                              Page 350
 1        little bit?
 2               THE WITNESS:  Yes.
 3               CHAIRPERSON NORTH:  Thank you.
 4      BY MR. KUGLAR:
 5        Q.   In your dealings over those 14 or so
 6    years, you found Mr. Mattson to be an honest person?
 7        A.   Yes.
 8        Q.   And you would agree that from 2004
 9    through -- let's go to the Jawbone deal -- 2004 up
10    through 2014, some of the investments in his
11    J.P. Morgan accounts lost money, right?
12        A.   Can you define specifically what you're
13    referring to?
14        Q.   Did any of the investments that were in
15    his J.P. Morgan Securities accounts from 2004 to
16    2014 suffer losses?
17        A.   There were -- yes, there were some
18    investments that suffered losses.  I don't remember
19    the magnitude, but, yes, there were.
20        Q.   Prior to 2014, had he ever suggested that
21    J.P. Morgan should be responsible for those losses?
22        A.   No.  But I also was referring to
23    investments I did with George that suffered losses
24    at Goldman Sachs, to be clear.  Because I worked
25    with him both there and at J.P. Morgan.
```

Page 368

1    program didn't exist in 2012.

2              In 2014, the program existed, and there

3    was a level of due diligence that our private equity

4    team did.  That wasn't my job to do.  That's their

5    job to do.  You can ask Josh Helfat later this week

6    what the level was of due diligence that they did on

7    this program.

8         Q.   And as you sit here today, you believe

9    that you, as an associated person of a

10   broker-dealer, do not have a duty of due diligence

11   to investigate a security before you go out and

12   speak with your customers?

13        A.   This specific program, we were serving as

14   placement agent.  In this regard, I relied on my

15   partners.  We have two diligence teams in the J.P.

16   Morgan private bank.  Larry has his own diligence

17   team.  I was told the diligence was done.  I knew

18   that we qualified George and he was approved for.

19   There's a Morgan Private Ventures screening

20   committee I was very familiar with.  They evaluated

21   50 investments and only picked 8 out of that 50,

22   being Jawbone being one, so I was familiar with the

23   parameters of the work being done regarding

24   suitability, regarding the private ventures

25   committee that evaluated investments.  But I'm not

Page 374

1    some documents pertaining to the suitability

2    requirements for this deal?

3         A.   Correct.  Jawbone had an NDA that was

4    between the client and them.  And the information

5    was confidential.  You can speak to due diligence

6    later this week about what access J.P. Morgan

7    broadly had.  But me, myself, in my seat was given

8    limited access as a placement agent.

9         Q.   Other than the suitability-type

10   requirements for this, what specific documents about

11   this deal or Jawbone or the Jawbone deal did you

12   review before bringing it to Mr. Mattson's

13   attention?

14        A.   I personally did not review anything.

15   That was not my job.  That was not my job.

16        Q.   It's not your job to review anything?

17        A.   It's not my job to review deals through

18   MPV, where the -- where we are serving as placement

19   agent.  This is Jasmine, not necessarily other parts

20   of the firm.

21        Q.   And you don't believe that you had access

22   to the term sheet, for instance?

23        A.   The only time I got my hand on a document

24   was when I was helping George with printing issues,

25   which has been, I know, a big conversation we've

Page 392

1        Q.    -- original email, correct?

2        A.    -- which is odd.  But I see that title on

3    the middle email, yes.

4        Q.    Okay.  And you don't have any reason to

5    believe that you didn't write the words "Investment

6    Opportunity" on the email?

7        A.    No, I don't.

8        Q.    In fact, that's what you were talking to

9    him about, correct?

10       A.    Yes.

11       Q.    And Mr. Mattson gets back and says,

12   "5:00 p.m.," and you say, "5:00 p.m. is good.  We'll

13   call you then," correct?

14       A.    Uh-huh.  Correct.

15       Q.    Do you recall -- prior to this email, had

16   you spoken with Mr. Unrein about Jawbone?

17       A.    Prior to this email, no.

18       Q.    And tell the panel everything you can

19   remember about what was said on this phone call.

20       A.    On this phone call at 5:00 p.m. on May 14,

21   I can't exactly remember what was said, but I would

22   imagine what was said was, "We're in the market with

23   an investment opportunity as part of the MPV

24   program.  It's a technology company."

25             We had some parameters around what we were

1   he was standing in his backyard down here in

2   Florida.

3        A.   Yeah, I don't recall if this was the one

4   where he was in the backyard, but he has a beautiful

5   backyard, so I can imagine he's been in the backyard

6   many times on a call.  So yes.

7        Q.   And so your testimony is that on that

8   first call, May 14, 2014, you did not tell him

9   anything other than perhaps the name of the company

10  or that it was a tech company.  So you -- let me

11  just go through some phrases.

12            You did not tell him that it was, for

13  instance, an exciting opportunity?

14       A.   I don't recall the details of the call.  I

15  would have stayed -- I would have been very -- I am

16  very -- I follow the rules.  I'm a rule follower,

17  and whatever I was allowed to share, I would have

18  stayed tight to that.  I don't recall the details of

19  the call.  This was four years ago.

20       Q.   Mr. Mattson testified that he does recall

21  the call clearly, didn't he?

22       A.   I think so.  I don't remember.  We've

23  talked a lot over the last two days or

24  day-and-a-half.

25       Q.   Your testimony here today is that on that

Page 397

1   call, you never said anything along the lines of it

2   being a hot company that was going public soon?

3        A.   I absolutely did not say that.

4        Q.   Or that this was expected to be the last

5   round of financing before the IPO?

6        A.   I would never say such a thing.

7        Q.   Or that J.P. Morgan, as an entity, had a

8   long relationship with Jawbone?

9        A.   I was familiar with J.P. Morgan in

10  previous rounds, which was disclosed in the Offering

11  Memorandum, that they had made previous investments

12  in Jawbone.  That was information known to me.

13       Q.   Did you ever, in any call, tell

14  Mr. Mattson that someone from J.P. Morgan was on the

15  board of Jawbone?

16       A.   No.  I actually remember the details

17  around the board conversation.  Larry had hoped he

18  could join the board -- and I don't recall dates

19  around -- I don't know which call.  This was

20  probably the May call in '15, but I don't know.

21            Larry had hoped he would be able to join

22  the board, but there were -- and he was very vocal

23  about this on investor calls.  Again, I don't

24  remember which calls, but he wanted to go on the

25  board because he knew that would be a good thing.

Page 412

1          And I think -- you know, there were often

2     slides that Code Advisors would put into the data

3     room so that people could follow through on these

4     calls, but the slides would disappear because of the

5     confidentiality.

6          So if you weren't in it live -- so I went

7     through an inordinate amount of work, which George

8     painfully had to wait for me to get done because it

9     wasn't easy, to get him all the slides that he

10    needed for that call.  But that wasn't set up by me;

11    that was a system call.

12        Q.   Okay.  And I'm not sure you understood my

13    question.  I asked between that first call and when

14    he signed the Subscription Documents, May 27, 2014,

15    what was the next communication you had with him

16    about the investment?

17        A.   It was that call.  I answered the

18    question.

19        Q.   Between when you first had that call and

20    said, "I've got this company.  You might be

21    interested," and he signed an NDA and sent it.

22        A.   Yeah.  There was an administrative back

23    and forth, because in June he got a capital call

24    notice for the first capital call, which all of you

25    saw in the statements yesterday when you reviewed

Page 413

1    the June 2014 statements showing the money being

2    invested both on behalf of George personally, as

3    well as on behalf of GNM ICBC, LLC, for $500,000

4    each.

5              He would have gotten a capital call notice

6    saying, "It's now time to fund," and that's when he

7    sent me an email communication saying that he wanted

8    to do it on margin, which was an email we looked at

9    yesterday.

10             So if -- the capital call was funded at

11   the end of June, and then Larry did his first formal

12   conference call for the entire system in September

13   of 2014, short few months later.

14        Q.   So your testimony is that in that time

15   period between the first email and when he signed

16   his Subscription Documents, you had no

17   communications with him other than purely

18   administrative?

19        A.   Correct.

20        Q.   You don't recall the email where he was

21   asking you specifically about what other banks were

22   going to be involved in the --

23        A.   No, we talked about that an hour ago.  I

24   mean, that -- I thought you were referring to

25   conversations with Larry and so -- no.  I got him

Page 416

1      BY MR. KUGLAR:

2          Q.    And in your calls you had with your other

3      customers, did you provide information to them such

4      as that Jawbone was a hot company that was looking

5      to go public soon?

6          A.    But I did not provide that, ever.  I never

7      said that.

8          Q.    And your testimony is that you didn't say

9      anything of substance whatsoever to any of those

10     potential customers other than the parameters you

11     had talked about?

12         A.    I did not, with a hundred percent

13     certainty.

14         Q.    Do you agree that it is wrong to make a

15     misrepresentation to a client?

16         A.    A hundred percent.

17         Q.    And you understand it's prohibited by

18     FINRA rules and your J.P. Morgan compliance manual?

19         A.    Yes.

20         Q.    And you would agree that a

21     misrepresentation includes ambiguous statements?

22             MR. NAGY:  Object to the form.

23         A.    I don't know how to answer that question.

24     BY MR. KUGLAR:

25         Q.    Do you understand that misrepresentation

Page 479

1          whole truth, and nothing but the truth?

2                    THE WITNESS:  I do.

3                         DIRECT EXAMINATION

4        BY MR. KUGLAR:

5          Q.    Good afternoon, Mr. Flynn.

6          A.    Good afternoon.

7          Q.    I have called everyone's attention to

8        Exhibit CX30, which is your CV, correct?

9          A.    Correct.

10         Q.    If you would -- I've provided this to you

11       to help expedite this, but if you would, just

12       introduce yourself to the panel, and then I guess

13       working backwards on your CV, walk the panel through

14       your background and experience in the securities

15       industry.

16         A.    I'm currently in private practice in

17       Boston, Massachusetts, and my clients generally are

18       investment advisors and broker-dealers.

19                    I also serve as the chief compliance

20       officer, financial and operational principal, for

21       five M&A broker-dealers.  I provide expert testimony

22       in securities litigation and I do some

23       representation of clients, both claimants and

24       respondents, in securities arbitrations.

25                    I've been in private practice since 2006.

1    Prior to going into private practice, I was -- held

2    a variety of positions as a regional broker-dealer

3    in Boston named Leerink Swann & Company.  I was the

4    chief compliance officer.  I was the financial

5    operational principal, I was the chief operating

6    officer, and I was general counsel.  And I was there

7    from 1995 until 2006.

8            When I left the firm in 2006, it had about

9    120 employees, with offices in Boston, New York, and

10   San Francisco, and it was engaged in the

11   institutional sales, research, and investment

12   banking areas of the securities industry.

13           Prior to that, I had spent 22 years at the

14   Securities and Exchange Commission.  I held a

15   variety of positions there.  I had started my career

16   as an examiner, which involved doing examinations of

17   broker-dealers and investment advisors to ensure

18   compliance with federal securities laws.  I was a

19   supervisor, an assistant regional administrator, and

20   special counsel in enforcement.

21           And I spent four years in the United

22   States Air Force during the Vietnam War.

23      Q.   Do you hold any securities licenses?

24      A.   I have a Series 7, Series 24, Series 27,

25   Series 79, Series 99.

1      Q.    And will you walk through what each one of

2   those licenses mean.

3      A.    The Series 7 is a general securities

4   license for -- basically, applies to most people in

5   the securities industry.

6            Series 24 is a principal's license, which

7   is required for people who are supervisory capacity.

8            Series 27 is a financial and operational

9   license.  It's for people who handle filings --

10   financial filings with either the SEC or FINRA.

11            The Series 79 is an investment banking

12   license and Series 99 is an operational license.

13      Q.    And explain what you did with respect to

14   examinations of broker-dealers during your tenure at

15   the SEC.

16      A.    So we would go on site and examine firms

17   by looking at their financial records to ensure that

18   they're in compliance with net capital rules,

19   liquidity rules, reserve requirements.

20            We would look at customer accounts,

21   looking for things like churning, suitability, those

22   kinds of issues.

23            We would look at registrations to make

24   sure that the employees were appropriately

25   registered, both with FINRA, which at that time was

Page 482

1   NASD, as well as state regulators.

2           Q.   Tell the panel about instances in which

3   you've been accepted as an expert witness.

4           A.   Yeah, I've testified in federal court,

5   state court on matters involving transfer agents and

6   investment advisors.

7                I've testified at FINRA arbitrations

8   involving customer disputes similar to this.  I've

9   been qualified in FINRA arbitrations involving

10  employee/employer disputes.  I've testified in JAMS

11  arbitrations, and probably something like 15

12  different times, and have always been qualified.

13               MR. KUGLAR:  At this time, I would tender

14          Mr. Flynn as an expert witness on rules and

15          regulations applicable to FINRA broker-dealers

16          and their associated persons.

17               CHAIRPERSON NORTH:  Any objection?

18               MR. NAGY:  I do object.  I believe this is

19          simply testimony about what the rules are.

20          You, ma'am, know what the rules are.  You can

21          discern what the rules are.  We don't need

22          someone to come tell us what the rules are.

23               For that purpose, if it's not about

24          something other than the rules, I think it's

25          improper.

```
 1              CHAIRPERSON NORTH:  Well, I'm going to
 2         allow him to testify.  He's qualified as an
 3         expert.  We'll decide how relevant, I guess, it
 4         is to the issues here.
 5      BY MR. KUGLAR:
 6         Q.   Now, Mr. Flynn, what have you done in this
 7      case in terms of reviewing -- what work have you
 8      done in this case prior to being here today?
 9         A.   So I've reviewed the Statement of Claim
10      and the Respondents' answer.  I reviewed the
11      Offering Documents, Subscription Document.  I've
12      reviewed a number of emails --
13              CHAIRPERSON NORTH:  Sorry.  He's asking if
14         you could speak up a little bit.
15              MR. KUGLAR:  Yeah.
16         A.   I've reviewed a number of emails that have
17      been discussed in this arbitration in the past two
18      days.
19              I've looked at Rule 2111.  I've looked at
20      a Notice to Member 1002, as well as a variety of
21      other pieces involving court cases involving
22      suitability and the like.
23      BY MR. KUGLAR:
24         Q.   And you've been here for the testimony of
25      Mr. Mattson and Ms. Abouzied, correct?
```

Page 484

1          A.    I have.

2          Q.    As a result of that work, have you reached

3    any opinions as to whether J.P. Morgan Securities

4    was acting as a broker in connection with

5    Mr. Mattson's purchase in interest in Digital Growth

6    Co-Investment 2, L.P.?

7          A.    I did.

8          Q.    What is that opinion?

9          A.    That J.P. Morgan acted as a broker in the

10   transaction, because it came between a buyer and a

11   seller of securities, Mr. Mattson, being the buyer

12   and Digital Growth, being the seller; and that if

13   one looked at the definition of a broker as provided

14   in the securities laws, it includes someone who

15   effects -- is in the business of effecting

16   transactions for the account involving securities.

17         Q.    What impact is -- is there any impact on

18   your opinion from the fact that they were calling

19   themselves a placement agent in connection with this

20   deal?

21         A.    Yeah, that would make no difference

22   whatsoever.  They were acting in the capacity of a

23   broker in what is a typical kind of transaction in

24   this business, the private placement.

25         Q.    What experience do you have as a result of

Page 485

1    your background in broker-dealers acting as

2    placement agents in a private offering?

3         A.   When I was at Leerink Swann, we

4    participated in a number of private placements with

5    Reg D offerings.  I advise clients on Reg D

6    offerings currently.

7              I've had experience when I was at the SEC

8    in dealing with private placements of securities.

9    So I've done this over a period of something like 40

10   years.

11        Q.   Mr. Flynn, you understand there's a

12   dispute as to whether J.P. Morgan Securities

13   recommended the investment to Mr. Mattson, right?

14        A.   I am aware of that.

15        Q.   Do you have any opinions on that question?

16        A.   I do.

17        Q.   What are they?

18        A.   That J.P. Morgan and its representative

19   recommended Digital Growth to Mr. Mattson.

20        Q.   Why is that?

21        A.   If you look at what a recommendation is,

22   you look at the -- all of the facts surrounding the

23   circumstances under which the transaction occurred.

24              Here, you had an entity that was an

25   affiliate of the broker-dealer which formed the

Page 486

1    investment vehicle, and then there was some internal

2    discussion at J.P. Morgan about going out and

3    identifying potential investors who would be offered

4    the security.

5            It was clear that they had a product in

6    mind and they were looking for a particular kind of

7    investor among their clients to offer the securities

8    to, and that's a securities recommendation.

9        Q.   What obligations go along with that

10   recommendation, assuming it was a recommendation?

11       A.   Rule 2111 requires that the firm have a

12   reasonable basis for making a recommendation to its

13   client.  And it's really a two-step process.

14           The first is looking at the offering to

15   determine whether it would be suitable for any

16   investor, and then the second step is, in

17   recommending it to a particular investor like

18   Mr. Mattson, whether it would have been suitable for

19   him.

20       Q.   Do you have any opinions as to whether a

21   broker-dealer can insist on its customer undertaking

22   due diligence in a transaction?

23       A.   I do.

24       Q.   What is that?

25       A.   It can't obviate its obligation to do due

Page 487

1   diligence by attempting to place that burden on its

2   client.  The firm's obligation is to conduct

3   reasonable inquiry about the security that they're

4   going to recommend to a client prior to making any

5   recommendations to the client.

6           And I think in the testimony that's been

7   provided and from the documents I have seen to date,

8   it seems to have been suggested that somehow they

9   could pass step one, identify Mr. Mattson, simply

10  because he was an accredited investor, and place the

11  burden on him to conduct due diligence.

12      Q.   Can they -- is it permissible for a

13  broker-dealer to disclaim its duty of due diligence?

14      A.   It is not permitted for a broker-dealer to

15  attempt to obviate its obligation to conduct due

16  diligence.

17      Q.   What, if any -- in what way does it change

18  the dynamic if the potential investor is

19  sophisticated?

20      A.   It doesn't change the obligation

21  whatsoever.  And I think the rule is fairly clear

22  that FINRA's position is that because somebody is an

23  accredited investor doesn't mean that they're not

24  entitled to the same kind of protection, which is

25  that the firm would do due diligence prior to making

Page 488

1    a recommendation.

2         Q.   And you understand that the specific

3    security purchase by Mr. Mattson and ICBC was a

4    limited partnership interest in Digital Growth

5    Co-Investment 2, L.P.?

6         A.   I do.

7         Q.   Do you have an opinion as to whether J.P.

8    Morgan Securities had an obligation to look not only

9    at Digital Growth Co-Investment 2, but also Jawbone?

10        A.   In conducting a reasonable due diligence,

11   you would have to look at the one asset that the

12   partnership owned, which was its interest in

13   Jawbone.  So any kind of reasonable basis due

14   diligence would require looking at the entity

15   Jawbone.  You would have to look through the limited

16   partnership and look to the firm itself, to Jawbone.

17        Q.   Mr. Flynn, what obligation, if any, did

18   Ms. Abouzied have to do due diligence on this

19   investment?

20        A.   So she had the same kind of obligation.

21   The obligation to do due diligence applies both to

22   the firm and to the associated person.

23             So the first thing she would have had to

24   do is familiarize herself with the nature of the

25   offering, and she would have had to look at the

Page 489

1    Offering Document.  She was required to understand

2    all of the terms and conditions, what the offering

3    involved, before she could reach out to any

4    investor, including Mr. Mattson.

5              Even if he were an accredited investor and

6    smart and sophisticated, as he was, she had to

7    undertake her own review.  She had to be comfortable

8    that the security being offered was appropriate for

9    him.

10        Q.   Do you have any opinions as to whether the

11   work that she testified to met that standard?

12        A.   I do.

13        Q.   What is that?

14        A.   I think her testimony is pretty clear,

15   which was that when she approached Mr. Mattson in

16   May of 2014, she didn't know anything about the

17   company.  She had not undertaken any review

18   whatsoever, despite the fact that the marketing

19   guidelines pointed out that the offering brochure

20   was available to her.

21             MR. KUGLAR:  Thank you, Mr. Flynn.

22                  CROSS EXAMINATION

23     BY MR. NAGY:

24        Q.   Afternoon, Mr. Flynn.

25        A.   Good afternoon.

Page 505

1    member or associated person," and then put in yellow

2    "to ascertain the customer's investment profile."

3           And it goes on, "A customer's investment

4    profile includes, but is not limited to, the

5    customer's age."

6           Is there anything about Mr. Mattson's age

7    that would indicate he's not suitable for this

8    Jawbone investment, sir?

9       A.   I mean, if you're asking me would he fit

10   the definition of an accredited investor, he would

11   meet that definition.

12          Whether he was -- whether you could get to

13   the point of making the determination that the

14   investment was suitable for him, you would have to

15   have undertaken the first aspect of it, which is you

16   would have to make a determination that the

17   investment is suitable for anybody.  And her

18   testimony was that she didn't look at anything.

19      Q.   Okay.  What specifically did Ms. Abouzied

20   not do that she should have done?

21      A.   She was required to undertake

22   reasonable -- she needed to have reasonable

23   diligence about the offering, which would be what

24   its terms were, what was contained in the Offering

25   Document.  She would have had to had some knowledge

Page 506

1   about the proposed investment before she ever

2   thought of looking to see if it was appropriate for

3   Mr. Mattson to make an investment.

4       Q.   You mentioned just now looking at the

5   Offering Documents, knowledge of the proposed

6   investment.  I want to know concrete things.

7            If she read all those Offering Documents,

8   would that have been enough, in your opinion?

9       A.   I think it could be if she read through

10  all of the documents that were listed on the

11  marketing guideline.  But her testimony was that she

12  did not look at those things.

13      Q.   Was there anything in the marketing

14  guideline itself that provided information about the

15  offering?

16      A.   It made reference to the offering

17  materials that were available.

18      Q.   Yes.  And what about substantively?  You

19  know, she -- those offering materials, they contain,

20  among other things, a page, a list -- I shouldn't

21  say page -- many pages of a list of patents, U.S.

22  patents, Chinese patents, Australian patents.

23           Did she need to read that list of patents?

24      A.   She needed to read the Offering Document.

25  She needed to understand the Offering Document.  She

1    had to have some basis for coming to the reasonable

2    conclusion that this investment was suitable for

3    that investor.

4            And her testimony was she looked at

5    nothing, so what she did is she skipped step one and

6    got to step two.

7        Q.    Uh-huh.  Now, when --

8        A.    She qualified him for an investment that

9    she knew nothing about.

10       Q.    Now, she testified she did know it was a

11   risky investment in a single company in the

12   technology sector.

13           Do you recall that?

14       A.    I do.

15       Q.    She also testified that she knew the terms

16   included big boy provisions.

17           Do you recall that?

18       A.    I do.

19       Q.    Both of those facts go to directly whether

20   or not a reasonable investigation was done; do you

21   agree, sir?

22       A.    They would be part of it.

23       Q.    And, in fact, it is a facts and

24   circumstances standard, is it not?

25       A.    The reasonable diligence, no.

Page 508

1      Q.   It's not a facts and circumstances

2   standard?

3      A.   She would have had to have looked at the

4   documents.  I mean, you can't --

5      Q.   Whether or not reasonable diligence was

6   done, there's not some checklist of things that need

7   to be done; it is a facts and circumstances

8   standard, according to FINRA guidelines, isn't it?

9      A.   Correct.

10     Q.   Okay.  Now, I'm looking at 2111(a) and I

11  see reference to various things relating to the

12  customer's investment profile:  "Age, other

13  investments, financial situation and needs, tax

14  status, investment objectives, investment

15  experience, investment time horizon, liquidity

16  needs, risk tolerance," and it goes on and on.

17          Ms. Abouzied testified she looked at all

18  of those things, including the specific suitability

19  guidelines established by JPMS for this investment.

20          Do you recall that testimony?

21     A.   I do.

22     Q.   Is there anything you are aware of with

23  respect to any of those factors listed here that

24  suggests Mr. Mattson was not suitable for an

25  investment in a private company like Jawbone, any

Page 509

1    one of those factors?

2          A.    For a company -- a private investment in a

3    company like Jawbone, no.  He would meet the

4    definition.

5          Q.    Now, if I, sir -- if I wanted to hire

6    somebody -- I'm a broker-dealer.  I wanted to hire

7    somebody who was capable of doing due diligence on

8    Jawbone.

9                Do you think someone who is a former

10   partner at Goldman Sachs for ten years, held a high

11   position there, then became an advisor to one

12   private equity firm, an executive partner in

13   another, and who generally has Mr. Mattson's

14   experience, would that person be someone I could

15   reasonably hire?  Are they qualified to do due

16   diligence, in your opinion, on a company like

17   Jawbone?

18         A.    Yeah, if he were hired to do that, yes.

19         Q.    Were you asked, sir, to identify, as part

20   of your expert opinion in this case, any specific

21   fact that was missed by JPMS about Jawbone?

22         A.    No.

23         Q.    So you don't have an opinion on any

24   particular fact that JPMS missed; is that right?

25         A.    I do not.

```
                                              Page 510

 1        Q.   Were you hired to do any research, any

 2   analysis, come to any opinions, on why Jawbone

 3   actually failed?

 4        A.   No.

 5             MR. NAGY:  I would like a short break.  I

 6        think I'm nearly done here.

 7             CHAIRPERSON NORTH:  Okay.  Take -- yeah,

 8        we'll come back in hopefully less than ten

 9        minutes.  No longer than ten.

10             MR. NAGY:  Ten?  Okay.  Thank you.

11      (Recess was held from 4:27 p.m. until 4:36 p.m.)

12             CHAIRPERSON NORTH:  We can go back on the

13        record.

14      BY MR. NAGY:

15        Q.   Mr. Flynn, just a few more questions.

16             I asked you a few questions about ICBC.  I

17   want to ask you now about Mr. Mattson's personal

18   account.

19             Can we bring up Exhibit 21.  That's

20   Mr. Mattson's account suitability form for his

21   personal account.  And can we blow out, please, the

22   top portion.  From the top, give me all of

23   Section A, please, and put in yellow "liquid net

24   worth, $50 million."  Put in yellow "total net worth

25   excluding primary residence, $60 million."
```

Page 522

1    BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY
                    DISPUTE RESOLUTION

2
                    FINRA NO.:  17-01969

3

     IN THE MATTER OF THE ARBITRATION
4    BETWEEN
5    GEORGE MATTSON AND GNM ICBC, LLC,
6
                    Claimants,
7    vs.
8    J.P. MORGAN SECURITIES, LLC,
9                    Respondent.
     _____/

10
11
12          TRANSCRIPT OF ARBITRATION PROCEEDINGS
13
14              VOLUME 3 (Pages 522 - 681)
15
16    DATE TAKEN:  September 19, 2018
      TIME:        9:30 a.m. - 1:46 p.m.
17    PLACE:       FINRA
                   5200 Town Center Circle
18                 Boca Raton, FL
19
20       This cause came on to be heard at the time and
     place aforesaid, when and where the following
21   proceedings were stenographically reported by:
22               Kimberly Fontalvo, RPR, CLR
               Realtime Systems Administrator
23
24
25

Page 530

1   reporting model to where I would essentially assess

2   claimants' cases and do the requisite accounting to

3   determine whether or not there were losses, whether

4   or not they were churning figures that would give

5   rise to a claim, making comparisons, statutory

6   interest comparisons, and I just built it up since

7   1999 through today.

8       Q.    And you're not a CPA?

9       A.    I am not.

10      Q.    Why do you, nevertheless, feel that you're

11   qualified to speak to accounting?

12      A.    As I mentioned, I've been in this business

13   since 1999.  I've been retained more than 400 times.

14   I've testified more than 30 times.  I've not been

15   challenged.  And this is what I've spent the last 20

16   years doing.

17      Q.    What specifically were you asked to do in

18   this case?

19      A.    In this case, I was asked to take a

20   baseline figure and apply various statutory interest

21   and rate of return calculations to that baseline

22   figure.

23          MR. KUGLAR:  At this time, Claimants would

24      tender Ms. Levasseur as an expert witness in

25      methodology of accounting.

1            MS. THATTE:  We just object on two

2       grounds.  To the extent that what Ms. Levasseur

3       would like to do is proffer mathematical

4       calculations, we take the position that that's

5       just arithmetic for which expert testimony is

6       not appropriate or necessary in this case.

7            And then secondly, to the extent that

8       Ms. Levasseur wants to testify about the

9       expected value period of damages, which we

10      heard from Mr. Mattson at length yesterday, we

11      also take the position that Mr. Kuglar has not

12      qualified her to testify about expected value

13      when it comes to private equity in a

14      single-company investment.  And those are our

15      two objections.

16           CHAIRPERSON NORTH:  Well, if you want to

17      voir dire her on that area, you can, but I will

18      allow her to testify at this point.

19           MS. THATTE:  Noted.

20           CHAIRPERSON NORTH:  Unless you want to

21      cross-examine her.

22           MS. THATTE:  We'll just do it on

23      cross-examination.  Thank you.

24   BY MR. KUGLAR:

25      Q.   Thank you, Ms. Levasseur.  You briefly

1  that in order to make him whole, there are

2  attorneys' fees -- okay, I understand what you're

3  saying.

4           The total damages in this first one is

5  1,390,000, roughly.  Attorneys' fees, I believe, are

6  a separate request.  So if you were to give the

7  total damages plus attorneys' fees, per the request,

8  that would be a total of 1.852.

9           MS. THATTE:  Thank you.  At this time, we

10      move to renew our objection with regard to

11      Ms. Levasseur's testimony.  She's testified

12      here that what she's done is inputted numbers

13      provided to her by counsel and put them into

14      this table to get to her end result.  And so

15      for that reason, we renew our objections.

16           CHAIRPERSON NORTH:  Why don't we have an

17      executive session on this.  If you-all would

18      leave the room for a second.

19   (Recess was held from 10:08 a.m. until 10:12 a.m.)

20           CHAIRPERSON NORTH:  Okay.  We've discussed

21      the Respondent's motion, and we're going to

22      grant it.  We don't think that this expert's

23      testimony is qualified as for the matters that

24      she was going to testify for, so we're going to

25      grant the motion.

Page 544

1      A.    Yes, I do.  I have a Bachelor of arts in
2  English from Catholic University.  I have a Master's
3  in liberal arts from St. John's College in
4  Annapolis.  I have a law degree from Catholic
5  University in Washington.
6      Q.   Give us a brief overview to start, and
7  we'll hone in, from your graduation from law school
8  through to your starting at Oyster.
9      A.    Right.  I didn't start at law school right
10  out of college.  I taught high school English for 13
11  years, but I went to law school at night.  My first
12  job was with a large law firm in Washington, D.C.
13  actually based in Philadelphia, an international law
14  firm.  I worked there as associate for four years,
15  working in their financial services practice,
16  primarily in the mutual funds group, doing offering
17  statements for mutual funds and variable annuities.
18      Q.    And what did you do after that, sir?
19      A.    I was hired by FINRA, then known as NASD,
20  in the fall of 1991 in its New Orleans office as a
21  regional enforcement attorney.  And I worked there
22  in varying positions for the next 22 years.
23      Q.    And can you give us an overview of the
24  position, maybe take us just by time frame, what you
25  did first, what you did second.

```
                                              Page 545
1        A.    Certainly.  I began as a regional -- kind
2    of a staff regional attorney.  I received a series
3    of promotions over the next five years or so
4    culminating in senior regional counsel.
5             In approximately 1997, about six years
6    after I had been there, I was promoted and became
7    the first regional chief counsel with supervisory
8    responsibilities over the enforcement department in
9    the New Orleans and Dallas office.
10            Within a year or two, I was also given
11   responsibility for the Atlanta office.  And then in
12   the early '90s, I was given responsibility for the
13   newly created Boca Raton office, which then
14   comprised the south region.  I was in charge of the
15   enforcement groups in those four offices.
16       Q.    Altogether, how many years did you spend
17   working at FINRA?
18       A.    Twenty-two years.
19       Q.    And altogether, how many years were you at
20   FINRA in that supervisory role over the enforcement
21   office?
22       A.    I haven't done the math, but 13 or 14 of
23   those years.
24       Q.    When did you last work at FINRA?
25       A.    I retired from FINRA in 2014, early 2014.
```

Page 546

1   So about four and a half years ago.

2        Q.   We've heard reference to a FINRA notice in

3   this case, Notice 10-22.  Were you at FINRA when

4   that notice came out?

5        A.   Yes, I was.

6        Q.   We've heard testimony from Claimant's

7   expert about a rule called Rule 2111.  Were you at

8   FINRA when that rule came out?

9        A.   Yes, I was.

10       Q.   And can you tell us, sir -- we heard

11  Mr. Flynn say he's testified before many times.  You

12  just heard Ms. Levasseur say she also testified many

13  times.  Have you ever testified on behalf of a

14  private litigant as an expert at a trial or hearing

15  or anything like that?

16       A.   No, I have not.

17            MR. NAGY:  At this time, we proffer

18        Mr. Favret as an expert both to rebut

19        Mr. Flynn's opinions and to address certain

20        related issues on these rules.

21            CHAIRPERSON NORTH:  Any objection?

22            MR. KUGLAR:  None from Claimants.

23            CHAIRPERSON NORTH:  You may proceed.

24     BY MR. NAGY:

25       Q.   Mr. Favret, you were here yesterday, sir,

Page 570

1    whether the -- given what you've seen in this case,

2    the Jawbone investment was suitable for at least

3    some investors?

4        A.    My opinion is that J.P. Morgan did

5    adequate due diligence to make a determination that

6    it was suitable for some investors.  I base my

7    response on three or four different things.

8              I did look at their procedures to see what

9    they do with respect to due diligence in their

10   registered rep compliance manual, which I think we

11   saw yesterday, there was a specific reference to

12   Regulatory Notice 10-22 which talks about due

13   diligence.

14             More importantly, I saw the charter of

15   Morgan Private Ventures, which describes in some

16   detail the extent to which they do due diligence

17   before bringing a product to the MPV group.

18             I saw minutes of meetings in April/May of

19   2014 that evidence that consideration.  And I talked

20   to Mr. Josh Helfat, who is in their due diligence

21   department, who I think is testifying tomorrow,

22   who -- I talked to him for half an hour, and he

23   explained to me both how they do due diligence and

24   how they did due diligence in this case.

25             I was also, I think, impressed, if you

Page 680

1          MR. NAGY:  I haven't spoken to Mr. Helfat.

2          CHAIRPERSON NORTH:  Do you want to say

3     10:00 to make it --

4          MR. NAGY:  If that's okay with the panel,

5     I think he would appreciate it.

6          CHAIRPERSON NORTH:  Any objection on your

7     side?

8          MR. KUGLAR:  No objection.  We will work

9     hard to expedite.

10          CHAIRPERSON NORTH:  Just thinking I hate

11     to have us here at 9:30 and then we're all

12     waiting.  Better to just say 10:00.  We'll see

13     everyone tomorrow at 10:00.

14          (Proceedings concluded for the day at 1:46

15     p.m., and will continue in Volume 4.)

16

17

18

19

20

21

22

23

24

25

Page 682

1   BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY
                   DISPUTE RESOLUTION
2
                   FINRA NO.:  17-01969
3
    IN THE MATTER OF THE ARBITRATION
4   BETWEEN
5   GEORGE MATTSON AND GNM ICBC, LLC,
6
                   Claimants,
7   vs.
8   J.P. MORGAN SECURITIES, LLC,
9                  Respondent.
    _____/
10
11
12         TRANSCRIPT OF ARBITRATION PROCEEDINGS
13
14            VOLUME 4 (Pages 682 - 925)
15
16    DATE TAKEN:  September 20, 2018
      TIME:        10:00 a.m. - 4:45 p.m.
17    PLACE:       FINRA
                   5200 Town Center Circle
18                 Boca Raton, FL
19
20      This cause came on to be heard at the time and
    place aforesaid, when and where the following
21  proceedings were stenographically reported by:
22             Kimberly Fontalvo, RPR, CLR
             Realtime Systems Administrator
23
24
25

1    process whereby Digital Growth Co-Investment 2, L.P.

2    was approved to be shown to the MPV clients,

3    including Mr. Mattson, right?

4         A.   I was involved in the discussions.  I

5    didn't lead the diligence on that specifically.

6         Q.   Who led the diligence on that?

7         A.   Eliott Lepofsky and Ari Zelman.

8         Q.   And Ari, A-R-I?

9         A.   A-R-I.

10        Q.   Last name?

11        A.   Zelman.

12        Q.   Do either Eliott or Ari work for

13   J.P. Morgan today?

14        A.   They do not.

15        Q.   In connection with your testimony here

16   today, have you looked back through the files and

17   the documents pertaining to the due diligence that

18   was conducted on Digital Growth Co-Investment 2,

19   L.P.?

20        A.   As part of my preparation for today, I

21   went back and reviewed the materials related to that

22   and the stuff we had related to that.

23        Q.   And you were, as a member of the due

24   diligence team, in fact, copied on numerous emails

25   discussing Digital Growth Co-Investment 2, L.P., at

Page 690

1   the time, right?

2        A.   I believe I was copied on some emails

3   related to this, yes.

4        Q.   Generally as it pertains to a security

5   such as this, what was the process at J.P. Morgan

6   Securities?  Let's start with there's a potential

7   security identified.  Okay?  Is that the starting

8   point, potential opportunity?

9        A.   Sure.

10       Q.   Is there a better starting point?

11       A.   That's perfectly fine.

12       Q.   So we identify a security that we might

13   want to offer to a customer, correct?

14       A.   Can I reframe that a little bit?

15       Q.   Please.

16       A.   I think we're referring to the Morgan

17   Private Ventures we had at J.P. Morgan.  That

18   program can only review opportunities that come from

19   trusted sources.  One of them is the funds on our

20   platform that we've taken to investment review

21   committee, have approved, and have underwritten.

22   The other source are opportunities that come through

23   our investment bank where they've done some work as

24   well.  And then those are the only things that can

25   be brought into --

Page 702

1   Co-Investment 2, L.P. had not yet been approved?

2       A.   I'm not sure.  This is an internal call to

3   prep people about an opportunity.  I understand

4   where you're going with the times.  I'm not sure.

5       Q.   Okay.  So that does not refresh your

6   recollection as to when the Digital Growth

7   Co-Investment 2, L.P. was approved to go to clients,

8   or does it?

9       A.   I'm sorry?

10      Q.   Does that help you in refreshing your

11  recollection as to when you believe --

12          MR. NAGY:  He's already answered May 2014.

13      He's already said he doesn't know more

14      specifically than that.  We don't need to

15      refresh his memory.  He's already said

16      May 2014.

17          CHAIRPERSON NORTH:  Does it help you

18      refresh your memory?

19      A.   I apologize.  I'm very familiar with these

20  materials.  I didn't do the primary work.  I was in

21  these meetings when they occurred.  The dates of

22  specific pieces, I don't have.  I apologize.

23    BY MR. KUGLAR:

24      Q.   Well, Mr. Helfat, we know from the record

25  that Ms. Abouzied contacted Mr. Mattson on May 14,

1    2014 to discuss this potential opportunity, okay?

2         A.    Sure.

3         Q.    Now, you don't have any information that

4    Ms. Abouzied was doing that without prior approval,

5    do you?

6         A.    I don't -- I can't -- I don't have

7    anything on that.

8         Q.    Okay.  So let's look at in the same

9    binder --

10             Let's go to 81, Mr. Helfat.  And this is

11    an email on April 14, 2014 that states, "Good call

12    with Jawbone today.  They are opening to giving us

13    50 million in capacity; same was open to increasing

14    if we have more demand.  They are inclined to have a

15    conduit come in rather than direct investors."

16             Do you see that?

17        A.    Yes.

18        Q.    Do you have any recollection of hearing

19    about a potential opportunity for MPV clients o

20    invest in Digital Growth Co-Investment 2, L.P. and

21    Jawbone before April 14, 2014?

22        A.    I don't have any recollection about a

23    co-investment in Jawbone prior to this.

24        Q.    And if you look at the email at 79 from

25    the same day, this is an email that your big boss,

Page 762

1          that's okay.

2               CHAIRPERSON NORTH:  All right.  Why don't

3          we come back about ten -- like 1:15.

4      (Lunch was held from 12:09 p.m. until 1:19 p.m.)

5               CHAIRPERSON NORTH:  Back on the record.

6                  CONTINUED DIRECT EXAMINATION

7      BY MR. KUGLAR:

8          Q.   Just a few more questions, Mr. Helfat.

9               You understand that Notice to Member 10-22

10     sets forth a list of five bullet points of

11     categories that FINRA contends a broker-dealer

12     should undertake at a minimum, and that includes the

13     intended use of the proceeds of the offer, correct?

14         A.   Yes.  I've opened your exhibit.  Yes.

15         Q.   Okay.  And you agree that a broker-dealer

16     should analyze whether the investors' money is

17     likely to be applied according to the stated use of

18     proceeds, correct?

19         A.   Yes.

20         Q.   And you agree that the broker-dealer

21     should analyze whether the stated use of proceeds is

22     reasonable in light of the issuer's business purpose

23     and prospects, right?

24         A.   Sorry.  Where is that last part?  Is it in

25     here, issuer's use of proceeds?

Page 763

1      Q.   I'm just asking if you agree with that

2   statement.

3      A.   Oh, that it's in line with the issuer's --

4   say that again.  I'm sorry.

5      Q.   Business purpose and prospects.

6      A.   The issuer's business purpose and

7   prospects?

8      Q.   (Nodding head.)

9      A.   Yeah.  Yes.

10      Q.   And with respect to the Series 6 capital

11   raise for Jawbone, you understood that that was to

12   be a $250 million potential capital raise, correct?

13      A.   Up to, I believe.  Up to.

14      Q.   Your understanding is it was going to be

15   up to 250 million, right?

16      A.   Yes.

17      Q.   And you understood all along that Rizvi

18   was only obligated contractually to put in

19   25 million?

20      A.   Correct.

21      Q.   Okay.  Did anyone from J.P. Morgan's due

22   diligence department go out to California and speak

23   with Jawbone management about the Series 6 offering?

24      A.   Our team had conversations with Jawbone's

25   management about this offering.

1       Q.   Did you go to California to meet with them

2    in person?

3       A.   I don't believe we went to California to

4    meet them in person.

5       Q.   Meeting with management in person is a key

6    part of the reasonable investigation, is it not?

7       A.   Meeting with management is something you

8    could consider.  In this case, the manager of this

9    SPV was JPMIM, and we had numerous in-person

10   meetings with them.

11      Q.   But JPMIM -- I'm sorry.  Can you repeat

12   the answer?

13           (Requested portion read back.)

14     BY MR. KUGLAR:

15      Q.   Mr. Helfat, earlier when we were walking

16   through the two behind you on the chart, where you

17   said that there were two things you look at in a

18   reasonable investigation, the underlying issuer,

19   right, number one?

20      A.   Yep --

21      Q.   And --

22      A.   -- understanding issuer.  It says what it

23   says.

24      Q.   Understanding the issuer and understanding

25   the company.

```
                                            Page 817

 1              MR. NAGY:  Is that big enough?

 2              CHAIRPERSON NORTH:  (Nodding head.)

 3      BY MR. NAGY:

 4         Q.   What are we looking at here, please?

 5         A.   You're looking at a flow diagram of how

 6      the PEG group reviews opportunities and takes them

 7      through -- you know, our approximation of how they

 8      take them through their process.

 9              And it's showing you ideas get loaded into

10      a database, there's meetings, there's an iterative

11      due diligence process.  That's what those funny

12      arrows are meant to portray.  There's a negotiation

13      and a terms discussion, a final approval, and a

14      commitment.

15         Q.   Why did your term at JPMS care about how

16      JPMIM did its own diligence?  Why did you care about

17      that?

18         A.   One of the key things we underwrite in

19      fund managers is their investment process, how do

20      they evaluate opportunities, do they have a strong

21      process, does that process yield strong results.

22      This is an important part of our diligence.

23         Q.   Can we take this down, please, and go to

24      Slide 37.  Slide 37.  Just blow out the title.

25      Leave it on top once you blow it out, Patrick.
```

Page 881

1    Group.  My role and function there was to run their

2    fee-based business and platform, as well as manage

3    all of the product-related activity for about 4,000

4    financial advisors at three broker-dealers within

5    the Advisory Group.

6              Those responsibilities included direct

7    oversight of the research and due diligence teams,

8    as well as the product review committee, and all

9    associated work within AIG Advisor Group related to

10   products.

11             Prior to that, spent a good deal of time

12   at LPL Financial, the largest independent

13   broker-dealer in the United States.  Was recruited

14   as a senior vice president of investment research

15   group.  Worked with a team of 40-plus people

16   dedicated to the investment research and product due

17   diligence for all the products within that

18   independent broker-dealer.

19             Prior to that, spent some time consulting.

20   I should probably jump into this, because it bounces

21   a little bit.

22             Prior to LPL Financial, I'm sorry, I was

23   at BISYS Fund Services, which is a service provider

24   to asset management firms and distribution

25   companies, and had a couple different roles there,

Page 920

1          talk about it.
2               And if that's what he's doing, he's doubly
3          unqualified.  He's not a lawyer, so why do we
4          look to him on what the rules say?  And he's
5          also -- he never worked for FINRA.  He's not
6          even registered with FINRA right now.  It's not
7          even close.
8               MR. KUGLAR:  The -- I'm sorry.
9               CHAIRPERSON NORTH:  Okay.  I'll let you
10         have the final word and then we'll take an
11         executive session.
12              MR. KUGLAR:  Thank you.
13              A question before this panel is whether
14         J.P. Morgan satisfied its duty -- its duty --
15         to perform reasonable basis suitability on
16         Digital Growth Co-Investment 2, L.P., which was
17         a security offered to Mr. Mattson and ICBC,
18         LLC.
19              The industry standard and methodologies by
20         which those products are approved is not
21         something that most laypersons would have
22         knowledge of, and, therefore, his testimony is
23         helpful to the panel to establish what a due
24         diligence -- reasonable basis due diligence
25         examination of any product should look like at

Page 921

1        a minimum.

2             CHAIRPERSON NORTH:  Okay.  All right.

3        We'll be off the record.

4    (Recess was held from 4:37 p.m. until 4:43 p.m.)

5             CHAIRPERSON NORTH:  Okay.  We had an

6        executive session and we've made a

7        determination that, in our opinion, this

8        witness is not capable of testifying in the

9        areas that he was proffered in.  So we are

10       going to grant Respondent's motion and I guess

11       that will conclude Mr. Keefe's testimony.

12            So it's 4:45.  I'm thinking this is

13       probably a good point to recess for the day and

14       we'll be back at 9:30 tomorrow.

15            ARBITRATOR CHIODO:  And can we do some

16       homework about tomorrow, just so we know what

17       we're doing and where we're going and --

18            CHAIRPERSON NORTH:  Do you have more

19       witnesses expected in for tomorrow?

20            MR. NAGY:  Well, we were thinking of

21       putting on Mr. Nguyen in response to whatever

22       we heard, so we may not need to do that now at

23       all and I'll try and limit it.  So probably

24       not.  Balance, no strike on you, Mr. Nguyen.

25            But that would leave closings.  I don't

Page 926

1   BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY
                    DISPUTE RESOLUTION

2
                     FINRA NO.:  17-01969
3

    IN THE MATTER OF THE ARBITRATION
4   BETWEEN
5   GEORGE MATTSON AND GNM ICBC, LLC,
6
                    Claimants,
7   vs.
8   J.P. MORGAN SECURITIES, LLC,
9                   Respondent.
    _____/
10
11
12          TRANSCRIPT OF ARBITRATION PROCEEDINGS
13
14              VOLUME 5 (Pages 926 - 1007)
15
16    DATE TAKEN:  September 21, 2018
      TIME:        9:30 a.m. - 11:35 a.m.
17    PLACE:       FINRA
                   5200 Town Center Circle
18                 Boca Raton, FL
19
20      This cause came on to be heard at the time and
    place aforesaid, when and where the following
21  proceedings were stenographically reported by:
22              Kimberly Fontalvo, RPR, CLR
              Realtime Systems Administrator
23
24
25

1           of those issues were looked into.

2                We saw some minutes of a screening

3           committee with some bullet points.  Remember

4           some of those were -- it said they were an hour

5           long and some of those involved seven companies

6           in different industries:  Airline, financials,

7           tech.  We're talking about, if you do the math,

8           maybe seven minutes a company, maybe, if it's

9           equally divided.

10               That's not due diligence.  There's no

11          evidence in any of those bullet points nor have

12          we seen any evidence from Mr. Helfat that the

13          steps you take in these bullet points was ever

14          undertaken, presented, much less documented.

15          No evidence of the stuff you do when you look

16          at the issuer in your management, starting with

17          going out and meeting them.  That's the first

18          step in due diligence.  Sitting down with the

19          CEO and the CFO and asking questions.

20               The data room is where you start.  That's

21          where you start.  You take that data room and

22          then you start doing your due diligence.  You

23          meet with the company.  You do industry review,

24          company review, business plan strategy.  You do

25          your financial due diligence, your legal due

```
1          transcript and page 196 of the transcript, just
2          a few minutes later:
3               "I called someone and confirmed.
4               "There was no special call to confirm."
5               But, boy, was he willing to say it right
6          out of the box, under oath.
7               Now, in my opening, I testified this case
8          is not just about money, it's also about
9          people's reputations.  The due diligence
10         professionals at JPMS who, according to your
11         record, missed nothing.  Jasmine Abouzied, who
12         works tirelessly, as we have seen, for her
13         clients.  Did Mr. Mattson think about them,
14         stop and think about them before he brought
15         this case and gave this testimony?
16              Now, I would submit he didn't.  He didn't.
17         And he definitely should have.  What I'm
18         showing you now is something else he agreed to
19         in the Subscription Agreement.  This
20         Subscription Agreement he signed, JPMS is
21         mentioned.  I apologize, it's wordy.  But let
22         me show you what it says.
23              "Except as otherwise agreed to in writing,
24         the investor" -- that's him, and ICBC -- "will
25         indemnify each covered person" -- that's us.
```

Page 1000

1              JPMS, we're a covered person -- "against any
2              losses, claims, damages or liabilities to which
3              any of them may become subject arising out
4              of" -- listen to this.  Arising out of or based
5              on what?  "Any false representation or
6              warranty."
7                   Well, he told us, I'm not going to claim,
8              if this goes badly, that I relied on some phone
9              call with Jasmine.  That was clearly false,
10             because that's exactly what he's done now.
11                  Or what?  "Or any breach of or failure to
12             comply with any covenant or agreement made by
13             the investor in the Subscription Agreement."
14                  This right here, "failure to comply with
15             any covenant or agreement made by the investor
16             in the Subscription Agreement," that's exactly
17             why we're standing here today.
18                  And it goes on, okay.  You see JPMS is
19             mentioned expressly, and the investor agrees
20             he's going to reimburse covered persons for
21             their reasonable legal fees and expenses, and
22             it goes on to say that obligation survives his
23             admission into the partnership.
24                  This agreement is binding on him and ICBC,
25             and I submit a just result in this case is to

Page 1003

1        making your decision on this, in looking at our

2        record, you pick what you think is fair and

3        just in this case.  Thank you.

4               CHAIRPERSON NORTH:  Thank you both.

5               MR. KUGLAR:  To the extent that that was

6        an attempt to assert a contractual indemnity

7        counterclaim, I would object to that.  There

8        was no counterclaim filed in this case, nor was

9        one asserted, but to the extent that that was

10       what that was about, we object to it.

11              MR. NAGY:  It's in our pleading.

12              CHAIRPERSON NORTH:  I thought it was plead

13       in the Answer.

14              MR. NAGY:  Yes.

15              CHAIRPERSON NORTH:  I know it's kind of a

16       contractual prevailing party clause.  But,

17       okay, your objection is noted.

18              All right.  So before we close this, I

19       have to read some information to you.  First I

20       have to ask each of you:  Do you have any other

21       issues or objections that you would like to

22       raise that you had not previously raised?

23              MR. KUGLAR:  None from Claimants.

24              MR. NAGY:  Actually, one housekeeping

25       matter.  This is really for Jasmine's benefit.

# EXHIBIT B

**THE FOLLOWING SECTION REGARDING ARBITRATION APPLIES ONLY TO BROKERAGE AND MARGIN ACCOUNTS WITH A J.P. MORGAN ENTITY**

**11.  Arbitration; Consent to Jurisdiction; Service of Process**

(a) THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE. BY SIGNING AN ARBITRATION AGREEMENT THE PARTIES AGREE AS FOLLOWS:

- ALL PARTIES TO THIS AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.
- ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.
- THE ABILITY OF THE PARTIES TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.
- THE ARBITRATORS DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD, UNLESS, IN AN ELIGIBLE CASE, A JOINT REQUEST FOR AN EXPLAINED DECISION HAS BEEN SUBMITTED BY ALL PARTIES TO THE PANEL AT LEAST 20 DAYS PRIOR TO THE FIRST SCHEDULED HEARING DATE.
- THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.
- THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION. IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.
- THE RULES OF THE ARBITRATION FORUM IN WHICH THE CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.
- NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL:
  - i)  THE CLASS CERTIFICATION IS DENIED;
  - ii)  THE CLASS IS DECERTIFIED; OR
  - iii)  THE CLIENT IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.
- BY ENTERING INTO THIS AGREEMENT THE CLIENT AND J.P. MORGAN AGREE THAT CONTROVERSIES ARISING UNDER OR RELATING TO THIS AGREEMENT OR ANY ACTIVITY BETWEEN THE CLIENT AND J.P. MORGAN, ITS PREDECESSORS, AND ANY OF THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND ANY OF THEIR, DIRECTORS, EMPLOYEES, AND ANY OTHER CONTROL PERSONS AND ANY OF THEIR AGENTS, WHETHER ARISING PRIOR TO, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION AND IN ACCORDANCE WITH THE RULES OF THE FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC. ("FINRA") BEFORE AN ARBITRATION PANEL APPOINTED BY FINRA IN ACCORDANCE WITH ITS RULES, AND SUCH HEARING OR HEARINGS SHALL BE CONDUCTED IN A LOCALE SELECTED BY FINRA. THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM, SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION.

(b) Notwithstanding the provisions of subparagraph (a) above, either party may, at any time prior to the initial arbitration hearing pertaining to such dispute or controversy, seek by application to the U.S. District Court for the Southern District of New York or the Supreme Court of the State of New York for the County of New York any such temporary or provisional relief or remedy ("Provisional Remedy") provided for by the laws of the U.S. or the laws of the State of New York as would be available in an action based upon such dispute or controversy in the absence of an agreement to arbitrate. The parties acknowledge and agree that it is their intention to have any such application for a Provisional Remedy decided by the Court to which it is made and that such application shall not be referred to or settled by arbitration. No such application to either said Court for a Provisional Remedy, nor any act or conduct by either party in furtherance of or in opposition to such application, shall constitute a relinquishment or waiver of any right to have the underlying dispute or controversy with respect to which such application is made settled by arbitration in accordance with subparagraph (a) above.

(c) With respect to any application for a Provisional Remedy and any application for judgment on an arbitration award, each party irrevocably (i) submits to the jurisdiction of the U.S. District Court for the Southern District of New York or the Supreme Court of the State of New York for the County of New York, (ii) waives any objection which it may have at any time to the laying of venue of any proceedings brought in any such court, waives any claim that such proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such proceedings, that such court does not have any jurisdiction over such party, and (iii) consents to service of process by certified mail, return receipt requested, to the address provided for herein.

(d) The client hereby agrees to receive service of process in connection with any legal matters or actions or proceedings based upon, arising out of or relating in any way to this Agreement by confirmed, return-receipt requested mail and that delivery shall be presumed if such service is mailed to the address maintained by J.P. Morgan in its records.

(e) The client agrees that in any arbitration proceeding with J.P. Morgan, the arbitrators shall be bound by, and obligated to follow, the substantive law of the State of New York and of the United States regardless of where the agreement was executed, except to the extent that such laws would permit the arbitrators to disregard the substantive laws of the State of New York and the United States.

(f) The client agrees that the terms of any settlement or any award determined by arbitration shall be confidential and shall not be disclosed by the client, the client's attorneys or the client's representatives under any circumstances unless required by applicable law, judicial proceeding, or self-regulatory organization rule or order.

(g) This arbitration provision may be waived only with the written agreement of J.P. Morgan.

**12.  Severability**

If and to the extent any term or provision herein is or should become invalid or unenforceable, then (i) the remaining terms and provisions hereof shall be unimpaired and remain in full force and effect and (ii) the invalid or unenforceable provision or term shall be replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term or provision.

**13.  Affiliations**

If the client is a natural person, the client represents that unless the client has notified J.P. Morgan to the contrary, neither the client nor any member of the client's immediate family is: (i) an employee or member of any exchange, (ii) an employee or member of FINRA, (iii) an employee of any corporation or firm engaged in the business of dealing, as broker or principal, in securities, options or futures or (iv) an employee of any bank, trust company or insurance company. Persons signing on behalf of others should indicate

CONFIDENTIAL

# EXHIBIT C

| | |
|---|---|
| **From:** | Abouzied, Jasmine C |
| **To:** | George Mattson |
| **Sent:** | 5/14/2014 8:14:34 PM |
| **Subject:** | RE: Investment opportunity |

5pm is good. Will call you then.

---

**From:** George Mattson [mailto:george.mattson323@gmail.com]
**Sent:** Wednesday, May 14, 2014 12:41 PM
**To:** Abouzied, Jasmine C
**Subject:** Re: Investment opportunity

late this afternoon should work

5pm?


Sent from my iPad

On May 14, 2014, at 12:38 PM, "Abouzied, Jasmine C" <jasmine.c.abouzied@jpmorgan.com> wrote:

Hi George,
Do you have a few minutes to discuss an investment opportunity late this afternoon or tomorrow? Given the confidentiality I am unable to provide color over email.
Let me know what time would work best.
Jasmine

**Jasmine C. Abouzied**
**Managing Director**
**J.P. Morgan Private Bank**
270 Park Avenue, 19th Floor, New York, NY  10017-2014
T: 212-464-1041
M: 646-339-5299
F: 212-464-0402
Email: jasmine.c.abouzied@jpmorgan.com


<image001.png>



This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

# EXHIBIT D

### III. SUBSCRIPTION AGREEMENT

Digital Growth Co-Investment 2, L.P.
c/o J.P. Morgan Securities LLC

Ladies and Gentlemen:

1.      The investor identified on the signature page hereto (the "Investor") hereby applies to become a limited partner of Digital Growth Co-Investment 2, L.P., a Delaware limited partnership (the "Partnership"), on the terms and conditions set forth in this Subscription Agreement and in the Amended and Restated Agreement of Limited Partnership of the Partnership (as it may be revised, finalized and/or amended from time to time, the "Partnership Agreement"), a form of which has been furnished to the Investor.  Capitalized terms used but not defined in this Subscription Agreement have the meanings specified in the Partnership Agreement.

2.      To the fullest extent permitted by law, the Investor hereby irrevocably subscribes for a limited partner interest in the Partnership (an "Interest") and agrees to make (a) capital contributions to the Partnership in an amount equal to the Investor's Capital Commitment as set forth on the signature page hereto (subject to reduction as provided in Section 4 below), (b) additional payments to the Partnership in an amount equal to the Investor's Additional Payment Obligation, (c) payments in respect of the Investor's share of the Management Fee and (d) if applicable, payments required pursuant to Section 6.8(a) of the Partnership Agreement.

3.      The Investor acknowledges and agrees that Digital Growth Co-Investment 2 LLC, a Delaware limited liability company, is the initial general partner of the Partnership (for so long as it is serving as general partner of the Partnership, and any other Person who, at a particular time, is serving as the general partner of the Partnership, the "General Partner"), and that J.P. Morgan Investment Management Inc., a Delaware corporation ("JPMIM"), is the initial investment advisor to the Partnership, and that the General Partner or JPMIM will notify the Investor as to the conditional acceptance, in whole or in part, or rejection of the Investor's subscription for an Interest.  An Interest shall not be deemed to be sold or issued to, or owned by, the Investor until the Investor is admitted as a limited partner of the Partnership (notice of which shall be given promptly to the Investor).  The Investor agrees that the General Partner or JPMIM shall have the right, in their sole discretion, to admit the Investor as a limited partner of the Partnership on the date of the initial closing of the Partnership or at any Subsequent Closing.  If admission is accepted by the General Partner or JPMIM, JPMIM, in its capacity as investment advisor to the Partnership, and on behalf of the Partnership, shall execute the signature page hereto.  Subject to and upon the Investor's admission as a limited partner of the Partnership by the General Partner or JPMIM, the Investor hereby adopts, accepts and agrees to be bound by the terms and conditions of the Partnership Agreement.

4.      The Investor acknowledges and agrees that the General Partner or JPMIM shall have the right, in their sole discretion, to reject this subscription for an Interest, in whole or in part, for any reason (including, without limitation, for regulatory reasons), at any time prior to the date the Investor is admitted as a limited partner of the Partnership, notwithstanding execution by or on behalf of the Investor of the signature page hereto or notice from the General Partner or JPMIM of its conditional acceptance of the Investor's subscription for an Interest.  Upon the admission of the Investor as a limited partner of the Partnership, the Investor's Capital

CONFIDENTIAL

Commitment shall be set forth on Schedule A to the Partnership Agreement in accordance with the terms thereof.

5.    If this subscription is rejected in full, or in the event the closing applicable to the Investor does not occur (in which event this subscription shall be deemed to be rejected), this Subscription Agreement shall thereafter have no force or effect.

6.    The Investor hereby represents and warrants to, and agrees with, the Partnership, the General Partner and JPMIM, in its capacity as Investment Advisor to the Partnership, that, except as disclosed in writing to JPMIM prior to the date the Investor is admitted as a limited partner of the Partnership, the following statements are true as of the date set forth on the signature page hereto and will be true as of the date such Investor is admitted as a limited partner of the Partnership and as of each date on which the Investor makes any capital contribution to the Partnership:

(a)    The Investor is fully aware that (i) the offering and sale of Interests in the Partnership have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state or non-U.S. jurisdiction, and are being made in reliance upon federal, state and non-U.S. exemptions for transactions not involving a public offering; and (ii) the Partnership will not be registered as an investment company under the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act"), in reliance upon an exemption therefrom in Section 3(c)(7) thereof.   In furtherance thereof, the Investor (v) represents and warrants that it is an "accredited investor" (as defined in Regulation D under the Securities Act) and a "qualified purchaser" (as defined under the Investment Company Act) and that it meets any additional or different suitability standards imposed by the state or other jurisdiction of the Investor's domicile with respect to investing in the Partnership, (w) represents and warrants that it (and each, if any, "beneficial owner"[1] of its Interest) has not been subject to any disqualifying event (as contemplated by Rule 506(d) of Regulation D) (a "Disqualifying Event") and is not subject to any proceeding or event that could result in a Disqualifying Event, (x) acknowledges and agrees that the Subscriber Information Form attached hereto as Exhibit A or Exhibit B, as applicable (the "SIF"), whether previously completed and submitted to JPMorgan Chase & Co. or one of its Affiliates (collectively, "JPMC") or completed and submitted to JPMC in connection herewith, forms an integral part of this Subscription Agreement, (y) represents and warrants that the information relating to the Investor set forth in the Investor Certifications included in Part IV of this Subscription Agreement (the "Investor Certifications") and in the SIF attached hereto as Exhibit A or Exhibit B, as applicable, and, in each case, forming a part of this Subscription Agreement, is complete and accurate as of the date set forth on the signature page hereto and will be complete and accurate as of the date the Investor is admitted as a limited partner of the Partnership, and agrees that should a Disqualifying Event occur after the Investor becomes a limited partner of the Partnership, the Investor shall notify the General Partner and JPMIM promptly in writing thereof and shall at the request of the General Partner or JPMIM use commercially reasonable efforts to eliminate any adverse effect of the Disqualifying Event on the Partnership and its Affiliates, and (z) represents and warrants that the Investor was not made aware of the offering of Interests by any form of general solicitation or general advertising. In

---

[1] Any beneficial owner of 20% or more of the Partnership's outstanding voting equity securities, determined in accordance with Rule 13d-3 under the Securities Exchange Act of 1934, as amended, which includes persons who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise, have or share (or are deemed to have or share) the power to vote or dispose of the relevant securities.

CONFIDENTIAL

addition, the Investor agrees to promptly confirm in writing to JPMIM and the General Partner whether any of the foregoing information continues to be accurate, in connection with and prior to each issuance of an Interest and otherwise to the extent requested and further acknowledges and agrees that the General Partner and JPMIM shall understand and deem the failure by the Investor to respond in writing within 3 days (or such longer period as may be required by law) to such requests to be an affirmation and restatement of the representations, warranties and covenants in this Section 6(a).

(b)  The Investor's Interest is being acquired for the Investor's own account solely for investment and not with a view to resale or distribution thereof, and the Investor has no present intention of selling, granting participations in or otherwise distributing the Investor's Interest.

(c)  The Investor (either alone or together with any advisors retained by the Investor in connection with evaluating the merits and risks of the prospective investment) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of purchasing an Interest in the Partnership, including the risks set forth under the captions "Risk Factors" and "Potential Conflicts of Interest" in the Confidential Offering Memorandum relating to the Partnership, as it may be supplemented from time to time (the "Memorandum") and is able to bear the economic risk of its investment in the Partnership for an indefinite period of time, including a complete loss of capital. The Investor's Capital Commitment to the Partnership and commitments to and/or investments in other investments which are not readily marketable are not, in the aggregate, disproportionate to the Investor's net worth.

(d)  The Investor has been furnished with, and has carefully read, (i) the Memorandum, (ii) the Partnership Agreement, (iii) the Investment Advisory Agreement relating to the Partnership, (iv) the Confidential Memorandum of Terms for Series 6 Convertible Preferred Stock Financing of AliphCom (the "Series 6 Preferred Term Sheet"), (v) the AliphCom Summary Capitalization Table (the "AliphCom Capitalization Table"), (vi) AliphCom's unaudited consolidated financial statements as of and for the year ended December 31, 2013 and audited consolidated financial statements as of and for the years ended December 31, 2012 and 2011 and the accompanying report of its independent auditor, KPMG LLP (the "AliphCom Financial Statements"), (vii) a draft of the Amended and Restated Articles of Incorporation of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom Certificate"), (viii) a draft of the Amended and Restated Bylaws of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom Bylaws"), (ix) a draft of the Seventh Amended and Restated Investor Rights Agreement of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom IRA"), (x) a draft of the Fourth Amended and Restated Right of First Refusal Agreement of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom ROFR Agreement"), (xi) a draft of the Fifth Amended and Restated Voting Rights Agreement of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom Voting Agreement") and (xii) a draft of the Series 6 Preferred Stock Purchase Agreement of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom SPA" and collectively with the Series 6 Preferred Term Sheet, the AliphCom Capitalization Table, the AliphCom Financial Statements, the AliphCom Certificate, the AliphCom Bylaws, the AliphCom IRA, the AliphCom ROFR Agreement and the AliphCom Voting Agreement, the "Offering Documents") and (prior to entering into this Subscription Agreement) a copy of Part 2A of the Form ADV of JPMIM.  To the full satisfaction of the Investor, the Investor has been

1168/48556-115 current/43033193v7                    3

given the opportunity to (i) ask questions of, and receive answers from JPMIM concerning the terms and conditions of the offering of Interests and other matters pertaining to an investment in the Partnership and (ii) obtain any additional information necessary to evaluate the merits and risks of an investment in the Partnership and AliphCom or to verify the information contained in the Memorandum, or the AliphCom Capitalization Table which JPMIM can acquire without unreasonable effort or expense. The Investor acknowledges and agrees that the Investor has received drafts of the Series 6 Preferred Term Sheet, the AliphCom Capitalization Table, the AliphCom Financial Statements, the AliphCom Certificate, the AliphCom Bylaws, the AliphCom IRA, the AliphCom ROFR Agreement, the AliphCom Voting Agreement and the AliphCom SPA and that prior to the closing of the sale of shares of Series 6 Preferred Stock of AliphCom (and after such closing, by amendment pursuant to the terms of such agreements), the terms of the AliphCom Certificate, the AliphCom Bylaws, the AliphCom IRA, the AliphCom ROFR Agreement, the AliphCom Voting Agreement and the AliphCom SPA and the capitalization of AliphCom reflected in the AliphCom Capitalization Table may change from those included in the drafts reviewed by the Investor, in each case, without notice to the Investor. The Investor understands the fees and conflicts of interest to which the Partnership is subject (as described in the Offering Documents) and hereby consents and agrees to the payment of such fees to the parties identified as the recipients thereof and to such conflicts of interest. In considering its investment in the Partnership, the Investor has not relied upon any representations made by, or other information (whether oral or written) furnished by or on behalf of, the Partnership, the General Partner, JPMIM, AliphCom, or any director, officer, employee, agent or Affiliate of such Persons, other than as set forth in the Offering Documents and any "side letter". The Investor has carefully considered and has, to the extent it believes such discussion necessary, discussed with legal, tax, accounting and financial advisers the suitability of an investment in the Partnership in light of its particular tax and financial situation, and has determined that an investment in the Partnership is a suitable investment for it. Further, the Investor acknowledges, agrees and confirms that with respect to the tax and other legal consequences of such an investment, it is relying solely upon the advice of such advisers and not upon the general discussion of such matters set forth in the Offering Documents.

(e)     If the Investor is an Entity, it was not formed or recapitalized (*e.g.*, through new investments made in the Investor solely for the purpose of financing its acquisition of the Interest and not pursuant to a prior financial commitment) for the purpose of investing in the Partnership.

(f)     If the Investor is an Entity: (i) its decision to invest in the Partnership was made in a centralized fashion (*e.g.*, by a board of directors, general partner, manager, trustee, investment committee or similar governing or managing body); (ii) the Investor is not managed to facilitate the individual decisions of its beneficial owners regarding investments (including an investment in the Partnership); and (iii) the Investor's shareholders, partners, members, beneficiaries, grantors or other participants, as applicable, did not and will not (x) contribute additional capital for the purpose of acquiring an Interest in the Partnership, (y) have any discretion to determine whether or how much of the Investor's assets are invested in any investment made by the Investor (including the Investor's investment in the Partnership), or (z) have the ability individually to elect whether or to what extent such shareholder, partner, member, beneficiary, grantor or other participant, as applicable, will participate in the Investor's investment in the Partnership.

CONFIDENTIAL                                                  JPMS_00002363

(g)   The Investor is not a participant-directed defined contribution plan (such as a 401(k) plan).

(h)   The Investor's Capital Commitment to the Partnership represents less than 40% of the value of the Investor's total assets. The Investor is not structured or operated for the purpose or as a means of circumventing the provisions of the Investment Company Act.

(i)   If the Investor is an Entity, it is not (i) an "investment company" within the meaning of the U.S. Investment Company Act, (ii) a "business development company" within the meaning of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act"), or (iii) a non-U.S. investment company that is not required to register as an "investment company" under the Investment Company Act pursuant to Section 7(d) thereunder. If the Investor is an Entity that is relying upon Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to except itself from the definition of "investment company" under, or the registration provisions of, the Investment Company Act (an "Excepted Investment Company"), (y) each beneficial owner of the Investor's outstanding securities, other than short-term paper (and, if an Excepted Investment Company has invested in the Investor and directly or indirectly controls, is controlled by or is under common control with the Investor or the Partnership, each beneficial owner of the outstanding securities, other than short-term paper, of such Excepted Investment Company), in each case if such beneficial owner acquired such securities on or before April 30, 1996, has consented to the treatment of the Investor and the Partnership as a "qualified purchaser" or (z) if such Investor (or such Excepted Investment Company that has invested in the Investor) is a "family company" (as defined in the SIF), all trustees, directors, general partners or managing members of such Investor (or such Excepted Investment Company) have unanimously consented to the treatment of the Investor and the Partnership as a "qualified purchaser." In addition, if the Investor is an Excepted Investment Company and directly or indirectly controls, is controlled by or is under common control with the Partnership (and/or if an Excepted Investment Company has invested in the Investor and directly or indirectly controls, is controlled by or is under common control with the Partnership), (y) each beneficial owner of the outstanding securities, other than short-term paper, of the Investor (or such Excepted Investment Company that has invested in the Investor, as applicable), in each case if such beneficial owner acquired such securities on or before April 30, 1996, has consented to the treatment of the Partnership as a "qualified purchaser" or (z) if such Investor (or such Excepted Investment Company that has invested in the Investor) is a "family company" (as defined in the SIF), all trustees, directors, general partners or managing members of such Investor (or such Excepted Investment Company, as applicable) have unanimously consented to the treatment of the Partnership as a "qualified purchaser."

(j)   The Investor is not (unless it has otherwise indicated in the Investor Certifications) (i) a "benefit plan investor" within the meaning of Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (a "Benefit Plan Investor"), (ii) investing assets allocated to an entity or an insurance company general or separate account or other account, deemed to be holding "plan assets" within the meaning of ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (iii) a "governmental plan" within the meaning of Section 3(32) of ERISA, a "foreign plan" or another plan or retirement arrangement that is not subject to Part 4 of Subtitle B of Title I of ERISA and with respect to which Section 4975 of the Code does not apply. An Investor described in either of clauses (i) or (ii) of this Section 6(j) is referred to herein as an "ERISA Investor." An Investor described in clause (iii) of this Section 6(j) is referred to herein as a "Plan Investor." The

CONFIDENTIAL

JPMS_00002364

Investor understands that, if he or she is investing through an individual retirement account or annuity, disclosure must be made in accordance with this paragraph.

(k)     If the Investor is an ERISA Investor or Plan Investor, then (i) it has been informed of and understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Partnership; (ii) it is aware of the provisions of Section 404 of ERISA or similar law applicable to the Investor ("Similar Law") relating to fiduciary duties, including if applicable, the requirement for diversifying the investments of an employee benefit plan subject to ERISA; (iii) it has given appropriate consideration to the facts and circumstances relevant to the investment by such ERISA Investor or Plan Investor in the Partnership and has determined that such investment is reasonably designed, as part of such ERISA Investor's or Plan Investor's portfolio of investments, to further the purposes of the relevant plan(s); (iv) its investment in the Partnership is consistent with the requirements of Section 404 of ERISA or Similar Law; (v) it understands that current income will not be a primary objective of the Partnership; (vi) its acquisition, and subsequent holding of an Interest in the Partnership is not a "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code or Similar Law; (vii) its decision to invest in the Partnership was made by fiduciaries independent of the General Partner, JPMIM, J.P. Morgan Securities LLC ("JPMS") or any Affiliate of the General Partner, JPMIM or JPMS who have concluded, after consideration of their fiduciary duties under applicable law, that the investment of assets of such ERISA Investor or Plan Investor in the Partnership is prudent; and (viii) it is not relying and has not relied on the General Partner, JPMIM, JPMS, AliphCom or any Affiliate of the General Partner, JPMIM, JPMS or AliphCom for any evaluation or other investment advice in respect of the advisability of an investment in the Partnership in light of the plan's assets, cash needs, investment policies or strategy, overall portfolio composition or plan for diversification of assets.

(l)     The Investor is not (unless it has otherwise so disclosed in writing to JPMIM) a "charitable remainder trust" within the meaning of Section 664 of the Code. If the Investor is a charitable remainder trust, the Investor acknowledges that it understands the risks, including the tax risks, associated with its investment in the Partnership.

(m)     The Investor is not (unless it has otherwise so disclosed in the SIF attached hereto as Exhibit A or Exhibit B, as applicable, or in writing to JPMIM) an individual retirement account or annuity.

(n)     The Investor will conduct its business and affairs (including its investment activities) in a manner such that it will be able to honor its obligations under this Subscription Agreement and the Partnership Agreement.

(o)     If the Investor is an Entity, it is duly organized or formed, validly existing and in good standing under the laws of its jurisdiction of organization or formation, and the execution, delivery and performance by it of this Subscription Agreement, the Investor Certifications, the SIF, and the Partnership Agreement are within the Investor's powers, have been duly authorized by all necessary corporate or other action on its behalf, require no action by or in respect of, or filing with, any governmental body, agency or official, and do not and will not contravene, or constitute a default under, any provision of applicable law or regulation or of its certificate of incorporation or other comparable organizational documents or any agreement, judgment, injunction, order, decree or other instrument to which the Investor is a party or by which the Investor or any of its properties is bound. This Subscription Agreement and the SIF constitute, and if the Investor is admitted as a limited partner of the Partnership, the Partnership Agreement

1168/48556-115 current/43033193v7                    6

will constitute, valid and binding agreements of the Investor, enforceable against the Investor in accordance with their respective terms, except that (i) enforceability may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors rights in general and (ii) enforceability is subject to general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(p)     If the Investor is a natural person, the execution, delivery and performance by the Investor of this Subscription Agreement, the Investor Certifications, the SIF and the Partnership Agreement are within the Investor's legal right, power and capacity, require no action by or in respect of, or filing with, any governmental body, agency or official, and do not and will not contravene, or constitute a default under, any provision of applicable law or regulation or of any agreement, judgment, injunction, order, decree or other instrument to which the Investor is a party or by which the Investor or any of his or her properties is bound. This Subscription Agreement and the SIF constitute, and if the Investor is admitted as a limited partner of the Partnership, the Partnership Agreement will constitute, valid and binding agreements of the Investor, enforceable against the Investor in accordance with their respective terms.

(q)     The Investor understands and agrees that JPMS or any Affiliate of JPMIM or JPMS (each a "JPM Securities Affiliate") may engage in "agency cross transactions" as defined in Reg. Section 275.206(3)-2 ("Agency Cross Transactions") promulgated by the Securities and Exchange Commission (the "SEC") under the Investment Advisers Act in which the JPM Securities Affiliate acts as a broker for both the Investor or the Partnership and for another person on the other side of the transaction. The Investor understands and agrees that the JPM Securities Affiliate may receive commissions from, and have a potentially conflicting division of loyalties and responsibilities regarding, both parties to such Agency Cross Transactions. THIS CONSENT, AS TO AGENCY CROSS TRANSACTIONS EFFECTED ON BEHALF OF THE INVESTOR, MAY BE REVOKED AT ANY TIME BY WRITTEN NOTICE FROM THE INVESTOR TO JPMIM. THIS CONSENT, AS TO AGENCY CROSS TRANSACTIONS EFFECTED ON BEHALF OF THE PARTNERSHIP, MAY BE REVOKED AT ANY TIME BY WRITTEN NOTICE TO JPMIM FROM A MAJORITY IN INTEREST OF THE INDEPENDENT LIMITED PARTNERS.

(r)     The Investor has carefully read and understands the paragraph entitled "Transactions with AliphCom" under the caption entitled "Potential Conflicts of Interest" in the Memorandum. The Investor acknowledges and further understands that there may be situations in which the interests of the Partnership may conflict with the interests of JPMIM, its respective Affiliates or J.P. Morgan Digital Growth Fund L.P., including the conflicts of interest that are identified in the Partnership Agreement and the Memorandum. The Investor agrees that the activities of JPMIM and its respective Affiliates specifically authorized or contemplated by or described in the Partnership Agreement and the Memorandum may be engaged in by JPMIM or any such Affiliate, as the case may be, and will not, in any case or in the aggregate, be deemed a breach of this Subscription Agreement, the Partnership Agreement or any duty owed by any such Person to the Partnership or to the Investor.

(s)     The Investor understands, acknowledges and agrees that the General Partner or JPMIM may present a completed copy of the Investor's SIF, the Investor Certifications and/or this Subscription Agreement to such Persons as the General Partner or JPMIM, in its sole discretion, deems appropriate if called upon to establish that (i) the proposed offer and sale of the Interests is exempt from registration under the Securities Act or meets the requirements of applicable securities laws of any state or other jurisdiction, (ii) the Partnership is exempt from

1168/48556-115 current/43033193v7                7

JPMS_00002366

registration under the Investment Company Act, (iii) the proposed offer and sale of the Interests is not a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or Similar Law, (iv) JPMIM is in compliance with the Investment Advisers Act, (v) the Partnership, the General Partner, JPMIM, JPMS, JPMII or any service provider to the Partnership or any of their respective Affiliates is in compliance with applicable laws and regulations, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (the "USA PATRIOT Act") or (vi) the Partnership may make and/or hold an indirect investment in AliphCom. The Investor further understands, acknowledges and agrees that (w) if required by law, rule or regulation (as reasonably determined by JPMIM after consultation with legal counsel to JPMIM), or to minimize or otherwise mitigate or reduce withholding or other taxes imposed by the United States, any state in the United States or any non-U.S. jurisdiction, the Partnership may disclose personal information with respect to the Investor, (x) a completed copy of the Investor's SIF, the Investor Certifications and/or this Subscription Agreement may be provided to lenders and prospective lenders to the Partnership, (y) each of the Partnership, the General Partner and JPMIM may disclose, as required by applicable law or as requested by any governmental body, agency or official in connection with this offering or the operations of the Partnership, the name of the Investor, the amount of its Capital Commitment and contributions to the Partnership and such other information required by applicable law or as requested by any governmental body, agency or official and (z) the offering of Interests may be reported to the SEC or to state securities commissioners pursuant to the requirements of applicable federal law and of various state securities laws.

(t)        (i)        The Investor hereby certifies under penalties of perjury that the information set forth in the Subscription Agreement, the SIF and any attachments thereto, in the Investor Certifications and on the signature page hereto is true and correct, including: (x) whether the Investor is a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement and (y) if the Investor is a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement, whether the Investor is a grantor trust that is treated as owned by a grantor or another person under subpart E of subchapter J of the Code (a "grantor trust").

(ii)        If the Investor is a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement (other than a disregarded entity owned by a person who is not a "United States person," as so defined), the Investor is delivering to the Partnership an Internal Revenue Service Form W-9 and will deliver a new Form W-9 upon the obsolescence, expiration or invalidity of any such form previously delivered by the Investor or upon the request of JPMIM, and hereby certifies under penalties of perjury that the Investor's social security or employer identification number set forth in such Form W-9 is true and correct and that the Investor is not subject to backup withholding because (x) the Investor is exempt from backup withholding or (y) the Investor has not been notified by the Internal Revenue Service that the Investor is subject to backup withholding as a result of a failure to report all interest or dividends (or, if the Investor has been so notified, the Internal Revenue Service has subsequently notified the Investor that the Investor is no longer subject to backup withholding). The Investor agrees to notify the Partnership within sixty (60) days after it ceases to be a United States person or any of the foregoing information changes.

(iii)        If the Investor (x) is not a "United States person" for U.S. federal

1168/48556-115 current/43033193v7        8

CONFIDENTIAL

income tax purposes, as defined in Appendix I to this Subscription Agreement, (y) is a grantor trust and one or more grantors is not a "United States person," as so defined or (z) is a disregarded entity with an owner that is not a "United States person," as so defined:

        (A)    the Investor is delivering to the Partnership an appropriate Internal Revenue Service Form W-8 (and any additional information that JPMIM may request) and will deliver a new Form W-8 upon the obsolescence, expiration or invalidity of any such form previously delivered by the Investor or upon the request of JPMIM, in each case, signed under penalties of perjury by such non-U.S. Investor (unless such non-U.S. Investor is a "disregarded entity" for U.S. federal income tax purposes) and by each such grantor or such owner, as the case may be and, in the case of a grantor trust, a statement under penalties of perjury identifying the portion of trust income allocable to each grantor.

        (iv)    If the Investor is not a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement, and the Investor intends to claim treaty benefits under an income tax treaty between the United States and the Investor's jurisdiction with respect to the Investor's indirect share of any item of income of AliphCom or the Investor's share of any item of the Partnership's income that is not derived from AliphCom, the Investor represents that either:

        (A)    the laws of the Investor's jurisdiction require the Investor to separately take into account on a current basis the Investor's indirect share of each such item of AliphCom's income and the Investor's share of each such item of the Partnership's income, whether or not distributed to the Investor, and the character and source of each such item in the hands of the Investor will be determined as if each such item were realized directly from the source from which it was realized by AliphCom or the Partnership; or

        (B)    the laws of the Investor's jurisdiction do not require the Investor to separately take into account the Investor's indirect or direct share of each such item, but (1) the Investor is required to take into account on a current basis the Investor's indirect or direct share of all such non-separately stated items of AliphCom's and the Partnership's income, whether or not distributed to the Investor, and (2) each such item, if separately taken into account by the Investor, would result in an income tax liability for the Investor that is the same as the income tax liability that will result when the Investor does not take the item into account separately.

The Investor cannot make either of the foregoing representations if, under the laws of the Investor's jurisdiction, the Investor is required to include in gross income its share of all or a part of AliphCom's or the Partnership's income on a current basis under any type of anti-deferral or comparable mechanism. For purposes of this clause (t)(iv), an Investor's jurisdiction is the jurisdiction where the Investor is organized or incorporated or may otherwise be considered a resident under the laws of that jurisdiction.

        (v)    If any beneficial owner of any interest in the Investor is not a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement, and intends to claim treaty benefits under an income tax treaty between the United States and the jurisdiction of such beneficial owner with respect to such beneficial owner's indirect share of any item of income of AliphCom or

CONFIDENTIAL

any item of the Partnership's income that is not derived from AliphCom, the Investor represents that the Investor has received from each such beneficial owner a written representation that the statements set forth in either clause (t)(iv)(A) or clause (t)(iv)(B) apply to such beneficial owner's indirect share of each such item of income.

(u)     The Investor agrees to cooperate with the General Partner and JPMIM and provide in a timely manner any additional forms, certificates, documents and other information that the General Partner or JPMIM, each in its sole discretion, requests (including, without limitation, any information with respect to any beneficial owner of an interest in the Investor and any tax reference numbers) concerning any tax return or filing, tax compliance documentation, tax records, tax exemption (or reduction) applications or similar tax documentation (including, without limitation, any information requested relating to or to comply with all U.S. federal withholding provisions) that the General Partner or JPMIM determines should be made in respect of the Partnership or on behalf of investors in the Partnership. In addition, (i) the Investor consents on behalf of itself and its beneficial owners to the use of any information or documentation provided by the Investor for purposes of complying with the foregoing (including, without limitation, any information or documentation requested to comply with withholding requirements under Sections 1471-1474 of the Code or any other U.S. federal, state, local or non-U.S. withholding provisions), and (ii) the Investor acknowledges on behalf of itself and its beneficial owners that any such information or documentation may be disclosed to the Internal Revenue Service or any other governmental authority. Failure to comply with the foregoing could result in the imposition of withholding taxes on distributions made to the Investor and other adverse consequences under the Partnership Agreement.

(v)     The Investor is not acting as agent or nominee on behalf of any other Person in connection with the Investor's investment in the Partnership.

(w)     In addition to, and not in limitation of, the other restrictions on assignment and transfer contained herein and in the Partnership Agreement, the Investor will not assign or transfer the Investor's Interest (or any interest therein) on or through an "established securities market" or a "secondary market or the substantial equivalent thereof," as such terms are used in Section 1.7704-1 of the Treasury Regulations. The Investor understands that (i) the Partnership intends to be classified as a partnership for U.S. federal income tax purposes and not as a "publicly traded partnership" within the meaning of Section 7704 of the Code and (ii) the Partnership will file a U.S. partnership information return annually disclosing to the Internal Revenue Service each partner's identity and its distributive share of the Partnership income, gain, loss or credits.

(x)     If the Investor is, for U.S. federal income tax purposes, a partnership, grantor trust or S corporation ("Flow-Through Entity"), then (i) no more than one half of the fair market value of the Flow-Through Entity is expected to be attributable to the Flow-Through Entity's interest (direct or indirect) in the Partnership and (ii) the Flow-Through Entity was not employed as a vehicle through which to invest in the Partnership with a purpose of allowing the Partnership to avoid being treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code.

(y)     The Investor understands that the Partnership seeks to comply with all applicable laws and regulations concerning money laundering, terrorist financing and other illegal activities. The Investor hereby represents and warrants that the proposed investment by the

1168/48556-115 current/43033193v7                    10

Investor in the Partnership that is being made on its own behalf or, if applicable, on behalf of any beneficial owner of the Investor does not directly or indirectly contravene United States federal, state, international or other laws or regulations, including anti-money laundering laws (a "**Prohibited Investment**"). The Investor further represents and warrants that the funds invested by the Investor in the Partnership are not derived from illegal or illegitimate activities.

(z)     The Investor also understands that United States federal regulations and Executive Orders administered by the Office of Foreign Assets Control ("**OFAC**") of the U.S. Treasury Department prohibit, among other things, engaging in transactions with, and providing services to, targeted non-U.S. countries and certain Entities and individuals (including, without limitation, those subject to OFAC sanctions or embargo programs or engaged in terrorist activities or narcotics trafficking). In furtherance of the Partnership's efforts to comply with the foregoing, the Investor represents, warrants and agrees that (i) all information regarding the identity of (w) the Investor, (x) each Affiliate of the Investor, (y) if the Investor is an Entity that is privately owned, each Person having a beneficial interest in the Investor and (z) any Person for whom the Investor is acting as a nominee or agent in connection with the Investor's investment in the Partnership (collectively, the "**Investor Related Parties**") provided or to be provided to the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates is and will be accurate and complete; (ii) none of the funds that the Investor has paid or contributed, or will pay or contribute, to the Partnership has been or will be derived, directly or indirectly, from any activity that contravenes any United States federal or any state or non-U.S. laws and regulations, including anti-money laundering laws and regulations, and no contribution by the Investor to the Partnership shall result in a violation by the Partnership, JPMIM or any of their respective Affiliates of any United States federal or any state or Non-U.S. laws and regulations, including anti-money laundering laws and regulations; (iii) none of the proceeds from the Investor's investment in the Partnership will be used to finance any illegal activities; (iv) none of the Investor Related Parties is a country, territory, Entity or individual named on an OFAC list[2], is prohibited under any program administered by OFAC or is identified as a terrorist or terrorist organization on any other relevant lists maintained by any governmental authority; (v) none of the Investor Related Parties is an individual or Entity (x) that resides or has a place of business in, or is organized under the laws of, a country or territory named on an OFAC list or which is designated as a non-cooperative country or territory by the Financial Action Task Force on Money Laundering ("**FATF**")[3] or which is designated by the Secretary of the Treasury under Section 311 or 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns[4] or (y) whose payments or contributions to the Partnership have been or will be transferred from or through such a country or territory; (vi) none of the Investor Related Parties is a "senior foreign political figure,"[5] or an "immediate

---

[2] The lists of OFAC sanctioned programs and specially designated nationals and blocked persons can be found on the OFAC website at http://www.treas.gov/offices/enforcement/ofac.

[3] The FATF list of non-cooperative countries and territories can be found on the FATF website at http://www.fatf-gafi.org.

[4] A list of these jurisdictions can be found at http://www.fincen.gov.

[5] A "senior foreign political figure" means a current or former senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a current or former senior official of a major non-U.S. political party, or a current or former senior executive of a non-U.S. government-owned commercial enterprise. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure. For purposes of this definition, a "senior official" or "senior executive" means an individual with substantial authority over policy,

CONFIDENTIAL

family member"[6] or "close associate"[7] of a senior foreign political figure; (vii) none of the Investor Related Parties is a "Foreign Shell Bank" within the meaning of the USA PATRIOT Act, i.e., a foreign bank that does not have a physical presence in any country and that is not affiliated with a bank that has a physical presence and an acceptable level of regulation and supervision; (viii) none of the payments or contributions to the Partnership originate from or have been or will be transferred from or through an account maintained at a Foreign Shell Bank or a foreign bank (other than a foreign bank that is affiliated with a bank that has an acceptable level of regulation and supervision) that is barred, pursuant to its banking license, from conducting banking activities with the citizens of, or with the local currency of, the country that issued the license; and (ix) if the Investor is an Entity, or is acting as an agent or nominee in connection with the Investor's investment in the Partnership, the Investor has adopted procedures designed to elicit and verify information from all Investor Related Parties to substantiate the representations, warranties and agreements contained herein, and the Investor will maintain evidence of the identities of the Investor Related Parties for at least five years from the date of the Investor's complete withdrawal from the Partnership. The Investor agrees promptly to notify the Partnership and JPMIM if any of the representations and warranties made by the Investor herein cease to be accurate and complete. The Investor agrees to promptly provide any additional information, documents and certificates which the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates deem necessary or desirable to comply with their responsibilities and policies, and applicable laws and regulations, regarding money laundering and similar activities or to satisfy their obligations with respect to money laundering and similar activities; provided, any Investor that is a client of J.P. Morgan (Suisse) S.A. may, in lieu of providing any such information directly, arrange for the delivery of a certificate from J.P. Morgan (Suisse) S.A. that satisfies the relevant request. The Investor understands and agrees that each of the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates may, in its sole discretion, release information regarding the Investor Related Parties to proper authorities, in order to comply, or to demonstrate compliance with, applicable laws and regulations. The Investor represents, warrants and agrees that the statements set forth in this Section 6(z) will be true and correct as of each date on which the Investor makes any capital contribution or payment to, or receives any distribution from, the Partnership or the Partnership makes any capital contribution to, or receives any distribution from, AliphCom. The Investor further acknowledges and agrees that if the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates determines that an Investor Related Party has appeared on a list of known or suspected terrorists or terrorist organizations compiled by any U.S. or non-U.S. governmental agency, or that any representation or warranty herein is no longer accurate and complete or if otherwise required by applicable law, regulation or administrative pronouncement related to money laundering or other criminal activities, then the Investor shall be deemed an "Affected Limited Partner" and the Partnership may take such actions as it deems necessary or desirable in connection therewith, including, but not limited to, segregation and/or redemption of the Investor's investment in the Partnership and/or any other actions described in the Partnership Agreement (including Section 5.7(a) thereof). Moreover,

---

operations, or the use of government-owned resources.

[6] An "immediate family member" of a senior foreign political figure means spouses, parents, siblings, children and a spouse's parents and siblings.

[7] A "close associate" of a senior foreign political figure is a person who is widely and publicly known (or is actually known) to be a close associate of the senior foreign political figure.

CONFIDENTIAL   JPMS_00002371

the Investor understands and agrees that, notwithstanding anything to the contrary contained in any document (including the Partnership Agreement or any side letters or similar agreements with the Investor and/or an Indirect Investor), if, following the Investor's investment in the Partnership, JPMIM reasonably believes that the investment is or has become a Prohibited Investment or if otherwise required by law, the Partnership may be obligated to "freeze the account" of the Investor, either by prohibiting additional Capital Contributions and/or restricting any distributions with respect to the Investor's Interest. In addition, in any such event, the Investor may be forced to forfeit its Interest, may be forced to withdraw from the Partnership or may otherwise be subject to the remedies required by law, and, to the fullest extent permitted by applicable law, the Investor shall have no claim against any Person for any form of damages as a result of any of the actions described in this Section 6(z).

(aa)   The Investor acknowledges and agrees that any distributions paid to it by the Partnership will be paid to the same account from which its Capital Contributions to the Partnership are remitted, unless JPMIM, in its sole discretion, agrees otherwise.

(bb)   The Investor understands and acknowledges that (i) no later than July 21, 2015, JPMorgan Chase & Co. and its Affiliates (collectively, "JPMC") and the Partnership must bring its activities and investments into compliance with certain provisions (known as the "Volcker Rule") of the Dodd-Frank Wall Street Reform and Consumer Protection Act and (ii) the Volcker Rule permits JPMC to acquire or retain an ownership interest in, or sponsor, in connection with directly or indirectly organizing and offering, a covered fund, such as the Partnership, if certain conditions of a permitted activity exemption (commonly known as the asset management exemption) are satisfied, including the requirement that no director or employee of JPMC takes or retains an equity interest, partnership interest or other similar interest in the Partnership, except for any director or employee of JPMC who is directly involved in providing investment advisory, or other services to the Partnership at the time the director or employee takes such an ownership interest.

(cc)   If the Investor is an employee or director of JPMC (or an affiliate of such an employee or director), the Investor hereby (i) confirms that as at the date hereof, the Investor is directly engaged in providing investment advisory or other services to the Partnership, (ii) confirms that with respect to its subscription for Interests, it has complied with all applicable JPMC pre-clearance policies and procedures and has received applicable JPMC personal account dealing and compliance authorization and (iii) acknowledges and agrees that if JPMC subsequently determines, in its sole and absolute discretion, that the Investor was not in fact so directly engaged in providing investment advisory, or other services to the Partnership as at the closing date of the Investor's subscription for Interests, the Investor may be designated as an Affected Limited Partner and thereafter, the General Partner shall be authorized to take such actions as it deems necessary or appropriate to mitigate, prevent or cure any adverse effect resulting from the participation of the Investor in the Partnership, taking into account the interests of all limited partners in the Partnership and the Partnership as a whole, including any one or more of the actions listed in Section 5.7(a) of the Partnership Agreement (which include a compulsory withdrawal of the Investor from the Partnership).

(dd)   The Investor acknowledges, agrees and understands that in the event that (i) it defaults with respect to any capital contribution or payment to the Partnership when due or (ii) it defaults with respect to its obligations to comply with Section 6.8(f) of the Partnership Agreement, such default or failure may result in the Investor forfeiting its entire Interest.

1168/48556-115 current/43033193v7                 13

CONFIDENTIAL                                                    JPMS_00002372

(ee)    The Investor is not (unless it has otherwise so disclosed in writing to JPMIM) (i) a "foreign government" for purposes of Section 892 of the Code or (ii) a U.S. state (including the District of Columbia, Puerto Rico, the U.S. Virgin Islands or any other possession of the United States) or political subdivision of a state, including: (1) any agency, authority or instrumentality of the state or political subdivision; (2) a pool of assets sponsored or established by the state or political subdivision or any agency, authority or instrumentality thereof, including, but not limited to a "defined benefit plan", as defined in Section 414(j) of the Code, or a state general fund; (3) a plan or program of a government entity or (4) an officer, agent or employee of a state or political subdivision or any agency, authority or instrumentality thereof, acting in its official capacity (provided, however, that any such officer, agent, or employee will not be considered a government entity if it is making an investment in the Partnership not in its official capacity).

(ff)    The Investor understands and agrees that in order for the Partnership to ensure compliance with applicable National Futures Association ("NFA") and Commodity Futures Trading Commission ("CFTC") rules and regulations, the Partnership must ascertain the status of the Investor (or if the Investor is a collective investment vehicle, the commodity pool operator of the Investor) required to be an NFA member and CFTC registrant. Accordingly, the Investor hereby represents and warrants that except as disclosed in the Investor's current SIF or otherwise in writing, the Investor is not required to be a CFTC registrant or to be a member of the NFA.

(gg)    The foregoing representations, warranties and agreements shall survive the date of the Investor's admission to the Partnership.

7.    The Investor acknowledges that it has been informed of the following disclosure, which is being made pursuant to the disclosure requirement of Rule 506(e) of Regulation D of the Securities Act:

(a)    Auction Rate Securities Investigation and Litigation:

(i)    Beginning in March 2008, several regulatory authorities initiated investigations of a number of industry participants, including J.P. Morgan Chase & Co. ("JPMC") concerning possible state and federal securities law violations in connection with the sale of auction-rate securities ("ARS"). The market for many such securities had frozen and a significant number of auctions for those securities began to fail in February 2008. The actions generally alleged that JPMC and other firms manipulated the market for auction-rate securities by placing bids at auctions that affected these securities' clearing rates or otherwise supported the auctions without properly disclosing these activities.

(ii)    JPMC, on behalf of itself and affiliates, agreed to a settlement with the New York Attorney General's Office which provided, among other things, that JPMC would offer to purchase at par certain ARS purchased from JPMS, Chase Investment Services Corp. and Bear, Stearns & Co. Inc. by individual investors, charities and small to medium-sized businesses. JPMC also agreed to a substantively similar settlement with the Office of Financial Regulation for the State of Florida and the North American Securities Administrators Association Task Force, which agreed to recommend approval of the settlement to all remaining states, Puerto Rico and the U.S. Virgin Islands. JPMC has finalized the settlement agreements with the New York Attorney General's Office and the Office of Financial Regulation for the State of Florida. The settlement agreements

CONFIDENTIAL                                                                                       JPMS_00002373

provide for the payment of penalties totaling $25 million to all states and territories. To date, JPMC has entered into settlements with the majority of states and is in the process of finalizing settlement agreements with the remaining states. In connection with the settlements, a number of state securities commissions issued final orders against JPMC and its affiliates.

(b)     Commodity Exchange Act Investigation and Litigation: On March 8, 2012, JPMS reached a settlement agreement with the CFTC to resolve its investigations of JPMS relating to execution of a prearranged trade that was found to be noncompetitively executed and a fictitious sale. In connection with the settlement, the CFTC issued an order against JPMS finding that JPMS violated Section 4c(a)(1) of the Commodity Exchange Act.

(c)     Residential Mortgage-Backed Securities Judgment:

(i)     On November 16, 2012, the SEC filed a complaint against JPMS and other industry participants (the "Defendants") in the District Court for the District of Columbia alleging that, in connection with an offering of residential mortgage-backed securities ("RMBS") by a JPMS affiliate, JPMS failed to include in the RMBS prospectus supplement delinquency disclosure with respect to mortgage loans that provided collateral for the RMBS offering.

(ii)     On January 8, 2013, the District Court entered a judgment that enjoined the Defendants from violating, directly or indirectly, Sections 17(a)(2) and (3) of the Securities Act. Additionally, the judgment required the Defendants to pay disgorgement in the amount of $177,700,000, prejudgment interest in the amount of $34,865,536 and a civil monetary penalty of $84,350,000. The Defendants consented to the filing of the complaint and the entry of a final judgment without admitting or denying the allegations in the complaint, except as to jurisdiction.

(d)     Municipal Reinvestment Instruments Judgment:

(i)     On July 7, 2011, the SEC filed a complaint against JPMS in the District Court of New Jersey alleging that JPMS engaged in fraudulent practices, misrepresentations and omissions in connection with bidding on municipal reinvestment instruments and that such actions allegedly affected prices of certain reinvestment instruments, deprived certain municipalities of a presumption that their reinvestment instruments were purchased at a fair market value and/or jeopardized the tax-exempt status of certain securities.

(ii)     On July 8, 2011, the District Court entered into a judgment against JPMS that enjoined JPMS from violating, directly or indirectly, Section 15(c)(1)(a) of the Securities Exchange Act of 1934. The judgment also required JPMS to pay disgorgement in the amount of $11,065,969, prejudgment interest in the amount of $7,620,380 and a civil monetary penalty of $32,500,000. JPMS consented to the entry of the judgment without admitting or denying the allegations of the complaint, except as to jurisdiction.

(e)     Synthetic Collateralized Debt Obligation Judgment:

(i)     On June 21, 2011, the SEC filed a complaint against JPMS in the District Court of New York alleging that, in connection with the offering of a largely synthetic

CONFIDENTIAL     JPMS_00002374

collateralized debt obligation ("CDO"), JPMS represented that the collateral manager selected the CDO's investment portfolio but failed to disclose that a hedge fund that took a short position on approximately half of the portfolio's assets played a significant role in the selection process.

(ii)     On June 29, 2011, the District Court entered a judgment that enjoined JPMS from violating, directly or indirectly, Sections 17(a)(2) and (3) of the Securities Act.

(iii)     Additionally, the judgment required JPMS to pay disgorgement in the amount of $18,600,000, prejudgment interest in the amount of $2,000,000 and a civil monetary penalty of $133,000,000. Under the terms of the judgment, JPMS also agreed to comply with undertakings relating to the marketing of certain investment products. JPMS consented to the entry of the judgment without admitting or denying the allegations of the complaint, except as to jurisdiction.

8.     The Investor acknowledges, agrees and is aware that:

(a)     The Partnership and AliphCom have only recently been organized and that the Partnership has no financial or operating history and AliphCom has a limited financial and operating history.

(b)     No federal or state agency has passed upon the Interests or made any finding or determination of the fairness of an investment in the Partnership.

(c)     There are risks of loss of investment incident to the purchase of an Interest.

(d)     There is no established market for the Interests, and there is no established market for the interests of AliphCom, and no public market for the Interests will develop.

(e)     The Partnership Agreement contains substantial restrictions on the transferability of Interests and the Partnership will be subject to substantial contractual and other restrictions on the transferability of the Partnership's shares in AliphCom.

(f)     The Investor will have no right to withdraw from the Partnership except as specifically provided in the Partnership Agreement.

9.     The Investor acknowledges that AliphCom may become an issuer of registered securities and that relevant securities laws restrict (i) the purchase or sale of such securities by any Person who has received material nonpublic information from the issuer of such securities, and (ii) the communication of material nonpublic information to any Person who could reasonably be expected to purchase or sell such securities in reliance upon such information (commonly referred to as "insider trading" or "insider dealing"). In addition, the Investor acknowledges that certain relevant securities laws, including Regulation FD (Fair Disclosure) promulgated by the SEC, prohibit selective disclosure of material nonpublic information by issuers of registered securities, in the absence of suitable confidentiality obligations. Accordingly, the Investor represents and warrants to, and agrees with, the General Partner, JPMIM and the Partnership (for their own benefit and the benefit of AliphCom, to the extent applicable) that all nonpublic information disseminated to the Investor is subject to Section 17.3

1168/48556-115 current/43033193v7                                  16

CONFIDENTIAL

of the Partnership Agreement, and that the Investor will not use, communicate or disclose such information in violation of such securities laws.

      10.    The Investor understands that, in accordance with the Partnership Agreement, the Investor will be required to make Capital Contributions, Additional Payments, payments required pursuant to Section 6.8(a) of the Partnership Agreement (if applicable), and other payments to the Partnership from time to time, on the date specified in a written notice given by the General Partner or JPMIM, which date, except as described below with respect to the initial capital contributions of Investors, will not be less than ten days after the notice has been given. The Investor agrees that it will fund Capital Contributions, Additional Payments and, if applicable, payments required pursuant to Section 6.8(a) of the Partnership Agreement in accordance with the terms and conditions of this Subscription Agreement and the Partnership Agreement and that such obligation is, to the fullest extent permitted by law, irrevocable and without right of offset, reduction, counterclaim or defense. In addition to such Capital Contributions, Additional Payments, and, if applicable, payments required pursuant to Section 6.8(a) of the Partnership Agreement, (i) pursuant to Section 8.3 of the Partnership Agreement, the Investor will be required to pay to the Partnership, which in turn will pay to the Investment Advisor, the Investor's share of the Management Fee, in semi-annual installments in arrears on July 1 and January 1 of each fiscal year, or such later date as may be specified by the Investment Advisor in a written notice delivered to the Investor and (ii) pursuant to Section 11 of this Subscription Agreement, if the Investor is not an investor in J.P. Morgan Digital Growth Fund L.P. (or its conduit), then the Investor will be required to pay an Origination Fee to JPMS or one of its Affiliates. The Investor's obligations in respect of the Management Fee, Origination Fee and, if applicable, payments required pursuant to Section 6.8(a) of the Partnership Agreement, are in addition to, and not in reduction of, its Capital Commitment, and amounts paid by the Investor in respect of the Management Fee and Origination Fee will not be treated as Capital Contributions and will not affect or be taken into account in determining its Unused Capital Commitment **The Investor further understands that it will be required to contribute all or substantially all of its Capital Commitment to the Partnership within 5 days following the Investor's admission to the Partnership.** The Investor also understands that all costs and expenses incurred in connection with any Transfer of its Interest, including legal fees and disbursements, are required to be paid by the Investor. In an effort to facilitate the funding process, the Investor agrees that JPMorgan Chase Bank, N.A. or one of its Affiliates is authorized to debit the Investor's custody/asset account with JPMC for the amount of any Capital Contribution, Management Fee payment, Origination Fee payment, Additional Payment, payments required pursuant to Section 6.8(a) of the Partnership Agreement (if applicable) or other payments required to be made by the Investor on the dates such amounts are due in accordance with the Partnership Agreement or, in the case of the Origination Fee, this Subscription Agreement (without any further action required on the part of the Investor except as described in the immediately following sentence). In addition, the Investor hereby agrees to deposit sufficient funds in such custody/asset account by the dates specified by the General Partner or JPMIM to cover the amount of each such Capital Contribution, Management Fee payment, Origination Fee payment, Additional Payment, payment required pursuant to Section 6.8(a) of the Partnership Agreement (if applicable) and other payments. The Investor agrees and confirms that (i) the Investor will maintain such custody/asset account with JPMC for so long as the Investor holds an Interest, (ii) if there is a change in beneficial ownership of the Investor, the beneficial owner or owners will maintain a custody/asset account at JPMC or one of its Affiliates and (iii) the Investor will not transfer its Interest unless the transferee opens a custody/asset account at JPMC. The Investor acknowledges that no overdraft facility will be available to fund

1168/48556-115 current/43033193v7       17

CONFIDENTIAL

any such amount.  If the funds in the Investor's custody/asset account are in a currency other than the currency required for the Capital Contribution, Management Fee payment, Origination Fee payment, Additional Payment, payment required pursuant to Section 6.8(a) of the Partnership Agreement (if applicable) or other payment, the Investor hereby authorizes JPMorgan Chase Bank, N.A. or one of its Affiliates to exchange the currency in the account for the appropriate currency at the rate of exchange customarily used, and for the service fee customarily charged, by JPMorgan Chase Bank, N.A. or such Affiliate.  If the Investor's Interest is held through a custody/asset account with J.P. Morgan (Suisse) S.A. or J.P. Morgan International Bank Limited, the Investor hereby authorizes the Partnership to make any payments to which the Investor is entitled under the Partnership Agreement to J.P. Morgan (Suisse) S.A. or J.P. Morgan International Bank Limited, as applicable, as the Investor's agent.

11.    In consideration of the placement services provided by JPMS and certain of its Affiliates, each Investor that is not an investor in J.P. Morgan Digital Growth Fund L.P. (or its conduit) and that makes a Capital Commitment to the Partnership shall pay a fee (the "Origination Fee") to JPMS or an Affiliate thereof.  Such Investor's obligation in respect of the Origination Fee is in addition to, and not in reduction of, its Capital Commitment, Management Fee payment obligation, Additional Payment, payments required pursuant to Section 6.8(a) of the Partnership Agreement (if applicable) and other obligations to the Partnership.  The Origination Fee shall be payable in cash upon the admission of the Investor as a limited partner of the Partnership.  The Origination Fee payable by such Investor shall be equal to 1.0% of the Investor's Capital Commitment.

12.    Except as otherwise agreed to in writing by the Partnership, the Investor will indemnify and hold harmless each Covered Person and the Partnership against any losses, claims, damages or liabilities to which any of them may become subject arising out of or based upon any false representation or warranty, or any breach of or failure to comply with any covenant or agreement, made by the Investor in this Subscription Agreement, the SIF or the Investor Certifications, or in any other document furnished to the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates by the Investor in connection with the offering of the Interests.  Except as otherwise agreed to in writing by the Partnership, the Investor will reimburse each Covered Person and the Partnership for their reasonable legal and other expenses (including the reasonable cost of any investigation and preparation) as they are incurred in connection with any action, proceeding or investigation arising out of or based upon the foregoing.  The indemnity and reimbursement obligations of the Investor under this Section 12 shall survive the Investor's admission as a limited partner of the Partnership and shall be in addition to any liability which the Investor may otherwise have (including, without limitation, liability under the Partnership Agreement), and shall be binding upon and inure to the benefit of any successors, assigns, heirs, estates, executors, administrators and personal representatives of each Covered Person and the Partnership.

13.    The Investor hereby irrevocably (to the fullest extent permitted by law) makes, constitutes and appoints the General Partner, JPMIM and each managing member of the General Partner and any officer of JPMIM, any subsequent general partner or investment advisor to the Partnership and each of their directors, managing members and officers, and the liquidating trustee, if any, for the Partnership in its capacity as liquidating trustee for the Partnership for so long as it acts as such, and each of them (each such Person, the "Attorney"), as the Investor's true and lawful agent and attorney-in-fact, with full power to substitute an Affiliate of such Attorney, and with full power and authority to act in the Investor's name, place and stead, and on

1168/48556-115 current/43033193v7                         18

the Investor's behalf, to make, execute (as a deed, if applicable), deliver, swear to, acknowledge, file and record (a) the Partnership Agreement on the date the Investor is admitted as a limited partner of the Partnership; (b) any amendment, modification or change to the Partnership Agreement that is adopted as provided therein or that is necessary or appropriate (as determined by the General Partner or JPMIM in its sole discretion) to fill in dates and similar omitted items; (c) all amendments to and/or restatements of the organizational documents of the Partnership required or permitted by law or the provisions of the Partnership Agreement; (d) all certificates, including certificates of amendment to the Certificate of Limited Partnership of the Partnership, notices, agreements and other instruments deemed necessary by the General Partner, JPMIM or any liquidating trustee to carry out the provisions of the Partnership Agreement, or to permit the Partnership to elect its classification for U.S. federal income tax purposes, or to provide limited liability to the limited partners of the Partnership in each jurisdiction in which the Partnership may be doing business or to effect the transfer of Interests or the admission of additional or substituted limited partners or the engagement of a replacement general partner, tax matters partner, special carry limited partner or investment advisor pursuant to the terms of the Partnership Agreement; (e) all conveyances and other instruments or documents deemed necessary by the General Partner, JPMIM or any liquidating trustee to effect the dissolution or termination of the Partnership, as applicable; (f) any certificate of fictitious name, if required by law, for the Partnership; (g) any tax return or filing, tax compliance documentation, tax records, tax exemption (or reduction) applications, or similar tax documentation, that the General Partner or JPMIM determines to make, execute, deliver, swear to, acknowledge, file and/or record in respect of the Partnership or on behalf of the investors in the Partnership; and (h) such other certificates or instruments as may be required under the laws of the State of Delaware or any other jurisdiction, or by any regulatory agency, as the General Partner, JPMIM or any liquidating trustee may deem necessary or advisable, in each case in accordance with the terms of the Partnership Agreement. The power of attorney granted hereby: (i) to the fullest extent permitted by law is coupled with an interest, shall be irrevocable and shall survive and not be affected by the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of the Investor; (ii) may be exercised by the Attorney, either by signing separately as attorney-in-fact for the Investor or by a single signature of the Attorney, acting as attorney-in-fact for all investors in the Partnership; and (iii) shall survive the assignment by the Investor of the whole or any fraction of the Investor's Interest, except that, where the assignee of the whole of the Investor's Interest has been approved by the General Partner or JPMIM for admission to the Partnership as a Substituted Limited Partner, the power of attorney hereby granted by the Investor shall survive the delivery of such assignment for the sole purpose of enabling the Attorney to execute, swear to, acknowledge and file any instrument necessary or appropriate to effect such substitution.

14.     The Investor understands that the information provided herein will be relied upon by the General Partner, JPMIM and the Partnership to determine the eligibility of the Investor to purchase the Interest. The Investor agrees promptly to notify the Partnership if any of the representations and warranties made by the Investor herein, in the Investor Certifications and/or in the Investor's SIF cease to be accurate and complete. The Investor agrees to provide any additional documents and information that the General Partner or JPMIM reasonably requests, including, without limitation, information relevant to a determination of whether the Investor is an "accredited investor" (as defined under Regulation D of the Securities Act), a "qualified purchaser" (as defined under the Investment Company Act), and/or a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement.

CONFIDENTIAL

15.    The Investor agrees to execute and deliver to the General Partner or JPMIM such additional instruments, documents and agreements and to provide such information as the General Partner, JPMIM or their Affiliates may reasonably request in connection with the matters contemplated by this Subscription Agreement or the Partnership Agreement or as may be necessary to effectuate the intent of any provision of this Subscription Agreement or the Partnership Agreement.

16.    Neither this Subscription Agreement nor any provision hereof may be waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom such waiver, modification, discharge or termination is sought to be enforced.

17.    This Subscription Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.  If the Investor is more than one Person, the obligations of the Investor shall be joint and several, and the agreements, representations, warranties and acknowledgments herein contained shall be deemed to be made by and be binding upon each such Person and its successors and assigns.

18.    This Subscription Agreement, the Investor Certifications, the SIF, the Partnership Agreement, the other agreements and documents referred to herein or in the Partnership Agreement and any "side letter" (as defined in the Partnership Agreement) entered into in connection with the Investor's investment in the Partnership contain the entire agreement of the parties and supersede any prior agreement of the parties, and there are no representations, covenants or other agreements except as stated or referred to herein and in such other agreements or documents.

19.    To the fullest extent permitted by law, this Subscription Agreement is not transferable or assignable by the Investor.

20.    This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the principles of conflicts of laws thereof.

21.    Any term or provision of this Subscription Agreement that is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms or provisions of this Subscription Agreement or affecting the validity or enforceability of any of the terms or provisions of this Subscription Agreement in any other jurisdiction.

22.    In any judicial proceeding involving any dispute, controversy or claim arising out of or relating to this Subscription Agreement or the Partnership or its operations, the Investor (except as otherwise agreed to in writing by the Partnership or unless the Investor is a sovereign entity that is a State of the United States or a political subdivision thereof) unconditionally accepts the non-exclusive jurisdiction and venue of any United States District Court located in the State of Delaware, or the Court of Chancery (or if the Court of Chancery is not the appropriate state court, the appropriate state court) of the State of Delaware, and the appellate courts to which orders and judgments thereof may be appealed.  In any such judicial proceeding, the Investor agrees that in addition to any method for the service of process permitted or required by such courts, to the fullest extent permitted by law, service of process may be made by prepaid certified or registered mail with a proof of mailing receipt validated by the U.S. Postal Service constituting evidence of valid service.  EXCEPT AS OTHERWISE AGREED TO IN WRITING

1168/48556-115 current/43033193v7            20

CONFIDENTIAL                                                            JPMS_00002379

BY THE PARTNERSHIP, THE INVESTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS SUBSCRIPTION AGREEMENT OR RELATING TO THE PARTNERSHIP OR ITS OPERATIONS.  Nothing contained herein shall affect the right of the Partnership to commence any action, suit or proceeding or otherwise to proceed against the Investor in any other jurisdiction or to serve process upon the Investor in any manner permitted by any applicable law in any relevant jurisdiction. The Partnership may agree in writing with any Investor that the provisions of this Section 22 shall not apply, in whole or in part as the Partnership may determine, to such Investor.

23.    To the fullest extent permitted by law, the Investor hereby irrevocably waives the right to arbitration, if any, arising from the documents governing the Investor's account with JPMC (the "Account Opening Documents"), involving any dispute, controversy or claim arising out of or relating to this Subscription Agreement, the SIF, Investor Certifications or the Partnership Agreement or relating to the Partnership or its operations. In addition, the Investor hereby agrees that, in the event of any conflict between this Section 23 and the Account Opening Documents, the provisions of this Section 23 shall govern.

24.    Notwithstanding anything to the contrary in the Investor's Account Opening Documents or the SIF, the Investor acknowledges and agrees that the General Partner or JPMIM may in the future elect (i) to distribute periodic reports, offering document supplements, revised Partnership documents (and/or amendments thereto), including, without limitation, the Partnership Agreement, and/or the Investment Advisory Agreement relating to the Partnership (and/or amendments thereto), and investor notices and other materials to the Investor by electronic mail ("e-mail") to the e-mail address associated with the Investor's account with JPMC, or to the e-mail address specified in writing to JPMIM by the Investor, and/or (ii) to notify the Investor of the availability of such materials at a specified website address.  Unless the Investor has given prior written notice to its JPMorgan representative that it wishes to receive paper copies of such materials, the Investor hereby consents to such delivery and/or such notification in lieu of printed copies of such materials being delivered to the Investor by other means.

25.    This Subscription Agreement may be executed in counterparts with the same effect as if the parties executing the counterparts had all executed one counterpart.

By executing the signature page included as Part V of this Subscription Agreement, the Investor agrees to be bound by the foregoing.

CONFIDENTIAL

## IV. INVESTOR CERTIFICATIONS

This Part IV "Investor Certifications" relates to the offering of the Interests in the Partnership. The purpose of the Investor Certifications is to assist JPMIM and certain of its Affiliates in determining whether the Investor is eligible to invest in and hold an interest in the Partnership. By executing the signature page to this Subscription Agreement, the Investor will be confirming that the information and the representations contained in the Investor Certifications are complete and accurate.

Check only one box:

The Investor hereby certifies (please check applicable box below):

 ☐ The Investor is a "United States person" for U.S. federal income tax purposes (as defined in Appendix I hereto).

☐ The Investor is not a "United States person" for U.S. federal income tax purposes (as defined in Appendix I hereto).

Check each applicable box:

The Investor hereby certifies (please check each applicable box below, if any):

☐ The Investor is an ERISA Investor (including an individual retirement account (IRA)) (as defined in Section 6(j)).

☐ The Investor is a Plan Investor (as defined in Section 6(j)).

☐ The Investor is a tax-exempt organization (generally a pension plan, an individual retirement account, a charitable organization, charitable trust or a religious organization).

Review and confirm the representation below by checking the box:

☑ The Investor is not an employee or director of JPMC or the spouse, domestic partner, minor child and/or financial dependent of an employee or director.

CONFIDENTIAL

JPMS_00002381

## V. SIGNATURE PAGE (Please sign all 3 copies)

This page constitutes the signature page for: (i) the Subscription Agreement, (ii) the Investor Certifications and (iii) the Amended and Restated Agreement of Limited Partnership of the Partnership.  Execution of this page constitutes execution of, and the undersigned hereby authorizes this page to be attached to a counterpart of, each of these documents. The undersigned hereby applies for an interest with a capital commitment to the Partnership of U.S. $ *500,000*.  The undersigned has read and understands that, in addition to (and not in reduction of) the undersigned's Capital Commitment, the undersigned will have a payment obligation in respect of the Management Fee, an Additional Payment Obligation, each as specified in the Partnership Agreement, and, if applicable, a payment obligation pursuant to Section 6.8(a) of the Partnership Agreement. The undersigned has read and understands the consent set forth in Section 24 regarding the electronic delivery of documents, statements, notices and other materials relating to the Partnership.

By signing below, the undersigned:

(i)     represents, warrants and covenants that (x) in connection with this subscription, the undersigned has reviewed the Subscriber Information Form completed by the undersigned and submitted to JPMC and confirmed that the information contained therein is accurate and complete as of the date hereof (or in the case of an Investor acting as the true and lawful agent and attorney-in-fact for a "Look Through" Person, the Investor has confirmed with each "Look Through" Person that the "Look Through" paperwork (as described in the Subscriber Information Form) is accurate and complete), and will be accurate and complete as of the date the Investor is admitted as a limited partner of the Partnership and as of each date on which the Investor makes any capital contribution to the Partnership (unless the undersigned specifically notifies JPMIM to the contrary in writing prior to the date of such admission or contribution, as applicable) and (y) the undersigned will promptly notify JPMIM of any change in any such information; and

(ii)    hereby authorizes JPMC to attach the undersigned's Subscriber Information Form (or "Look Through" paperwork (as described in the Subscriber Information Form) in the case of a "Look Through" Person), whether completed and submitted to JPMC concurrently with this subscription or previously in connection with an investment in any private investment offering, as Exhibit A or Exhibit B (as applicable) to the Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this signature page this 27ᵗʰ day of May, 2014.

FOR INDIVIDUALS:                                    FOR ENTITIES:

GEORGE MATTSON
_____                        _____
Print Name of Limited Partner (Investor)            Print Name of Limited Partner (Investor)

By: _____                        By: _____
Signature of Authorized Signatory                   Signature of Authorized Signatory

_____                        _____
Print Name of Joint Investor, if any                Print Name of Authorized Signatory

_____                        _____
Signature of Joint Investor, if any                 Print Title of Authorized Signatory

Accepted and Agreed as of June 2, 2014.

J.P. Morgan Investment Management Inc.,
*in its capacity as investment advisor, and on behalf of Digital Growth Co-Investment 2, L.P.*

By: _____
    Name:   David A. Taplitz
    Title:  Executive Director

1168/48556-115 current/43033193v7                   23

CONFIDENTIAL

## V. SIGNATURE PAGE (Please sign all 3 copies)

This page constitutes the signature page for: (i) the Subscription Agreement, (ii) the Investor Certifications and (iii) the Amended and Restated Agreement of Limited Partnership of the Partnership. Execution of this page constitutes execution of, and the undersigned hereby authorizes this page to be attached to a counterpart of, each of these documents. The undersigned hereby applies for an Interest with a capital commitment to the Partnership of U.S. $ *500,000*. The undersigned has read and understands that, in addition to (and **not in reduction of) the undersigned's Capital Commitment, the undersigned will have a payment** obligation in respect of the Management Fee, an Additional Payment Obligation, each as specified in the Partnership Agreement, and, if applicable, a payment obligation pursuant to Section 6.8(a) of the Partnership Agreement. The undersigned has read and understands the consent set forth in Section 24 regarding the electronic delivery of documents, statements, notices and other materials relating to the Partnership.

By signing below, the undersigned:

(i)     represents, warrants and covenants that (x) in connection with this subscription, the undersigned has reviewed the Subscriber Information Form completed by the undersigned and submitted to JPMC and confirmed that the information contained therein is accurate and complete as of the date hereof (or in the case of an Investor acting as the true and lawful agent and attorney-in-fact for a "Look Through" Person, the Investor has confirmed with each "Look Through" Person that the "Look Through" paperwork (as described in the Subscriber Information Form) is accurate and complete), and will be accurate and complete as of the date the Investor is admitted as a limited partner of the Partnership and as of each date on which the Investor makes any capital contribution to the Partnership (unless the undersigned specifically notifies JPMIM to the contrary in writing prior to the date of such admission or contribution, as applicable) and (y) the undersigned will promptly notify JPMIM of any change in any such information; and

(ii)    hereby authorizes JPMC to attach the undersigned's Subscriber Information Form (or "Look Through" paperwork (as described in the Subscriber Information Form) in the case of a "Look Through" Person), whether completed and submitted to JPMC concurrently with this subscription or previously in connection with an investment in any private investment offering, as Exhibit A or Exhibit B (as applicable) to the Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this signature page this 27th day of May 20 14.

FOR INDIVIDUALS:                                       FOR ENTITIES:

GEORGE MATTSON
_____                                _____
Print Name of Limited Partner (Investor)               Print Name of Limited Partner (Investor)

By: _____                            By: _____
Signature of Authorized Signatory                      Signature of Authorized Signatory

_____                                _____
Print Name of Joint Investor, if any                   Print Name of Authorized Signatory

_____                                _____
Signature of Joint Investor, if any                    Print Title of Authorized Signatory

Accepted and Agreed as of June 2, 20 14.

J.P. Morgan Investment Management Inc.,
*in its capacity as investment advisor, and on behalf of*
*Digital Growth Co-Investment 2, LP.*

By: _____
      Name:
      Title:        David A. Taplitz
                    Executive Director

1168/48556-115 current/43033193v7                    24

## V. SIGNATURE PAGE (Please sign all 3 copies)

This page constitutes the signature page for: (i) the Subscription Agreement, (ii) the Investor Certifications and (iii) the Amended and Restated Agreement of Limited Partnership of the Partnership. Execution of this page constitutes execution of, and the undersigned hereby authorizes this page to be attached to a counterpart of, each of these documents. The undersigned hereby applies for an Interest with a capital commitment to the Partnership of U.S. $ *500,000*. The undersigned has read and understands that, in addition to (and not in reduction of) the undersigned's Capital Commitment, the undersigned will have a payment obligation in respect of the Management Fee, an Additional Payment Obligation, as specified in the Partnership Agreement, and, if applicable, a payment obligation pursuant to Section 6.8(a) of the Partnership Agreement. The undersigned has read and understands the consent set forth in Section 24 regarding the electronic delivery of documents, statements, notices and other materials relating to the Partnership.

By signing below, the undersigned:

(i)     represents, warrants and covenants that (x) in connection with this subscription, the undersigned has reviewed the Subscriber Information Form completed by the undersigned and submitted to JPMC and confirmed that the information contained therein is accurate and complete as of the date hereof (or in the case of an Investor acting as the true and lawful agent and attorney-in-fact for a "Look Through" Person, the Investor has confirmed with each "Look Through" Person that the "Look Through" paperwork (as described in the Subscriber Information Form) is accurate and complete), and will be accurate and complete as of the date the Investor is admitted as a limited partner of the Partnership and as of each date on which the Investor makes any capital contribution to the Partnership (unless the undersigned specifically notifies JPMIM to the contrary in writing prior to the date of such admission or contribution, as applicable) and (y) the undersigned will promptly notify JPMIM of any change in any such information; and

(ii)    hereby authorizes JPMC to attach the undersigned's Subscriber Information Form (or "Look Through" paperwork (as described in the Subscriber Information Form) in the case of a "Look Through" Person), whether completed and submitted to JPMC concurrently with this subscription or previously in connection with an investment in any private investment offering, as Exhibit A or Exhibit B (as applicable) to the Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this signature page this 25th day of May, 20 14

FOR INDIVIDUALS:                                         FOR ENTITIES:

GEORGE MATSON
_____                                  _____
Print Name of Limited Partner (Investor)                 Print Name of Limited Partner (Investor)

By: _____                                      By: _____
Signature of Authorized Signatory                        Signature of Authorized Signatory

_____                                  _____
Print Name of Joint Investor, if any                     Print Name of Authorized Signatory

_____                                  _____
Signature of Joint Investor, if any                      Print Title of Authorized Signatory

Accepted and Agreed as of June 2, 20 14

J.P. Morgan Investment Management Inc.,
*In its capacity as investment advisor, and on behalf of*
*Digital Growth Co-Investment 2, L.P.*

By: _____
    Name:
    Title:      David A. Taplitz
                Executive Director

1168/48556-115 current/43033193v7                        25

# EXHIBIT E

### III. SUBSCRIPTION AGREEMENT

Digital Growth Co-Investment 2, L.P.
c/o J.P. Morgan Securities LLC

Ladies and Gentlemen:

1.      The investor identified on the signature page hereto (the "Investor") hereby applies to become a limited partner of Digital Growth Co-Investment 2, L.P., a Delaware limited partnership (the "Partnership"), on the terms and conditions set forth in this Subscription Agreement and in the Amended and Restated Agreement of Limited Partnership of the Partnership (as it may be revised, finalized and/or amended from time to time, the "Partnership Agreement"), a form of which has been furnished to the Investor. Capitalized terms used but not defined in this Subscription Agreement have the meanings specified in the Partnership Agreement.

2.      To the fullest extent permitted by law, the Investor hereby irrevocably subscribes for a limited partner interest in the Partnership (an "Interest") and agrees to make (a) capital contributions to the Partnership in an amount equal to the Investor's Capital Commitment as set forth on the signature page hereto (subject to reduction as provided in Section 4 below), (b) additional payments to the Partnership in an amount equal to the Investor's Additional Payment Obligation, (c) payments in respect of the Investor's share of the Management Fee and (d) if applicable, payments required pursuant to Section 6.8(a) of the Partnership Agreement.

3.      The Investor acknowledges and agrees that Digital Growth Co-Investment 2 LLC, a Delaware limited liability company, is the initial general partner of the Partnership (for so long as it is serving as general partner of the Partnership, and any other Person who, at a particular time, is serving as the general partner of the Partnership, the "General Partner"), and that J.P. Morgan Investment Management Inc., a Delaware corporation ("JPMIM"), is the initial investment advisor to the Partnership, and that the General Partner or JPMIM will notify the Investor as to the conditional acceptance, in whole or in part, or rejection of the Investor's subscription for an Interest. An Interest shall not be deemed to be sold or issued to, or owned by, the Investor until the Investor is admitted as a limited partner of the Partnership (notice of which shall be given promptly to the Investor). The Investor agrees that the General Partner or JPMIM shall have the right, in their sole discretion, to admit the Investor as a limited partner of the Partnership on the date of the initial closing of the Partnership or at any Subsequent Closing. If admission is accepted by the General Partner or JPMIM, JPMIM, in its capacity as investment advisor to the Partnership, and on behalf of the Partnership, shall execute the signature page hereto. Subject to and upon the Investor's admission as a limited partner of the Partnership by the General Partner or JPMIM, the Investor hereby adopts, accepts and agrees to be bound by the terms and conditions of the Partnership Agreement.

4.      The Investor acknowledges and agrees that the General Partner or JPMIM shall have the right, in their sole discretion, to reject this subscription for an Interest, in whole or in part, for any reason (including, without limitation, for regulatory reasons), at any time prior to the date the Investor is admitted as a limited partner of the Partnership, notwithstanding execution by or on behalf of the Investor of the signature page hereto or notice from the General Partner or JPMIM of its conditional acceptance of the Investor's subscription for an Interest. Upon the admission of the Investor as a limited partner of the Partnership, the Investor's Capital

CONFIDENTIAL

JPMS_00009793

Commitment shall be set forth on Schedule A to the Partnership Agreement in accordance with the terms thereof.

5. If this subscription is rejected in full, or in the event the closing applicable to the Investor does not occur (in which event this subscription shall be deemed to be rejected), this Subscription Agreement shall thereafter have no force or effect.

6. The Investor hereby represents and warrants to, and agrees with, the Partnership, the General Partner and JPMIM, in its capacity as Investment Advisor to the Partnership, that, except as disclosed in writing to JPMIM prior to the date the Investor is admitted as a limited partner of the Partnership, the following statements are true as of the date set forth on the signature page hereto and will be true as of the date such Investor is admitted as a limited partner of the Partnership and as of each date on which the Investor makes any capital contribution to the Partnership:

(a) The Investor is fully aware that (i) the offering and sale of Interests in the Partnership have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state or non-U.S. jurisdiction, and are being made in reliance upon federal, state and non-U.S. exemptions for transactions not involving a public offering; and (ii) the Partnership will not be registered as an investment company under the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act"), in reliance upon an exemption therefrom in Section 3(c)(7) thereof. In furtherance thereof, the Investor (v) represents and warrants that it is an "accredited investor" (as defined in Regulation D under the Securities Act) and a "qualified purchaser" (as defined under the Investment Company Act) and that it meets any additional or different suitability standards imposed by the state or other jurisdiction of the Investor's domicile with respect to investing in the Partnership, (w) represents and warrants that it (and each, if any, "beneficial owner"[1] of its Interest) has not been subject to any disqualifying event (as contemplated by Rule 506(d) of Regulation D) (a "Disqualifying Event") and is not subject to any proceeding or event that could result in a Disqualifying Event, (x) acknowledges and agrees that the Subscriber Information Form attached hereto as <u>Exhibit A</u> or <u>Exhibit B</u>, as applicable (the "SIF"), whether previously completed and submitted to JPMorgan Chase & Co. or one of its Affiliates (collectively, "JPMC") or completed and submitted to JPMC in connection herewith, forms an integral part of this Subscription Agreement, (y) represents and warrants that the information relating to the Investor set forth in the Investor Certifications included in Part IV of this Subscription Agreement (the "Investor Certifications") and in the SIF attached hereto as <u>Exhibit A</u> or <u>Exhibit B</u>, as applicable, and, in each case, forming a part of this Subscription Agreement, is complete and accurate as of the date set forth on the signature page hereto and will be complete and accurate as of the date the Investor is admitted as a limited partner of the Partnership, and agrees that should a Disqualifying Event occur after the Investor becomes a limited partner of the Partnership, the Investor shall notify the General Partner and JPMIM promptly in writing thereof and shall at the request of the General Partner or JPMIM use commercially reasonable efforts to eliminate any adverse effect of the Disqualifying Event on the Partnership and its Affiliates, and (z) represents and warrants that the Investor was not made aware of the offering of Interests by any form of general solicitation or general advertising. In

---

[1] Any beneficial owner of 20% or more of the Partnership's outstanding voting equity securities, determined in accordance with Rule 13d-3 under the Securities Exchange Act of 1934, as amended, which includes persons who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise, have share (or are deemed to have share) the power to vote or dispose of the relevant securities.

CONFIDENTIAL                                          JPMS_00009794

addition, the Investor agrees to promptly confirm in writing to JPMIM and the General Partner whether any of the foregoing information continues to be accurate, in connection with and prior to each issuance of an Interest and otherwise to the extent requested and further acknowledges and agrees that the General Partner and JPMIM shall understand and deem the failure by the Investor to respond in writing within 3 days (or such longer period as may be required by law) to such requests to be an affirmation and restatement of the representations, warranties and covenants in this Section 6(a).

(b)   The Investor's Interest is being acquired for the Investor's own account solely for investment and not with a view to resale or distribution thereof, and the Investor has no present intention of selling, granting participations in or otherwise distributing the Investor's Interest.

(c)   The Investor (either alone or together with any advisors retained by the Investor in connection with evaluating the merits and risks of the prospective investment) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of purchasing an Interest in the Partnership, including the risks set forth under the captions "Risk Factors" and "Potential Conflicts of Interest" in the Confidential Offering Memorandum relating to the Partnership, as it may be supplemented from time to time (the "Memorandum") and is able to bear the economic risk of its investment in the Partnership for an indefinite period of time, including a complete loss of capital. The Investor's Capital Commitment to the Partnership and commitments to and/or investments in other investments which are not readily marketable are not, in the aggregate, disproportionate to the Investor's net worth.

(d)   The Investor has been furnished with, and has carefully read, (i) the Memorandum, (ii) the Partnership Agreement, (iii) the Investment Advisory Agreement relating to the Partnership, (iv) the Confidential Memorandum of Terms for Series 6 Convertible Preferred Stock Financing of AliphCom (the "Series 6 Preferred Term Sheet"), (v) the AliphCom Summary Capitalization Table (the "AliphCom Capitalization Table"), (vi) AliphCom's unaudited consolidated financial statements as of and for the year ended December 31, 2013 and audited consolidated financial statements as of and for the years ended December 31, 2012 and 2011 and the accompanying report of its independent auditor, KPMG LLP (the "AliphCom Financial Statements"), (vii) a draft of the Amended and Restated Articles of Incorporation of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom Certificate"), (viii) a draft of the Amended and Restated Bylaws of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom Bylaws"), (ix) a draft of the Seventh Amended and Restated Investor Rights Agreement of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom IRA"), (x) a draft of the Fourth Amended and Restated Right of First Refusal Agreement of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom ROFR Agreement"), (xi) a draft of the Fifth Amended and Restated Voting Rights Agreement of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom Voting Agreement") and (xii) a draft of the Series 6 Preferred Stock Purchase Agreement of AliphCom (as it may be revised, finalized and/or amended from time to time, the "AliphCom SPA" and collectively with the Series 6 Preferred Term Sheet, the AliphCom Capitalization Table, the AliphCom Financial Statements, the AliphCom Certificate, the AliphCom Bylaws, the AliphCom IRA, the AliphCom ROFR Agreement and the AliphCom Voting Agreement, the "Offering Documents") and (prior to entering into this Subscription Agreement) a copy of Part 2A of the Form ADV of JPMIM.  To the full satisfaction of the Investor, the Investor has been

CONFIDENTIAL                                           JPMS_00009795

given the opportunity to (i) ask questions of, and receive answers from JPMIM concerning the terms and conditions of the offering of Interests and other matters pertaining to an investment in the Partnership and (ii) obtain any additional information necessary to evaluate the merits and risks of an investment in the Partnership and AliphCom or to verify the information contained in the Memorandum, or the AliphCom Capitalization Table which JPMIM can acquire without unreasonable effort or expense. The Investor acknowledges and agrees that the Investor has received drafts of the Series 6 Preferred Term Sheet, the AliphCom Capitalization Table, the AliphCom Financial Statements, the AliphCom Certificate, the AliphCom Bylaws, the AliphCom IRA, the AliphCom ROFR Agreement, the AliphCom Voting Agreement and the AliphCom SPA and that prior to the closing of the sale of shares of Series 6 Preferred Stock of AliphCom (and after such closing, by amendment pursuant to the terms of such agreements), the terms of the AliphCom Certificate, the AliphCom Bylaws, the AliphCom IRA, the AliphCom ROFR Agreement, the AliphCom Voting Agreement and the AliphCom SPA and the capitalization of AliphCom reflected in the AliphCom Capitalization Table may change from those included in the drafts reviewed by the Investor, in each case, without notice to the Investor. The Investor understands the fees and conflicts of interest to which the Partnership is subject (as described in the Offering Documents) and hereby consents and agrees to the payment of such fees to the parties identified as the recipients thereof and to such conflicts of interest. In considering its investment in the Partnership, the Investor has not relied upon any representations made by, or other information (whether oral or written) furnished by or on behalf of, the Partnership, the General Partner, JPMIM, AliphCom, or any director, officer, employee, agent or Affiliate of such Persons, other than as set forth in the Offering Documents and any "side letter". The Investor has carefully considered and has, to the extent it believes such discussion necessary, discussed with legal, tax, accounting and financial advisers the suitability of an investment in the Partnership in light of its particular tax and financial situation, and has determined that an investment in the Partnership is a suitable investment for it. Further, the Investor acknowledges, agrees and confirms that with respect to the tax and other legal consequences of such an investment, it is relying solely upon the advice of such advisers and not upon the general discussion of such matters set forth in the Offering Documents.

(e)     If the Investor is an Entity, it was not formed or recapitalized (*e.g.*, through new investments made in the Investor solely for the purpose of financing its acquisition of the Interest and not pursuant to a prior financial commitment) for the purpose of investing in the Partnership.

(f)     If the Investor is an Entity: (i) its decision to invest in the Partnership was made in a centralized fashion (*e.g.*, by a board of directors, general partner, manager, trustee, investment committee or similar governing or managing body); (ii) the Investor is not managed to facilitate the individual decisions of its beneficial owners regarding investments (including an investment in the Partnership); and (iii) the Investor's shareholders, partners, members, beneficiaries, grantors or other participants, as applicable, did not and will not (x) contribute additional capital for the purpose of acquiring an Interest in the Partnership, (y) have any discretion to determine whether or how much of the Investor's assets are invested in any investment made by the Investor (including the Investor's investment in the Partnership), or (z) have the ability individually to elect whether or to what extent such shareholder, partner, member, beneficiary, grantor or other participant, as applicable, will participate in the Investor's investment in the Partnership.

CONFIDENTIAL                                                             JPMS_00009796

(g)     The Investor is not a participant-directed defined contribution plan (such as a 401(k) plan).

(h)     The Investor's Capital Commitment to the Partnership represents less than 40% of the value of the Investor's total assets.  The Investor is not structured or operated for the purpose or as a means of circumventing the provisions of the Investment Company Act.

(i)     If the Investor is an Entity, it is not (i) an "investment company" within the meaning of the U.S. Investment Company Act, (ii) a "business development company" within the meaning of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act"), or (iii) a non-U.S. investment company that is not required to register as an "investment company" under the Investment Company Act pursuant to Section 7(d) thereunder.  If the Investor is an Entity that is relying upon Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to except itself from the definition of "investment company" under, or the registration provisions of, the Investment Company Act (an "Excepted Investment Company"), (y) each beneficial owner of the Investor's outstanding securities, other than short-term paper (and, if an Excepted Investment Company has invested in the Investor and directly or indirectly controls, is controlled by or is under common control with the Investor or the Partnership, each beneficial owner of the outstanding securities, other than short-term paper, of such Excepted Investment Company), in each case if such beneficial owner acquired such securities on or before April 30, 1996, has consented to the treatment of the Investor and the Partnership as a "qualified purchaser" or (z) if such Investor (or such Excepted Investment Company that has invested in the Investor) is a "family company" (as defined in the SIF), all trustees, directors, general partners or managing members of such Investor (or such Excepted Investment Company) have unanimously consented to the treatment of the Investor and the Partnership as a "qualified purchaser." In addition, if the Investor is an Excepted Investment Company and directly or indirectly controls, is controlled by or is under common control with the Partnership (and/or if an Excepted Investment Company has invested in the Investor and directly or indirectly controls, is controlled by or is under common control with the Partnership), (y) each beneficial owner of the outstanding securities, other than short-term paper, of the Investor (or such Excepted Investment Company that has invested in the Investor, as applicable), in each case if such beneficial owner acquired such securities on or before April 30, 1996, has consented to the treatment of the Partnership as a "qualified purchaser" or (z) if such Investor (or such Excepted Investment Company that has invested in the Investor) is a "family company" (as defined in the SIF), all trustees, directors, general partners or managing members of such Investor (or such Excepted Investment Company, as applicable) have unanimously consented to the treatment of the Partnership as a "qualified purchaser."

(j)     The Investor is not (unless it has otherwise indicated in the Investor Certifications) (i) a "benefit plan investor" within the meaning of Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (a "Benefit Plan Investor"), (ii) investing assets allocated to an entity or an insurance company general or separate account or other account, deemed to be holding "plan assets" within the meaning of ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (iii) a "governmental plan" within the meaning of Section 3(32) of ERISA, a "foreign plan" or another plan or retirement arrangement that is not subject to Part 4 of Subtitle B of Title I of ERISA and with respect to which Section 4975 of the Code does not apply.  An Investor described in either of clauses (i) or (ii) of this Section 6(j) is referred to herein as an "ERISA Investor." An Investor described in clause (iii) of this Section 6(j) is referred to herein as a "Plan Investor."  The

CONFIDENTIAL

JPMS_00009797

Investor understands that, if he or she is investing through an individual retirement account or annuity, disclosure must be made in accordance with this paragraph.

(k)   If the Investor is an ERISA Investor or Plan Investor, then (i) it has been informed of and understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Partnership; (ii) it is aware of the provisions of Section 404 of ERISA or similar law applicable to the Investor ("Similar Law") relating to fiduciary duties, including if applicable, the requirement for diversifying the investments of an employee benefit plan subject to ERISA; (iii) it has given appropriate consideration to the facts and circumstances relevant to the investment by such ERISA Investor or Plan Investor in the Partnership and has determined that such investment is reasonably designed, as part of such ERISA Investor's or Plan Investor's portfolio of investments, to further the purposes of the relevant plan(s); (iv) its investment in the Partnership is consistent with the requirements of Section 404 of ERISA or Similar Law; (v) it understands that current income will not be a primary objective of the Partnership; (vi) its acquisition, and subsequent holding of an Interest in the Partnership is not a "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code or Similar Law; (vii) its decision to invest in the Partnership was made by fiduciaries independent of the General Partner, JPMIM, J.P. Morgan Securities LLC ("JPMS") or any Affiliate of the General Partner, JPMIM or JPMS who have concluded, after consideration of their fiduciary duties under applicable law, that the investment of assets of such ERISA Investor or Plan Investor in the Partnership is prudent; and (viii) it is not relying and has not relied on the General Partner, JPMIM, JPMS, AliphCom or any Affiliate of the General Partner, JPMIM, JPMS or AliphCom for any evaluation or other investment advice in respect of the advisability of an investment in the Partnership in light of the plan's assets, cash needs, investment policies or strategy, overall portfolio composition or plan for diversification of assets.

(l)   The Investor is not (unless it has otherwise so disclosed in writing to JPMIM) a "charitable remainder trust" within the meaning of Section 664 of the Code. If the Investor is a charitable remainder trust, the Investor acknowledges that it understands the risks, including the tax risks, associated with its investment in the Partnership.

(m)   The Investor is not (unless it has otherwise so disclosed in the SIF attached hereto as Exhibit A or Exhibit B, as applicable, or in writing to JPMIM) an individual retirement account or annuity.

(n)   The Investor will conduct its business and affairs (including its investment activities) in a manner such that it will be able to honor its obligations under this Subscription Agreement and the Partnership Agreement.

(o)   If the Investor is an Entity, it is duly organized or formed, validly existing and in good standing under the laws of its jurisdiction of organization or formation, and the execution, delivery and performance by it of this Subscription Agreement, the Investor Certifications, the SIF, and the Partnership Agreement are within the Investor's powers, have been duly authorized by all necessary corporate or other action on its behalf, require no action by or in respect of, or filing with, any governmental body, agency or official, and do not and will not contravene, or constitute a default under, any provision of applicable law or regulation or of its certificate of incorporation or other comparable organizational documents or any agreement, judgment, injunction, order, decree or other instrument to which the Investor is a party or by which the Investor or any of its properties is bound. This Subscription Agreement and the SIF constitute, and 🗨e Investor is admitted as a limited partner of the Partnership, the Partnership Agreement

1168/48556-115 current/43033193v7              6

will constitute, valid and binding agreements of the Investor, enforceable against the Investor in accordance with their respective terms, except that (i) enforceability may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors rights in general and (ii) enforceability is subject to general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(p)    If the Investor is a natural person, the execution, delivery and performance by the Investor of this Subscription Agreement, the Investor Certifications, the SIF and the Partnership Agreement are within the Investor's legal right, power and capacity, require no action by or in respect of, or filing with, any governmental body, agency or official, and do not and will not contravene, or constitute a default under, any provision of applicable law or regulation or of any agreement, judgment, injunction, order, decree or other instrument to which the Investor is a party or by which the Investor or any of his or her properties is bound. This Subscription Agreement and the SIF constitute, and if the Investor is admitted as a limited partner of the Partnership, the Partnership Agreement will constitute, valid and binding agreements of the Investor, enforceable against the Investor in accordance with their respective terms.

(q)    The Investor understands and agrees that JPMS or any Affiliate of JPMIM or JPMS (each a "JPM Securities Affiliate") may engage in "agency cross transactions" as defined in Reg. Section 275.206(3)-2 ("Agency Cross Transactions") promulgated by the Securities and Exchange Commission (the "SEC") under the Investment Advisers Act in which the JPM Securities Affiliate acts as a broker for both the Investor or the Partnership and for another person on the other side of the transaction. The Investor understands and agrees that the JPM Securities Affiliate may receive commissions from, and have a potentially conflicting division of loyalties and responsibilities regarding, both parties to such Agency Cross Transactions. THIS CONSENT, AS TO AGENCY CROSS TRANSACTIONS EFFECTED ON BEHALF OF THE INVESTOR, MAY BE REVOKED AT ANY TIME BY WRITTEN NOTICE FROM THE INVESTOR TO JPMIM. THIS CONSENT, AS TO AGENCY CROSS TRANSACTIONS EFFECTED ON BEHALF OF THE PARTNERSHIP, MAY BE REVOKED AT ANY TIME BY WRITTEN NOTICE TO JPMIM FROM A MAJORITY IN INTEREST OF THE INDEPENDENT LIMITED PARTNERS.

(r)    The Investor has carefully read and understands the paragraph entitled "Transactions with AliphCom" under the caption entitled "Potential Conflicts of Interest" in the Memorandum. The Investor acknowledges and further understands that there may be situations in which the interests of the Partnership may conflict with the interests of JPMIM, its respective Affiliates or J.P. Morgan Digital Growth Fund L.P., including the conflicts of interest that are identified in the Partnership Agreement and the Memorandum. The Investor agrees that the activities of JPMIM and its respective Affiliates specifically authorized or contemplated by or described in the Partnership Agreement and the Memorandum may be engaged in by JPMIM or any such Affiliate, as the case may be, and will not, in any case or in the aggregate, be deemed a breach of this Subscription Agreement, the Partnership Agreement or any duty owed by any such Person to the Partnership or to the Investor.

(s)    The Investor understands, acknowledges and agrees that the General Partner or JPMIM may present a completed copy of the Investor's SIF, the Investor Certifications and/or this Subscription Agreement to such Persons as the General Partner or JPMIM, in its sole discretion, deems appropriate if called upon to establish that (i) the proposed offer and sale of the Interests is exempt from registration under the Securities Act or meets the requirements of applicable securities laws of any state or other jurisdiction, (ii) the Partnership is exempt from

1168/48556-115 current/43033193v7                                        7

registration under the Investment Company Act, (iii) the proposed offer and sale of the Interests is not a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or Similar Law, (iv) JPMIM is in compliance with the Investment Advisers Act, (v) the Partnership, the General Partner, JPMIM, JPMS, JPMII or any service provider to the Partnership or any of their respective Affiliates is in compliance with applicable laws and regulations, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (the "USA PATRIOT Act") or (vi) the Partnership may make and/or hold an indirect investment in AliphCom. The Investor further understands, acknowledges and agrees that (w) if required by law, rule or regulation (as reasonably determined by JPMIM after consultation with legal counsel to JPMIM), or to minimize or otherwise mitigate or reduce withholding or other taxes imposed by the United States, any state in the United States or any non-U.S. jurisdiction, the Partnership may disclose personal information with respect to the Investor, (x) a completed copy of the Investor's SIF, the Investor Certifications and/or this Subscription Agreement may be provided to lenders and prospective lenders to the Partnership, (y) each of the Partnership, the General Partner and JPMIM may disclose, as required by applicable law or as requested by any governmental body, agency or official in connection with this offering or the operations of the Partnership, the name of the Investor, the amount of its Capital Commitment and contributions to the Partnership and such other information required by applicable law or as requested by any governmental body, agency or official and (z) the offering of Interests may be reported to the SEC or to state securities commissioners pursuant to the requirements of applicable federal law and of various state securities laws.

(t)      (i)      The Investor hereby certifies under penalties of perjury that the information set forth in the Subscription Agreement, the SIF and any attachments thereto, in the Investor Certifications and on the signature page hereto is true and correct, including: (x) whether the Investor is a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement and (y) if the Investor is a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement, whether the Investor is a grantor trust that is treated as owned by a grantor or another person under subpart E of subchapter J of the Code (a "grantor trust").

(ii)      If the Investor is a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement (other than a disregarded entity owned by a person who is not a "United States person," as so defined), the Investor is delivering to the Partnership an Internal Revenue Service Form W-9 and will deliver a new Form W-9 upon the obsolescence, expiration or invalidity of any such form previously delivered by the Investor or upon the request of JPMIM, and hereby certifies under penalties of perjury that the Investor's social security or employer identification number set forth in such Form W-9 is true and correct and that the Investor is not subject to backup withholding because (x) the Investor is exempt from backup withholding or (y) the Investor has not been notified by the Internal Revenue Service that the Investor is subject to backup withholding as a result of a failure to report all interest or dividends (or, if the Investor has been so notified, the Internal Revenue Service has subsequently notified the Investor that the Investor is no longer subject to backup withholding). The Investor agrees to notify the Partnership within sixty (60) days after it ceases to be a United States person or any of the foregoing information changes.

(iii)      If the Investor (x) is not a "United States person" for U.S. federal

CONFIDENTIAL                                                                              JPMS_00009800

income tax purposes, as defined in Appendix I to this Subscription Agreement, (y) is a grantor trust and one or more grantors is not a "United States person," as so defined or (z) is a disregarded entity with an owner that is not a "United States person," as so defined:

(A)  the Investor is delivering to the Partnership an appropriate Internal Revenue Service Form W-8 (and any additional information that JPMIM may request) and will deliver a new Form W-8 upon the obsolescence, expiration or invalidity of any such form previously delivered by the Investor or upon the request of JPMIM, in each case, signed under penalties of perjury by such non-U.S. Investor (unless such non-U.S. Investor is a "disregarded entity" for U.S. federal income tax purposes) and by each such grantor or such owner, as the case may be and, in the case of a grantor trust, a statement under penalties of perjury identifying the portion of trust income allocable to each grantor.

(iv)  If the Investor is not a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement, and the Investor intends to claim treaty benefits under an income tax treaty between the United States and the Investor's jurisdiction with respect to the Investor's indirect share of any item of income of AliphCom or the Investor's share of any item of the Partnership's income that is not derived from AliphCom, the Investor represents that either:

(A)  the laws of the Investor's jurisdiction require the Investor to separately take into account on a current basis the Investor's indirect share of each such item of AliphCom's income and the Investor's share of each such item of the Partnership's income, whether or not distributed to the Investor, and the character and source of each such item in the hands of the Investor will be determined as if each such item were realized directly from the source from which it was realized by AliphCom or the Partnership; or

(B)  the laws of the Investor's jurisdiction do not require the Investor to separately take into account the Investor's indirect or direct share of each such item, but (1) the Investor is required to take into account on a current basis the Investor's indirect or direct share of all such non-separately stated items of AliphCom's and the Partnership's income, whether or not distributed to the Investor, and (2) each such item, if separately taken into account by the Investor, would result in an income tax liability for the Investor that is the same as the income tax liability that will result when the Investor does not take the item into account separately.

The Investor cannot make either of the foregoing representations if, under the laws of the Investor's jurisdiction, the Investor is required to include in gross income its share of all or a part of AliphCom's or the Partnership's income on a current basis under any type of anti-deferral or comparable mechanism.  For purposes of this clause (t)(iv), an Investor's jurisdiction is the jurisdiction where the Investor is organized or incorporated or may otherwise be considered a resident under the laws of that jurisdiction.

(v)  If any beneficial owner of any interest in the Investor is not a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement, and intends to claim treaty benefits under an income tax treaty between the United States and the jurisdiction of such beneficial owner with respect to such beneficial owner's indirect share of any item of income of AliphCom or

CONFIDENTIAL                                                                 JPMS_00009801

any item of the Partnership's income that is not derived from AliphCom, the Investor represents that the Investor has received from each such beneficial owner a written representation that the statements set forth in either clause (t)(iv)(A) or clause (t)(iv)(B) apply to such beneficial owner's indirect share of each such item of income.

(u)     The Investor agrees to cooperate with the General Partner and JPMIM and provide in a timely manner any additional forms, certificates, documents and other information that the General Partner or JPMIM, each in its sole discretion, requests (including, without limitation, any information with respect to any beneficial owner of an interest in the Investor and any tax reference numbers) concerning any tax return or filing, tax compliance documentation, tax records, tax exemption (or reduction) applications or similar tax documentation (including, without limitation, any information requested relating to or to comply with all U.S. federal withholding provisions) that the General Partner or JPMIM determines should be made in respect of the Partnership or on behalf of investors in the Partnership. In addition, (i) the Investor consents on behalf of itself and its beneficial owners to the use of any information or documentation provided by the Investor for purposes of complying with the foregoing (including, without limitation, any information or documentation requested to comply with withholding requirements under Sections 1471-1474 of the Code or any other U.S. federal, state, local or non-U.S. withholding provisions), and (ii) the Investor acknowledges on behalf of itself and its beneficial owners that any such information or documentation may be disclosed to the Internal Revenue Service or any other governmental authority. Failure to comply with the foregoing could result in the imposition of withholding taxes on distributions made to the Investor and other adverse consequences under the Partnership Agreement.

(v)     The Investor is not acting as agent or nominee on behalf of any other Person in connection with the Investor's investment in the Partnership.

(w)     In addition to, and not in limitation of, the other restrictions on assignment and transfer contained herein and in the Partnership Agreement, the Investor will not assign or transfer the Investor's Interest (or any interest therein) on or through an "established securities market" or a "secondary market or the substantial equivalent thereof," as such terms are used in Section 1.7704-1 of the Treasury Regulations. The Investor understands that (i) the Partnership intends to be classified as a partnership for U.S. federal income tax purposes and not as a "publicly traded partnership" within the meaning of Section 7704 of the Code and (ii) the Partnership will file a U.S. partnership information return annually disclosing to the Internal Revenue Service each partner's identity and its distributive share of the Partnership income, gain, loss or credits.

(x)     If the Investor is, for U.S. federal income tax purposes, a partnership, grantor trust or S corporation ("Flow-Through Entity"), then (i) no more than one half of the fair market value of the Flow-Through Entity is expected to be attributable to the Flow-Through Entity's interest (direct or indirect) in the Partnership and (ii) the Flow-Through Entity was not employed as a vehicle through which to invest in the Partnership with a purpose of allowing the Partnership to avoid being treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code.

(y)     The Investor understands that the Partnership seeks to comply with all applicable laws and regulations concerning money laundering, terrorist financing and other illegal activities. The Investor hereby represents and warrants that the proposed investment by the

1168/48556-115 current/43033193v7          10

Investor in the Partnership that is being made on its own behalf or, if applicable, on behalf of any beneficial owner of the Investor does not directly or indirectly contravene United States federal, state, international or other laws or regulations, including anti-money laundering laws (a "**Prohibited Investment**"). The Investor further represents and warrants that the funds invested by the Investor in the Partnership are not derived from illegal or illegitimate activities.

(z)   The Investor also understands that United States federal regulations and Executive Orders administered by the Office of Foreign Assets Control ("**OFAC**") of the U.S. Treasury Department prohibit, among other things, engaging in transactions with, and providing services to, targeted non-U.S. countries and certain Entities and individuals (including, without limitation, those subject to OFAC sanctions or embargo programs or engaged in terrorist activities or narcotics trafficking). In furtherance of the Partnership's efforts to comply with the foregoing, the Investor represents, warrants and agrees that (i) all information regarding the identity of (w) the Investor, (x) each Affiliate of the Investor, (y) if the Investor is an Entity that is privately owned, each Person having a beneficial interest in the Investor and (z) any Person for whom the Investor is acting as a nominee or agent in connection with the Investor's investment in the Partnership (collectively, the "**Investor Related Parties**") provided or to be provided to the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates is and will be accurate and complete; (ii) none of the funds that the Investor has paid or contributed, or will pay or contribute, to the Partnership has been or will be derived, directly or indirectly, from any activity that contravenes any United States federal or any state or non-U.S. laws and regulations, including anti-money laundering laws and regulations, and no contribution by the Investor to the Partnership shall result in a violation by the Partnership, JPMIM or any of their respective Affiliates of any United States federal or any state or Non-U.S. laws and regulations, including anti-money laundering laws and regulations; (iii) none of the proceeds from the Investor's investment in the Partnership will be used to finance any illegal activities; (iv) none of the Investor Related Parties is a country, territory, Entity or individual named on an OFAC list[2], is prohibited under any program administered by OFAC or is identified as a terrorist or terrorist organization on any other relevant lists maintained by any governmental authority; (v) none of the Investor Related Parties is an individual or Entity (x) that resides or has a place of business in, or is organized under the laws of, a country or territory named on an OFAC list or which is designated as a non-cooperative country or territory by the Financial Action Task Force on Money Laundering ("**FATF**")[3] or which is designated by the Secretary of the Treasury under Section 311 or 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns[4] or (y) whose payments or contributions to the Partnership have been or will be transferred from or through such a country or territory; (vi) none of the Investor Related Parties is a "senior foreign political figure,"[5] or an "immediate

---

[2] The lists of OFAC sanctioned programs and specially designated nationals and blocked persons can be found on the OFAC website at http://www.treas.gov/offices/enforcement/ofac.

[3] The FATF list of non-cooperative countries and territories can be found on the FATF website at http://www.fatf-gafi.org.

[4] A list of these jurisdictions can be found at http://www.fincen.gov.

[5] A "senior foreign political figure" means a current or former senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a current or former senior official of a major non-U.S. political party, or a current or former senior executive of a non-U.S. government-owned commercial enterprise. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure. For purposes of this defin[...] a "senior official" or "senior executive" means an individual with substantial authority over policy,

1168/48556-115 current/43033193v7        11

family member"[6] or "close associate"[7] of a senior foreign political figure; (vii) none of the Investor Related Parties is a "Foreign Shell Bank" within the meaning of the USA PATRIOT Act, i.e., a foreign bank that does not have a physical presence in any country and that is not affiliated with a bank that has a physical presence and an acceptable level of regulation and supervision; (viii) none of the payments or contributions to the Partnership originate from or have been or will be transferred from or through an account maintained at a Foreign Shell Bank or a foreign bank (other than a foreign bank that is affiliated with a bank that has an acceptable level of regulation and supervision) that is barred, pursuant to its banking license, from conducting banking activities with the citizens of, or with the local currency of, the country that issued the license; and (ix) if the Investor is an Entity, or is acting as an agent or nominee in connection with the Investor's investment in the Partnership, the Investor has adopted procedures designed to elicit and verify information from all Investor Related Parties to substantiate the representations, warranties and agreements contained herein, and the Investor will maintain evidence of the identities of the Investor Related Parties for at least five years from the date of the Investor's complete withdrawal from the Partnership. The Investor agrees promptly to notify the Partnership and JPMIM if any of the representations and warranties made by the Investor herein cease to be accurate and complete. The Investor agrees to promptly provide any additional information, documents and certificates which the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates deem necessary or desirable to comply with their responsibilities and policies, and applicable laws and regulations, regarding money laundering and similar activities or to satisfy their obligations with respect to money laundering and similar activities; provided, any Investor that is a client of J.P. Morgan (Suisse) S.A. may, in lieu of providing any such information directly, arrange for the delivery of a certificate from J.P. Morgan (Suisse) S.A. that satisfies the relevant request. The Investor understands and agrees that each of the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates may, in its sole discretion, release information regarding the Investor Related Parties to proper authorities, in order to comply, or to demonstrate compliance with, applicable laws and regulations. The Investor represents, warrants and agrees that the statements set forth in this Section 6(z) will be true and correct as of each date on which the Investor makes any capital contribution or payment to, or receives any distribution from, the Partnership or the Partnership makes any capital contribution to, or receives any distribution from, AliphCom. The Investor further acknowledges and agrees that if the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates determines that an Investor Related Party has appeared on a list of known or suspected terrorists or terrorist organizations compiled by any U.S. or non-U.S. governmental agency, or that any representation or warranty herein is no longer accurate and complete or if otherwise required by applicable law, regulation or administrative pronouncement related to money laundering or other criminal activities, then the Investor shall be deemed an "Affected Limited Partner" and the Partnership may take such actions as it deems necessary or desirable in connection therewith, including, but not limited to, segregation and/or redemption of the Investor's investment in the Partnership and/or any other actions described in the Partnership Agreement (including Section 5.7(a) thereof). Moreover,

---

operations, or the use of government-owned resources.

[6] An "immediate family member" of a senior foreign political figure means spouses, parents, siblings, children and a spouse's parents and siblings.

[7] A "close associate" of a senior foreign political figure is a person who is widely and publicly known (or is actually known to be a close associate of the senior foreign political figure.

CONFIDENTIAL                                                                   JPMS_00009804

the Investor understands and agrees that, notwithstanding anything to the contrary contained in any document (including the Partnership Agreement or any side letters or similar agreements with the Investor and/or an Indirect Investor), if, following the Investor's investment in the Partnership, JPMIM reasonably believes that the investment is or has become a Prohibited Investment or if otherwise required by law, the Partnership may be obligated to "freeze the account" of the Investor, either by prohibiting additional Capital Contributions and/or restricting any distributions with respect to the Investor's Interest. In addition, in any such event, the Investor may be forced to forfeit its Interest, may be forced to withdraw from the Partnership or may otherwise be subject to the remedies required by law, and, to the fullest extent permitted by applicable law, the Investor shall have no claim against any Person for any form of damages as a result of any of the actions described in this Section 6(z).

(aa)   The Investor acknowledges and agrees that any distributions paid to it by the Partnership will be paid to the same account from which its Capital Contributions to the Partnership are remitted, unless JPMIM, in its sole discretion, agrees otherwise.

(bb)   The Investor understands and acknowledges that (i) no later than July 21, 2015, JPMorgan Chase & Co. and its Affiliates (collectively, "JPMC") and the Partnership must bring its activities and investments into compliance with certain provisions (known as the "Volcker Rule") of the Dodd-Frank Wall Street Reform and Consumer Protection Act and (ii) the Volcker Rule permits JPMC to acquire or retain an ownership interest in, or sponsor, in connection with directly or indirectly organizing and offering, a covered fund, such as the Partnership, if certain conditions of a permitted activity exemption (commonly known as the asset management exemption) are satisfied, including the requirement that no director or employee of JPMC takes or retains an equity interest, partnership interest or other similar interest in the Partnership, except for any director or employee of JPMC who is directly involved in providing investment advisory, or other services to the Partnership at the time the director or employee takes such an ownership interest.

(cc)   If the Investor is an employee or director of JPMC (or an affiliate of such an employee or director), the Investor hereby (i) confirms that as at the date hereof, the Investor is directly engaged in providing investment advisory or other services to the Partnership, (ii) confirms that with respect to its subscription for Interests, it has complied with all applicable JPMC pre-clearance policies and procedures and has received applicable JPMC personal account dealing and compliance authorization and (iii) acknowledges and agrees that if JPMC subsequently determines, in its sole and absolute discretion, that the Investor was not in fact so directly engaged in providing investment advisory, or other services to the Partnership as at the closing date of the Investor's subscription for Interests, the Investor may be designated as an Affected Limited Partner and thereafter, the General Partner shall be authorized to take such actions as it deems necessary or appropriate to mitigate, prevent or cure any adverse effect resulting from the participation of the Investor in the Partnership, taking into account the interests of all limited partners in the Partnership and the Partnership as a whole, including any one or more of the actions listed in Section 5.7(a) of the Partnership Agreement (which include a compulsory withdrawal of the Investor from the Partnership).

(dd)   The Investor acknowledges, agrees and understands that in the event that (i) it defaults with respect to any capital contribution or payment to the Partnership when due or (ii) it defaults with respect to its obligations to comply with Section 6.8(f) of the Partnership Agreement, such default or failure may result in the Investor forfeiting its entire Interest.

CONFIDENTIAL                                                                       JPMS_00009805

(ee)    The Investor is not (unless it has otherwise so disclosed in writing to JPMIM) (i) a "foreign government" for purposes of Section 892 of the Code or (ii) a U.S. state (including the District of Columbia, Puerto Rico, the U.S. Virgin Islands or any other possession of the United States) or political subdivision of a state, including: (1) any agency, authority or instrumentality of the state or political subdivision; (2) a pool of assets sponsored or established by the state or political subdivision or any agency, authority or instrumentality thereof, including, but not limited to a "defined benefit plan", as defined in Section 414(j) of the Code, or a state general fund; (3) a plan or program of a government entity or (4) an officer, agent or employee of a state or political subdivision or any agency, authority or instrumentality thereof, acting in its official capacity (provided, however, that any such officer, agent, or employee will not be considered a government entity if it is making an investment in the Partnership not in its official capacity).

(ff)    The Investor understands and agrees that in order for the Partnership to ensure compliance with applicable National Futures Association ("NFA") and Commodity Futures Trading Commission ("CFTC") rules and regulations, the Partnership must ascertain the status of the Investor (or if the Investor is a collective investment vehicle, the commodity pool operator of the Investor) required to be an NFA member and CFTC registrant. Accordingly, the Investor hereby represents and warrants that except as disclosed in the Investor's current SIF or otherwise in writing, the Investor is not required to be a CFTC registrant or to be a member of the NFA.

(gg)    The foregoing representations, warranties and agreements shall survive the date of the Investor's admission to the Partnership.

7.    The Investor acknowledges that it has been informed of the following disclosure, which is being made pursuant to the disclosure requirement of Rule 506(e) of Regulation D of the Securities Act:

(a)    Auction Rate Securities Investigation and Litigation:

(i)    Beginning in March 2008, several regulatory authorities initiated investigations of a number of industry participants, including J.P. Morgan Chase & Co. ("JPMC") concerning possible state and federal securities law violations in connection with the sale of auction-rate securities ("ARS"). The market for many such securities had frozen and a significant number of auctions for those securities began to fail in February 2008. The actions generally alleged that JPMC and other firms manipulated the market for auction-rate securities by placing bids at auctions that affected these securities' clearing rates or otherwise supported the auctions without properly disclosing these activities.

(ii)    JPMC, on behalf of itself and affiliates, agreed to a settlement with the New York Attorney General's Office which provided, among other things, that JPMC would offer to purchase at par certain ARS purchased from JPMS, Chase Investment Services Corp. and Bear, Stearns & Co. Inc. by individual investors, charities and small to medium-sized businesses. JPMC also agreed to a substantively similar settlement with the Office of Financial Regulation for the State of Florida and the North American Securities Administrators Association Task Force, which agreed to recommend approval of the settlement to all remaining states, Puerto Rico and the U.S. Virgin Islands. JPMC has finalized the settlement agreements with the New York Attorney General's Office and the Office of Financial Regulation for the State of Florida. The settlement agreements

CONFIDENTIAL

provide for the payment of penalties totaling $25 million to all states and territories. To date, JPMC has entered into settlements with the majority of states and is in the process of finalizing settlement agreements with the remaining states. In connection with the settlements, a number of state securities commissions issued final orders against JPMC and its affiliates.

(b)　Commodity Exchange Act Investigation and Litigation: On March 8, 2012, JPMS reached a settlement agreement with the CFTC to resolve its investigations of JPMS relating to execution of a prearranged trade that was found to be noncompetitively executed and a fictitious sale. In connection with the settlement, the CFTC issued an order against JPMS finding that JPMS violated Section 4c(a)(1) of the Commodity Exchange Act.

(c)　Residential Mortgage-Backed Securities Judgment:

(i)　On November 16, 2012, the SEC filed a complaint against JPMS and other industry participants (the "Defendants") in the District Court for the District of Columbia alleging that, in connection with an offering of residential mortgage-backed securities ("RMBS") by a JPMS affiliate, JPMS failed to include in the RMBS prospectus supplement delinquency disclosure with respect to mortgage loans that provided collateral for the RMBS offering.

(ii)　On January 8, 2013, the District Court entered a judgment that enjoined the Defendants from violating, directly or indirectly, Sections 17(a)(2) and (3) of the Securities Act. Additionally, the judgment required the Defendants to pay disgorgement in the amount of $177,700,000, prejudgment interest in the amount of $34,865,536 and a civil monetary penalty of $84,350,000. The Defendants consented to the filing of the complaint and the entry of a final judgment without admitting or denying the allegations in the complaint, except as to jurisdiction.

(d)　Municipal Reinvestment Instruments Judgment:

(i)　On July 7, 2011, the SEC filed a complaint against JPMS in the District Court of New Jersey alleging that JPMS engaged in fraudulent practices, misrepresentations and omissions in connection with bidding on municipal reinvestment instruments and that such actions allegedly affected prices of certain reinvestment instruments, deprived certain municipalities of a presumption that their reinvestment instruments were purchased at a fair market value and/or jeopardized the tax-exempt status of certain securities.

(ii)　On July 8, 2011, the District Court entered into a judgment against JPMS that enjoined JPMS from violating, directly or indirectly, Section 15(c)(1)(a) of the Securities Exchange Act of 1934. The judgment also required JPMS to pay disgorgement in the amount of $11,065,969, prejudgment interest in the amount of $7,620,380 and a civil monetary penalty of $32,500,000. JPMS consented to the entry of the judgment without admitting or denying the allegations of the complaint, except as to jurisdiction.

(e)　Synthetic Collateralized Debt Obligation Judgment:

(i)　On June 21, 2011, the SEC filed a complaint against JPMS in the District Court of New York alleging that, in connection with the offering of a largely synthetic

CONFIDENTIAL　　　　　JPMS_00009807

collateralized debt obligation ("CDO"), JPMS represented that the collateral manager selected the CDO's investment portfolio but failed to disclose that a hedge fund that took a short position on approximately half of the portfolio's assets played a significant role in the selection process.

    (ii)    On June 29, 2011, the District Court entered a judgment that enjoined JPMS from violating, directly or indirectly, Sections 17(a)(2) and (3) of the Securities Act.

    (iii)    Additionally, the judgment required JPMS to pay disgorgement in the amount of $18,600,000, prejudgment interest in the amount of $2,000,000 and a civil monetary penalty of $133,000,000. Under the terms of the judgment, JPMS also agreed to comply with undertakings relating to the marketing of certain investment products. JPMS consented to the entry of the judgment without admitting or denying the allegations of the complaint, except as to jurisdiction.

8.    The Investor acknowledges, agrees and is aware that:

    (a)    The Partnership and AliphCom have only recently been organized and that the Partnership has no financial or operating history and AliphCom has a limited financial and operating history.

    (b)    No federal or state agency has passed upon the Interests or made any finding or determination of the fairness of an investment in the Partnership.

    (c)    There are risks of loss of investment incident to the purchase of an Interest.

    (d)    There is no established market for the Interests, and there is no established market for the interests of AliphCom, and no public market for the Interests will develop.

    (e)    The Partnership Agreement contains substantial restrictions on the transferability of Interests and the Partnership will be subject to substantial contractual and other restrictions on the transferability of the Partnership's shares in AliphCom.

    (f)    The Investor will have no right to withdraw from the Partnership except as specifically provided in the Partnership Agreement.

9.    The Investor acknowledges that AliphCom may become an issuer of registered securities and that relevant securities laws restrict (i) the purchase or sale of such securities by any Person who has received material nonpublic information from the issuer of such securities, and (ii) the communication of material nonpublic information to any Person who could reasonably be expected to purchase or sell such securities in reliance upon such information (commonly referred to as "insider trading" or "insider dealing"). In addition, the Investor acknowledges that certain relevant securities laws, including Regulation FD (Fair Disclosure) promulgated by the SEC, prohibit selective disclosure of material nonpublic information by issuers of registered securities, in the absence of suitable confidentiality obligations. Accordingly, the Investor represents and warrants to, and agrees with, the General Partner, JPMIM and the Partnership (for their own benefit and the benefit of AliphCom, to the extent applicable) that all nonpublic information disseminated to the Investor is subject to Section 17.3

CONFIDENTIAL                                                JPMS_00009808

of the Partnership Agreement, and that the Investor will not use, communicate or disclose such information in violation of such securities laws.

10.     The Investor understands that, in accordance with the Partnership Agreement, the Investor will be required to make Capital Contributions, Additional Payments, payments required pursuant to Section 6.8(a) of the Partnership Agreement (if applicable), and other payments to the Partnership from time to time, on the date specified in a written notice given by the General Partner or JPMIM, which date, except as described below with respect to the initial capital contributions of Investors, will not be less than ten days after the notice has been given. The Investor agrees that it will fund Capital Contributions, Additional Payments and, if applicable, payments required pursuant to Section 6.8(a) of the Partnership Agreement in accordance with the terms and conditions of this Subscription Agreement and the Partnership Agreement and that such obligation is, to the fullest extent permitted by law, irrevocable and without right of offset, reduction, counterclaim or defense. In addition to such Capital Contributions, Additional Payments, and, if applicable, payments required pursuant to Section 6.8(a) of the Partnership Agreement, (i) pursuant to Section 8.3 of the Partnership Agreement, the Investor will be required to pay to the Partnership, which in turn will pay to the Investment Advisor, the Investor's share of the Management Fee, in semi-annual installments in arrears on July 1 and January 1 of each fiscal year, or such later date as may be specified by the Investment Advisor in a written notice delivered to the Investor and (ii) pursuant to Section 11 of this Subscription Agreement, if the Investor is not an investor in J.P. Morgan Digital Growth Fund L.P. (or its conduit), then the Investor will be required to pay an Origination Fee to JPMS or one of its Affiliates. The Investor's obligations in respect of the Management Fee, Origination Fee and, if applicable, payments required pursuant to Section 6.8(a) of the Partnership Agreement, are in addition to, and not in reduction of, its Capital Commitment, and amounts paid by the Investor in respect of the Management Fee and Origination Fee will not be treated as Capital Contributions and will not affect or be taken into account in determining its Unused Capital Commitment The Investor further understands that it will be required to contribute all or substantially all of its Capital Commitment to the Partnership within 5 days following the **Investor's admission to the Partnership.** The Investor also understands that all costs and expenses incurred in connection with any Transfer of its Interest, including legal fees and disbursements, are required to be paid by the Investor. In an effort to facilitate the funding process, the Investor agrees that JPMorgan Chase Bank, N.A. or one of its Affiliates is authorized to debit the Investor's custody/asset account with JPMC for the amount of any Capital Contribution, Management Fee payment, Origination Fee payment, Additional Payment, payments required pursuant to Section 6.8(a) of the Partnership Agreement (if applicable) or other payments required to be made by the Investor on the dates such amounts are due in accordance with the Partnership Agreement or, in the case of the Origination Fee, this Subscription Agreement (without any further action required on the part of the Investor except as described in the immediately following sentence). In addition, the Investor hereby agrees to deposit sufficient funds in such custody/asset account by the dates specified by the General Partner or JPMIM to cover the amount of each such Capital Contribution, Management Fee payment, Origination Fee payment, Additional Payment, payment required pursuant to Section 6.8(a) of the Partnership Agreement (if applicable) and other payments. The Investor agrees and confirms that (i) the Investor will maintain such custody/asset account with JPMC for so long as the Investor holds an Interest, (ii) if there is a change in beneficial ownership of the Investor, the beneficial owner or owners will maintain a custody/asset account at JPMC or one of its Affiliates and (iii) the Investor will not transfer its Interest unless the transferee opens a custody/asset account at JPMC. The Investor acknowledges that no overdraft facility will be available to fund

1168/48556-115 current/43033193v7                    17

any such amount.  If the funds in the Investor's custody/asset account are in a currency other than the currency required for the Capital Contribution, Management Fee payment, Origination Fee payment, Additional Payment, payment required pursuant to Section 6.8(a) of the Partnership Agreement (if applicable) or other payment, the Investor hereby authorizes JPMorgan Chase Bank, N.A. or one of its Affiliates to exchange the currency in the account for the appropriate currency at the rate of exchange customarily used, and for the service fee customarily charged, by JPMorgan Chase Bank, N.A. or such Affiliate.  If the Investor's Interest is held through a custody/asset account with J.P. Morgan (Suisse) S.A. or J.P. Morgan International Bank Limited, the Investor hereby authorizes the Partnership to make any payments to which the Investor is entitled under the Partnership Agreement to J.P. Morgan (Suisse) S.A. or J.P. Morgan International Bank Limited, as applicable, as the Investor's agent.

11.    In consideration of the placement services provided by JPMS and certain of its Affiliates, each Investor that is not an investor in J.P. Morgan Digital Growth Fund L.P. (or its conduit) and that makes a Capital Commitment to the Partnership shall pay a fee (the "Origination Fee") to JPMS or an Affiliate thereof.  Such Investor's obligation in respect of the Origination Fee is in addition to, and not in reduction of, its Capital Commitment, Management Fee payment obligation, Additional Payment, payments required pursuant to Section 6.8(a) of the Partnership Agreement (if applicable) and other obligations to the Partnership.   The Origination Fee shall be payable in cash upon the admission of the Investor as a limited partner of the Partnership.  The Origination Fee payable by such Investor shall be equal to 1.0% of the Investor's Capital Commitment.

12.    Except as otherwise agreed to in writing by the Partnership, the Investor will indemnify and hold harmless each Covered Person and the Partnership against any losses, claims, damages or liabilities to which any of them may become subject arising out of or based upon any false representation or warranty, or any breach of or failure to comply with any covenant or agreement, made by the Investor in this Subscription Agreement, the SIF or the Investor Certifications, or in any other document furnished to the Partnership, the General Partner, JPMIM, JPMS or any of their respective Affiliates by the Investor in connection with the offering of the Interests.  Except as otherwise agreed to in writing by the Partnership, the Investor will reimburse each Covered Person and the Partnership for their reasonable legal and other expenses (including the reasonable cost of any investigation and preparation) as they are incurred in connection with any action, proceeding or investigation arising out of or based upon the foregoing.  The indemnity and reimbursement obligations of the Investor under this Section 12 shall survive the Investor's admission as a limited partner of the Partnership and shall be in addition to any liability which the Investor may otherwise have (including, without limitation, liability under the Partnership Agreement), and shall be binding upon and inure to the benefit of any successors, assigns, heirs, estates, executors, administrators and personal representatives of each Covered Person and the Partnership.

13.    The Investor hereby irrevocably (to the fullest extent permitted by law) makes, constitutes and appoints the General Partner, JPMIM and each managing member of the General Partner and any officer of JPMIM, any subsequent general partner or investment advisor to the Partnership and each of their directors, managing members and officers, and the liquidating trustee, if any, for the Partnership in its capacity as liquidating trustee for the Partnership for so long as it acts as such, and each of them (each such Person, the "Attorney"), as the Investor's true and lawful agent and attorney-in-fact, with full power to substitute an Affiliate of such Attorney, and with full power and authority to act in the Investor's name, place and stead, and on

1168/48556-115 current/43033193v7                    18

the Investor's behalf, to make, execute (as a deed, if applicable), deliver, swear to, acknowledge, file and record (a) the Partnership Agreement on the date the Investor is admitted as a limited partner of the Partnership; (b) any amendment, modification or change to the Partnership Agreement that is adopted as provided therein or that is necessary or appropriate (as determined by the General Partner or JPMIM in its sole discretion) to fill in dates and similar omitted items; (c) all amendments to and/or restatements of the organizational documents of the Partnership required or permitted by law or the provisions of the Partnership Agreement; (d) all certificates, including certificates of amendment to the Certificate of Limited Partnership of the Partnership, notices, agreements and other instruments deemed necessary by the General Partner, JPMIM or any liquidating trustee to carry out the provisions of the Partnership Agreement, or to permit the Partnership to elect its classification for U.S. federal income tax purposes, or to provide limited liability to the limited partners of the Partnership in each jurisdiction in which the Partnership may be doing business or to effect the transfer of Interests or the admission of additional or substituted limited partners or the engagement of a replacement general partner, tax matters partner, special carry limited partner or investment advisor pursuant to the terms of the Partnership Agreement; (e) all conveyances and other instruments or documents deemed necessary by the General Partner, JPMIM or any liquidating trustee to effect the dissolution or termination of the Partnership, as applicable; (f) any certificate of fictitious name, if required by law, for the Partnership; (g) any tax return or filing, tax compliance documentation, tax records, tax exemption (or reduction) applications, or similar tax documentation, that the General Partner or JPMIM determines to make, execute, deliver, swear to, acknowledge, file and/or record in respect of the Partnership or on behalf of the investors in the Partnership; and (h) such other certificates or instruments as may be required under the laws of the State of Delaware or any other jurisdiction, or by any regulatory agency, as the General Partner, JPMIM or any liquidating trustee may deem necessary or advisable, in each case in accordance with the terms of the Partnership Agreement. The power of attorney granted hereby: (i) to the fullest extent permitted by law is coupled with an interest, shall be irrevocable and shall survive and not be affected by the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of the Investor; (ii) may be exercised by the Attorney, either by signing separately as attorney-in-fact for the Investor or by a single signature of the Attorney, acting as attorney-in-fact for all investors in the Partnership; and (iii) shall survive the assignment by the Investor of the whole or any fraction of the Investor's Interest, except that, where the assignee of the whole of the Investor's Interest has been approved by the General Partner or JPMIM for admission to the Partnership as a Substituted Limited Partner, the power of attorney hereby granted by the Investor shall survive the delivery of such assignment for the sole purpose of enabling the Attorney to execute, swear to, acknowledge and file any instrument necessary or appropriate to effect such substitution.

14.	The Investor understands that the information provided herein will be relied upon by the General Partner, JPMIM and the Partnership to determine the eligibility of the Investor to purchase the Interest. The Investor agrees promptly to notify the Partnership if any of the representations and warranties made by the Investor herein, in the Investor Certifications and/or in the Investor's SIF cease to be accurate and complete. The Investor agrees to provide any additional documents and information that the General Partner or JPMIM reasonably requests, including, without limitation, information relevant to a determination of whether the Investor is an "accredited investor" (as defined under Regulation D of the Securities Act), a "qualified purchaser" (as defined under the Investment Company Act), and/or a "United States person" for U.S. federal income tax purposes, as defined in Appendix I to this Subscription Agreement.

CONFIDENTIAL                                                                                    JPMS_00009811

15.     The Investor agrees to execute and deliver to the General Partner or JPMIM such additional instruments, documents and agreements and to provide such information as the General Partner, JPMIM or their Affiliates may reasonably request in connection with the matters contemplated by this Subscription Agreement or the Partnership Agreement or as may be necessary to effectuate the intent of any provision of this Subscription Agreement or the Partnership Agreement.

16.     Neither this Subscription Agreement nor any provision hereof may be waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom such waiver, modification, discharge or termination is sought to be enforced.

17.     This Subscription Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.  If the Investor is more than one Person, the obligations of the Investor shall be joint and several, and the agreements, representations, warranties and acknowledgments herein contained shall be deemed to be made by and be binding upon each such Person and its successors and assigns.

18.     This Subscription Agreement, the Investor Certifications, the SIF, the Partnership Agreement, the other agreements and documents referred to herein or in the Partnership Agreement and any "side letter" (as defined in the Partnership Agreement) entered into in connection with the Investor's investment in the Partnership contain the entire agreement of the parties and supersede any prior agreement of the parties, and there are no representations, covenants or other agreements except as stated or referred to herein and in such other agreements or documents.

19.     To the fullest extent permitted by law, this Subscription Agreement is not transferable or assignable by the Investor.

20.     This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the principles of conflicts of laws thereof.

21.     Any term or provision of this Subscription Agreement that is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms or provisions of this Subscription Agreement or affecting the validity or enforceability of any of the terms or provisions of this Subscription Agreement in any other jurisdiction.

22.     In any judicial proceeding involving any dispute, controversy or claim arising out of or relating to this Subscription Agreement or the Partnership or its operations, the Investor (except as otherwise agreed to in writing by the Partnership or unless the Investor is a sovereign entity that is a State of the United States or a political subdivision thereof) unconditionally accepts the non-exclusive jurisdiction and venue of any United States District Court located in the State of Delaware, or the Court of Chancery (or if the Court of Chancery is not the appropriate state court, the appropriate state court) of the State of Delaware, and the appellate courts to which orders and judgments thereof may be appealed.  In any such judicial proceeding, the Investor agrees that in addition to any method for the service of process permitted or required by such courts, to the fullest extent permitted by law, service of process may be made by prepaid certified or registered mail with a proof of mailing receipt validated by the U.S. Postal Service constituting evidence of valid service.  EXCEPT AS OTHERWISE AGREED TO IN WRITING

1168/48556-115 current/43033193v7                           20

CONFIDENTIAL                                                                    JPMS_00009812

BY THE PARTNERSHIP, THE INVESTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS SUBSCRIPTION AGREEMENT OR RELATING TO THE PARTNERSHIP OR ITS OPERATIONS. Nothing contained herein shall affect the right of the Partnership to commence any action, suit or proceeding or otherwise to proceed against the Investor in any other jurisdiction or to serve process upon the Investor in any manner permitted by any applicable law in any relevant jurisdiction. The Partnership may agree in writing with any Investor that the provisions of this Section 22 shall not apply, in whole or in part as the Partnership may determine, to such Investor.

23.     To the fullest extent permitted by law, the Investor hereby irrevocably waives the right to arbitration, if any, arising from the documents governing the Investor's account with JPMC (the "Account Opening Documents"), involving any dispute, controversy or claim arising out of or relating to this Subscription Agreement, the SIF, Investor Certifications or the Partnership Agreement or relating to the Partnership or its operations. In addition, the Investor hereby agrees that, in the event of any conflict between this Section 23 and the Account Opening Documents, the provisions of this Section 23 shall govern.

24.     Notwithstanding anything to the contrary in the Investor's Account Opening Documents or the SIF, the Investor acknowledges and agrees that the General Partner or JPMIM may in the future elect (i) to distribute periodic reports, offering document supplements, revised Partnership documents (and/or amendments thereto), including, without limitation, the Partnership Agreement, and/or the Investment Advisory Agreement relating to the Partnership (and/or amendments thereto), and investor notices and other materials to the Investor by electronic mail ("e-mail") to the e-mail address associated with the Investor's account with JPMC, or to the e-mail address specified in writing to JPMIM by the Investor, and/or (ii) to notify the Investor of the availability of such materials at a specified website address. Unless the Investor has given prior written notice to its JPMorgan representative that it wishes to receive paper copies of such materials, the Investor hereby consents to such delivery and/or such notification in lieu of printed copies of such materials being delivered to the Investor by other means.

25.     This Subscription Agreement may be executed in counterparts with the same effect as if the parties executing the counterparts had all executed one counterpart.

By executing the signature page included as Part V of this Subscription Agreement, the Investor agrees to be bound by the foregoing.

CONFIDENTIAL     JPMS_00009813

## IV. INVESTOR CERTIFICATIONS

This Part IV "Investor Certifications" relates to the offering of the Interests in the Partnership. The purpose of the Investor Certifications is to assist JPMIM and certain of its Affiliates in determining whether the Investor is eligible to invest in and hold an interest in the Partnership. By executing the signature page to this Subscription Agreement, the Investor will be confirming that the information and the representations contained in the Investor Certifications are complete and accurate.

Check only one box:

The Investor hereby certifies (please check applicable box below):

 ☑ The Investor is a "United States person" for U.S. federal income tax purposes (as defined in Appendix 1 hereto).

☐ The Investor is not a "United States person" for U.S. federal income tax purposes (as defined in Appendix 1 hereto).

Check each applicable box:

The Investor hereby certifies (please check each applicable box below, if any):

☐ The Investor is an ERISA Investor (including an individual retirement account (IRA)) (as defined in Section 6(j)).

☐ The Investor is a Plan Investor (as defined in Section 6(j)).

☐ The Investor is a tax-exempt organization (generally a pension plan, an individual retirement account, a charitable organization, charitable trust or a religious organization).

Review and confirm the representation below by checking the box:

☑ The Investor is not an employee or director of JPMC or the spouse, domestic partner, minor child and/or financial dependent of an employee or director.

CONFIDENTIAL                                                 JPMS_00009814

## V. SIGNATURE PAGE (Please sign all 3 copies)

This page constitutes the signature page for: (i) the Subscription Agreement, (ii) the Investor Certifications and (iii) the Amended and Restated Agreement of Limited Partnership of the Partnership. Execution of this page constitutes execution of, and the undersigned hereby authorizes this page to be attached to a counterpart of, each of these documents. The undersigned hereby applies for an Interest with a capital commitment to the Partnership of U.S. $ **500,000** The undersigned has read and understands that, in addition to (and not in reduction of) the undersigned's Capital Commitment, the undersigned will have a payment obligation in respect of the Management Fee, an Additional Payment Obligation, each as specified in the Partnership Agreement, and, if applicable, a payment obligation pursuant to Section 6.8(a) of the Partnership Agreement. The undersigned has read and understands the consent set forth in Section 24 regarding the electronic delivery of documents, statements, notices and other materials relating to the Partnership.

By signing below, the undersigned:

    (i)    represents, warrants and covenants that (x) in connection with this subscription, the undersigned has reviewed the Subscriber Information Form completed by the undersigned and submitted to JPMC and confirmed that the information contained therein is accurate and complete as of the date hereof (or in the case of an Investor acting as the true and lawful agent and attorney-in-fact for a "Look Through" Person, the Investor has confirmed with each "Look Through" Person that the "Look Through" paperwork (as described in the Subscriber Information Form) is accurate and complete), and will be accurate and complete as of the date the Investor is admitted as a limited partner of the Partnership and as of each date on which the Investor makes any capital contribution to the Partnership (unless the undersigned specifically notifies JPMIM to the contrary in writing prior to the date of such admission or contribution, as applicable) and (y) the undersigned will promptly notify JPMIM of any change in any such information; and

    (ii)    hereby authorizes JPMC to attach the undersigned's Subscriber Information Form (or "Look Through" paperwork (as described in the Subscriber Information Form) in the case of a "Look Through" Person), whether completed and submitted to JPMC concurrently with this subscription or previously in connection with an investment in any private investment offering, as Exhibit A or Exhibit B (as applicable) to the Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this signature page this 27th day of May, 2014.

FOR INDIVIDUALS:

_Signature_

Print Name of Limited Partner (Investor)

By: _Signature_

Signature of Authorized Signatory

_____

Print Name of Joint Investor, if any

_____

Signature of Joint Investor, if any

Accepted and Agreed as of ___June 2___, 2014.

J.P. Morgan Investment Management Inc.,
*in its capacity as investment advisor, and on behalf of
Digital Growth Co-Investment 2, L.P.*

By: _Signature_

    Name:
    Title:    David A. Yaplitz
         Executive Director

1168/48556-115 current/43033193v7

FOR ENTITIES:

_CGM ICBC LLC_

Print Name of Limited Partner (Investor)

By: _Signature_

Signature of Authorized Signatory

GEORGE MATTON

Print Name of Authorized Signatory

MANAGER

Print Title of Authorized Signatory

23

 JPMS_00009815

## V. SIGNATURE PAGE (Please sign all 3 copies)

This page constitutes the signature page for: (i) the Subscription Agreement, (ii) the Investor Certifications and (iii) the Amended and Restated Agreement of Limited Partnership of the Partnership. Execution of this page constitutes execution of, and the undersigned hereby authorizes this page to be attached to a counterpart of, each of these documents. The undersigned hereby applies for an interest with a capital commitment to the Partnership of U.S. $ **500,000** The undersigned has read and understands that, in addition to (and **not in reduction of) the undersigned's Capital Commitment, the undersigned will have a payment** obligation in respect of the Management Fee, an Additional Payment Obligation, each as specified in the Partnership Agreement, and, if applicable, a payment obligation pursuant to Section 6.8(a) of the Partnership Agreement. The undersigned has read and understands the consent set forth in Section 24 regarding the electronic delivery of documents, statements, notices and other materials relating to the Partnership.

By signing below, the undersigned:

(i)     represents, warrants and covenants that (x) in connection with this subscription, the undersigned has reviewed the Subscriber Information Form completed by the undersigned and submitted to JPMC and confirmed that the information contained therein is accurate and complete as of the date hereof (or in the case of an investor acting as the true and lawful agent and attorney-in-fact for a "Look Through" Person, the Investor has confirmed with each "Look Through" Person that the "Look Through" paperwork (as described in the Subscriber Information Form) is accurate and complete), and will be accurate and complete as of the date the Investor is admitted as a limited partner of the Partnership and as of each date on which the Investor makes any capital contribution to the Partnership (unless the undersigned specifically notifies JPMIM to the contrary in writing prior to the date of such admission or contribution, as applicable) and (y) the undersigned will promptly notify JPMIM of any change in any such information; and

(ii)    hereby authorizes JPMC to attach the undersigned's Subscriber Information Form (or "Look Through" paperwork (as described in the Subscriber Information Form) in the case of a "Look Through" Person), whether completed and submitted to JPMC concurrently with this subscription or previously in connection with an investment in any private investment offering, as Exhibit A or Exhibit B (as applicable) to the Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this signature page this 25th day of May, 2014.

FOR INDIVIDUALS:

_____
Print Name of Limited Partner (Investor)

By: _____
Signature of Authorized Signatory

_____
Print Name of Joint Investor, if any

_____
Signature of Joint Investor, if any

Accepted and Agreed as of  June 2 , 20 14 .

J.P. Morgan Investment Management Inc.,
*in its capacity as investment advisor, and on behalf of*
*Digital Growth Co-Investment 2, L.P.*

By: _____
Name:        David A. Taplitz
                   Executive Director

FOR ENTITIES:

GNM JESL LLC
Print Name of Limited Partner (Investor)

By _____
Signature of Authorized Signatory

GEORGE MATSON
Print Name of Authorized Signatory

MANAGER
Print Title of Authorized Signatory

1168/48556-115 current/43033193v7                    24

CONFIDENTIAL                                                                    JPMS_00009816

## V. SIGNATURE PAGE (Please sign all 3 copies)

This page constitutes the signature page for: (i) the Subscription Agreement, (ii) the Investor Certifications and (iii) the Amended and Restated Agreement of Limited Partnership of the Partnership. Execution of this page constitutes execution of, and the undersigned hereby authorizes this page to be attached to a counterpart of, each of these documents. The undersigned hereby applies for an Interest with a capital commitment to the Partnership of U.S. $ __500,000__ The undersigned has read and understands that, in addition to (and not in reduction of) the undersigned's Capital Commitment, the undersigned will have a payment obligation in respect of the Management Fee, an Additional Payment Obligation, each as specified in the Partnership Agreement, and, if applicable, a payment obligation pursuant to Section 6.8(a) of the Partnership Agreement. The undersigned has read and understands the consent set forth in Section 24 regarding the electronic delivery of documents, statements, notices and other materials relating to the Partnership.

By signing below, the undersigned:

(i)  represents, warrants and covenants that (x) in connection with this subscription, the undersigned has reviewed the Subscriber Information Form completed by the undersigned and submitted to JPMC and confirmed that the information contained therein is accurate and complete as of the date hereof (or in the case of an Investor acting as the true and lawful agent and attorney-in-fact for a "Look Through" Person, the Investor has confirmed with each "Look Through" Person that the "Look Through" paperwork (as described in the Subscriber Information Form) is accurate and complete), and will be accurate and complete as of the date the Investor is admitted as a limited partner of the Partnership and as of each date on which the Investor makes any capital contribution to the Partnership (unless the undersigned specifically notifies JPMIM to the contrary in writing prior to the date of such admission or contribution, as applicable) and (y) the undersigned will promptly notify JPMIM of any change in any such information; and

(ii)  hereby authorizes JPMC to attach the undersigned's Subscriber Information Form (or "Look Through" paperwork (as described in the Subscriber Information Form) in the case of a "Look Through" Person), whether completed and submitted to JPMC concurrently with this subscription or previously in connection with an investment in any private investment offering, as Exhibit A or Exhibit B (as applicable) to the Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this signature page this 27th day of May, 2014.

FOR INDIVIDUALS:

_____
Print Name of Limited Partner (Investor)

By: _____
Signature of Authorized Signatory

_____
Print Name of Joint Investor, if any

_____
Signature of Joint Investor, if any

Accepted and Agreed as of __June 2__, 20 14.

J.P. Morgan Investment Management Inc.,
*in its capacity as investment advisor, and on behalf of Digital Growth Co-Investment 2, L.P.*

By: _____
 Name: _____
  David A. Taplitz
  Executive Director
1168/48556-115 current/43033193v7

FOR ENTITIES:
GUM ICBL LLC
Print Name of Limited Partner (Investor)

By: _____
Signature of Authorized Signatory
GEORGE WATTSON
Print Name of Authorized Signatory
MANAGER
Print Title of Authorized Signatory

25

CONFIDENTIAL                                                                    JPMS_00009817

# EXHIBIT F

**JPMC Internal Use Only**

J.P.Morgan

# Alternatives

**J.P. Morgan Digital Growth Fund (the "Fund") and Digital Growth Co-Investment 2, L.P. (the "Co-Investment")**
**Update Call on Jawbone**

**Date: Friday, May 1, 2015**
**Time: 11:00am NY / 4:00pm London**
**Hosted by: Larry Unrein, Managing Director and Head of the Private Equity Group ("PEG"),**
**J.P. Morgan Investment Management Inc. (the, "PM")**

*Replay will be available through June 15, 2015*
Within the U.S.: 855-859-2056
Outside the U.S.: 404-537-3406
Passcode: 23539428

---

## Jawbone Recent Developments

- Jawbone completed an initial close on Series 6 Preferred shares in Q2 2014. The Series 6 round was anticipated to be a total of $250 million, but in the second half of 2014, the lead investor in the round (Rizvi Traverse) failed to fund its $150 million commitment.
- The fact that the Company did not raise the entire anticipated $250 million of funding, combined with operational challenges resulted in a need for significant additional funding in the first half of 2015.
- In April 2015, Jawbone closed on $320 million of new equity financing (Series 7) led by existing investor BlackRock.
    - BlackRock has already funded $220 million, and it is expected  to fund the remaining $100 million in the next several months
- The issuance of the Series 7 Preferred has impacted all existing investors in Jawbone; conditions of the financing included the increase of the Option Pool for employees to 8.5% (from 1.0%) and the removal of the PIK feature associated with the Series 6 Preferred.
- Prior to the new round, the Fund owned a number of different classes of shares, including Common, Series 1 Preferred, Series 2 Preferred , Series 5 Preferred and Series 6 Preferred.
- The Co-Investment exposure was limited to the Series 6 Preferred.
- **PEG was able to mitigate its dilution due to the fact that it controlled the Series 6 round.**
    - **Series 6 (May 2014):** $3 billion  post valuation; ~$11.27/share
        - Series 6 previously had a PIK component.  As time went on, the valuation would go down by 10% every year.
    - **Series 7 (April 2015):** $1.85 billion pre-money and $2.07 billion post-money valuations; ~$5.46 per share
        - PEG negotiated for an advance of ~3.5 years of PIK issuance in the form of additional ownership for Series 6 shareholders, thus increasing the % ownership of Jawbone for Series 6 holders.
- As part of the capital raise, the company has hired a new COO, which will be publicly announced soon.
    - This individual is in the process of transitioning out of their current role.
    - The individual is someone that Jawbone management and several members of the board know very well.

*The above summary is based upon the Fund's estimates and does not represent actual performance. Real Estate, hedge funds, and private investments are illiquid, present significant risks and may be sold or redeemed at more or less than the original amount invested. Private Investments and hedge funds are offered only by offering memoranda, which more fully describe the possible risks. There are no assurances that the stated investment objectives of any investment product will be met. Past performance is no guarantee of future results.*

**JPMC Internal Use Only**

- The company is also in the process of finding a new CFO.
- The PM believes that Jawbone now focus on execution:
    - building out and developing new products; and
    - successfully launching the new series of products (UP2, UP3 and soon-to-be UP4).

## Impact on the Fund Investment
- **Pre-Series 7:**
    - Ownership Percentage: 9%
- **Post-Series 7:**
    - Ownership Percentage: 7.9%
    - Valuation Change: -46% from 2.16x to 1.17x gross MOI

## Impact on the Co-Investment
- **Pre-Series 7:**
    - Ownership Percentage: 1.9%
- **Post-Series 7:**
    - Ownership Percentage: 2.2%
    - Valuation Change: -25% from 1.00x to 0.75x gross MOI
- Due to the liquidation preference (last in, first out), if the company were to be sold today for $1bn, the Co-Investment would get all of their money back plus a little bit more.

***Important to note***: PEG was able to mitigate its dilution due to the fact that it controlled the Series 6 shares.  The percent ownership increased by 17% (Co-Investment) and decreased by 12% (Fund), compared to other significant investors whose ownership change was reduced by ~20%.

## Questions and Answer:

**Q: How is Jawbone doing operationally?**
**A:** 2014 was a transition year for Jawbone as it shifted focus to 100% wellness and wearables.  In Q4 the company sold most of its "older" inventory.  2014 sales were disappointing, about the same as they were the prior year.  The focus now must be on execution, without any more delays.  The Up3 tracks both sleep and heart rate, but according to the PM, the real "game changer" is Jawbone's technology for blood pressure.  The company also recently announced a deal with American Express around payments.

The PM is very happy with the COO candidate, which should be positive for the company.

**Q: What is the outlook for the company?**
**A:** The Series 7 financing will likely provide enough capital for the company to operate until the end of 2015 into the beginning of 2016.  If the company focuses on execution, and does so over the next 12 to 18 months there will be a lot of positive options for liquidity.  The PM believes that by early 2016 we will have a better sense for what the company's options are (IPO or strategic sale).

*The above summary is based upon the Fund's estimates and does not represent actual performance. Real Estate, hedge funds, and private investments are illiquid, present significant risks and may be sold or redeemed at more or less than the original amount invested. Private Investments and hedge funds are offered only by offering memoranda, which more fully describe the possible risks. There are no assurances that the stated investment objectives of any investment product will be met. **Past performance is no guarantee of future results.***

JPMS_00011830

# EXHIBIT G

| **From:** | Abouzied, Jasmine C |
| **To:** | George Mattson |
| **Sent:** | 4/23/2015 1:40:59 AM |
| **Subject:** | RE: Jawbone |

Hi George,

I don't want you to be concerned here. JPM is invested in Jawbone through one our Digital Growth funds and as a result has been watching the investment very closely which makes this investment unique because JPM is an investor as well as you. There will be Q&A on the call next Friday and I will also do my best to get you any additional information you want/ need post that call.

Is there something specific about the investment that has you concerned? I do want to do all I can to put your mind at ease if I can.

Best,
Jasmine

-----Original Message-----
From: George Mattson [mailto:george.mattson323@gmail.com]
Sent: Wednesday, April 22, 2015 8:34 PM
To: Abouzied, Jasmine C
Subject: Re: Jawbone

i am concerned about the level of initial and ongoing diligence jpm has been doing on the investment...and given the structure individual investors really can't do it for themselves....thats why jpm was paid fees...

Sent from my iPad

> On Apr 22, 2015, at 5:02 PM, Abouzied, Jasmine C <jasmine.c.abouzied@jpmorgan.com> wrote:
>
> Hi George,
>
> Attached is the detail for the Jawbone call which will take place Next Friday, May 1st at 11am NY time.
>
> Best,
> Jasmine
>
>
>
> -----Original Message-----
> From: Abouzied, Jasmine C
> Sent: Wednesday, April 22, 2015 7:42 PM
> To: 'George Mattson'
> Cc: Bayer, Timothy J
> Subject: RE: Jawbone
>
> Hi George,
>
> Completely understand. It is unclear what materials will be used if any on the call but I will stay on top of this to ensure you have what is released.
>
> Jawbone is currently in a quite period as a deal that was suppose to close is still being worked on so once that deal does close, the call will be set up.
>

CONFIDENTIAL

> Best regards,
> Jasmine
>
> -----Original Message-----
> From: George Mattson [mailto:george.mattson323@gmail.com]
> Sent: Wednesday, April 22, 2015 7:28 PM
> To: Abouzied, Jasmine C
> Cc: Bayer, Timothy J
> Subject: Re: Jawbone
>
> thank you - i will plan to be on the call and want to make sure i have
> access to the materials that will be reviewed ahead of the call (in
> advance) as this has been an issue in the past
>
> i understand there have been a number of important developments at the
> company which i hope will be discussed openly and transparently on the
> call
>
> george
>
>
>
> Sent from my iPad
>
>> On Apr 22, 2015, at 2:48 PM, Abouzied, Jasmine C <jasmine.c.abouzied@jpmorgan.com>
wrote:
>>
>> Hi George,
>>
>> Your timing is spot on as we will be hosting a Jawbone update over the next few weeks.
The team is still working on the day and the time of the call. We will be sure to post you
as soon as we have the details.
>>
>> Best,
>> Jasmine
>>
>> -----Original Message-----
>> From: George Mattson [mailto:george.mattson323@gmail.com]
>> Sent: Tuesday, April 21, 2015 10:30 PM
>> To: Abouzied, Jasmine C
>> Subject: Jawbone
>>
>> Can I get an update please?
>>
>>
>>
>> Sent from my iPhone
>>
>> This email is confidential and subject to important disclaimers and
>> conditions including on offers for the purchase or sale of
>> securities, accuracy and completeness of information, viruses,
>> confidentiality, legal privilege, and legal entity disclaimers,
>> available at http://www.jpmorgan.com/pages/disclosures/email
>
> This email is confidential and subject to important disclaimers and
> conditions including on offers for the purchase or sale of securities,
> accuracy and completeness of information, viruses, confidentiality,
> legal privilege, and legal entity disclaimers, available at
> http://www.jpmorgan.com/pages/disclosures/email
> <JPM Digital Growth_Investor Call Invite_2015.05.01.pdf>

CONFIDENTIAL

# EXHIBIT H

**CONFIDENTIAL MEMORANDUM OF TERMS**
**SERIES 6 CONVERTIBLE PREFERRED STOCK FINANCING**
**OF**
**ALIPHCOM**

The following is a summary of terms for a proposed financing of the company set forth above. Except as set forth next to "Confidentiality" and "Exclusivity" below, this Term Sheet is not intended to create any binding obligation on the part of any party and there shall be no legal obligation of any party with respect to the matters contemplated hereby until mutually agreeable definitive documents relating thereto are executed by all parties.

| | |
|---|---|
| **Issuer:** | AliphCom (a/k/a Jawbone, the "**Company**"). |
| **Investors; Investment Amount:** | Financing of $250 million. Rizvi Traverse Management LLC ("**Rizvi**"). and/or affiliated investment funds and existing investors in the Company (collectively, the "**Investors**"), as follows: |

| | | |
|---|---|---|
| | Rizvi | Up to $175 million, which shall be funded $25 million at the initial closing, and up to an additional $150 million that will be funded either directly through Rizvi or related LP relationships. It is anticipated that this additional funding will occur within a month or two following the initial closing, but Rizvi may invest the $150 million for up to 6 months. |
| | Other New Investors | $[___] million |
| | Existing Investors | $[___] million |

| | |
|---|---|
| **Type of Security:** | Series 6 Convertible Preferred Stock ("**Series 6 Preferred**"). |
| **Pre-Money Valuation; Pro Forma Capitalization:** | $3.0 billion on a fully diluted basis, which amount includes an option pool reserve of [TBD]% of the Company's fully-diluted post-financing securities. Post-money capitalization table is included as <u>Exhibit A</u> hereto. |
| **Use of Proceeds:** | General working capital purposes. |
| **Dividends:** | The holders of the Series 6 Preferred shall be entitled to receive, out of any funds legally available therefor, dividends at a rate of 10% per annum, compounding quarterly, payable in additional shares of Series 6 Preferred. The Preferred will be entitled to participate on an as-converted basis in any dividends declared on the Common Stock. |
| **Liquidation Preference:** | In the event of any Liquidation Event (as defined below), the holders of Series 6 Preferred Stock will receive, in preference to the holders of the existing preferred stock (the "**Existing Preferred**" and together with the Series 6 Preferred, the "**Preferred**") and the Common Stock, |

1347506 v7/SF

CONFIDENTIAL

JPMS_00002503

the greater of (i) the original purchase price per share of the Series 6 Preferred plus any declared but unpaid dividends on such shares or (ii) the amount payable in respect of such Series 6 Preferred if it was converted to Common Stock immediately before such event (the "**Preference Amount**"). The Series 6 Preferred will rank senior to any other existing series or class of preferred stock or Common Stock of the Company. After payment of the Preference Amount, the remaining proceeds will be distributed pursuant to the existing liquidation preferences and thereafter to the holders of Common Stock.

Any liquidation, dissolution or winding up of the Company, any sale, license, lease or other disposition of all or substantially all of the Company's assets or intellectual property, or any other transaction (including any merger, consolidation or other reorganization) or series of related transactions which results in the stockholders of the Company owning less than a majority of the equity or voting power of the surviving entity will be deemed to be a "**Liquidation Event.**"

**Conversion:**

Each holder of the Series 6 Preferred will have the right to convert, at any time, any shares of Series 6 Preferred that it holds into shares of Common Stock. Initially convertible on a one-to-one basis, subject to adjustment in accordance with the anti-dilution provisions described below.

In addition, the Series 6 Preferred will automatically convert into Common Stock (i) upon the closing of a registered firm commitment underwritten public offering of Common Stock listed on the NYSE or NASDAQ with a minimum of $100 million in net proceeds to the Company (a "**Qualified IPO**"), or (ii) at the election of the holders of a majority of the Series 6 Preferred.

**Anti-dilution Provisions:**

The conversion price of the Series 6 Preferred will be subject to broad-based weighted average anti-dilution adjustments in the event of issuance of, or commitments to issue, securities for less than its conversion price then in effect immediately prior to such issue or sale, subject to customary exceptions.

**Voting Rights:**

The Series 6 Preferred will vote together with the Common Stock on all matters other than as required by law and except as set forth herein.

**Protective Provisions:**

Consent of the holders of a majority of the Preferred Stock (on an as-converted to Common Stock basis) will be required to (by merger, consolidation, reorganization or otherwise and whether at the Company or any subsidiary level):

(i) amend the Company's Articles of Incorporation or Bylaws;

(ii) alter, change or modify the rights, preferences or privileges of the Preferred Stock;

(iii) redeem or repurchase any shares (other than the repurchase of

1347506 v7/SF

CONFIDENTIAL

JPMS_00002504

Common Stock at no more than cost upon the termination of services of a stockholder pursuant to a restricted stock purchase agreement or similar agreement);

(iv) declare or pay any dividends on or declare or make any other distribution on any shares of capital stock of the Company;

(v) increase or decrease the authorized number of shares of Preferred (or any series thereof) or Common Stock; or

(vi) effect any Liquidation Event that values the Company at less than $[___][1].

**Series 6 Protective Provisions**

Consent of the holders of a majority the Series 6 Preferred will be required to (by merger, consolidation, reorganization or otherwise and whether at the Company or any subsidiary level):

(i) consummate an initial public offering of the Company in which the price to the public set forth in the prospectus of the number of shares into which each share of Series 6 Preferred converts is less than 1.25X of the sum of (A) the original issue price of such share of Series 6 Preferred (as adjusted for stock splits, stock dividends, recapitalizations, etc.) plus (B) the original issue price of any additional shares or portions of shares issued or issuable as a dividend or distribution on such share of Series 6 Preferred; or

(ii) authorize, create or issue any new class or series of shares senior to or on parity with the Series 6 Preferred.

**Board of Directors; Management Rights:**

Rizvi shall be entitled to a non-voting board observer seat.   The Company will reimburse the observer for his or her costs and expenses in attending meetings.

The Company will also enter into a standard management rights letter with Rizvi, which will also include a requirement of notice and reasonable consultation with Rizvi prior to the incurrence of any indebtedness for borrowed money other than equipment leases.

**Preemptive Rights:**

Each holder of at least 2,000,000 shares of Series 6 Preferred will have customary preemptive rights (subject to customary exceptions) to purchase its *pro rata* portion of additional securities proposed to be sold by the Company.  These rights will terminate immediately prior to an Qualified IPO or a Liquidation Event.

**First Refusal Rights on Secondary Sales:**

Subject to a prior right of first refusal of the Company, the holders of Series 6 Preferred shall receive, together with the holders of the Existing Preferred, rights of first refusal with respect to transfers or sale of stock by preferred stockholders of the Company (with customary exceptions for estate planning and similar matters). These rights will terminate immediately prior to a Qualified IPO or a Liquidation Event.

---

[1] 1 times current valuation.

1347506 v7/SF

CONFIDENTIAL

JPMS_00002505

| | |
|---|---|
| **Assignment of ROFR** | To the extent that the Company does not exercise its right of first refusal with respect to future secondary sales of the Company's Common Stock and any Preferred Stock that the Company has a right of first refusal to purchase), the Company will assign to the Investors on a pro rata basis based on their Series 6 Preferred holdings, the Company's rights of first refusal with respect to such secondary sales. The Company's obligation to assign its rights of first refusal to the Investors will terminate at the first to occur of a closing of a Liquidation Event or Qualified IPO. |
| **Information Rights:** | The Series 6 Preferred shall be entitled to customary information and inspection rights, including quarterly and annual management financial statements (with comparisons against budget) and annual budget.   These rights will terminate upon a Qualified IPO or Liquidation Event. |
| **Registration Rights:** | <u>Demand Rights</u>.  Beginning six (6) months after the Company's IPO, two (2) demand registrations upon initiation by holders of the Requisite Holders, provided that the anticipated aggregate offering price of each registration is at least $10 million. |
| | <u>Piggyback Rights</u>. Unlimited piggyback registration rights, subject to pro rata cut back after cut back of all securities of the Company held by persons not contractually entitled to registration, at the underwriter's discretion.   Full cutback on IPO; 30% minimum inclusion thereafter. |
| | <u>S-3 Rights</u>.  Two (2) S-3 registrations per twelve month period of at least $2 million, subject to customary exceptions. |
| **Market Standoff:** | All holders of Common Stock and Preferred will agree, to the extent requested by the Company or the underwriters in connection with an initial public offering of the Company's Common Stock, not to sell or otherwise transfer any securities of the Company for up to 180 days following the effective date of the registration statement or such shorter time as may be required by the managing underwriters of any such offering consistent with market practice and provided that all officers, directors and significant shareholders enter into similar agreements, and provided further that the holders of Series 6 Preferred will be released from such agreements on a pro rata basis to any other releases. |
| **Conditions:** | The transaction will be subject to customary closing conditions.   In addition, the transaction will be subject to the following conditions: (i) completion of satisfactory review of business, accounting and legal due diligence, (ii) receipt of all required approvals and consents, including regulatory approvals, (iii) no material adverse change to the business, operations, assets, condition (financial or otherwise), or prospects of the Company, (iv) negotiation and execution of definitive transaction documents and (v) other customary closing conditions. |

1347506 v7/SF

CONFIDENTIAL                                                     JPMS_00002506

| **Stock Purchase Agreement and Investment Documents:** | The Company will enter into a stock purchase agreement and other investment documents mutually acceptable to the parties that shall contain customary representations and warranties, covenants and indemnification provisions.  Any rights of the holders of Existing Preferred in the existing financing documents that are not specifically identified in this term sheet shall also be provided to the holders of Series 6 Preferred. |
|---|---|
| **Exclusivity:** | Until the earliest to occur of (a) the mutual written agreement of the parties not to pursue the transaction contemplated hereby, (b) the termination of the definitive transaction documents as a result of a failure to meet all closing conditions set forth therein, and (c) 45 days after the date hereof, the Company will not, and will use all commercially reasonable efforts to cause its shareholders, any person acting on its behalf and their respective affiliates not to, directly or indirectly, solicit, negotiate with respect to, facilitate, or accept any offers for the purchase of, or sell or transfer (whether by merger, consolidation, or otherwise), a material number of shares of capital stock, or options or warrants to purchase any such stock or any securities convertible into or exchangeable for any such stock and shall terminate any existing activities or discussions with any party other than Rizvi and its representatives, and the Company shall promptly (within two days) advise Rizvi of any inquiry or proposal relating thereto that may be received, including the terms of the proposal and the identity of the inquirer or offeror. |
| **Confidentiality:** | This term sheet and its contents and the transactions contemplated hereby (including the identity of the Investor) will be kept confidential unless and until the parties agree upon the language and timing of a press release or until one such party determines, based upon the advice of counsel, that a public announcement is required by law, in which case the parties will in good faith attempt to agree on any public announcements or publicity statements. |
| **Expenses:** | If the proposed transaction closes, the Company will reimburse Rizvi for the reasonable costs of its counsel, accountants and diligence expenditures (such costs and expenditures not to exceed $75,000 in the aggregate plus the cost of any patent diligence approved in advance by the Company) to be paid at closing. |
| **Governing Law:** | This term sheet shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to conflict of laws principles thereunder. |

Except with respect to paragraphs entitled "Exclusivity," "Confidentiality," "Expenses" and "Governing Law," which are intended to be binding on the parties, this term sheet is intended to serve only as an expression of the parties' intent and not as a binding obligation to consummate the contemplated transactions; any such obligation will be created only by definitive agreements, the provisions of which will supersede this and all other understandings between the parties.

1347506 v7/SF

CONFIDENTIAL                                JPMS_00002507

This Memorandum of Terms shall expire unless fully executed and delivered before 5 p.m. (EST) on January ___, 2014.  The paragraphs entitled "Confidentiality," "Expenses" and "Governing Law" shall survive the expiration or termination of this Memorandum of Terms unless and until they are superseded by the definitive agreements.  If you are in agreement with the terms and conditions set forth above and desire to proceed on that basis, please sign this letter agreement in the space provided below and return an executed copy to the undersigned prior to such time.


Very truly yours,

Rizvi Traverse Management LLC


By:_____
Name:
Title:


Accepted and agreed

AliphCom

By: _____
Name:  Hosain S. Rahman
Title:  CEO

---

1347506 v7/SF

CONFIDENTIAL

JPMS_00002508

This Memorandum of Terms shall expire unless fully executed and delivered before 5 p.m. (EST) on January ___, 2014.  The paragraphs entitled "Confidentiality," "Expenses" and "Governing Law" shall survive the expiration or termination of this Memorandum of Terms unless and until they are superseded by the definitive agreements.  If you are in agreement with the terms and conditions set forth above and desire to proceed on that basis, please sign this letter agreement in the space provided below and return an executed copy to the undersigned prior to such time.

Very truly yours,

Rizvi Traverse Management LLC

By: _____
Name: Ogur Shariff
Title: Partner

Accepted and agreed

AliphCom

By: _____
Name: Hosain S. Rahman
Title: CEO

1347506 v7/SF

CONFIDENTIAL

JPMS_00002509

# EXHIBIT I

**Award**
**FINRA Office of Dispute Resolution**

In the Matter of the Arbitration Between:

<u>Claimants</u>                                           <u>Case Number</u>: 17-01969
George Mattson
GNM ICBC, LLC

     vs.

<u>Respondent</u>                                          <u>Hearing Site</u>: Boca Raton, Florida
J.P. Morgan Securities, LLC

Nature of the Dispute: Customers vs. Member

This case was decided by an all-public panel.

## REPRESENTATION OF PARTIES

For Claimants GNM ICBC, LLC and George Mattson: Craig H. Kuglar, Esq., Law Office of Craig Kuglar, LLC, Atlanta, Georgia.

For Respondent J.P. Morgan Securities, LLC: Tibor L. Nagy, Jr., Esq. and Anuja Thatte, Esq., Dontzin Nagy & Fleissig LLP, New York, New York.

## CASE INFORMATION

Statement of Claim filed on or about: July 26, 2017.
George Mattson signed the Submission Agreement: July 26, 2017.
GNM ICBC, LLC signed the Submission Agreement: July 26, 2017.

Statement of Answer filed by Respondent on or about: November 21, 2017.
J.P. Morgan Securities, LLC signed the Submission Agreement: November 21, 2017.

## CASE SUMMARY

Claimants asserted the following causes of action: negligence (failure to conduct due diligence and failure to supervise); common law fraud; breach of fiduciary duty; respondeat superior; and violations of state and federal securities laws, and FINRA rules. The causes of action relate to Claimants' investment in Jawbone, a San Francisco-based technology company.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimants requested: compensatory damages in the amount

of $1,000,000.00; interest at the rate of 4.75% per annum; attorneys' fees; costs;
punitive damages; and such other and further relief deemed just and appropriate by the
Panel.

In the Statement of Answer, Respondent requested: denial of the Statement of Claim,
with prejudice; attorneys' fees; costs; and such other and further relief deemed just and
proper by the Panel.

At the close of the hearing, Claimants presented three different final damage
calculations using various interest rates and rates of return. The first total was
$3,450,525.63, the second total was $1,852,120.83, and the third total was
$2,768,513.42.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other
materials filed by the parties.

During the evidentiary hearing, Respondent moved to strike two of Claimants' expert
witnesses based on lack of qualifications, to which Claimants objected.  The Panel
granted both motions.

The parties present at the hearing have agreed that the Award in this matter may be
executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing,
and the post-hearing submissions (if any), the Panel has decided in full and final
resolution of the issues submitted for determination as follows:

1.  Claimants' claims are denied in their entirety.

2.  Claimants are jointly and severally liable for and shall pay to Respondent the
    sum of $200,000.00 in attorneys' fees pursuant to the terms of the
    Subscription Agreement dated May 27, 2014.

3.  Claimants are jointly and severally liable for and shall pay to Respondent the
    sum of $75,000.00 in costs.

4.  Any and all claims for relief not specifically addressed herein, including Claimants'
    requests for punitive damages and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

FINRA Office of Dispute Resolution
Arbitration No. 17-01969
<u>Award Page 3 of 5</u>

**<u>Filing Fees</u>**
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

Initial Claim Filing Fee                                                        =$ 1,725.00

*The filing fee is made up of a non-refundable and a refundable portion.*

**<u>Member Fees</u>**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

Member Surcharge                                                       =$ 2,475.00
Member Process Fee                                                   =$ 5,075.00

**<u>Discovery-Related Motion Fee</u>**
Fees apply for each decision rendered on a discovery-related motion.

One (1) decision on a discovery-related motion on the papers
with one (1) arbitrator @ $200.00/decision                               =$   200.00

Non-parties submitted one (1) discovery-related motion

Total Discovery-Related Motion Fees                                     =$   200.00

The Panel has assessed the total $200.00 discovery-related motion fee jointly and severally to Claimants.

**<u>Hearing Session Fees and Assessments</u>**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s) that lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single arbitrator @ $450.00/session    =$   450.00
Pre-hearing conference:      February 21, 2018            1 session

One (1) pre-hearing session with the Panel @ $1,300.00/session           =$ 1,300.00
Pre-hearing conference:      January 11, 2018             1 session

Nine (9) hearing sessions @ $1,300.00/session                            =$11,700.00
Hearing Dates:          September 17, 2018        2 sessions
                        September 18, 2018        2 sessions
                        September 19, 2018        2 sessions
                        September 20, 2018        2 sessions
                        September 21, 2018        1 session

Total Hearing Session Fees                                               =$13,450.00

FINRA Office of Dispute Resolution
Arbitration No.  17-01969
<u>Award Page 4 of 5</u>

The Panel has assessed $12,575.00 of the hearing session fees jointly and severally to Claimants.

The Panel has assessed $875.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

FINRA Office of Dispute Resolution
Arbitration No. 17-01969
Award Page 5 of 5

## ARBITRATION PANEL

| | | |
|---|---|---|
| Gloria O. North | - | Public Arbitrator, Presiding Chairperson |
| Daniel Joseph Chiodo | - | Public Arbitrator |
| Ronald W. Weissman | - | Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_Gloria O. North_
Gloria O. North
Public Arbitrator, Presiding Chairperson

_September 28, 2018_
Signature Date

_____
Daniel Joseph Chiodo
Public Arbitrator

_____
Signature Date

_____
Ronald W. Weissman
Public Arbitrator

_____
Signature Date

10/1/18
Date of Service (For FINRA Office of Dispute Resolution office use only)

FINRA Office of Dispute Resolution
Arbitration No. 17-01969
Award Page 5 of 5

## ARBITRATION PANEL

| | | |
|---|---|---|
| Gloria O. North | - | Public Arbitrator, Presiding Chairperson |
| Daniel Joseph Chiodo | - | Public Arbitrator |
| Ronald W. Weissman | - | Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_____
Gloria O. North
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Daniel Joseph Chiodo
Public Arbitrator

_9/27/18_
Signature Date

_____
Ronald W. Weissman
Public Arbitrator

_____
Signature Date

10/1/18
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

FINRA Office of Dispute Resolution
Arbitration No. 17-01969
<u>Award Page 5 of 5</u>

## ARBITRATION PANEL

| | | |
|---|---|---|
| Gloria O. North | - | Public Arbitrator, Presiding Chairperson |
| Daniel Joseph Chiodo | - | Public Arbitrator |
| Ronald W. Weissman | - | Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

### Concurring Arbitrators' Signatures

_____          _____
Gloria O. North                    Signature Date
Public Arbitrator, Presiding Chairperson


_____          _____
Daniel Joseph Chiodo                Signature Date
Public Arbitrator

*Ronald W Weissman*                 9/27/2018
_____          _____
Ronald W. Weissman                  Signature Date
Public Arbitrator



10/1/18
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

# EXHIBIT J

---

## FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.

---

Case No.: _____

## IN THE MATTER OF THE ARBIRATION BETWEEN:

## GEORGE MATTSON AND GNM ICBC, LLC

**Claimants,**

**v.**

## JP MORGAN SECURITIES, LLC (CRD # 79)

**Respondent.**

---

## STATEMENT OF CLAIM

---

Submitted by:

The Law Office of Craig Kuglar, LLC
Craig H. Kuglar, Esq.
931 Monroe Dr. NE, Suite A102-353
Atlanta, Georgia  30308
TEL (404) 432-4448
FAX (404) 393-8007
***Attorney for Claimants***

## INTRODUCTION

In mid-2014, JP Morgan Securities, LLC ("JPM Securities") recommended that Mattson invest $1,000,000.00 in Jawbone, a San Francisco based technology company.  As will be demonstrated at hearing, JPM Securities completely failed in its task of performing due diligence on Jawbone and made material misrepresentations to Mattson about the nature of the investment. Within months of the investment, Jawbone was revealed to be in a liquidity crisis and was forced into rescue with Blackrock, rendering Mattson's entire investment worthless.  On various calls subsequent to this debacle, representatives of JPM Securities and its various affiliates acknowledged that mistakes were made and that the money should never have been sent to Jawbone.  Despite this, JPM Securities has refused to take any action to compensate Mattson for his losses.

## ARBITRATION DEMAND

Claimants demand arbitration before an all-public panel pursuant to FINRA Rule 12200, in or near Manalapan, Florida.  Claimants were customers of the Respondent at all times relevant hereto.

## THE PARTIES

George Mattson ("Mattson") is a resident of Manalapan, Florida.  Mattson is the managing member of GNM ICBC, LLC ("GNM"), a Delaware limited liability company with its principal place of business in Manalapan, Florida.  Mattson and GNM will be collectively referred to herein as "Mattson" or "Claimants."

Mattson received his B.S. in Electrical Engineering from Duke University and his M.B.A. from the Wharton School of Business, University of Pennsylvania.  Mattson was an employee of Goldman, Sachs & Co. from 1994 to his retirement in August 2012.  During that time, he served

1

as co-head of the Global Industrials Group in Investment Banking, which had the responsibility for a diverse set of industry sectors. Mattson has served for years on a number of civic and charitable boards. Since 2012, Mattson has served as a member of the board of directors of Delta Air Lines, Inc.

JPM Securities is a FINRA member firm. It is an affiliate of JPMorgan Chase Bank, N.A. ("JPM"). The "JP Morgan Private Bank" is a branded group within JPM Securities that focuses on high net worth customers.

## FACTS GIVING RISE TO THE CLAIMS

### JAWBONE 1998-2011

AliphCom, Inc. was founded in San Francisco in 1998 by Alexander Asseily and Hosain Rahman, who met at Stanford University. AliphCom, Inc. will be referred to herein as the "Company" or "Jawbone." Jawbone designed, developed, and marketed lifestyle oriented audio and health products under the "Jawbone" brand.

Jawbone got its start developing noise cancelling devices for the military but quickly switched over to the consumer market. From 2000 to 2011, Jawbone brought a number of products to market, including its Jawbone Bluetooth headsets, sold through the Apple store beginning in 2008. Over the years, Jawbone pivoted into different products, starting with Bluetooth headsets, then its Jambox Bluetooth speaker. In 2011, in response to the emergence of the Fitbit, Jawbone pivoted again to target the "wearable" fitness market. Its answer to the Fitbit was UP by Jawbone, introduced in 2011.

### JPM's Multi-Faceted Relationship With Jawbone

For a number of years, JPM has worked to get its foot in the door early with tech startups with an eye towards getting their business when they later go public. From 2011-2014, JPM's deal rainmaker, Jimmy Lee, was part of the JPM team involved in cultivating its long-term

relationship with Jawbone.  This pre-IPO push included lending money to Jawbone, raising money for Jawbone from JPM Securities' customers, taking a seat on the Jawbone Board of Directors, and extending Jawbone's CEO millions of dollars in personal loans for his purchase of a luxury vacation property in Montana's "Yellowstone Club."

JPM's first capital raise for Jawbone took place in 2011.  On July 12, 2011, Jawbone publicly announced that it secured $70 million in funding from investors advised by J.P. Morgan Asset Management, bringing total investment in Jawbone close to $170 million to date.  The funding was intended to allow Jawbone to continue its rapid growth and expand into new markets and categories.

Larry Unrein, managing director of J.P. Morgan Asset Management, was quoted as saying that "we seek to invest in the best high-growth companies."  He went on to say that "[w]e believe Jawbone is poised to be the next great mobile computing company coming out of Silicon Valley."

Jawbone's CEO explained that the "Funding from J.P. Morgan Asset Management is fantastic for us as we continue to rapidly expand our business.  As people's digital lives become increasingly centered around mobile devices, we see no shortage of opportunities for our technology and products to unlock the potential of a full mobile experience.  The support of J.P. Morgan Asset Management will help us be even more aggressive in our pursuit of these opportunities."

Jawbone's board members also commented on the deal.  Roelof Botha, a partner at Sequoia Capital and Jawbone board member, stated that "[w]e are delighted to have J.P. Morgan Asset Management on board."

### Problems at Jawbone

JPM's $70 million investment was intended to take Jawbone through its highly anticipated launch of its UP by Jawbone product.  In November 2011, Jawbone launched the product but was forced to stop production a month later in response to widespread customer claims of issues with charging, syncing, and in some cases, product failure.

### JPM Continues Raising Money for Jawbone

The failure of UP by Jawbone did not temper JPM's appetite to solicit additional capital for the Company. Between July 2011 and April 2013, JP Morgan raised a total of $81,500,000 for Jawbone's Series 5 Offering, which valued the Company at between $1.5 billion and $1.65 billion.  Throughout this same time period, JP Morgan also lead a number of investments in the common stock of Jawbone and led an investment of $12,500,000 in Jawbone's Series 2 offering.

### The 2014 Capital Raise

By early 2014, JPM had served as the lead investor in common and/or preferred stock offerings of Jawbone stock totaling $194.72 million.  All of this capital was completely wiped out, making Jawbone one of the largest private tech company failures in history.  It had also extended Jawbone's CEO at least $16.2 million in personal loans dependent entirely on the sale of Jawbone stock.  Nevertheless, Jawbone was continuing to lose money and was in need of more capital.

By this time, JPM had a multi-year relationship with Jawbone giving it key insight and knowledge of the Company.   Jawbone's CEO acknowledged this relationship when JPM later foreclosed on the loans backed by Jawbone stock:

> [JPM] and/or its affiliates/subsidiaries have a special relationship with [the CEO], including advising him on financial dealings, especially with respect to AliphCom ("Jawbone")[…]."   Indeed, [JPM] and/or its affiliates/subsidiaries have invested

hundreds of millions of dollars in Jawbone and are intimately familiar with Jawbone."[1]

Ignoring all of the Company's problems, in early 2014 JPM began advising its customers, including Mattson, to invest in yet another round of investments valuing the Company at $3.179 billion. JPM Securities contacted Mattson to offer him the opportunity to invest in Jawbone. Mattson was told that only JPM Securities' most selective clients were being given the opportunity, and that Mattson might be able to get a position in Jawbone if he was interested.

Representatives of JPM Securities stated:

- That Jawbone was a "hot" company that was looking to go public in 1-2 years and referenced various comparable public companies that implied a significant return on investment;

- That Jawbone was going be the "winner" in the wearable tech space as it had the best technology which was "IP protected";

- That JPM's customers would be co-investing along with Rizvi Traverse Management, LLC ("Rizvi") in a $300 million capital raise;

- That Rizvi alone had committed to invest $175 million;

- That Rizvi was an experienced blue chip investor in high tech startups (including Twitter) and had done its due diligence into Jawbone; and

- That the $300 million should carry Jawbone through to the IPO.

JPM Securities also touted its close relationship with Jawbone, including the fact that an employee of JPM was serving on the Jawbone Board of Directors. These representations were

---

[1] See Defs' Answer to Complaint, *JP Morgan Chase Bank, N.A. v. Hosain Rahman*, Civil Action No. 2:16-cv-00035, U.S. Dist. Ct. for the Dist. Of Montana, Sept. 12, 2016.

repeated by representatives of JPM Securities, other affiliates of JPM who were arranging the financing, and Jawbone's own senior management team.

The Offering Documents provided to Mattson included:

- Confidential Memorandum of Terms for Series 6 Convertible Preferred Stock (the "Offering Memo");

- Summary Capitalization Table;

- Fiscal 2011 and 2012 Audited Financial Statements and 2013 Unaudited Financial Statements;

- Amended and Restated Articles of Incorporation;

- Amended and Restated Bylaws;

- Seventh Amended and Restated Investor Rights Agreement;

- Fourth Amended and Restated Right of First Refusal Agreement;

- Fifth Amended and Restated Voting Rights Agreement;

- Series 6 Convertible Preferred Stock Purchase Agreement; and

- Series 6 Convertible Preferred Stock Schedule of Exceptions.

The Offering Memo reiterated that the Company would be raising $250 million, led by a $175 million investment by Rizvi.  The Offering Memo, signed by Rizvi and the Jawbone CEO, provided that Rizvi, referred to in the documents as "Lead Investor," would take a non-voting seat on the Jawbone Board of Directors and would be reimbursed up to $75,000.00 for due diligence and other expenses incurred by Rizvi.

In May 2014, Mattson invested $1,000,000.00 in Jawbone through Digital Growth Co-Investment 2, L.P. ("Digital Growth"), a special purpose vehicle created by JPM to provide JPM's

clients an opportunity to make an indirect investment in Jawbone.[2]  In the third quarter of 2015, Mattson was required to contribute an additional $166,669, bringing his total investment to $1,166,669.00.  Such additional capital was held in escrow and subsequently refunded.

### Billions in Value Vanishes

Just months after the capital raise, Jawbone announced that its UP3 would not ship by year-end as previously promised due to a "sealing problem."  Even worse, the company was forced to give customers who had pre-ordered the product a $40 rebate.  This resulted in its products not even being stocked in key stores such as Best Buy during the holiday season.

In early 2015, Mattson participated in a conference call with various JPM entities and individuals, including representatives of JPM Securities.  Therein, in addition to learning about all of the Company's holiday season woes, he learned for the first time that the Company had only been able to raise $179 of the $300 million it needed and upon which all of the various cash flow models provided to Mattson were based, that the lead investor, Rizvi, had decided to invest only $25 million of the $175 million it anticipated investing, and that JPM's customers' investments were put in the deal prior to the Rizvi funding and not conditioned upon it.  As a result, the Company, was again out seeking additional investment, a sure sign to the investing community that it was in trouble.  No explanation was ever given as to why Rizvi ultimately failed to invest, or why the J.P. Morgan investment closed anyway.

### 2015-2017:  The Blackstone Deal and Beyond

After the disastrous holiday season of 2014, the Company's Chairman of the Board and its President both resigned.  In April 2015, after other attempts to raise additional funds, Jawbone

---

[2] Digital Growth was formed by affiliates of JPM.  An affiliate of JPM, JPMPE Special Member, LLC, acted as the special carry limited partner of Digital Growth.  J.P. Morgan Investment Management, Inc. was the investment advisor to Digital Growth.

closed a $300 million rescue financing deal, 11 months after the Mattson investment closed, from investment management firm BlackRock, severely impairing Mattson's 2014 investment and valuing the company at a fraction of its former value.  In January 2016, it was reported that the Company received $165 million, mainly from the Kuwait Investment Authority, valuing the Company at $1.5 billion.   However, in July 2017 it was reported that Jawbone was in the process of being liquidated.

### JPM Securities' Failure to Conduct Due Diligence

The Securities and Exchange Commission (SEC) and federal courts have long held that a broker-dealer that recommends a security is under a duty to conduct a reasonable investigation concerning that security and the issuer's representations about it.  This duty emanates from the broker-dealer's "special relationship" to the customer, and from the fact that in recommending the security, the broker-dealer represents to the customer that a reasonable investigation has been made and that its recommendation rests on the conclusions based on such investigation.

Failure to comply with this duty can constitute a violation of the antifraud provisions of the federal securities laws and, particularly, Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder.  It also can constitute a violation of FINRA Rule 2010, requiring adherence to just and equitable principles of trade, and FINRA Rule 2020, prohibiting manipulative and fraudulent devices.

Courts have found that the amount and nature of the investigation required depends, among other factors, upon the nature of the recommendation, the role of the broker in the transaction, its knowledge of and relationship to the issuer, and the size and stability of the issuer.

While there are no iron clad rules as to what a broker must do to meet his responsibility, the presence of any "red flags" also would alert the broker to the need for further inquiry.  In

general, however, a broker-dealer may not rely blindly upon the issuer for information concerning a company, nor may it rely on the information provided by the issuer and its counsel in lieu of conducting its own reasonable investigation.

While broker-dealers are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a "high degree of care" in investigating and independently verifying an issuer's representations and claims.  Indeed, when an issuer seeks to finance a new speculative venture, broker dealers "must be particularly careful in verifying the issuer's obviously self-serving statements."

FINRA has notified its member firms that the fact that the firm's customers may be sophisticated and knowledgeable does not obviate the duty to investigate.  Moreover, in Regulation D offerings the SEC advises issuers to provide the same information to accredited investors as they are required to provide to non-accredited investors in view of the antifraud provisions.

FINRA requires that a broker-dealer that is an affiliate of an issuer in a Regulation D offering must ensure that its affiliation does not compromise its independence as it performs its investigation.  The broker-dealer must resolve any conflict of interest that could impair its ability to conduct a thorough and independent investigation.  Indeed, its affiliation with the issuer typically would raise expectations by its customers, particularly some retail customers, that the broker-dealer has special expertise concerning the issuer.

FINRA notes that a reasonable investigation of the issuer's business prospects, and the relationship of those prospects to the proposed price of the securities being offered, might include: (i) inquiring about the viability of any patent or other intellectual property rights held by the issuer; (ii) inquiring about the industry in which the issuer conducts its business, (iii) the prospects

for that industry, any existing or potential regulatory restrictions on that business and the competitive position of the issuer, (iv) requesting any business plan, business model or other description of the business intentions of the issuer and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based, (v) a broker-dealer might test models with information from representative assets to validate projected returns, break-even points and similar information provided to investors; (vi) requesting financial models used to generate projections or targeted returns; and (vii) maintaining in the broker-dealer's files a summary of the analysis that was performed on financial models provided by the issuer that detail the results of any stress tests performed on the issuer's assumptions and projections.

JPM Securities failed to conduct a reasonable investigation into Jawbone and the representations about it.  The failure of JPM Securities to understand the perilous state of affairs at Jawbone is particularly egregious, given its close relationship with Jawbone.  This relationship included having a JPM executive on the Board of Directors of Jawbone, various lending and banking relationships, and the like.  Indeed, JPM should have known more about Jawbone than any other firm in the world.

If JPM Securities had conducted a reasonable investigation, it would have discovered, at a minimum:

- That Jawbone's business forecasts were completely unattainable given facts then known to the Company;

- That Jawbone's products were not in key retailers in advance of the 2015 holiday season;

- That Jawbone's products and IP were not best in class;

- The reasons for Rizvi's decision to back out of its position as lead investor;

- That the 2014 Series 6 offering would not enable Jawbone to become profitable so as to position itself for an initial public offering;

- That Jawbone's key managers, including its President, were failing to execute the business plan; and

- That Jawbone would need to go back to the capital markets within months thus resulting in the Series 6 investors, including Mattson, being immediately impaired and ultimately wiped out within months of investing.

**JPM Securities' Misrepresentations and Omissions**

From the very first call with JPM Securities through the date of his investment in Digital Growth, Mattson was repeatedly given a consistent story about Jawbone.   Specifically, JPM Securities represented:

- That Jawbone was a "hot" company that was looking to go public in 1-2 years;

- That Jawbone was going be the "winner" in the wearable tech space as it had the best technology which was "IP protected";

- That JP Morgan was co-investing along with Rizvi in a $250-$300 million capital raise;

- That Rizvi was a blue chip investor in high tech startups and had done its due diligence into Jawbone;

- That Rizvi would be the lead investor and invest $175 million; and

- That the $300 million would carry Jawbone through to the IPO alongside Fitbit's IPO.

Each of the representations were false and misleading when made.  Further, JPM's

actual knowledge of the reality of the Company's situation negates any risk disclosures contained in the various offering documents provided to Mattson.

## **EFFORTS TO AVOID THIS DISPUTE**

The laws that protect investors against misrepresentations and a firm's failure to conduct adequate due diligence apply equally to Mattson as to an investing novice.

Mattson made it known early and often that he was disappointed with JPM Securities' handling of the Jawbone investment.  In a number of calls with JPM employees subsequent to the Jawbone debacle, Mattson was told in no uncertain terms that JPM had not understood or properly conveyed the nature of Rizvi's commitment, did not know why Rizvi had backed out, and acknowledged that JPM's customers' monies should not have been committed until Rizvi met their commitment, and that they believed Rizvi's capital commitment was a firm commitment.

In early 2017, Mattson contacted JPM Securities, demanding that JPM Securities make him whole for the losses he sustained.  On April 17, 2017, Mattson met with Kelly Coffey, the CEO of the JPM Private Bank, at her office in New York.  In the meeting, Mattson provided Coffey with all the relevant facts, including the admissions from various JPM Securities personnel that the Jawbone investment had been negligently managed, and demanded JPM Securities compensate him for his losses.

After the meeting, Coffey sent an email to Mattson claiming that any representations made to him by JPM Securities were disclaimed by various language in the Offering Documents and refusing to take any action.  The Panel should award Mattson full damages to make him whole, including pre-judgment interest, costs and attorneys' fees, because he made every effort to avoid this dispute.

## LEGAL CLAIMS

Claimants assert the following legal claims against Respondent:

(A)     Negligence (Failure to Conduct Due Diligence);

(B)     Negligence (Failure to Supervise its Representatives);

(C)     Common Law Fraud;

(D)     Breach of Fiduciary Duty;

(E)     Respondeat Superior;

(F)     Violation of State Securities Laws;

(G)     Federal Securities Laws; and

(H)     Violation of FINRA Rules.

## DEMAND FOR RELIEF

The claims and causes of action set forth and the relief requested herein are intended to encompass any and all claims Claimants have against Respondent whether specifically stated or not and now known to Claimants or not.  The relief specifically demanded is not intended to limit, in any way, the relief to which Claimants are entitled.  During the course of this matter, Claimants may discover additional information relevant to their claims that would give rise to additional causes of action.   As a result, Claimants hereby demand relief for damages caused by Respondent's acts, omissions, representations, misrepresentations, breaches and failures not specifically set forth herein but supported by evidence subsequently discovered and proven by Claimants during the course of this matter including, but not limited to, those matters proven during the final hearing.

WHEREFORE, Claimants requests damages and recovery against Respondent as follows:

1.  Compensatory damages in the amount of $1,000,000.00;

2.  Interest at 4.75% per annum pursuant to Fla. Stat. Ann. § 517.211 and Fla. Stat. Ann.

    § 55.03.

3.  Attorneys' Fees pursuant to Fla. Stat. Ann. § 517.211;

4.  Costs and expenses of this arbitration;

5.  Punitive damages in an amount according to proof; and

6.  Such other and further relief as this Panel deems just and appropriate.


Respectfully submitted this 26th day of July, 2017.


**The Law Office of Craig Kuglar, LLC**
Craig H. Kuglar, Esq.
931 Monroe Dr., NE, Suite A102-353
Atlanta, Georgia  30307
Tel.      (404) 432-4448
Fax      (404) 393-8007

*Attorney for Claimant*s

# EXHIBIT K



[ Print ]

## 12303. Answering the Statement of Claim

(a) Respondent(s) must serve each other party with the following documents within 45 days of receipt of the statement of claim:

      (1) Signed and dated Submission Agreement; and

      (2) An answer specifying the relevant facts and available defenses to the statement of claim.

The respondent may include any additional documents supporting the answer to the statement of claim. Parties that fail to answer in the time provided may be subject to default proceedings under Rule 12801.

(b) The answer to the statement of claim may include any counterclaims against the claimant, cross claims against other respondents, or third party claims, specifying all relevant facts and remedies requested, as well as any additional documents supporting such claim. If the answer contains a third party claim, the respondent must serve the third party with the answer containing the third party claim and all documents previously served by any party, or sent to the parties by the Director, by first-class mail, overnight mail service, overnight delivery service, hand delivery, email or facsimile, and must file proof of service with the Director through the Party Portal except as provided in Rule 12300(a)(2). The respondent must file the third party claim with the Director through the Party Portal except as provided in Rule 12300(a)(2).

(c) At the same time that the answer to the statement of claim is served on the other parties, the respondent must file copies of the Submission Agreement, the answer to the statement of claim, and any additional documents, with the Director, pursuant to Rule 12300(b).

(d) If the answer to the statement of claim contains any counterclaims, cross claims or third party claims, the respondent must pay all required filing fees.

---

Amended by SR-FINRA-2016-029 eff. April 3, 2017.
Amended by SR-FINRA-2008-031. eff. Feb. 9, 2009.
Amended by SR-FINRA-2008-021 eff. Dec. 15, 2008.
Adopted by SR-NASD-2003-158 eff. April 16, 2007.

**Selected Notice:** 07-07, 08-57, 09-04, 17-03.

© FINRA. All rights reserved.

# EXHIBIT L

**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION PANEL**

| | |
|---|---|
| GEORGE MATTSON AND GNM ICBC, LLC, | |
| *Claimants,* | |
| v. | FINRA No. 17-01969 |
| J.P. MORGAN SECURITIES LLC, | |
| *Respondent.* | |

## ANSWER OF RESPONDENT J.P. MORGAN SECURITIES LLC

**Contains Confidential Information**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................... 6

I.    MATTSON'S EXTENSIVE INVESTMENT AND INVESTMENT BANKING EXPERIENCE .... 6

II.   JPMS'S LIMITED ROLE AS DGF II PLACEMENT AGENT AND JPMIM'S ROLE AS
      DGF II INVESTMENT ADVISOR ........................................................................................ 7

III.  MATTSON AND OTHER HIGH-NET-WORTH INVESTORS ARE INVITED TO REVIEW
      THE DGF II/JAWBONE INVESTMENT OPPORTUNITY .................................................... 8

IV.   KEY PROVISIONS IN THE OFFERING DOCUMENTS .......................................................... 9

V.    MATTSON DECIDES TO INVEST IN JAWBONE AND AGREES TO ALL PROVISIONS IN
      THE OFFERING DOCUMENTS ........................................................................................... 9

VI.   JAWBONE CONTINUES TO RECEIVE FUNDING FROM OTHER INVESTORS ................ 10

VII.  DISCLOSED RISKS AT JAWBONE MATERIALIZE ......................................................... 10

APPLICABLE LAW AND DEFENSES ................................................................................... 11

I.    THE OFFERING DOCUMENTS REFUTE ALL OF MATTSON'S ALLEGATIONS ............. 11

II.   MATTSON CANNOT BLAME JPMS FOR JAWBONE'S OPERATIONAL PROBLEMS ...... 13

      A.   The Offering Documents Warned Prospective Investors Of Operational
           Risks At Jawbone ................................................................................................ 13

      B.   Mattson Was Contractually Obligated To Conduct His Own Due
           Diligence Before Making His DGF II/Jawbone Investment And Aware
           That Jawbone Had Significant, Publicly-Known Operational Risks ......... 14

III.  MATTSON CANNOT BLAME JPMS FOR RIZVI'S DECISION TO INVEST $25 MILLION
      INSTEAD OF $175 MILLION ........................................................................................... 15

IV.   JPMS DID NOT BREACH ANY DUTY TO MATTSON ..................................................... 16

      A.   Settled Law And Mattson's Written Agreements Provide That JPMS Had
           No Duty To Perform Mattson's Due Diligence For Him ............................ 16

      B.   Mattson Deliberately Sued JPMS, Rather Than DGF II And JPMIM, In
           An Effort To Avoid The Provisions Of The Offering Documents ............. 18

V.    MATTSON'S CLAIMS ARE ALL ENTIRELY WITHOUT LEGAL MERIT ......................... 19

VI.   ADDITIONAL DEFENSES .................................................................................................. 22

CONCLUSION ........................................................................................................................... 22

## LIST OF EXHIBITS

**Exhibit 1:**   Confidential Offering Memorandum ("Offering Memo")

**Exhibit 2:**   Confidential Memorandum of Terms ("Term Sheet")

**Exhibit 3:**   Subscription Agreement of George N. Mattson

**Exhibit 4:**   Subscription Agreement of GNM ICBC, LLC

**Exhibit 5:**   Star Mountain Capital Press Release ("George Mattson, former Goldman Sachs partner and co-head of the Global Industrials Group, joins Star Mountain as a Strategic Investor and Industry Advisor")

**Exhibit 6:**   Delta Airlines Press Release ("Delta Board of Directors Names George N. Mattson as Newest Member")

**Exhibit 7:**   Stock Purchase Agreement

**Exhibit 8:**   Dec. 8, 2011 Article ("Jawbone Up owners eligible for full refund; can keep the troubled band")

**Exhibit 9:**   Aug. 15, 2013 Article ("Giving up on Jawbone's UP")

**Exhibit 10:**   Aug. 2013 Article ("Fitness Bands Report")

**Exhibit 11:**   Chart of Key Provisions in Offering Documents

Respondent J.P. Morgan Securities LLC ("JPMS") submits this Answer to Claimants George Mattson ("Mattson") and GNM ICBC, LLC's ("GNM LLC") July 26, 2017 Statement of Claim (the "SoC") in the above-captioned matter.

## INTRODUCTION

Claimant Mattson[1] is an ultra-high-net-worth investor who knowingly made a high-risk investment in Jawbone, a technology startup company, through an investment vehicle called Digital Growth Co-Investment 2, L.P. ("DGF II" or the "Partnership") (the "DGF II/Jawbone Investment"). Now that his investment has failed, Mattson seeks to use this arbitration to improperly shift his losses to Respondent JPMS. Mattson is extremely familiar with high-risk investments: as Mattson points out in his SoC, he is a former Goldman Sachs partner who, among other things, served as Co-Head of Investment Banking at Goldman Sachs until 2012, when he retired at age 46 with a large amount of personal wealth to invest. Like most ultra-high-net-worth investors, Mattson's portfolio held a wide range of investment risk, including high-risk investments on which Mattson hoped to earn high returns. The $1 million investment at issue here was exactly that type of investment. Now that the technology startup company Mattson chose to invest in has failed, he is not entitled to a bailout from JPMS. Instead, Mattson's claims fail for three fundamental reasons.

### Reason #1: The Offering Documents Refute All Of Mattson's Allegations

*First*, the terms of the deal documents governing Mattson's DGF II/Jawbone Investment (the "Offering Documents") directly refute his allegations. Mattson alleges that "representatives of JPMS" told him (i) that "Jawbone was going to be the winner in the wearable tech space," (ii)

---

[1]     As applicable and unless otherwise noted, the use of "Mattson" herein refers to both Claimant Mattson and his limited liability company, Claimant GNM LLC.

that "the $300 million" that Jawbone was raising in the stock issuance that Mattson's investment was part of "should carry Jawbone through to the IPO," and (iii) that "an experienced blue chip investor in high tech startups" called "Rizvi" had "done its due diligence into Jawbone" and was going to "invest $175 million" in the deal.[2]  Mattson claims he should get all of his money back because he purportedly relied on these alleged statements when he chose to invest in Jawbone.

But the Offering Documents conclusively demonstrate that Mattson did not rely on these alleged statements.  Contrary to Mattson's allegations, the Offering Documents show that what Mattson actually agreed to directly contradicts his claims in this lawsuit:

| MATTSON'S ALLEGATION (SoC at 5, 11) | WHAT THE OFFERING DOCUMENTS ACTUALLY SAY (Exs. 1 & 2) |
|---|---|
| "Jawbone was going to be the winner in the wearable tech space." | Jawbone's "consumer business is *highly competitive*" and "[a]n investment in [Jawbone] involves a *high degree of risk*" as Jawbone "is *currently cash flow negative and not profitable*[,] . . . and there can be *no assurance that there will be any return of capital* to investors."[3] |
| "The $300 million" that Jawbone was raising in the stock issuance that Mattson's investment was part of "should carry Jawbone through to the IPO." | "[I]nitial public offering . . . opportunities may be limited or non-existent" for Jawbone, which may further "require multiple rounds of capital" and "third-party sources of financing." |
| "An experienced blue chip investor in high tech startups" called "Rizvi" had "done its due diligence into Jawbone" and was going to "invest $175 million" in the deal. | Rizvi "shall . . . fund[] $25 million at the initial closing" with the option to invest "*up to an additional* $150 million . . . for up to six months" afterwards, but has no obligation to do so. |

Mattson also specifically agreed in the Offering Documents that, by participating in the offering, he was not "relying upon any representations made by, or other information (whether

---

[2]     SoC at 5, 11.

[3]     All emphasis in quotations that appears in capital letters is original whereas all emphasis in italics has been added.

oral or written) furnished by," JPMS or any other JPMorgan Chase & Co. entity.[4]  It is *undisputed* that Mattson received the Offering Documents and, given his sophistication (including his experience at Goldman Sachs), it is beyond dispute that he understood all of their terms. Accordingly, Mattson's claims fail because they are refuted by the Offering Documents.

### Reason #2:  Mattson Cannot Blame JPMS For Jawbone's Operational Problems

*Second*, Mattson alleges that his investment failed because of operational problems at Jawbone—including a "sealing problem" with one of its products[5]—and he now seeks to blame JPMS for failing to foresee those operational problems. But it is absolutely clear that *Mattson*, and not JPMS, was responsible for assessing Jawbone's operational risks.   The Offering Documents stated, and Mattson agreed, that Mattson was responsible for conducting his own due diligence and deciding whether to invest:

> IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE . . . TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.[6]

And as mentioned, Mattson agreed that he was not "relying upon any representations made by, or other information (whether oral or written) furnished by," JPMS or any other JPMorgan Chase & Co. entity.[7]

It is also clear that Mattson actually *knew* that Jawbone faced significant operational risks because the Offering Documents specifically stated that an investment in Jawbone "involves a high degree of risk," "will be highly speculative," and "is presented with many significant manufacturing, marketing, operational and other risks and uncertainties."[8]  Moreover, it was clear

---

[4]   Exs. 3 & 4 (Subscription Agreements) at 4.
[5]   SoC at 7.
[6]   Ex. 1 (Offering Memo) at iii.
[7]   Exs. 3 & 4 (Subscription Agreements) at 4.
[8]   Ex. 1 (Offering Memo) at 4, 26.

that Jawbone, a startup technology company attempting to bring new products to market, would face serious operational risks.[9]  At the time Mattson made his investment in 2014, it already had been widely reported in the press that Jawbone was facing serious operational risks.[10]  In fact, Mattson's SoC acknowledges that Jawbone was known to have significant operational risks and had been "forced to stop production" of a newly-launched product in late 2011 "in response to widespread customer claims of issues with charging, syncing, and in some cases, product failure."[11]

Mattson chose to invest in Jawbone despite public reports of those operational risks—and despite the Offering Documents expressly telling him that an investment in Jawbone "involves a high degree of risk"[12]—*because he sought the potential high returns that the investment offered him.*  Mattson cannot now blame JPMS because some of these known risks materialized, nor can he disregard his written agreement that *he*—and not JPMS[13]—was responsible for conducting due diligence into Jawbone.

<u>Reason #3:  Mattson Cannot Blame JPMS For Rizvi's Decision To Invest Only $25 Million</u>

*Third,* Mattson's attempt to blame JPMS because Rizvi ultimately invested only $25 million in Jawbone, and not $175 million, is directly contrary to the terms in the Offering

---

[9]     The primary product Jawbone was attempting to bring to market was its UP by Jawbone ("UP"), a wearable fitness tracker.  In bringing this new product to market, Jawbone was competing with multiple other companies, including Fitbit.

[10]    *See, e.g.,* Exs. 8-10.

[11]    SoC at 4.

[12]    Ex. 1 (Offering Memo) at 4.

[13]    JPMS served only as the placement agent to DGF II and it did not play any role in advising DGF II or holding DGF II's funds, nor did it play any role in advising Mattson or holding Mattson's DGF II/Jawbone funds.  Rather, the only entity advising DGF II was J.P. Morgan Investment Management, Inc. ("JPMIM"), an investment manager within the J.P. Morgan Private Equity Group.  JPMIM served as Mattson's primary point of contact with respect to DGF II.  JPMIM and DGF II are not members of FINRA.  Mattson's tactical decision to demand arbitration against JPMS, rather than litigating his claims against DGF II or JPMIM, is an effort to avoid the contractual provisions in Mattson's agreements governing his DGF II/Jawbone investment that any and all DGF II-related claims be brought in Delaware federal or state court.  JPMS, JPMIM, DGF II, and all other affiliates of JPMorgan Chase & Co. reserve all rights such that nothing herein nor any other conduct with respect to this arbitration proceeding waives or should be construed to waive any rights to enforce the provisions governing Mattson's DGF II/Jawbone investment.

Documents that Mattson agreed to. Specifically, Mattson alleges that JPMS told him that another investor called Rizvi—whom Mattson describes as "an experienced blue chip investor in high tech startups"—had "done its due diligence into Jawbone" and was going to "invest $175 million" in the deal. Mattson now makes the incredible claim that JPMS should bear Mattson's investment losses because Rizvi ultimately invested only $25 million, not $175 million.

Mattson's claim about Rizvi is entirely without merit because the Offering Documents specifically told Mattson that Rizvi "shall . . . fund[] $25 million at the initial closing" and had the *option* to invest "*up to an additional* $150 million . . . for up to six months" after closing.[14] Mattson's present attempt to blame JPMS because Rizvi did not exercise its option to invest an additional $150 million is baseless: Rizvi had no obligation to invest an additional $150 million, *and the Offering Documents specifically told Mattson as much.*

Mattson's complaint about Rizvi is further undercut by the fact that Mattson's theory appears to be that he only invested in Jawbone because he was assured that "Rizvi was an experienced blue chip investor in high tech startups (including Twitter) and had done its due diligence into Jawbone."[15] But, as noted above, Mattson agreed that *he* would do his *own* due diligence into Jawbone. Now that his investment in Jawbone has failed, Mattson cannot shirk his obligations and claim that, instead of doing his own due diligence as he promised to do, he instead was actually relying on Rizvi and JPMS to do the diligence for him.

---

[14]  Ex. 2 (Term Sheet) at 1.
[15]  SoC at 5.

## STATEMENT OF FACTS

## I.  MATTSON'S EXTENSIVE INVESTMENT AND INVESTMENT BANKING EXPERIENCE

Mattson is an ultra-high-net-worth individual with decades of investment and investment banking experience. At the time of his investment in DGF II/Jawbone, Mattson had over $60 million in personal investable assets. As Mattson explains in his SoC, he is a client of the "JP Morgan Private Bank[,] . . . a branded group within [JPMS] that focuses on high net worth customers" like himself.[16] As Mattson also explains, he joined Goldman Sachs in 1994, where he was a long-time partner and "co-head of the Global Industrials Group in Investment Banking, which had the responsibility for a diverse set of industry sectors."[17] Mattson stepped down from Goldman Sachs in 2012 after eighteen years at the investment bank.[18]

Since 2012, Mattson has remained active in the investment industry, including as a personal investor, investment advisor, and current member of Delta Airlines' Board of Directors.[19] Among his current roles, Mattson serves as a Strategic Investor and Industry Advisor at Star Mountain Capital, a private equity firm whose portfolio includes investments similar in structure and risk to Mattson's DGF II/Jawbone Investment.[20] Likewise, in announcing Mattson's appointment to its Board of Directors, Delta Airlines highlighted Mattson's "deep and broad-based experience in the areas of mergers and acquisitions, corporate finance and capital markets."[21]

In his general account opening documents, Mattson disclosed that he has over 20 years of personal trading experience in the following areas: stocks, bonds, foreign exchange, structured products, options, emerging markets, hedge funds/private placements, commodity futures, and

---

16    *Id.*
17    SoC at 1-2.
18    *Id.*
19    *See id.*; Ex. 5 ("Star Mountain Capital, "George Mattson, former Goldman Sachs partner and co-head of the Global Industrials Group, joins Star Mountain as a Strategic Investor and Industry Advisor" (Jan. 24, 2017)).
20    *See* Ex. 5.
21    Ex. 6 ("Delta Board of Directors Names George N. Mattson As Newest Member" (Oct. 1, 2012)).

6

mutual funds. Mattson also described his goal in investing as "Capital Appreciation" and indicated that "[s]peculative or aggressive investments that may generate higher returns but may be riskier . . . [a]re permitted." Consistent with his stated investment goals, Mattson's portfolio includes a variety of speculative investments.

## II.   JPMS's LIMITED ROLE AS DGF II PLACEMENT AGENT AND JPMIM's ROLE AS DGF II INVESTMENT ADVISOR

As Mattson was told in the Offering Memo for the DGF II/Jawbone Investment, JPMS's only role with respect to DGF II was that of placement agent to DGF II.[22]  As placement agent, JPMS's limited purpose was to serve as an intermediary to communicate the investment opportunity to prospective investors.  As such, JPMS was not a seller, broker-dealer, advisor, or custodian with respect to the DGF II funds, nor did JPMS set the terms of the DGF II/Jawbone Investment.  In exchange for JPMS's limited services, DGF II investors paid JPMS a small placement agent origination fee.[23]  In fact, Mattson considered even that small fee to be too large given JPMS's extremely limited role and demanded, and received, a 50% reduction of the fee.

The Offering Memo also made clear that the only entity advising DGF II would be JPMIM, an investment manager within the J.P. Morgan Private Equity Group.[24]  As the investment advisor to DGF II, JPMIM was responsible "for executing, managing and disposing of the Partnership's investment in [Jawbone]."[25]  Indeed, JPMIM served as Mattson's primary point of contact with respect to DGF II.  Acknowledging JPMS's limited role here, Mattson's SoC refers to non-JPMS entities *nearly twice as many times* as it refers to JPMS.

---

[22]     *See* Ex. 1 (Offering Memo) at 11-12.
[23]     *See id.*
[24]     *See id.* at 8.
[25]     *Id.*

In light of these facts, why did Mattson sue only JPMS? The answer, as discussed further below (see pp. 18-19), is that Mattson is forum shopping to avoid his contractual obligation under the Subscription Agreements to bring any DGF II-related claims only in Delaware federal or state court.[26] Mattson seeks to avoid federal or state court because he is aware that in either of those forums, his claims—all of which are plainly refuted by the Offering Documents—would be dismissed at the pre-trial motion to dismiss stage.

## III.   MATTSON AND OTHER HIGH-NET-WORTH INVESTORS ARE INVITED TO REVIEW THE DGF II/JAWBONE INVESTMENT OPPORTUNITY

In May 2014, the Jawbone private equity opportunity was sent to multiple high-net-worth investors, including Mattson, for their review. As the Offering Documents explained, the investment was to be made via DGF II, a limited partnership vehicle organized to acquire shares in Jawbone as part of Jawbone's Series 6 Preferred fundraising round.[27] Prospective investors therefore were invited to make indirect investments in Jawbone by acquiring limited partner interests in the DGF II partnership.[28] The opportunity was sent to such prospective investors by JPMS in its capacity as placement agent for DGF II.

The investment was classified as a "Regulation D" offering in a private company that is unregulated by the Securities and Exchange Commission.[29] Given the inherent risks of such an investment, federal law allows such investments to be made only by "accredited investors" who

---

[26]   See Exs. 3 & 4 (Subscription Agreements) ¶¶ 22-23. In the Subscription Agreements, Mattson agreed:
22.   In any judicial proceeding involving any dispute, controversy or claim arising out of or relating to this Subscription Agreement or the Partnership or its operations, *the Investor . . . unconditionally accepts the non-exclusive jurisdiction and venue of any United States District Court located in the State of Delaware, or . . . the appropriate state court . . . of the State of Delaware. . . .*
23.   To the fullest extent permitted by law, *the Investor hereby irrevocably waives the right to arbitration, if any. . . .*

[27]   See Ex. 1 (Offering Memo) at 5.

[28]   See id.

[29]   See 17 C.F.R. § 230.501 et seq.; Ex. 1 (Offering Memo) at 12, 54.

8

have the financial ability to take on a high degree of risk.[30]  In other words, only sophisticated investors (like Mattson) whose net worth was at or above a specified level were invited to consider the Jawbone opportunity, which the Offering Documents emphasized would be "highly speculative" such that "there can be no assurance that there will be any return of capital to investors."[31]  This structure is typical for such a private equity investment and one that Mattson was very familiar with given his background and sophistication.

## IV.    KEY PROVISIONS IN THE OFFERING DOCUMENTS

In his SoC, Mattson agrees that "the Offering Documents provided to Mattson included" the "Offering Memo" and various other documents which explain the terms of and risks presented by the deal.[32]  These Offering Documents contain provisions that refute all of Mattson's allegations, including their (i) provisions mandating that Mattson independently "EXAMIN[E] . . . THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED"; (ii) disclosures regarding the "many significant . . . risks," including "operational" risks, of investing in Jawbone; and (iii) disclosures regarding Rizvi's obligation to fund only $25 million with the option to invest "up to an additional $150 million" later on.[33]  For the Panel's convenience, a one-page chart setting forth Mattson's allegations and the key provisions in the Offering Documents that refute each of those allegations is provided as Exhibit 11 hereto.

## V.    MATTSON DECIDES TO INVEST IN JAWBONE AND AGREES TO ALL PROVISIONS IN THE OFFERING DOCUMENTS

After reviewing the Offering Documents, including those mentioned above, and "THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED,"[34]

---

[30]    *See* 17 C.F.R. § 230.501 *et seq.*; Ex. 1 (Offering Memo) at 12, 54.
[31]    *Id.* at 4.
[32]    SoC at 6.
[33]    Ex. 1 (Offering Memo) at 4, 25-38; Ex. 2 (Term Sheet) at 1.
[34]    Ex. 1 (Offering Memo) at 4.

9

Mattson decided to invest $1,000,000 of his own money in Jawbone—$500,000 personally and $500,000 from his personal investment vehicle, GNM LLC (which takes its name from Mattson's initials, G.N.M.).[35] In executing the Subscription Agreements for his DGF II/Jawbone Investment, Mattson agreed that he had read, and that he agreed to, all of the provisions contained in the Offering Documents.[36]   Mattson signed the Subscription Agreements in six places.[37] Subsequently, JPMIM, in its capacity as investment advisor to DGF II, purchased Jawbone Series 6 Preferred stock with the DGF II funds.

## VI. JAWBONE CONTINUES TO RECEIVE FUNDING FROM OTHER INVESTORS

Despite that Rizvi had no obligation to invest more than $25 million in Jawbone's Series 6 Preferred round (as the Offering Documents made clear), one of Mattson's claims is that his investment losses are attributable to Rizvi's decision not to exercise its option of investing another $150 million later on.[38]  Yet, in addition to the fact that Mattson knew that Rizvi was not required to invest that additional money,[39] there is no dispute that other investors continued providing hundreds of millions to Jawbone long after the Series 6 Preferred round closed.[40]  As Mattson's SoC concedes, these later investors included two prominent institutional entities, BlackRock (which provided approximately $300 million in 2015) and the Kuwait Investment Authority (which led a $165 million funding round in 2016).[41]

## VII. DISCLOSED RISKS AT JAWBONE MATERIALIZE

Ultimately, however, operational risks at Jawbone materialized and Mattson's DGF II/Jawbone Investment resulted in a zero return of capital.  As discussed, such risks were expressly

---

35    *See* Exs. 3 & 4 (Subscription Agreements).
36    *See id.* at ii, 3-4.
37    *See id.* at 22-25.
38    *See* SoC at 5, 11.
39    *See* Ex. 2 (Term Sheet) at 1.
40    SoC at 7-8.
41    *See id.*

disclosed to and accepted by Mattson (and publicly-known) prior to Mattson making his DGF II/Jawbone Investment.[42]  Critically, Mattson agreed that he alone was responsible for conducting due diligence.[43]  The Offering Documents also emphasized Jawbone's significant operational risks, warning that an investment in Jawbone "involves a high degree of risk . . . and there can be no assurance of any return of capital to investors."[44]  And as Mattson well knew, private placement investments in private companies, particularly startup companies that may seek to go public, are by definition high-risk.

<h2 style="text-align:center"><u>APPLICABLE LAW AND DEFENSES</u></h2>

**I.    THE OFFERING DOCUMENTS REFUTE ALL OF MATTSON'S ALLEGATIONS**

Each and every one of Mattson's claims are directly refuted by the Offering Documents. Contrary to Mattson's characterization in his SoC, placement agent JPMS in no way made "material misrepresentations to Mattson about the nature of the investment" in Jawbone or fell short of any obligation to "perform[] due diligence."[45]  No JPMorgan entity did.  It was just the opposite: the Offering Documents expressly set forth the significant risks of the investment and made clear that Mattson was responsible for conducting his own due diligence:[46]

| MISREPRESENTATION(S) ALLEGED BY MATTSON (SoC at 5, 11) | ACTUAL PROVISIONS IN OFFERING DOCUMENTS PROVIDED TO MATTSON[47] |
|---|---|
| "That Jawbone was a 'hot' company that was looking to go public in 1-2 years." | • "An investment in the Partnership involves a high degree of risk. . . . [Jawbone] is currently cash flow negative and not profitable. The Partnership's investment in [Jawbone], and an investor's investment in the Partnership, will be highly speculative and |

---

[42]   *See, e.g.,* Exs. 8-10.
[43]   Ex. 1 (Offering Memo) at iii.
[44]   *Id.* at 4; *see id.* at 25-38.
[45]   SoC at 6.
[46]   The following chart also is provided as Exhibit 11.
[47]   Ex. 1 (Offering Memo) at iii, 4, 26-27, 29, 34, 39; Ex. 2 (Term Sheet) at 1; Exs. 3 & 4 (Subscription Agreements) at 4; Ex. 7 (Stock Purchase Agreement) at 2-3.

| MISREPRESENTATION(S) ALLEGED BY MATTSON (SoC at 5, 11) | ACTUAL PROVISIONS IN OFFERING DOCUMENTS PROVIDED TO MATTSON[7] |
|---|---|
| | there can be no assurance that there will be any return of capital to investors." |
| | • "[I]nitial public offering . . . opportunities may be limited or non-existent." |
| "That Jawbone was going to be the 'winner' in the wearable tech space as it had the best technology which was 'IP protected'." | • "Early stage company; Risks of certain business challenges[:] . . . . Prospective investors should consider . . . the many challenges [Jawbone] faces, which include its ability to, among other things: . . . forecast trends and timely meet the demand for consumer products."<br><br>• "[Jawbone's] consumer business is highly competitive and is presented with many significant manufacturing, marketing, operational and other risks and uncertainties."<br><br>• "Intellectual property rights[:] [Jawbone's] success depends in part on its ability to protect [its] . . . intellectual property. . . . Assertions by third parties of infringement . . . by [Jawbone] could result in significant costs and could substantially harm [Jawbone's] business. . . . There can be no assurance that [Jawbone] is not infringing or violating any third-party intellectual property rights. [Jawbone] has faced intellectual property rights claims and expects to face more in the future." |
| "That JPM's customers would be coinvesting along with Rizvi in a $250-$300 million capital raise."<br><br>"That Rizvi would be the lead investor and invest $175 million." | • "Investors; Investment Amount: Rizvi[:] *Up to* $175 million, which shall be funded $25 million at the initial closing, *and up to an additional* $150 million that will be funded either directly through Rizvi or related LP relationships. . . . Rizvi *may invest* the $150 million for up to 6 months."<br><br>• "Rizvi . . . shall, for the 180 days following the Initial Closing, *have the right* to purchase *up to* $150,000,000 worth of additional shares." |
| "That Rizvi was a blue chip investor in high tech startups and had done its due diligence into Jawbone." | • "IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PARTNERSHIP AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED."<br><br>• "In considering its investment in the Partnership, the Investor has not relied upon any representations made by, or other information (whether oral or written) furnished by or on behalf of, [anyone affiliated with JPMS or Jawbone] . . . other than as set forth in the Offering Documents." |
| "That the $300 million would carry Jawbone | • "[I]nitial public offering . . . opportunities may be limited or non-existent." |

| MISREPRESENTATION(S) ALLEGED BY MATTSON (SoC at 5, 11) | ACTUAL PROVISIONS IN OFFERING DOCUMENTS PROVIDED TO MATTSON[47] |
|---|---|
| through to the IPO alongside Fitbit's IPO." | • "Risks of private technology investments[:] . . . These companies are often operating at a loss . . . [and] may require substantial additional capital to support their operations, to finance expansion or to maintain their competitive position, and often face intense competition." <br><br> • "No availability of additional investment capital from the Partnership[:] Private emerging companies such as [Jawbone] typically require multiple rounds of capital before reaching maturity. The Partnership will not be in a position to provide follow-on capital to [Jawbone]. Additionally, [Jawbone] may require third-party sources of financing." |

In entering into the Subscription Agreements with DGF II, Mattson agreed that he had read, and that he agreed to, these and all other provisions contained in the Offering Documents.[48] He cannot now pretend that his agreements do not apply to him.

## II.    MATTSON CANNOT BLAME JPMS FOR JAWBONE'S OPERATIONAL PROBLEMS

Mattson cannot blame JPMS for Jawbone's operational problems, which not only were among the risks expressly disclosed in the Offering Documents, but also were public knowledge at the time Mattson chose to make his DGF II/Jawbone Investment.

### A.    The Offering Documents Warned Prospective Investors Of Operational Risks At Jawbone

As an initial matter, and as outlined above, the Offering Documents plainly warned prospective investors like Mattson that Jawbone faced "many significant manufacturing, marketing, operational and other risks and uncertainties."[49]  In fact, the Offering Memo devoted thirteen pages to "RISK FACTORS" at Jawbone, including sections concerning (i) "Risks of certain business challenges," (ii) "Net losses since inception; increased operating expenses," (iii)

---

[48]    *See* Exs. 2 & 3 (Subscription Agreements) at ii, 3-4.
[49]    Ex. 1 (Offering Memo) at 26.

13

"Rapidly Changing Technology," (iv) "Ability to match production to demand," (v) "Dependence on manufacturers," (vi) "Dependence on suppliers," and (vii) "Operating challenges . . . associated with [Jawbone's] ability to execute its business strategy."[50]

### B. Mattson Was Contractually Obligated To Conduct His Own Due Diligence Before Making His DGF II/Jawbone Investment And Aware That Jawbone Had Significant, Publicly-Known Operational Risks

Moreover, Mattson was contractually obligated to conduct his "OWN EXAMINATION OF THE PARTNERSHIP AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED" before deciding to invest.[51]  The operational risks with Jawbone were well-known before Mattson made his DGF II/Jawbone Investment and typical of start-up companies which investors hope will yield them high returns.  Indeed, *Mattson in his own SoC concedes that there were known operational problems at Jawbone as early as 2011*—over two years before Mattson elected to invest in the company.[52]  As his SoC summarizes the situation,

> [i]n November 2011, Jawbone launched the [UP by Jawbone] product but was forced to stop production a month later in response to widespread customer claims of issues with charging, syncing, and in some cases, product failure.[53]

The operational problems with UP by Jawbone are well-documented, including in news reports announcing in December 2011 that "Jawbone Up owners eligible for full refund; can keep the troubled band."[54]

Likewise, as reflected in articles from 2013—the year prior to Mattson's DGF II/Jawbone Investment—customers reported sealing, battery, and charging problems with Jawbone's

---

[50]  *Id.* at 25-38.
[51]  *Id.* at 4.
[52]  *See* SoC at 4.
[53]  *Id.*
[54]  *See* Ex. 8.

14

redesigned UP model.[55] As one industry blogger reported in August 2013: "[t]he Jawbone UP is the best fitness tracker [he had] ever used . . . and [he had] yet to find a rival offering with a more intuitive software design. And yet despite all this, [he had] given up on the Jawbone UP and switched to a rival band with a vastly inferior user experience" because "[i]n the eight months since [he] purchased [his] first UP band . . . , [he has] been through five of them. . . . [T]he quality control is just not there. The company's supply and manufacturing partners clearly do not have their acts together and Jawbone itself doesn't seem to be applying enough pressure or actively participating in [quality control] to the extent it should be."[56] A consumer survey also published in August 2013 ranked Jawbone as the "Most Frustrating" of fitness bands on the market, citing "Battery Issues," "Syncing Issues," and issues with Jawbone's "Proprietary Charger."[57]

In short, Mattson should have known that Jawbone faced significant operational risks as a startup bringing new products to market. Basic due diligence (which Mattson agreed to do) would have revealed these risks, which were widely reported prior to his making his DGF II/Jawbone Investment. As the Offering Documents made clear, it is Mattson, not JPMS, who agreed to bear full responsibility for due diligence and the risk of loss. As a sophisticated investor, Mattson either actually did the required due diligence, knew and assumed the risks in hopes of seeing high returns, and is now looking for a windfall, or, conversely, neglected to do his required due diligence and is now searching for a scapegoat. Mattson is not entitled to a bailout for his decision to invest in a high-risk venture that ultimately did not make him money.

## III. MATTSON CANNOT BLAME JPMS FOR RIZVI'S DECISION TO INVEST $25 MILLION INSTEAD OF $175 MILLION

Nor can Mattson blame JPMS for Rizvi's decision to invest just the $25 million it had

---

[55]   See, e.g., Ex. 9.
[56]   Id. at 1, 4.
[57]   Ex. 10 at 5-7.

committed to Jawbone instead of the $175 million that, as Mattson knew, Rizvi simply had the *option* of investing. Again, as the Offering Documents clearly stated—including on page 1 of the Term Sheet—Rizvi had committed to "fund[] $25 million at the initial closing" for Series 6 Preferred but retained the option to invest "*up to* an additional $150 million" which "Rizvi *may invest* . . . for up to 6 months."[58] Mattson does not dispute that Rizvi funded its mandatory $25 million.[59] Mattson made his own investment in Jawbone with full disclosure that Rizvi had no obligation with respect to the additional $150 million, and his attempt to argue otherwise (now that his high-risk investment has proved unsuccessful) is refuted by the plain terms of the Offering Documents and should be rejected.

## IV.   JPMS DID NOT BREACH ANY DUTY TO MATTSON

### A.   Settled Law And Mattson's Written Agreements Provide That JPMS Had No Duty To Perform Mattson's Due Diligence For Him

Notwithstanding that the Offering Documents clearly required Mattson to conduct his own due diligence, Mattson's SoC spends nearly four pages on the inapplicable "duty" of a "broker-dealer that recommends a security . . . to conduct a reasonable investigation."[60] Specifically, in alleging that JPMS somehow is liable, Mattson states:

> The Securities and Exchange Commission (SEC) and federal courts have long held that a broker-dealer that recommends a security is under a duty to conduct a reasonable investigation concerning that security and the issuer's representations about it. This duty emanates from the broker-dealer's "special relationship" to the customer, and from the fact that in recommending the security, the broker-dealer represents to the customer that a reasonable investigation has been made and that its recommendation rests on the conclusions based on such investigation. . . .
>
> Courts have found that the amount and nature of the investigation required depends, among other factors, upon the nature of the

---

[58]     Ex. 2 (Term Sheet) at 1.
[59]     *See* SoC at 7.
[60]     *See* SoC at 8-11.

16

> recommendation, the role of the broker in the transaction, its knowledge of and relationship to the issuer, and the size and stability of the issuer. . . . [T]here are no iron clad rules as to what a broker must do to meet his responsibility. . . . [61]

Such principles—which rightfully protect ordinary investors who make investments based on recommendations from their broker-dealer—are inapplicable here because (i) Mattson is not an ordinary or inexperienced investor, and (ii) his DGF II/Jawbone Investment was not based on any recommendation by JPMS. Rather, Mattson is a sophisticated private equity investor who agreed in writing that *he would conduct his own due diligence and not rely on JPMS in any way in making his investment.* Mattson's suggestion that JPMS should nevertheless bail him out for his deliberately risky investment is entirely without merit.

The same federal courts that Mattson relies on agree that there can be no duty where the parties expressly agree that such a relationship will not exist.[62] In *Curry v. TD Ameritrade*, for example, the plaintiff similarly tried to impose liability on a broker-dealer defendant despite the fact that the parties' agreement provided that the plaintiff alone was "responsible for determining the nature, potential value and suitability" of the investment and that defendant was not providing "any advice or guidance" on the subject.[63] The federal district court applied settled law and rejected plaintiff's claim, holding that "the existence of a fiduciary duty is . . . determined . . . by the substantive agreement of the parties."[64] Likewise here, Mattson expressly agreed that his investment decision was made based entirely on his "OWN EXAMINATION OF . . . THE TERMS,"[65] and that he "ha[d] not relied upon any representations made by, or other information

---

[61] SoC at 8 (quoting without attribution FINRA Regulatory Notice 10-22, http://www.finra.org/sites/default/files/NoticeDocument/p121304.pdf).

[62] *See, e.g., Curry v. TD Ameritrade*, No. 14 Civ. 1361, 2015 WL 11251449 (N.D. Ga. June 30, 2015).

[63] *See id.* at *7.

[64] *Id.* at *12; *see Lamm v. State Street Bank & Trust*, 749 F.3d 938, 943, 950 (11th Cir. 2014) (no fiduciary duty where contract "impos[ed] limited obligations on the parties" and provided "that [defendant broker] would have no decisionmaking role over [plaintiff's] investments").

[65] Ex. 1 (Offering Memo) at 4.

17

(whether oral or written) furnished by or on behalf of, [anyone affiliated with JPMS or Jawbone] . . . other than as set forth in the Offering Documents."[66] Accordingly, pursuant to his "substantive agreement" in making his DGF II/Jawbone Investment,[67] Mattson now cannot seek to impose liability on JPMS for an obligation that he expressly agreed would not exist.

Even looking at the "factors" to which Mattson refers rather than the federal case law, not one weighs in Mattson's favor: (i) the "nature of the recommendation" and "role of the broker in the transaction" were non-existent, as JPMS served only as placement agent for DGF II and was not providing any investment advice to Mattson; (ii) JPMS's "knowledge of and relationship to the issuer" were irrelevant to Mattson's investment decision, which he agreed was based completely on his own due diligence and not in reliance on JPMS or any JPMS affiliate; and (iii) with respect to Mattson's final listed factor, which relates to the amount of information available to investors, Jawbone was a popularly-known technology startup with widely-marketed products, which meant that Mattson could conduct his own due diligence (as he was, in fact, contractually obligated to do).

### B. Mattson Deliberately Sued JPMS, Rather Than DGF II And JPMIM, In An Effort To Avoid The Provisions Of The Offering Documents

Notably, as discussed, JPMS has no meaningful connection to the allegations in the SoC: it served only as placement agent to DGF II and played neither an advisory role in nor custodial role over the DGF II funds. By contrast, JPMIM was the sole investment advisor to DGF II as well as Mattson's primary point of contact with respect to DGF II. In fact, the SoC actually refers to non-JPMS entities throughout, nearly twice as much as it refers to JPMS, and makes explicit that the relevant parties are DGF II and JPMIM, and not JPMS.

---

[66]   Exs. 3 & 4 (Subscription Agreements) at 4.
[67]   *Curry*, 2015 WL 11251449, at *12.

18

Why then did Mattson choose to sue only JPMS before FINRA? The answer is simple: Given the express provisions in the Offering Documents, Mattson knows that he does not have a valid claim against DGF II or JPMIM. Instead of facing a strong pre-trial motion to dismiss in a federal or state court proceeding[68] (where he agreed in his Subscription Agreements he would bring his claims),[69] Mattson is hoping he can extract a windfall settlement from the placement agent to his investment through a FINRA arbitration, which will require a hearing.[70] However, no matter the forum, all of Mattson's claims are wholly precluded by the provisions he agreed to in the Offering Documents. Mattson should not be permitted to shirk his contractual obligations in this fashion.

## V.     MATTSON'S CLAIMS ARE ALL ENTIRELY WITHOUT LEGAL MERIT

Finally, for many of the reasons discussed above, all of Mattson's claims are entirely without legal merit. Mattson broadly asserts claims for: "(A) Negligence (Failure to Conduct Due Diligence); (B) Negligence (Failure to Supervise its Representatives); (C) Common Law Fraud; (D) Breach of Fiduciary Duty; (E) Respondeat Superior; (F) Violation of State Securities Laws; (G) [Violation of] Federal Securities Laws; and (H) Violation of FINRA Rules."[71] As set forth in the chart below, each fails as a matter of law.

Critically, however, each of these claims fails because it requires, among other things, (i) the existence of a duty by, or a relationship of reliance on, JPMS, and (ii) that the breach of duty or reliance was a direct and proximate cause of the claimant's losses. Both requirements fail here. As detailed above, the first requirement fails because Mattson expressly agreed, in writing, that

---

[68]      There is no comparable mechanism in a FINRA proceeding.

[69]      *See* Exs. 3 & 4 (Subscription Agreements) ¶¶ 22-23.

[70]      As Mattson and his counsel well know, a hearing with live testimony in Mattson's home jurisdiction will be more expensive than a motion to dismiss concerning the terms of the agreements governing his DGF II/Jawbone Investment.

[71]      SoC at 13.

there would be no duty of or reliance on JPMS.[72] The second requirement also fails because JPMS played no advisory or custodial role over the DGF II funds and thus, could not have played any role in Mattson's allegations, let alone his losses. Further, Jawbone carried significant operational risks (in spite of which Mattson chose to invest) and Mattson's allegations, including as to Rizvi's decision not to invest its discretionary $150 million, were not the cause of these risks materializing—not least because (i) Jawbone's operational risks were well-known prior to 2014, and (ii) Jawbone continued receiving hundreds of millions of dollars from later investors after receiving DGF II's funds.

For these and other reasons, each of Mattson's claims fails as a matter of law:

| CLAIM(S) ASSERTED BY MATTSON | ELEMENTS | | KEY DEFENSE(S) BARRING CLAIM |
|---|---|---|---|
| Negligence; Breach of Fiduciary Duty | (i) (ii) (iii) | Duty; Breach of Duty; and Direct and proximate causal connection between breach and injury.[73] | • No duty: The parties' written agreements expressly agree that no duty exists. • No breach. • No causation: No direct and proximate causal connection between alleged breach and Mattson's losses on his investment in Jawbone, an inherently risky venture. |
| Common Law Fraud; Violation of "Securities Laws"[74] | (i) (ii) (iii) | Knowing and material false statement; Intent by declarant to induce reliance on statement; Actual reliance; and | • No false statement. • Lack of specificity due to "[f]ailure to state with particularity the circumstances constituting fraud or mistake" and failure to specify bases for securities fraud claims.[76] |

---

[72] *See, e.g., Lamm*, 749 F.3d at 943, 950; *Curry*, 2015 WL 11251449, at *12.
[73] *See Med. & Chiropractic Clinic, Inc. v. Oppenheim*, 246 F. Supp. 3d 1329, 1332 (M.D. Fla. 2017); *Watson v. Bank of Am. Corp.*, No. 13 Civ. 81137, 2014 WL 3667877, at *3 (S.D. Fla. July 22, 2014).
[74] Although Mattson's SoC does not specify the bases for his claims under "Federal [and State] Securities Laws," JPMS assumes for purposes of this Answer, without waiving any rights, that Mattson's claims are asserted under Section 10(b) of the Securities Exchange Act and analogous state law.
[76] *White v. Americas Servicing Co.*, 461 Fed. App'x 841, 843 (11th Cir. 2012).

| CLAIM(S) ASSERTED BY MATTSON | ELEMENTS | KEY DEFENSE(S) BARRING CLAIM |
|---|---|---|
| | (iv) Injury proximately caused by the reliance.[75] | • **No intent** (indeed, Mattson makes no showing in his SoC—nor could he—as to why JPMS would seek to defraud him).<br>• **No reliance**, including because (i) the parties' written agreements expressly agree that Mattson would not rely on any statements by JPMS, and (ii) Mattson, a sophisticated investor, was fully apprised of risks of investing.<br>• **No causation.** |
| **Respondeat Superior** | (i) Wrongful conduct by employee;<br>(ii) Conducted in scope of employer's business.[77] | • **No wrongful conduct** by JPMS employees to give rise to liability, including due to lack of duty/reliance or causation. |
| **Violation of FINRA Rules** | N/A as Mattson has not specified the FINRA Rule(s) under which his claim is asserted. | • **Lack of specificity** due to failure to identify bases for claimed violation of FINRA Rules.<br>• **No private right of action** under FINRA Rules.[78]<br>• **No wrongful conduct** by JPMS or any of its employees, including due to lack of duty/reliance or causation. |

[75] *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (stating elements of securities fraud under Section 10(b) of the Securities Exchange Act of 1934); *Cadow v. Sandals Resorts Intern.*, No. 10 Civ. 24092, 2011 WL 1527555, at *2 n.1 (S.D. Fla. Apr. 20, 2011) (stating elements of common law fraud).

[77] *Blount v. Sterling Healthcare Grp., Inc.*, 934 F. Supp. 1365, 1372 (S.D. Fla. 1996).

[78] *See, e.g.*, *Owens v. Stifel, Nicolaus & Co., Inc.*, No. 12 Civ. 144, 2014 WL 2769044, at *6 (M.D. Ga. June 18, 2014) ("FINRA Rules do not equate to law or public policy, and [there is] no private cause of action . . . to proceed with an action based on FINRA rules."), *rev'd in part on other grounds*; *Greene v. Loeb Partners*, 532 F. Supp. 747, 748 (S.D. Fla. 1982) ("[T]here is no provision in the . . . NASD Rules [(the precursor to the FINRA Rules)] providing for a private cause of action for violations thereof.").

## VI.    ADDITIONAL DEFENSES

For the avoidance of doubt, JPMS asserts the following additional defenses to Mattson's claims:

(i)      Mattson's SoC fails to state any cause of action upon which relief may be granted;

(ii)     All of JPMS's actions were justified and cannot be the basis of any liability;

(iii)    Mattson has not suffered any damages by reason of any act or omission by JPMS;

(iv)     Mattson ordered, approved, participated in, and/or ratified the acts and transactions of which he now complains and is therefore barred from any recovery under the doctrines of waiver, estoppel, and ratification;

(v)      Mattson's claims are barred by the doctrine of unclean hands;

(vi)     Mattson's losses on his DGF II/Jawbone Investment were a direct result of his own actions, including his decision to invest based on his own due diligence, and not by any action or inaction for which JPMS can be held liable;

(vii)    JPMS fulfilled all of its duties, contractual or otherwise, to Mattson;

(viii)   The handling of Mattson's DGF II/Jawbone Investment was in accordance and compliance with applicable industry standards and guidelines and all regulatory requirements;

(ix)     Mattson's claims are barred as a result of failing to minimize or mitigate his alleged damages; and

(x)      JPMS reserves the right to assert any additional defenses which may exist.

## CONCLUSION

As an ultra-high-net-worth investor with over $60 million in investible assets, it was perfectly reasonable for Mattson to invest $1 million (*i.e.*, less than 2% of his portfolio) in a risky

startup like Jawbone. Given his sophistication, Mattson understood the risks, and he doubtless invested in hopes of seeing very high potential returns. If Jawbone had turned out well, Mattson would not be sharing his profits with JPMS; likewise, now that Jawbone has failed, Mattson is not entitled to a bailout from JPMS. His claims should be rejected.

* * *

**WHEREFORE**, Respondent JPMS respectfully requests that the Panel enter an award:

(i) Denying Claimants' SoC with prejudice;

(ii) Awarding JPMS its attorneys' fees and costs in defending this action; and

(iii) Awarding JPMS such other and further relief as the Panel deems just and proper.

Dated: November 21, 2017
New York, New York

**DONTZIN NAGY & FLEISSIG LLP**

By: Tibor L. Nagy, Jr.
Anuja D. Thatte
980 Madison Avenue
New York, NY 10075
Tel: (212) 717-2900

*Counsel for Respondent*

23

## LIST OF EXHIBITS

**Exhibit 1:**   Confidential Offering Memorandum ("Offering Memo")

**Exhibit 2:**   Confidential Memorandum of Terms ("Term Sheet")

**Exhibit 3:**   Subscription Agreement of George N. Mattson

**Exhibit 4:**   Subscription Agreement of GNM ICBC, LLC

**Exhibit 5:**   Star Mountain Capital Press Release ("George Mattson, former Goldman Sachs partner and co-head of the Global Industrials Group, joins Star Mountain as a Strategic Investor and Industry Advisor")

**Exhibit 6:**   Delta Airlines Press Release ("Delta Board of Directors Names George N. Mattson as Newest Member")

**Exhibit 7:**   Stock Purchase Agreement

**Exhibit 8:**   Dec. 8, 2011 Article ("Jawbone Up owners eligible for full refund; can keep the troubled band")

**Exhibit 9:**   Aug. 15, 2013 Article ("Giving up on Jawbone's UP")

**Exhibit 10:**   Aug. 2013 Article ("Fitness Bands Report")

**Exhibit 11:**   Chart of Key Provisions in Offering Documents

**Contains Confidential Information**

# EXHIBIT M



Print

## 12304. Answering Counterclaims

(a) Except as provided in Rule 12300(a)(2), a claimant must serve any answer to a counterclaim on each other party through the Party Portal within 20 days of receipt of the counterclaim. At the same time, the claimant must file the answer to the counterclaim with the Director.

(b) The answer must include the relevant facts and available defenses to the counterclaim. The claimant may include any additional documents supporting the answer to the counterclaim.

Amended by SR-FINRA-2016-029 eff. April 3, 2017.
Amended by SR-FINRA-2008-021 eff. Dec. 15, 2008.
Adopted by SR-NASD-2003-158 eff. April 16, 2007.

**Selected Notice:** 07-07, 08-57, 17-03.

© FINRA. All rights reserved.

# EXHIBIT N



[Print]

## 12309. Amending Pleadings

### (a) Before Panel Appointment

Except as provided in paragraph (c), a party may amend a pleading at any time before the panel has been appointed. Panel appointment occurs when the Director sends notice to the parties of the names of the arbitrators on the panel.

(1) To amend a statement of claim that has been filed but not yet served by the Director, the claimant must file the amended claim with the Director. The Director will then serve the Claim Notification Letter or amended statement of claim in accordance with Rules 12300 and 12301.

(2) To amend any other pleading, a party must serve the amended pleading on each party and file the amended pleading with the Director. If a pleading is amended to add a party to the arbitration, the party amending the pleading must serve the new party with the amended pleading and all documents previously served by any party, or sent to the parties by the Director, by first-class mail, overnight mail service, overnight delivery service, hand delivery, email or facsimile, and must file proof of service with the Director through the Party Portal except as provided in Rule 12300(a)(2). The party amending the pleading must file the amended pleading with the Director through the Party Portal except as provided in Rule 12300(a)(2).

### (b) After Panel Appointment

Once a panel has been appointed, a party may only amend a pleading if the panel grants a motion to amend in accordance with Rule 12503. Motions to amend a pleading must include a copy of the proposed amended pleading. If the panel grants the motion to amend, the amended pleading does not need to be re-served on the other parties, the Director, or the panel, unless the panel determines otherwise.

### (c) Amendments to Add Parties

Once the ranked arbitrator lists are due to the Director under Rule 12402(d) or Rule 12403(c), no party may amend a pleading to add a new party to the arbitration until a panel has been appointed and the panel grants a motion to add the party. Motions to add a party after panel appointment must be served on all parties, including the party to be added. The party seeking to amend the pleading may serve the party to be added by first-class mail, overnight mail service, overnight delivery service, hand delivery, email or facsimile. Service by first-class mail or overnight mail service is accomplished on the date of mailing. Service by any other means is accomplished on the date of delivery. The party to be added may respond to the motion in accordance with Rule 12503 without waiving any rights or objections under the Code. The response may be filed with the Director and served on all other parties by first-class mail, overnight mail service, overnight delivery service, hand delivery, email or facsimile.

### (d) Responding to an Amended Pleading

Any party may file a response to an amended pleading, provided the response is filed and served within 20 days of receipt of the amended pleading, unless the panel determines otherwise.

---

Amended by SR-FINRA-2016-029 eff. April 3, 2017.
Amended by SR-FINRA-2013-023 eff. Sep. 30, 2013.
Amended by SR-FINRA-2011-007 eff. Feb. 16, 2011.
Amended by SR-FINRA-2008-021 eff. Dec. 15, 2008.
Adopted by SR-NASD-2003-158 eff. April 16, 2007.

**Selected Notice:** 07-07, 08-57, 13-30, 17-03.

---

© FINRA. All rights reserved.

# EXHIBIT O

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

| | |
|---|---|
| GEORGE MATTSON and GNM ICBC, LLC, | |
| Claimants, | |
| vs. | FINRA Arbitration No. 17-01969 |
| JP MORGAN SECURITIES, LLC, | |
| Respondent. | |

## CLAIMANTS' MOTION FOR
## ISSUANCE OF SUBPOENA TO ALIPHCOM, INC.

Pursuant to FINRA Rule 12512 of the FINRA Code of Arbitration Procedure, Claimants respectfully request the Chairperson execute the attached Subpoena so that it may be timely served upon AliphCom, Inc. d/b/a Jawbone.

AliphCom, Inc. was the issuer of the investment at issue in this case. Its agents, including high level executives, were involved in and copied on, prior to the meetings, calls and other communications with Claimants and Respondent prior to, during, and after Claimants investment in this Company. The Company in which Claimants invested is an essential witness. Claimants seek records concerning Respondent as well as the appearance of a representative at the hearing.

For the foregoing reasons, Claimants respectfully urge their motion ought to be granted.

THE LAW OFFICE OF CRAIG KUGLAR, LLC


CRAIG H. KUGLAR, ESQ.
Georgia State Bar No. 429968

The Law Office of Craig Kuglar, LLC
931 Monroe Drive NE, Suite A102-353
Atlanta, Georgia  30308
TEL (404) 432-4448
FAX (404) 393-8007

ATTORNEY FOR CLAIMANTS

2

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing upon all parties to this matter by e-mail addressed to counsel of record as follows:

Tibor L. Nagy, Jr.
Anuja Thatte
tibor@dnfllp.com
athatte@dnfllp.com

This 23rd day of January, 2018.

_____
CRAIG H. KUGLAR, ESQ.

3

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC,
LLC,

        Claimants,

vs.

JP MORGAN SECURITIES, LLC,

        Respondent.

FINRA Arbitration No. 17-01969

## SUBPOENA TO ALIPHCOM, INC.

**TO:**  **AliphCom, Inc.**
**c/o CT Corporation System**
**99 Rhode Island Street**
**San Francisco, California  94103**

You are hereby commanded to appear, on a date to be determined at a place to be determined to testify as a witness at the hearing in the above-captioned case from day-to-day until discharged.  Further, pursuant to the provisions of Rule 12512 of the FINRA Code of Arbitration Procedure, we hereby direct that you produce to counsel for Claimants, Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, (404) 432-4448, within 30 days from receipt of this Subpoena the following:

1.      Any and all correspondence (including e-mail) and documents pertaining to an investment in AliphCom, Inc. d/b/a Jawbone by Digital Growth Co-Investment 2, L.P.

2.      Any and all communications (including e-mail) between AliphCom, Inc. and any individual or entity associated with JP Morgan Chase & Co. (including but not limited to J.P. Morgan Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2, LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

3.      Any and all correspondence (including e-mail) and documents pertaining to the Company's 2014 capital raise led by Rizvi Traverse Management LLC.

4.   All emails between Hosain Rahman and Rizvi Traverse Management LLC from 2013-2015.

5.   All emails between Hosain Rahman and any individual or entity associated with JP Morgan Chase & Co. (including but not limited to J.P. Morgan Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2, LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

6.   All emails from July 2013 through July 2014 to/from Jon Gray (former Director of Finance) to any officer or director (including Hosain Rahman) regarding the operations, finances, prospects or other business of AliphCom, Inc.

You may mail or deliver the copies to the attorney whose name appears on this Subpoena together with your bill for same.  Claimants' counsel will notify you of the hearing location as soon as FINRA provides one.  If you have any questions concerning the subpoena, contact Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, phone: (404) 432-4448.

DATED: _____          _____
                                        Presiding Arbitrator

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC,
LLC,

      Claimants,

vs.

JP MORGAN SECURITIES, LLC,

      Respondent.

FINRA Arbitration No. 17-01969

**CLAIMANTS' MOTION FOR
ISSUANCE OF SUBPOENA TO DIGITAL GROWTH CO-INVESTMENT 2 L.L.C.**

Pursuant to FINRA Rule 12512 of the FINRA Code of Arbitration Procedure, Claimants respectfully request the Chairperson execute the attached Subpoena so that it may be timely served upon Digital Growth Co-Investment 2 L.L.C.

Digital Growth Co-Investment 2 L.L.C. is the General Partner of the special purpose vehicle whose sole purpose was to provide investors (including Claimants) an opportunity to make an indirect investment in AliphCom, Inc. (d/b/a Jawbone). This entity had full discretion to manage and control the business and affairs of the special purpose vehicle. Its agents were involved in and have evidence of all the meetings, calls and documents provided to Claimants prior to, during and after their investment. Claimants seek records concerning Respondent and Jawbone as well as the appearance of a representative at the hearing.

For the foregoing reasons, Claimants respectfully urge their motion ought to be granted.

**THE LAW OFFICE OF CRAIG KUGLAR, LLC**

CRAIG H. KUGLAR, ESQ.
Georgia State Bar No. 429968

The Law Office of Craig Kuglar, LLC
931 Monroe Drive NE, Suite A102-353
Atlanta, Georgia  30308
TEL (404) 432-4448
FAX (404) 393-8007

ATTORNEY FOR CLAIMANTS

2

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing upon all

parties to this matter by e-mail addressed to counsel of record as follows:

<div align="center">

Tibor L. Nagy, Jr.
Anuja Thatte
tibor@dnfllp.com
athatte@dnfllp.com

</div>

This 23rd day of January, 2018.

CRAIG H. KUGLAR, ESQ.

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

| | |
|---|---|
| GEORGE MATTSON and GNM ICBC, LLC, | |
| Claimants, | |
| vs. | FINRA Arbitration No. 17-01969 |
| JP MORGAN SECURITIES, LLC, | |
| Respondent. | |

## SUBPOENA TO DIGITAL GROWTH CO-INVESTMENT 2, L.L.C.

**TO:   Digital Growth Co-Investment, 2, L.L.C.**
**c/o Corporation Service Company**
**251 Little Falls Drive**
**Wilmington, Delaware  19808**

You are hereby commanded to appear, on a date to be determined at a place to be determined to testify as a witness at the hearing in the above-captioned case from day-to-day until discharged.  Further, pursuant to the provisions of Rule 12512 of the FINRA Code of Arbitration Procedure, we hereby direct that you produce to counsel for Claimants, Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, (404) 432-4448, within 30 days from receipt of this Subpoena the following:

1.      Any and all correspondence (including e-mail) and documents pertaining to an investment in AliphCom, Inc. d/b/a Jawbone.

2.      Any and all communications (including e-mail) between You and any individual or entity associated with JP Morgan Chase & Co. (including but not limited to J.P. Morgan Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2, LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

3.      Any and all correspondence (including e-mail) and documents pertaining to George Mattson or GNM ICBC, LLC.

4.      Any and all due diligence files, reports or other information prepared in anticipation of a potential investment in AliphCom, Inc. d/b/a Jawbone.

5.      Any and all records reflecting compensation paid to J.P. Morgan Securities, LLC (as well as its associated persons) for services performed in connection with an investment in AliphCom, Inc. d/b/a/ Jawbone.

You may mail or deliver the copies to the attorney whose name appears on this Subpoena together with your bill for same.  Claimants' counsel will notify you of the hearing location as soon as FINRA provides one.  If you have any questions concerning the subpoena, contact Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, phone: (404) 432-4448.


DATED: _____          _____
                                          Presiding Arbitrator

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

| | |
|---|---|
| GEORGE MATTSON and GNM ICBC, LLC,<br><br>           Claimants,<br><br>vs.<br><br>JP MORGAN SECURITIES, LLC,<br><br>           Respondent. | FINRA Arbitration No. 17-01969 |

## CLAIMANTS' MOTION FOR
## ISSUANCE OF SUBPOENA TO DIGITAL GROWTH CO-INVESTMENT 2, L.P.

Pursuant to FINRA Rule 12512 of the FINRA Code of Arbitration Procedure, Claimants respectfully request the Chairperson execute the attached Subpoena so that it may be timely served upon Digital Growth Co-Investment 2, L.P.

Digital Growth Co-Investment 2, L.P. is a special purpose vehicle whose sole purpose was to provide investors (including Claimants) an opportunity to make an indirect investment in AliphCom, Inc. (d/b/a Jawbone). This entity was the conduit for Claimants investment. Its agents were involved in and have evidence of all the meetings, calls and documents provided to Claimants prior to, during and after their investment. Claimants seek records concerning Respondent and Jawbone as well as the appearance of a representative at the hearing.

For the foregoing reasons, Claimants respectfully urge their motion ought to be granted.

THE LAW OFFICE OF CRAIG KUGLAR, LLC

CRAIG H. KUGLAR, ESQ.
Georgia State Bar No. 429968

The Law Office of Craig Kuglar, LLC
931 Monroe Drive NE, Suite A102-353
Atlanta, Georgia 30308
TEL (404) 432-4448
FAX (404) 393-8007

ATTORNEY FOR CLAIMANTS

2

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing upon all parties to this matter by e-mail addressed to counsel of record as follows:

Tibor L. Nagy, Jr.
Anuja Thatte
tibor@dnfllp.com
athatte@dnfllp.com

This 23rd day of January, 2018.

_____
CRAIG H. KUGLAR, ESQ.

3

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC,
LLC,

        Claimants,

vs.

JP MORGAN SECURITIES, LLC,

        Respondent.

FINRA Arbitration No. 17-01969

## SUBPOENA TO DIGITAL GROWTH CO-INVESTMENT 2, L.P.

**TO:**    **Digital Growth Co-Investment, 2, L.P.**
        **c/o Corporation Service Company**
        **251 Little Falls Drive**
        **Wilmington, Delaware 19808**

You are hereby commanded to appear, on a date to be determined at a place to be determined to testify as a witness at the hearing in the above-captioned case from day-to-day until discharged. Further, pursuant to the provisions of Rule 12512 of the FINRA Code of Arbitration Procedure, we hereby direct that you produce to counsel for Claimants, Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, (404) 432-4448, within 30 days from receipt of this Subpoena the following:

1.      Any and all correspondence (including e-mail) and documents pertaining to an investment in AliphCom, Inc. d/b/a Jawbone.

2.      Any and all communications (including e-mail) between You and any individual or entity associated with JP Morgan Chase & Co. (including but not limited to J.P. Morgan Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2, LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

3.      Any and all correspondence (including e-mail) and documents pertaining to George Mattson or GNM ICBC, LLC.

4.      Any and all due diligence files, reports or other information prepared in anticipation of a potential investment in AliphCom, Inc. d/b/a Jawbone.

5.      Any and all records reflecting compensation paid to J.P. Morgan Securities, LLC (as well as its associated persons) for services performed in connection with an investment in AliphCom, Inc. d/b/a/ Jawbone.

You may mail or deliver the copies to the attorney whose name appears on this Subpoena together with your bill for same.  Claimants' counsel will notify you of the hearing location as soon as FINRA provides one.  If you have any questions concerning the subpoena, contact Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, phone: (404) 432-4448.


DATED: _____                    _____
                                                                        Presiding Arbitrator

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC,
LLC,

        Claimants,

vs.

JP MORGAN SECURITIES, LLC,

        Respondent.

FINRA Arbitration No. 17-01969

## CLAIMANTS' MOTION FOR
## ISSUANCE OF SUBPOENA TO J.P. MORGAN INVESTMENT MANAGEMENT, INC.

Pursuant to FINRA Rule 12512 of the FINRA Code of Arbitration Procedure, Claimants respectfully request the Chairperson execute the attached Subpoena so that it may be timely served upon J.P. Morgan Investment Management, Inc.

J.P. Morgan Investment Management, Inc. is the Investment Advisor to the special purpose vehicle whose sole purpose was to provide investors (including Claimants) an opportunity to make an indirect investment in AliphCom, Inc. (d/b/a Jawbone). Its agents, including high level executives, were involved in and copied on, prior to the meetings, calls and other communications with Claimants and Respondent prior to, during, and after Claimants investment in this Company. Claimants seek records concerning Respondent and Jawbone as well as the appearance of a representative at the hearing.

For the foregoing reasons, Claimants respectfully urge their motion ought to be granted.

**THE LAW OFFICE OF CRAIG KUGLAR, LLC**

CRAIG H. KUGLAR, ESQ.
Georgia State Bar No. 429968

The Law Office of Craig Kuglar, LLC
931 Monroe Drive NE, Suite A102-353
Atlanta, Georgia  30308
TEL (404) 432-4448
FAX (404) 393-8007

ATTORNEY FOR CLAIMANTS

2

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing upon all parties to this matter by e-mail addressed to counsel of record as follows:

Tibor L. Nagy, Jr.
Anuja Thatte
tibor@dnfllp.com
athatte@dnfllp.com

This 23rd day of January, 2018.

CRAIG H. KUGLAR, ESQ.

3

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC,
LLC,

        Claimants,

vs.

        FINRA Arbitration No. 17-01969

JP MORGAN SECURITIES, LLC,

        Respondent.

## SUBPOENA TO J.P. MORGAN INVESTMENT MANAGEMENT, INC.

**TO:**  **J.P. MORGAN INVESTMENT MANAGEMENT, INC.**
     **270 Park Avenue**
     **New York, New York  10017-2014**

You are hereby commanded to appear, on a date to be determined at a place to be determined to testify as a witness at the hearing in the above-captioned case from day-to-day until discharged. Further, pursuant to the provisions of Rule 12512 of the FINRA Code of Arbitration Procedure, we hereby direct that you produce to counsel for Claimants, Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, (404) 432-4448, within 30 days from receipt of this Subpoena the following:

     1.     Any and all correspondence (including e-mail) and documents pertaining to an investment in AliphCom, Inc. d/b/a Jawbone.

     2.     Any and all communications (including e-mail) between You and any individual or entity associated with J.P. Morgan Chase & Co. (including but not limited to J.P. Morgan Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2, LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

     3.     Any and all correspondence (including e-mail) and documents pertaining to George Mattson or GNM ICBC, LLC.

4.      Any and all due diligence files, reports or other information prepared in anticipation of a potential investment in AliphCom, Inc. d/b/a Jawbone.

5.      Any and all records reflecting compensation paid to J.P. Morgan Securities, LLC (as well as its associated persons) for services performed in connection with an investment in AliphCom, Inc. d/b/a/ Jawbone.

You may mail or deliver the copies to the attorney whose name appears on this Subpoena together with your bill for same.  Claimants' counsel will notify you of the hearing location as soon as FINRA provides one.  If you have any questions concerning the subpoena, contact Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, phone: (404) 432-4448.


DATED: _____          _____
                                     Presiding Arbitrator

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC,
LLC,

        Claimants,

vs.

JP MORGAN SECURITIES, LLC,

        Respondent.

FINRA Arbitration No. 17-01969

## CLAIMANTS' MOTION FOR
## ISSUANCE OF SUBPOENA TO RIZVI TRAVERSE MANAGEMENT LLC

Pursuant to FINRA Rule 12512 of the FINRA Code of Arbitration Procedure, Claimants respectfully request the Chairperson execute the attached Subpoena so that it may be timely served upon Rizvi Traverse Management, LLC ("Rizvi").

Rizvi is an essential witness in this arbitration. As alleged in the Statement of Claim, in the month leading up to the investment at issue, JP Morgan Securities, LLC ("JPM") falsely represented that (1) JPM's customers would be co-investing along with Rizvi in a $300 million capital raise; (2) Rizvi alone had committed to invest $175 million; and that the $300 milion should carry Jawbone through to the IPO.

Further, after the investment soured, Claimants were told by JPM that JPM itself did not understand the nature of the Rizvi commitment or why Rizvi had failed to fully commit.

The requests set forth in the Subpoena are narrowly tailored to the allegations at issue and necessary for a full, fair and complete hearing.

Claimants seek records concerning Respondent and Jawbone as well as the appearance of a JPM representative at the hearing.

For the foregoing reasons, Claimants respectfully urge their motion ought to be granted.

**THE LAW OFFICE OF CRAIG KUGLAR, LLC**

CRAIG H. KUGLAR, ESQ.
Georgia State Bar No. 429968

The Law Office of Craig Kuglar, LLC
931 Monroe Drive NE, Suite A102-353
Atlanta, Georgia  30308
TEL (404) 432-4448
FAX (404) 393-8007

ATTORNEY FOR CLAIMANTS

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing upon all parties to this matter by e-mail addressed to counsel of record as follows:

Tibor L. Nagy, Jr.
Anuja Thatte
tibor@dnfllp.com
athatte@dnfllp.com

This 23rd day of January, 2018.

CRAIG H. KUGLAR, ESQ.

3

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC,
LLC,

        Claimants,

vs.

                    FINRA Arbitration No. 17-01969

JP MORGAN SECURITIES, LLC,

        Respondent.

## SUBPOENA TO RIZVI TRAVERSE MANAGEMENT LLC

**TO:**  **Rizvi Traverse Management LLC**
      **c/o Corporation Service Company**
      **251 Little Falls Drive**
      **Wilmington, Delaware 19808**

You are hereby commanded to appear, on a date to be determined at a place to be determined to testify as a witness at the hearing in the above-captioned case from day-to-day until discharged. Further, pursuant to the provisions of Rule 12512 of the FINRA Code of Arbitration Procedure, we hereby direct that you produce to counsel for Claimants, Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, (404) 432-4448, within 30 days from receipt of this Subpoena the following:

1.    Any and all correspondence (including e-mail) and documents pertaining to an investment in AliphCom, Inc. d/b/a Jawbone.

2.    Any and all communications (including e-mail) between You and any individual or entity associated with JP Morgan Chase & Co. (including but not limited to J.P. Morgan Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2, LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

3.    Any and all due diligence files, reports or other information prepared in anticipation of a potential investment in AliphCom, Inc. d/b/a Jawbone.

You may mail or deliver the copies to the attorney whose name appears on this Subpoena together with your bill for same.  Claimants' counsel will notify you of the hearing location as soon as FINRA provides one.  If you have any questions concerning the subpoena, contact Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, phone: (404) 432-4448.


DATED: _____          _____
                                        Presiding Arbitrator

# EXHIBIT P



**Financial Industry Regulatory Authority**

| | |
|---|---|
| **TO:** | Craig H. Kuglar, Esq. |
| **CC:** | Tibor L. Nagy, Jr., Esq.<br>Gloria North |
| **From:** | Lisa D. Lasher<br>Senior Case Administrator |
| **Subject:** | FINRA Office Of Dispute Resolution Arbitration Number 17-01969<br>George Mattson and GNM ICBC, LLC vs. J.P. Morgan Securities, LLC |
| **Date:** | February 23, 2018 |

The Chairperson has directed me to advise you that you must submit revised subpoenas for her signature that comply with the Order issued on February 23, 2018.

If you have any questions, please do not hesitate to contact me at 561-362-7932 or by email at Lisa.Lasher@finra.org.

LYL:lyl:LC53A
idr: 07/08/2016

RECIPIENTS:
Craig H. Kuglar, Esq., Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, A102-353,
    Atlanta, GA 30308
On Behalf Of: GNM ICBC, LLC; George Mattson

CC:
Tibor L. Nagy, Jr., Esq., Dontzin Nagy & Fleissig LLP, 980 Madison Avenue, New York, NY
    10075
On Behalf Of: J.P. Morgan Securities, LLC

Gloria North

Investor protection. Market integrity.    Office of Dispute Resolution    Boca Center Tower 1    t 561 416 0277
Southeast Regional Office    5200 Town Center Circle    www.finra.org
Suite 200
Boca Raton, FL
33486-1017

# EXHIBIT Q

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC, LLC,

        Claimants,

vs.

JP MORGAN SECURITIES, LLC,

        Respondent.

FINRA Arbitration No. 17-01969

## SUBPOENA TO ALIPHCOM, INC.

TO:   AliphCom, Inc.
     c/o CT Corporation System
     99 Rhode Island Street
     San Francisco, California 94103

Pursuant to the Federal Arbitration Act, 9 U.S.C.A. § 7, the undersigned Arbitrator hereby summons you to provide documents to counsel within 30 days from receipt of this subpoena pursuant to the provisions of Rule 12512 of the FINRA Code of Arbitration Procedure. We hereby direct that you produce to counsel for Claimants, Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, (404) 432-4448 the following:

1.    Any and all correspondence (including e-mail) and documents pertaining to an investment in AliphCom, Inc. d/b/a Jawbone by Digital Growth Co-Investment 2, L.P.

2.    Any and all communications (including e-mail) between AliphCom, Inc. and any individual or entity associated with JP Morgan Chase & Co. (including but not limited to J.P. Morgan Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2, LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

3.    Any and all correspondence (including e-mail) and documents pertaining to the Company's 2014 capital raise led by Rizvi Traverse Management LLC.

4.    All emails between Hosain Rahman and Rizvi Traverse Management LLC from 2013-2015.

5.    All emails between Hosain Rahman and any individual or entity associated with JP Morgan Chase & Co. (including but not limited to J.P. Morgan Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2, LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

6.    All emails from July 2013 through July 2014 to/from Jon Gray (former Director of Finance) to any officer or director (including Hosain Rahman) regarding the operations, finances, prospects or other business of AliphCom, Inc.

You may mail or deliver the copies to the attorney whose name appears on this Subpoena together with your bill for same. If you have any questions concerning the subpoena, contact Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, phone: (404) 432-4448.

DATED: _April 9, 2018_

_Gloria O. North_
Presiding Arbitrator

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC,
LLC,

        Claimants,

vs.

                                    FINRA Arbitration No. 17-01969

JP MORGAN SECURITIES, LLC,

        Respondent.

## SUBPOENA TO DIGITAL GROWTH CO-INVESTMENT 2, L.L.C.

TO:   Digital Growth Co-Investment, 2, L.L.C.
      c/o Corporation Service Company
      251 Little Falls Drive
      Wilmington, Delaware 19808

Pursuant to the Federal Arbitration Act, 9 U.S.C.A. § 7, the undersigned Arbitrator hereby summons you to provide documents to counsel within 30 days from receipt of this subpoena pursuant to the provisions of Rule 12512 of the FINRA Code of Arbitration Procedure. We hereby direct that you produce to counsel for Claimants, Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, (404) 432-4448 the following:

1.     Any and all correspondence (including e-mail) and documents pertaining to an investment in AliphCom, Inc. d/b/a Jawbone.

2.     Any and all communications (including e-mail) between You and any individual or entity associated with JP Morgan Chase & Co. (including but not limited to J.P. Morgan Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2, LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

3.     Any and all correspondence (including e-mail) and documents pertaining to George Mattson or GNM ICBC, LLC.

4.     Any and all due diligence files, reports or other information prepared in anticipation of a potential investment in AliphCom, Inc. d/b/a Jawbone.

5.    Any and all records reflecting compensation paid to J.P. Morgan Securities, LLC (as well as its associated persons) for services performed in connection with an investment in AliphCom, Inc. d/b/a/ Jawbone.

You may mail or deliver the copies to the attorney whose name appears on this Subpoena together with your bill for same. If you have any questions concerning the subpoena, contact Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, phone: (404) 432-4448.

DATED: _April 9, 2018_

_Gloria O. North_
Presiding Arbitrator

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC,
LLC,

Claimants,

vs.

FINRA Arbitration No. 17-01969

JP MORGAN SECURITIES, LLC,

Respondent.

## SUBPOENA TO DIGITAL GROWTH CO-INVESTMENT 2, L.P.

TO:   **Digital Growth Co-Investment, 2, L.P.**
      **c/o Corporation Service Company**
      **251 Little Falls Drive**
      **Wilmington, Delaware 19808**

Pursuant to the Federal Arbitration Act, 9 U.S.C.A. § 7, the undersigned Arbitrator hereby summons you to provide documents to counsel within 30 days from receipt of this subpoena pursuant to the provisions of Rule 12512 of the FINRA Code of Arbitration Procedure. We hereby direct that you produce to counsel for Claimants, Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, (404) 432-4448 the following:

1.   Any and all correspondence (including e-mail) and documents pertaining to an investment in AliphCom, Inc. d/b/a Jawbone.

2.   Any and all communications (including e-mail) between You and any individual or entity associated with JP Morgan Chase & Co. (including but not limited to J.P. Morgan Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2, LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

3.   Any and all correspondence (including e-mail) and documents pertaining to George Mattson or GNM ICBC, LLC.

4.   Any and all due diligence files, reports or other information prepared in anticipation of a potential investment in AliphCom, Inc. d/b/a Jawbone.

5.      Any and all records reflecting compensation paid to J.P. Morgan Securities, LLC (as well as its associated persons) for services performed in connection with an investment in AliphCom, Inc. d/b/a/ Jawbone.

You may mail or deliver the copies to the attorney whose name appears on this Subpoena together with your bill for same. If you have any questions concerning the subpoena, contact Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, phone: (404) 432-4448.

DATED: April 9, 2018

_____
Presiding Arbitrator

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC,
LLC,

            Claimants,

vs.                                                    FINRA Arbitration No. 17-01969

JP MORGAN SECURITIES, LLC,

            Respondent.

## SUBPOENA TO J.P. MORGAN INVESTMENT MANAGEMENT, INC.

TO:   J.P. MORGAN INVESTMENT MANAGEMENT, INC.
      270 Park Avenue
      New York, New York 10017-2014

      Pursuant to the Federal Arbitration Act, 9 U.S.C.A. § 7, the undersigned Arbitrator hereby

summons you to provide documents to counsel within 30 days from receipt of this subpoena

pursuant to the provisions of Rule 12512 of the FINRA Code of Arbitration Procedure. We hereby

direct that you produce to counsel for Claimants, Craig H. Kuglar at The Law Office of Craig

Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, (404) 432-4448

the following:

      1.      Any and all correspondence (including e-mail) and documents pertaining to an
investment in AliphCom, Inc. d/b/a Jawbone.

      2.      Any and all communications (including e-mail) between You and any individual or
entity associated with J.P. Morgan Chase & Co. (including but not limited to J.P. Morgan
Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2,
LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

      3.      Any and all correspondence (including e-mail) and documents pertaining to George
Mattson or GNM ICBC, LLC.

      4.      Any and all due diligence files, reports or other information prepared in anticipation
of a potential investment in AliphCom, Inc. d/b/a Jawbone.

5.    Any and all records reflecting compensation paid to J.P. Morgan Securities, LLC (as well as its associated persons) for services performed in connection with an investment in AliphCom, Inc. d/b/a/ Jawbone.

You may mail or deliver the copies to the attorney whose name appears on this Subpoena together with your bill for same. If you have any questions concerning the subpoena, contact Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, phone: (404) 432-4448.

DATED: April 9, 2018

Gloria O. North
Presiding Arbitrator

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION, INC.

GEORGE MATTSON and GNM ICBC,
LLC,

        Claimants,

vs.

JP MORGAN SECURITIES, LLC,

        Respondent.

FINRA Arbitration No. 17-01969

## SUBPOENA TO RIZVI TRAVERSE MANAGEMENT LLC

TO:   **Rizvi Traverse Management LLC**
      **c/o Corporation Service Company**
      **251 Little Falls Drive**
      **Wilmington, Delaware 19808**

Pursuant to the Federal Arbitration Act, 9 U.S.C.A. § 7, the undersigned Arbitrator hereby summons you to provide documents to counsel within 30 days from receipt of this subpoena pursuant to the provisions of Rule 12512 of the FINRA Code of Arbitration Procedure. We hereby direct that you produce to counsel for Claimants, Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, (404) 432-4448 the following:

1. Any and all correspondence (including e-mail) and documents pertaining to an investment in AliphCom, Inc. d/b/a Jawbone.

2. Any and all communications (including e-mail) between You and any individual or entity associated with JP Morgan Chase & Co. (including but not limited to J.P. Morgan Securities, LLC, J.P. Morgan Investment Management, Inc., Digital Growth Co-Investment 2, LLC or Digital Growth Co-Investment 2, L.P.) pertaining to AliphCom, Inc. d/b/a Jawbone.

3. Any and all due diligence files, reports or other information prepared in anticipation of a potential investment in AliphCom, Inc. d/b/a Jawbone.

You may mail or deliver the copies to the attorney whose name appears on this Subpoena together with your bill for same. If you have any questions concerning the subpoena, contact Craig H. Kuglar at The Law Office of Craig Kuglar, LLC, 931 Monroe Drive NE, Suite A102-353, Atlanta, Georgia 30308, phone: (404) 432-4448.

DATED: April 9, 2018

Gloria O. North

Presiding Arbitrator

# EXHIBIT R

FINANCIAL INDUSTRY REGULATORY AUTHORITY DISPUTE RESOLUTION
-----------------------------------------------------------------
                                   FINRA CASE NO. 17-01969

GEORGE MATTSON and GNM ICBC, LLC,

              Claimants

v.

J.P. MORGAN SECURITIES, LLC,

              Respondent
_____

### ORDER ON NON-PARTY OBJECTIONS TO SUBPOENAS

     Based upon a review of the Objections to Subpoenas filed

by J.P. Morgan Investment Managment, Inc., Digital Growth Co-

Investment 2, L.L.C., and Digital Growth Co-Investment 2, L.P.,

as non-parties, the panel hereby sustains the objections to

the three subpoenas.


Dated: May ___22___, 2018

                              _Gloria O. North_____
                              Gloria O. North, Chairperson

# EXHIBIT S



Print

## 12514. Prehearing Exchange of Documents and Witness Lists, and Explained Decision Requests

### (a) Documents and Other Materials

At least 20 days before the first scheduled hearing date, all parties must provide all other parties with copies of all documents and other materials in their possession or control that they intend to use at the hearing that have not already been produced. The parties should not file the documents with the Director or the arbitrators before the hearing.

### (b) Witness Lists

At least 20 days before the first scheduled hearing date, all parties must provide each other party with the names and business affiliations of all witnesses they intend to present at the hearing. All parties must file their witness lists with the Director.

### (c) Exclusion of Documents or Witnesses

Parties may not present any documents or other materials not produced and or any witnesses not identified in accordance with this rule at the hearing, unless the panel determines that good cause exists for the failure to produce the document or identify the witness. Good cause includes the need to use documents or call witnesses for rebuttal or impeachment purposes based on developments during the hearing. Documents and lists of witnesses in defense of a claim are not considered rebuttal or impeachment information and, therefore, must be exchanged by the parties.

### (d) Explained Decision Request

At least 20 days before the first scheduled hearing date, all parties must file with the Director any joint request for an explained decision under Rule 12904(g).

Amended by SR-FINRA-2016-029 eff. April 3, 2017.
Amended by SR-FINRA-2009-026 eff. Apr. 17, 2009.
Amended by SR-FINRA-2008-051 eff. Apr. 13, 2009.
Amended by SR-FINRA-2008-021 eff. Dec. 15, 2008.
Adopted by SR-NASD-2003-158 eff. April 16, 2007.

**Selected Notice:** 07-07, 08-57, 09-16, 17-03.

© FINRA. All rights reserved.

# EXHIBIT T



August 28, 2018

**VIA ELECTRONIC MAIL**
Tibor L. Nagy, Jr., Esq.
Dontzin Nagy & Fleissig, LLP
980 Madison Ave.
New York, NY 10075

      Re:    Mattson v. JPM
              FINRA Arbitration No. 17-01969

Dear Tibor,

      Pursuant to FINRA Code of Arbitration Rule 12514, this letter shall serve as Claimants' additional disclosure of witnesses that may be called and documents that may be introduced as evidence during its case-in-chief.

      A copy of this letter (without enclosures) is being sent to FINRA via DR Portal for distribution to the Panel.

      Claimants may call the following individuals at Hearing:

- Claimant George Mattson, Individually and on Behalf of GNM ICBC, LLC
- Jasmine C. Abouzied (J.P. Morgan Securities, LLC employee)
- Ricardo Matthew Walker (J.P. Morgan Securities, LLC employee)
- Michael Joseph Chiaravalotti (J.P. Morgan Securities, LLC employee)
- Josh Helfat (J.P. Morgan Securities, LLC employee)
- If not named above, the J.P. Morgan Securities, LLC representative most knowledgeable about supervisory policies and procedures relating to the firm acting as placement agent in a Reg D offering
- If not named above, the J.P. Morgan Securities, LLC representative most knowledgeable about the due diligence conducted by J.P. Morgan Securities, LLC in connection with the offering at issue
- Peter Flynn / Boston, MA (Expert Witness as to FINRA Rules/Regulation and Duty of Due Diligence)
- Kevin Keefe/ (Expert Witness as to FINRA Rules/Regulation and Duty of Due Diligence)
- Laura G. Levasseur/ Genesis Forensic Consulting, LLC/ New Braunfels, Texas (Via telephone) (Expert Witness as to damages)
- Craig H. Kuglar, Esq. (Claimants' Counsel as to attorneys' fees).

Claimants reserve the right to call any witness on Respondent's witness list or any witness for rebuttal purposes. Claimants also reserve the right to call such other and further expert testimony as may be determined necessary based on subsequent disclosures and/or productions of documents or information by Respondents. As for documents, I am attaching hereto documents labeled MATTSON004240-4794. In addition, Claimants may seek to introduce any of the following documents into evidence during their case-in-chief:

- All pleadings filed by any party in this matter including, but not limited to, all attachments thereto;
- All correspondence delivered by parties and third parties in this matter, including emails and letters;
- All documents exchanged, including those still to be exchanged, between the parties, including all non-party documents provided to or produced by any party pursuant to subpoena or otherwise;
- Any other materials Claimants have requested but not yet received from Respondent and other parties and non-parties;
- Copies of any/all applicable regulation and laws of the securities industry, including without limitation, FINRA/NASD conduct rules, Notices to Members, Regulatory Notices, SRO Disciplinary Actions, etc.;
- Copies of any and all applicable state laws applicable to the claims;
- RE3s, U-4s, U-5s, and CRD printouts for any witness or party;
- All documents disclosed or described by Respondents in its pre-hearing disclosures;
- Records relating to fees and expenses;
- All documents produced by non-parties;
- Demonstrative exhibits, and loss and other analyses such as summaries of damages, expenses, interest calculations on damages; or
- Any documents relevant to impeachment, cross-examination or rebuttal.

Thank you for your attention to this matter.

Sincerely,

Craig H. Kuglar, Esq.

Enclosure(s)

cc:      FINRA (via DR Portal w/o attachments)

1

# EXHIBIT U

**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION PANEL**

|  |  |
|---|---|
| GEORGE MATTSON AND GNM ICBC LLC, | |
| *Claimants*, | FINRA No. 17-01969 |
| v. | |
| J.P. MORGAN SECURITIES LLC, | |
| *Respondent*. | |

**RESPONDENT J.P. MORGAN SECURITIES LLC'S WITNESS LIST**

Pursuant to Chairperson Gloria O. North's Scheduling Order, dated January 11, 2018, and FINRA Rule 12514, Respondent J.P. Morgan Securities LLC ("JPMS") respectfully submits the following list of witnesses to be called by JPMS at the upcoming hearing in this case:

| Witness Name | Affiliation |
|---|---|
| *Will Call* | |
| Jasmine Abouzied | JPMS |
| Michael Gandolfo | Goldman Sachs Family Office; Employed by Claimant Mattson |
| Joshua Helfat | JPMS |
| George Mattson | Claimant |
| Bao Nguyen (Expert Witness) | Kaufman Rossin |
| *May Call* | |
| Michael Chiaravalloti | JPMS |
| Ricardo Walker | JPMS |
| Craig Kuglar | Counsel for Claimants |

JPMS reserves the right to call any additional witnesses necessary (i) for rebuttal purposes (including, but not limited to, additional witnesses to rebut the testimony of any witness called by Claimants, such as expert testimony regarding FINRA Rules or publications, attorneys' fees, and/or damages), as well as (ii) for any other purpose necessary based on further disclosures, assertions, and/or productions made by Claimants.

Dated: August 28, 2018

**DONTZIN NAGY & FLEISSIG LLP**

By:  Tibor L. Nagy, Jr.
     Anuja D. Thatte
     980 Madison Avenue
     New York, NY 10075
     Tel: (212) 717-2900

     *Counsel for Respondent J.P. Morgan Securities LLC*

# EXHIBIT V

**BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**DISPUTE RESOLUTION PANEL**

| | |
|---|---|
| GEORGE MATTSON AND GNM ICBC LLC,<br><br>　　　　　*Claimants*,<br>　　v.<br><br>J.P. MORGAN SECURITIES LLC,<br><br>　　　　*Respondent*. | FINRA No. 17-01969 |

**RESPONDENT J.P. MORGAN SECURITIES LLC'S PRE-HEARING BRIEF**

**CONTAINS CONFIDENTIAL INFORMATION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

SUMMARY OF RELEVANT FACTS .................................................................................... 9

I.   MATTSON OPENED ACCOUNTS WITH JPMS SEEKING "CAPITAL APPRECIATION" AND "SPECULATIVE" INVESTMENTS ................................................. 9

II.  MATTSON ENROLLED IN THE MORGAN PRIVATE VENTURES ("MPV") PROGRAM ........... 9

III. JPMS SCREENED AND APPROVED JAWBONE FOR INCLUSION IN THE MPV PROGRAM ................................................................................................................ 11

     A.   JPMS Used A Screening Committee To Review And Screen Prospective MPV Investments And Set Deal-Specific Suitability Criteria ........................................ 11

     B.   The Screening Committee Considered Prospective Investments Only From Known And Trusted Sources—Such As JPMIM, Jawbone's Sponsor ................ 11

     C.   The MPV Screening Committee, Including Multiple Members Of JPMS's Due Diligence Team, Reviewed The Jawbone Investment At Multiple Meetings ....... 14

     D.   The MPV Screening Committee Approved Jawbone To Be Shown To MPV Clients With A Liquid Net Worth Of At Least $50 Million ...................... 16

IV.  MATTSON STUDIED THE JAWBONE OPPORTUNITY AND DECIDED TO INVEST ............... 17

     A.   Mattson Reviewed The Documents In Jawbone's Data Room And Saw That Jawbone Had Experienced Tremendous Growth In 2013 and Q1 2014 ....... 17

     B.   Mattson Requested And Received A 50% Discount On JPMS's Placement Agent Fee ........................................................................................... 20

     C.   Mattson Asked JPMS To Allow Him To Invest Less Than The $1 Million Minimum .................................................................................................. 20

V.   THE SERIES 6 FINANCING CLOSED WITH $179 MILLION RAISED ................................ 21

VI.  JAWBONE'S UP FITNESS TRACKER LAGGED BEHIND THE COMPETITION AND MATTSON'S INVESTMENT FLOUNDERED ........................................................................ 23

     A.   Apple Announced The Apple Watch In September 2014—Three Months After Mattson's Investment ................................................................... 23

     B.   Jawbone Announced The UP3 In November 2014 But The UP3 Did Not Ship Until April 2015 ................................................................................ 23

     C.   Jawbone Raised Approximately $500 Million After Series 6—Leading Commentators To Call Its Ultimate Demise "Death By Overfunding" ............... 24

     D.   Mattson Himself Sought To Invest More Money In Jawbone In August 2015—And Continued To Do So Until October 2016 ........................... 25

i

| | E. | Consumer Demand For The UP3 Lagged In The Wake Of Fierce Competition From FitBit And Apple ...............................25 |

| VII. | MATTSON CONSIDERED "POSSIBLE LITIGATION" AGAINST RIZVI TO RECOVER HIS LOSSES ..............................................................26 |

| VIII. | MATTSON CONTINUES TO BLAME RIZVI AND OTHER NON-PARTIES— BUT SUED JPMS ..............................................................27 |

**ARGUMENT** ..........................................................................................**28**

| I. | THE EVIDENCE REFUTES MATTSON'S FRAUD CLAIMS ....................28 |

| | A. | The Alleged Misrepresentations Are All Refuted By The Plain Terms Of The Offering Documents ...........................................29 |

| | B. | Mattson Cannot Even Articulate, Much Less Prove, Fraudulent Intent Because JPMS Had No Incentive To Steer Him Into Any Flawed Investments—And Multiple JPMorgan Entities Lost Millions Of Dollars When Jawbone Failed ....30 |

| II. | MATTSON'S NEGLIGENCE CLAIMS ARE REFUTED BY THE EVIDENCE AND LEGALLY BARRED ..................................................31 |

| | A. | Mattson Cannot Blame JPMS For Jawbone's Failure To Successfully Compete Against FitBit And Apple .................................31 |

| | B. | Mattson Cannot Use FINRA Notice 10-22 To Avoid The Big Boy Provisions Because JPMS Did Not "Recommend" Jawbone To MPV Investors ..................32 |

| | | 1. | It Is Settled Law That Notice 10-22 Applies Only When A Broker-Dealer "Recommends" A Security—And That Investors Cannot Use Notice 10-22 To Avoid Big Boy Provisions ..........................32 |

| | | 2. | JPMS Did Not Recommend Jawbone To Mattson— And Mattson Confirmed That Fact In Writing When He Agreed To The Big Boy Provisions ...........................34 |

| | C. | Although Notice 10-22 Is Inapplicable, The Evidence Demonstrates That JPMS's Investigation Of Jawbone More Than Satisfied Notice 10-22 ...............34 |

| | | 1. | Notice 10-22 Establishes That What Constitutes A "Reasonable Investigation" Is "Based Upon The Facts And Circumstances" ..............................................34 |

| | | 2. | The MPV Screening Committee's Review Of Jawbone More Than Satisfied Notice 10-22's Requirements ...............................36 |

| III. | MATTSON'S REMAINING CLAIMS ARE LEGALLY BARRED .............37 |

**CONCLUSION** .......................................................................................**37**

# LIST OF EXHIBITS[*]

| No. | Document |
|-----|----------|
| 1. | Chart of Alleged Misrepresentations vs. Actual Provisions In The Offering Documents |
| 2. | Timeline Of Key Events |
| 3. | Glossary of Terms Used In This Brief—And Likely To Be Used At The Hearing |
| 4. | Confidential Offering Memorandum for Digital Growth Co-Investment 2, L.P.[†] |
| 5. | Subscription Booklet For Digital Growth Co-Investment 2, L.P. |
| 6. | Confidential Memorandum Of Terms Between Rizvi And AliphCom/Jawbone |
| 7. | AliphCom/Jawbone Series 6 Preferred Stock Purchase Agreement[‡] |
| 8. | FINRA Notice To Members 10-22 |

[*] For the Panel's convenience, JPMS has attached a limited number of exhibits to this filing. Any additional documents cited herein can be provided upon request.
[†] Due to length, JPMS has omitted Exhibit A to this document, which contains certain notices pertinent to residents of jurisdictions outside of the United States.
[‡] Due to length, JPMS has omitted certain reports appended to this document, including approximately 215 pages of reports concerning Jawbone's intellectual property (primarily voluminous patent reports).

## PRELIMINARY STATEMENT

This arbitration arises from a venture capital investment that Claimant George N. Mattson ("Mattson"),[1] an ultra-high-net-worth investor, made in May 2014, when he invested $1 million in a technology startup called AliphCom d/b/a Jawbone ("Jawbone").  Now that his investment has failed, Mattson seeks to use this arbitration to improperly shift his losses to Respondent J.P. Morgan Securities LLC ("JPMS"), which served as one of the placement agents in the transaction.  Mattson is extremely familiar with high-risk investments:  he is a former Goldman Sachs partner who, among other things, served as a Co-Head of Investment Banking at Goldman Sachs until 2012, when he retired at age 46 with a large amount of personal wealth to invest.  Like most ultra-high-net-worth investors, Mattson's portfolio held a wide range of investment risk, including high-risk investments on which Mattson hoped to earn high returns.  The $1 million investment at issue here was exactly that type of investment:  Jawbone was a single company betting its future on a single new product line, a wearable fitness tracker band called the "UP," and Mattson's investment in Jawbone was a high-risk bet that Jawbone would ride its rapid growth to an initial public offering ("IPO").

Now that Mattson's speculative investment in Jawbone has failed, he is not entitled to shift the consequences of his decision to take that risk onto JPMS.  JPMS played a limited role with respect to Mattson's investment:  JPMS was a placement agent whose role was to introduce private investment opportunities like Jawbone to an elite group of investors who had enrolled in a program for that purpose known as the Morgan Private Ventures ("MPV") program.  MPV investors who invested in Jawbone, including Mattson, all had to meet certain criteria.  First, to even be shown the Jawbone investment, they had to have a liquid net worth ("LNW") of at least $50 million ($50,000,000.00), as well as a documented history of extensive experience with private investments.  Second, they had to agree in writing to what are known in the industry as "Non-Reliance" or "Big Boy" provisions.  The Big Boy

---

[1]   Claimant Mattson also brought this action on behalf of his personal investment vehicle, Claimant GNM ICBC, LLC.  As applicable and unless otherwise noted, the use of "Mattson" herein refers to both Claimants.

provisions that Mattson agreed to included:[2]

- That "IN MAKING AN INVESTMENT DECISION," investors had to "RELY ON THEIR OWN EXAMINATION" of "THE MERITS AND RISKS INVOLVED." Mattson further averred that he had "*not* relied upon any representations made by, or other information (whether oral or written) furnished by or on behalf of," JPMS or any other J.P. Morgan entity, "other than as set forth in the Offering Documents."[3]

- That (i) he had "sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of" investing in Jawbone, and (ii) he in fact had conducted his own evaluation and, to his "*full satisfaction*," he had "been given the opportunity" to "obtain" the "information" he deemed "necessary to evaluate the merits and risks of an investment."

- That he understood that (i) any investment in Jawbone "involves a *high degree of risk*," "will be *highly speculative*," and "may result in the loss of" his "entire investment," (ii) Jawbone "is *cash flow negative*," and (iii) Jawbone faced "*intense competition* from other functional companies with greater financial and technical resources."

Thus, JPMS did not recommend the Jawbone investment to MPV investors, nor did it provide MPV investors with any investment advice.  Instead, JPMS's role was limited to introducing Jawbone (and other private investment opportunities) to the elite group of ultra-wealthy, ultra-sophisticated investors who had enrolled in the MPV program for that purpose—and those MPV investors pointedly did not rely on "*any* representations made by" JPMS, much less on any recommendation or investment advice.  Instead, as they averred in writing, Mattson and the other MPV investors relied solely "ON THEIR OWN EXAMINATION" of "THE MERITS AND RISKS INVOLVED."

While Mattson previously agreed to the Big Boy provisions—at a time when Jawbone was experiencing rapid growth, and Mattson hoped its anticipated IPO would earn him substantial profits—he now seeks to disavow them and to have JPMS, which earned a total placement agent fee of $5,000

---

[2]  These Big Boy provisions are contained in Sections 6(c) and 6(d) of the Subscription Booklets (the "Subscription Agreements") that Mattson signed, as well as in the Confidential Offering Memorandum (the "Offering Memo") referred to and incorporated in the Subscription Agreement.  A copy of Mattson's Subscription Agreement (for his personal account, which is substantively identical to that executed for GNM ICBC, LLC) is attached as Ex. 5, and the Offering Memo is attached as Ex. 4.

[3]  All capitals in quotations are from the original.  All other emphasis in quotations (such as text in italics) has been added.

2

as a result of Mattson's investment,[4] bail him out on his losses.  Mattson claims he is entitled to shirk his written commitments for two reasons: (i) Mattson alleges that JPMS made certain misrepresentations to him about Jawbone; and (ii) while the Big Boy provisions clearly state that Mattson was responsible for doing his own due diligence on Jawbone, Mattson now claims that JPMS was responsible to do that due diligence instead, and that JPMS purportedly failed to do so.  Both of these claims are directly refuted by the evidence, as well as by the controlling law, and should be rejected by the Panel.

MISREPRESENTATION CLAIMS ("FRAUD").    Mattson claims that JPMS made six misrepresentations about Jawbone, which he alleges duped him into investing.[5]  But each of Mattson's six alleged misrepresentations is directly refuted by the terms of the Jawbone offering documents (the "Offering Documents") that Mattson signed.

For example, the first of Mattson's six alleged misrepresentations is that "Jawbone was a 'hot' company that was looking to go public in 1-2 years."[6]  While Mattson may very well have believed that Jawbone was a "hot" company that he hoped would "go public," the evidence refutes the notion that JPMS made any such assertions to him, let alone that Mattson could have reasonably relied on them.  Instead, the Offering Documents emphatically stated to Mattson that investing in Jawbone "involves a high degree of risk" and made multiple risk disclosures, including:[7]

---

[4]  As discussed in greater detail below, JPMS's placement agent fee should have been $10,000 (*i.e.*, 1% of Mattson's $1 million investment).  However, before he invested, Mattson demanded, and received, a 50% discount on this fee.
[5]  *See* Statement of Claim ("SoC") at 5, 11.
[6]  *Id.* at 11.
[7]  Ex. 4 (Offering Memo) at JPMS_00003017, JPMS_00003039, JPMS_00003052.

| MISREPRESENTATION ALLEGED BY MATTSON | ACTUAL PROVISIONS IN OFFERING DOCUMENTS SUBSCRIBED TO BY MATTSON |
|---|---|
| "That Jawbone was a 'hot' company that was looking to go public in 1-2 years." | • "[I]nitial public offering . . . opportunities may be *limited or non-existent*." <br><br> • "[Jawbone] is currently *cash flow negative* and not profitable." <br><br> • "[Jawbone's] consumer business is *highly competitive* and is presented with many significant manufacturing, marketing, operational and other risks and uncertainties." <br><br> • "[A]n investor's investment in [Jawbone] will be *highly speculative* and there can be no assurance that there will be any return of capital to investors." |

Another misrepresentation alleged by Mattson is that JPMS purportedly told him that another investor, Rizvi Traverse Management LLC ("Rizvi"), would "invest $175 million" in the same Jawbone Series 6 stock issuance round that Mattson invested in, whereas Rizvi in fact ultimately invested only $25 million.[8] But, once again, the Offering Documents squarely refute Mattson's claim because they plainly state that Rizvi was obligated to invest only "$25 million," not $175 million, and that Rizvi had an *option*—but not an obligation—to invest "*up to* $150,000,000" more.[9] Nothing in the Offering Documents required Rizvi to exercise its option—to the contrary, the Offering Documents expressly contemplate that Rizvi might "*not* intend to purchase the entirety of its" potential allocation.[10]

Each of Mattson's other alleged misrepresentations is similarly refuted by the Offering Documents. For the Panel's convenience, JPMS has prepared a one-page chart juxtaposing each of Mattson's six alleged misrepresentations with the terms from the Offering Documents that refute them. A copy of this chart is attached as **Exhibit 1**. As demonstrated in that chart, the plain terms of the Offering Documents decisively refute Mattson's fraud claims.

---

[8]  SoC at 5, 11.
[9]  Ex. 6 (Term Sheet) at JPMS_00001615; Ex. 7 (Stock Purchase Agreement) at JPMS_00001832-33.
[10]  Ex. 7 (Stock Purchase Agreement) at JPMS_00001833.

DUE DILIGENCE CLAIMS ("NEGLIGENCE").  While the Big Boy provisions clearly state that Mattson was responsible for doing his own due diligence on Jawbone, Mattson now claims that JPMS should have done that due diligence instead, and he purports to assert claims against JPMS for "Negligence."[11]  These claims fail for three reasons.

First, the sole basis for Mattson's contention that he can disavow the Big Boy provisions and sue JPMS for allegedly failing to perform sufficient due diligence on Jawbone is FINRA Notice to Members 10-22 ("Notice 10-22").[12]  But Notice 10-22 does not exist to allow ultra-sophisticated investors to disavow their written agreements, and it is clearly inapplicable here.

Notice 10-22 provides that a broker-dealer has a duty "to conduct a reasonable investigation of securities that it *recommends*, including those sold in a Regulation D offering."[13]  But, as shown above, JPMS did not *recommend* the Jawbone investment to Mattson or any other MPV investor.  Instead, pursuant to its well-disclosed role as placement agent, JPMS *introduced* the Jawbone investment to MPV investors, and those elite investors then made their own investment decisions without any recommendation from JPMS.  In fact, as stated in the Big Boy provisions that Mattson agreed to, he was not relying on "*any* representations" by JPMS at all, much less on any recommendation.

Moreover, consistent with the Big Boy provisions, the hearing evidence will show that Mattson in fact did perform his own due diligence, and did not seek or obtain any recommendation from JPMS prior to making his investment.  After signing Jawbone's required non-disclosure agreement ("NDA"), Mattson was given access to a secure online data room set up by Jawbone (the "Jawbone Data Room") which contained confidential Jawbone documents.  The Jawbone Data Room log shows that Mattson accessed the data room multiple times and repeatedly reviewed Jawbone's financial and other confidential information before he invested.  Mattson also had a conference call with Jawbone's CEO Hosain Rahman before he made his investment.

---

[11] SoC at 13.
[12] For the Panel's convenience, a copy of Notice 10-22 is attached as Ex. 8.
[13] Ex. 8 (Notice 10-22) at 1.

5

Mattson is not the first sophisticated investor who has sought to disavow Big Boy provisions he agreed to after his investment failed, nor is he the first to try using Notice 10-22 for that purpose. Courts, however, uniformly have rejected such tactics. As a threshold matter, it is settled law that, "to form the basis for liability in damages, the broker's violations of the rules must be 'tantamount to *fraud*,'" and that claimants whose investments have failed cannot sue their brokers based on allegations of "negligence."[14]  Mattson's negligence claims fail for that reason alone.

Moreover, courts specifically have rejected the notion that sophisticated investors can circumvent non-reliance provisions by bringing negligence claims based on Notice 10-22. Instead, "*[c]ourts have enforced such disclaimers*," holding that "the agreed upon waiver serves to disclaim the [broker's] duty of care under FINRA guidelines," including in particular "Notice 10-22."[15]  In short, sophisticated investors like Mattson cannot have it both ways:  Mattson agreed to the Big Boy provisions, and the Panel should now hold him to his word.  As the courts that have addressed this issue have held, Notice 10-22 does not remotely suggest otherwise.

<u>Second</u>, while Notice 10-22 is inapplicable here, Mattson cannot blame JPMS's due diligence efforts in any case because Jawbone failed due to "intense competition from the likes of wearable devices maker Fitbit Inc. and Apple,"[16] not due to any facts that were overlooked by JPMS—or by

---

[14]  *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 268 (S.D.N.Y. 2012).  As the *BNP Paribas* court itself observed, Notice 10-22 itself states that it is "enforceable under federal securities laws and FINRA rules," and not under any common law or other "negligence" claims.  *Id.* at 268-69.

[15]  *Id.* at 267-68 (dismissing negligence and other claims where the sophisticated purchasers "explicitly disavowed" reliance on the placement agents, and in so holding, rejecting the argument that FINRA Notice 10-22 imposed a due diligence obligation because, to hold that "a broker's mere participation in a private placement constitutes a 'recommendation'" would "border on making [the placement agent] an insurer," contrary to the parties' bargain); *see also In re Nat'l Century Finan. Enters., Inc. Invest. Litig.*, 905 F. Supp. 2d 814, 819, 824 (S.D. Ohio 2012), *aff'd Pharos Cap. Partners v. Deloitte & Touche*, 535 Fed. App'x 522 (6th Cir. 2013) (rejecting fraud and negligence claims brought by a sophisticated investor against placement agent where investor (i) signed a "'big boy' agreement" attesting "that it knew what it was doing and could take care of itself," and (ii) did, in fact, conduct "its own due diligence investigation," including by accessing the issuer's "data room," because for the court "[t]o allow [plaintiff] to proceed any further" with its lawsuit "would upset the risk allocation the parties bargained for").

[16]  Wall Street Journal, "Jawbone Lays Off 15 Percent of Employees Amid Heated Rivalry in Wearables" (Nov. 20, 2015), https://blogs.wsj.com/venturecapital/2015/11/20/jawbone-lays-off-15-of-employees-amid-heated-rivalry-in-wearables; *see also* Business Insider, "*Jawbone Bet Big on Fitness Trackers and Lost*" (July 10, 2017), https://www.businessinsider.com/jawbone-bet-big-on-fitness-trackers-and-lost-2017-7 (reporting that Jawbone failed because "Jawbone's fitness trackers never caught on with consumers to the extent the company had hoped they would").

Mattson himself—in May 2014.  For example, in September 2014 (*i.e.*, just four months after Mattson made his Jawbone investment), Apple revealed that it would be entering the wearables market—and thus would be competing with Jawbone for the first time—when it announced that it shortly would begin selling a new product called the "Apple Watch."[17]  The Offering Documents disclosed "intense competition" from "competitors with greater financial resources" as one of the principal risks of investing in Jawbone—and Mattson knowingly accepted that risk.

Recognizing that he cannot blame JPMS for the fact that Jawbone failed due to increased competition, Mattson now seeks to blame Jawbone's failure on other events, such as (i) Rizvi's decision to invest only $25 million in Jawbone, and not to exercise its option to invest $150 million more, and (ii) the fact that the "UP3," a new fitness tracker Jawbone announced in November 2014, was supposed to ship to stores in December 2014 but failed to ship until April 2015, four months later than anticipated, due to a "sealing" problem.[18]  But Mattson cannot blame JPMS for these events, either, because there is no evidence that they destroyed Jawbone, let alone caused his investment loss.  In any case, the Offering Documents once again refute Mattson's claims because they (i) state that Rizvi was required to invest only $25 million, not $175 million; and (ii) disclose that Jawbone might experience "operational" and "manufacturing" issues like the "sealing" problem that led to the four-month delay in shipping the UP3—a problem which Mattson cannot pin on JPMS for the additional reason that it did not arise until November 2014, *six months after* Mattson made his investment.

<u>Third</u>, while Notice 10-22 does not apply here because JPMS did not "recommend" Jawbone to the MPV investors, JPMS nonetheless performed an investigation of Jawbone that more than satisfied what Notice 10-22 requires.  Notice 10-22 provides that the "scope" of the investigation that should be undertaken by broker-dealers who "recommend" securities in private placements depends on the "facts and circumstances," including "the role of the broker in the transaction," the "nature of

---

[17]  *See* Apple, "Apple Unveils Apple Watch—Apple's Most Personal Device Ever" (Sept. 9, 2014), https://www.apple.com/newsroom/2014/09/09Apple-Unveils-Apple-Watch-Apples-Most-Personal-Device-Ever.
[18]  SoC at 7.

the recommendation," the "size and stability" of the issuer, and the presence of any "red flags."[19]  The

facts and circumstances here establish that that JPMS's investigation more than satisfied Notice 10-22:

- The Jawbone investment was shown only to MPV investors, all of whom (i) agreed to conduct their own independent due diligence, (ii) disclaimed any reliance on JPMS and (iii) had a documented history of extensive experience with private investments and a liquid net worth of at least $50 million.

- The MPV program had a Screening Committee which evaluated all potential MPV investments before they were shown to MPV clients, and that committee routinely utilized members of JPMS's Due Diligence teams to assist in its evaluations.

- As of June 2014 (the date of Mattson's Jawbone investment), the MPV Screening Committee had evaluated 50 potential MPV investments and had approved only 8 of them (including Jawbone) to be shown to MPV clients.

- As a threshold matter, the MPV Screening Committee permitted only investments that came from known and trusted sponsors.  In Jawbone's case, the sponsor was J.P. Morgan Investment Management, Inc. ("JPMIM")—a sponsor on which JPMS had done substantial due diligence and with which it had worked for years.  JPMIM had done its own substantial due diligence on Jawbone because, in one of the private equity funds that it managed, JPMIM had made substantial investments in Jawbone in 2011, 2012, and 2013—and it was adding to that investment in the Series 6 round.

- The MPV Screening Committee met at least six times prior to June 2014 to evaluate Jawbone.  Among other things, the Committee had the following facts available to it: Jawbone had been founded in 1999; had over 450 employees; had numerous industry leaders on its Board (such as Yahoo CEO Marissa Mayer) and in its employment; and had successfully brought two prior categories of technology products to market (noise-cancelling Bluetooth headsets, which Jawbone had developed for the U.S. military and portable Bluetooth speakers).  In addition, multiple venture capital firms on Forbes' "Midas List" were investors in Jawbone and in the Series 6 round in particular, including Andreessen Horowitz, Kleiner Perkins, Khosla Ventures and Sequoia Capital.

- At its meetings, the MPV Screening Committee was assisted by multiple members of the JPMS Alternatives Group's Due Diligence team.

In sum, having agreed to the Big Boy provisions when he hoped Jawbone would ride its rapid

growth to an IPO, Mattson cannot now disavow his written commitments and seek a bail out from

JPMS in the guise of a "Negligence" claim.  The law does not permit such a claim, and the facts here

decisively refute it.

---

[19]  Ex. 8 (Notice 10-22) at 2.

## SUMMARY OF RELEVANT FACTS

### I.   MATTSON OPENED ACCOUNTS WITH JPMS SEEKING "CAPITAL APPRECIATION" AND "SPECULATIVE" INVESTMENTS

Mattson opened his self-directed brokerage accounts with JPMS in 2012.  In his account opening agreements, Mattson indicated that he was an ultra-high-net-worth client with substantial experience in private investments, including 20 years of experience in "Hedge Funds / Private Placements":[20]

| Owner Annual Income ($) | 1 MM | Liquid Net Worth ($) | 50 MM | Total Net Worth excl. primary residence ($) | 60 MM |
|---|---|---|---|---|---|

| Please indicate the number of years of personal trading experience for the authorized party(s) on this account: | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Stocks 20 | Bonds 20 | FX 12 | Structured Products 12 | Options 20 | Emerging Markets 20 | Hedge Funds/ Private Placements 20 | Futures Commodities 12 | Mutual Funds 10 | | |

Mattson, who retired from Goldman Sachs in 2012, also stated that his primary source of income was now his "Investments," and that his account "Objective" was the riskiest option available: "Capital Appreciation" (rather than "Capital Preservation" or "Income Generation"):[21]

| My objective for this account (check one): | ☐ Capital Preservation | ☐ Income Generation | ☒ Capital Appreciation |
|---|---|---|---|
| Speculative or aggressive investments that may generate higher returns but may be riskier than other investments because I may lose all or part of my investment (check one): | ☒ Are permitted in this account | ☐ Are not permitted in this account | |
| Primary source of income: ☒ Investments | ☐ Compensation | ☐ Pension | ☐ Other_____ |

As shown above, Mattson also indicated that "Speculative or aggressive investment that may generate higher returns but may be riskier than other investments because I may lose all or part of my investment" are "permitted in this account."

### II.   MATTSON ENROLLED IN THE MORGAN PRIVATE VENTURES ("MPV") PROGRAM

In December 2013, Mattson enrolled in the MPV program.  The MPV program was intended to provide highly-sophisticated, ultra-high net worth investors with "direct, private market investment opportunities" not available to regular investors.[22]  These opportunities included exclusive access to invest in private companies before they went public.  Mattson took advantage of the MPV program to

---

[20] JPMS_00017121.
[21] Id.
[22] JPMS_00016648.

9

invest in Jawbone.  Only clients with (i) a *liquid net worth in excess of $25 million* and (ii) the ability "to conduct their own independent due diligence on individual opportunities" were invited to enroll in the MPV program.[23]  Because these were private investments in individual companies/opportunities, they were, by definition, riskier than diversified fund offerings like mutual funds, and therefore only clients with extreme financial sophistication and who had specified an interest in "speculative" investments (as Mattson had done) were invited to enroll.[24]

Moreover, private investments like those offered to MPV clients "typically have a more compressed timeline versus traditional funds," as short as a few weeks.[25]  Accordingly, MPV clients also had to have a demonstrated "ability to act quickly."[26]

To be admitted to the MPV program, clients who indicated an interest in joining had to be approved by two JPMS employees: the client's "Investor" representative at JPMS, and the Regional Investment Team Leader.[27]

In addition to the program's initial onboarding process, a second onboarding process was put in place to ensure the client's suitability for each individual MPV investment.  Among other things, MPV clients were required to (i) meet deal-specific suitability criteria and (ii) execute deal-specific agreements/letters containing Big Boy" provisions.[28]  That process was illustrated as follows in one contemporaneous JPMS presentation:[29]

---

[23] *Id.*
[24] *Id.*
[25] JPMS_00016650.
[26] *Id.*
[27] *Id.*
[28] JPMS_00016656.
[29] *Id.*



## III. JPMS SCREENED AND APPROVED JAWBONE FOR INCLUSION IN THE MPV PROGRAM

### A. JPMS Used A Screening Committee To Review And Screen Prospective MPV Investments And Set Deal-Specific Suitability Criteria

JPMS completes its own investigation of each prospective MPV investment before deciding whether to serve as Placement Agent in introducing the deal to clients like Mattson. Once MPV clients are introduced and express interest, they agree to do their own due diligence and disclaim any reliance on JPMS. Nonetheless JPMS's pre-screening of prospective MPV opportunities was a multi-step process. Among other things, the MPV Program had a Screening Committee that met weekly to evaluate potential MPV offerings and set deal-specific suitability criteria.[30] The Screening Committee was "composed of investment, business, and control professionals" from across JPMS's various divisions, including members of JPMS's "Due Diligence" teams.[31]

As of June 2014 (*i.e.*, the month Mattson made his investment), JPMS had considered over 50 prospective MPV investments, and the Screening Committee approved only 8 of them (including Jawbone) as "qualified to be shown to clients."[32]

### B. The Screening Committee Considered Prospective Investments Only From Known And Trusted Sources—Such As JPMIM, Jawbone's Sponsor

As part of its investment criteria, the MPV Screening Committee considered investments only

---

[30] *See id.*
[31] JPMS_00016661.
[32] JPMS_00016648.

from approved "sources" and "sponsors" with whom JPMS had substantial experience.[33]  In the case of Jawbone, the sponsor was JPMIM—an investment manager with whom JPMS had years of experience, on which it had performed substantial due diligence, and which had been reviewed and approved by JPMS's separate Investment Review Committee  multiple times.  Specifically, the Private Equity Group ("PEG") within JPMIM, led by Larry Unrein, acted as the sponsor of the Jawbone investment, and would serve as the investment manager for Digital Growth Co-Investment 2, L.P. (the "Partnership"), the special purpose vehicle through which MPV investors (including Mattson) were to invest in Jawbone.[34]

1.     **The MPV Screening Committee Trusted JPMIM/PEG Because Of JPMIM/PEG's Substantial Experience Investing In Jawbone And Its Prior Approval By JPMS's Investment Review Committee**

The MPV Screening Committee trusted Mr. Unrein and his team at JPMIM/PEG as suitable sponsors for the Jawbone investment for two reasons.  First, Mr. Unrein and his team at JPMIM/PEG had substantial experience investing in Jawbone.  Specifically, Mr. Unrein and his team worked as the investment manager for a private equity fund called the Digital Growth Fund I ("DGF I"), and DGF I had been a substantial investor in Jawbone since 2011.  As of June 2014 (*i.e.*, the date of Mattson's investment), DGF I had invested over $115.5 million in Jawbone,[35] and Jawbone was one of the best-performing investments in DGF I's portfolio.[36]

Second, as noted above, JPMS already had performed substantial due diligence on Mr. Unrein and his team at JPMIM/PEG, culminating with a review and approval of Mr. Unrein and his team by JPMS's Investment Review Committee in 2011.[37]  That Investment Review Committee approval occurred because, in 2011, JPMS approved DGF I as a fund that could be shown to clients.  While Jawbone was offered only to MPV clients, DGF I was a more diversified and thus safer investment,

---

[33] JPMS_00016650.
[34] *See* Ex. 4 (Offering Memo) at JPMS_00003021.
[35] *See* JPMS_00012449-50.
[36] *See* JPMS_00016879.
[37] *See* JPMS_00017070-JPMS_00017102.

and it was offered to a much broader group of clients: specifically, DGF I was offered to all JPMS clients who were Qualified Purchasers and Accredited Investors under the federal securities laws.[38]

       **2.**     **In 2014, JPMS Performed Additional Due Diligence On JPMIM/PEG And DGF—Including The Performance Of DGF's Jawbone Investment—At The Same Time That The MPV Screening Committee Considered Jawbone**

In 2014, at the same time that the MPV Screening Committee was considering whether to approve Jawbone to be shown to MPV clients, Mr. Unrein and his team at JPMIM/PEG were launching Digital Growth Fund II ("DGF II"), a new fund similar to DGF I but to be comprised of different investments. JPMS's Investment Review Committee once again did diligence on Mr. Unrein and his team, including a review of the performance of DGF I's investments from 2011 through May 2014. As shown in the following May 2014 presentation that JPMS's Due Diligence team prepared, that review indicated that Jawbone was DGF I's second-best performing investment:[39]

| Investment | Date | Invested capital | Realized proceeds | 12/31/2013 | | | |
|---|---|---|---|---|---|---|---|
| | | | | Unrealized value | Total value | Gross MOI | Gross IRR |
| Twitter | Feb-11 | 521 | 0 | 2,281 | 2,281 | 4.4x | 74.3% |
| LivingSocial | Jun-11 | 296 | 0 | 97 | 97 | 0.3x | (38.7%) |
| Jawbone | Jun-11 | 106 | 0 | 245 | 245 | 2.3x | 44.3% |
| Tapjoy | Jun-11 | 15 | 0 | 26 | 26 | 1.8x | 25.1% |
| RetailMeNot | Oct-11 | 99 | 18 | 172 | 190 | 1.9x | 35.7% |
| Conduit | Apr-12 | 100 | 26 | 89 | 115 | 1.2x | 7.6% |
| Rocket Internet | Jul-12 | 111 | 0 | 168 | 168 | 1.5x | 39.4% |
| Varonis | Sep-12 | 16 | 0 | 16 | 16 | 1.0x | 0.0% |
| Total | | 1,264 | 44 | 3,094 | 3,138 | 2.5x | 47.9% |
| | | | | | | Net: | 39.4% |

JPMS's Investment Review Committee approved DGF II in May 2014, at the same time that the MPV Screening Committee was considering whether to show Jawbone to MPV clients.[40] The hearing evidence will show that the same JPMS Due Diligence analysts who participated in the JPMS Investment Review Committee's review of DGF I in 2011 and of DGF II in 2014 also assisted the MPV Screening Committee in 2014.

---

[38] *See* JPMS_00017098.
[39] JPMS_00016879.
[40] *See id.*

In addition to being the investment manager for both DGF I and DGF II, Mr. Unrein and his team at JPMIM/PEG also were to serve as the investment manager for the Partnership through which Mattson elected to make his Jawbone investment.[41]

### C. The MPV Screening Committee, Including Multiple Members Of JPMS's Due Diligence Team, Reviewed The Jawbone Investment At Multiple Meetings

The MPV Screening Committee held at least six meetings in April and May 2014 at which the Jawbone investment was screened.  These meetings were attended by numerous JPMS professionals. For example, the initial Screening Committee meeting on April 16, 2014 was attended by 17 JPMS professionals, including from the Due Diligence team.[42]

The record establishes that, starting in April 2014, the JPMS Due Diligence analysts who assisted the MPV Screening Committee downloaded and reviewed hundreds of pages of due diligence materials concerning Jawbone, including:  (i) Jawbone's recent financial statements, as well as other materials Jawbone made available to prospective Series 6 investors via the Jawbone Data Room; and (ii) the Offering Documents for Series 6 investors.  As shown in the following April 2014 e-mail, those due diligence materials were stored on a shared network drive titled "Co-Investment → Jawbone → DD Materials," which was created specifically to host JPMS's due diligence materials for the Jawbone opportunity (that, ultimately, would be approved to be shown to certain MPV clients):[43]

---

[41] *See* Ex. 4 (Offering Memo) at JPMS_00003021.
[42] *See* JPMS_00017123.
[43] JPMS_00016731.

From: Thomas, Lindsay J
Sent: Tuesday, April 22, 2014 4:29 PM
To: Chiaravalloti, Michael J
Cc: Garrison, Christopher W; O'Hearn, Patrick; Blasenheim, Itay; Hill, Glenn J
Subject: RE: Welcome to Box. Get started with Sync.

Yes, just finished – the documents can be found via the following path:

*ALTERNATIVE INVESTMENTS → JPM Digital Growth Fund → Co-Investment → Jawbone → DD Materials*

Thanks!
Lindsay

From: Chiaravalloti, Michael J
Sent: Tuesday, April 22, 2014 4:10 PM
To: Thomas, Lindsay J
Cc: Garrison, Christopher W; O'Hearn, Patrick
Subject: Re: Welcome to Box. Get started with Sync.

All downloaded to share drive?

In addition, the record establishes that JPMS's Due Diligence analysts, as well as other MPV Screening Committee members, communicated with JPMIM/PEG, including Mr. Unrein himself, about the prospective Jawbone investment over numerous e-mails and conference calls.[44]

Among other things, the MPV Screening Committee considered the following salient facts about the prospective Jawbone investment before it was approved to be shown to MPV investors:

- Jawbone had been founded in 1999, had over 450 employees, and was valued at $3.2 billion as of April 2014.

- Jawbone had raised over $285 million from a number of blue-chip venture capital investors, including:  Andreessen Horowitz; Kleiner Perkins Caufield & Byers; Sequoia Capital; Khosla Ventures; and Silver Lake Partners.

- In the Series 6 round in particular (*i.e.*, the round in which Mattson and other MPV investors would participate), substantial investors included Andreessen Horowitz, Sequoia Capital, Khosla Ventures, BlackRock, and Rizvi.

- Mr. Unrein and JPMIM/PEG had substantial experience working successfully with Andreessen Horowitz on Jawbone and other investments.  Not only was Andressen Horowitz adding to its existing Jawbone investment in Series 6, DGF I also would be participating in Series 6:  DGF I would be investing $9.9 million in Series 6, bringing its total Jawbone investment to $115.5 million.

- There were multiple industry-leading professionals on Jawbone's Board and executive team, including Board Members Marissa Mayer (Yahoo CEO) and Ben Horowitz (Co-Founder of Andreessen Horowitz).

[44] *See,  e.g.,*   JPMS_00016694;   JPMS_00016699;   JPMS_00016710;   JPMS_00016728;   JPMS_00016729-JPMS_00016730; JPMS_00016769.

15

- Jawbone successfully had brought two prior product categories to market and had been a market leader in both: (i) Bluetooth headsets, particularly noise-cancelling headsets (which Jawbone initially developed for and sold to the U.S. military); and (ii) Bluetooth speakers, particularly its portable "Jambox" speakers.

- Jawbone had experienced substantial growth in 2013 that had continued into the first quarter of 2014. Among other things, sales of Jawbone's fitness tracker "increased from $8m in 2012 to $149m in 2013, a 19x increase," and Jawbone's "revenue nearly doubled in Q1 2014 year-over-year."

**D.     The MPV Screening Committee Approved Jawbone To Be Shown To MPV Clients With A Liquid Net Worth Of At Least $50 Million**

The Screening Committee approved Jawbone to be shown to MPV clients in May 2014. As with all MPV investments, Jawbone was offered only to a highly-exclusive category of clients who had enrolled in MPV and agreed to conduct their own independent due diligence. Among other things, the Screening Committee limited the Jawbone investment to MPV clients who met the following criteria:[45]

- A "minimum liquid net worth" of "$50 million."[46]

- "Prior experience in investing in hedge funds, funds of hedge funds, private equity funds or other risky, limited liquidity investments."

- "Ability to evaluate and withstand the investment risks (including the possibility of complete loss of the investment)."

- "Understanding of, and tolerance for, the limited liquidity of the investment."[47]

MPV clients who expressed an interest in Jawbone were required to sign a NDA, after which they were given access to the confidential Data Room set up by Jawbone. MPV clients also were put in touch with Jawbone's CEO, Hosain Rahman, who hosted several investor calls.

All MPV clients who ultimately chose to invest in Jawbone—including Mattson—were also required to sign multiple Big Boy provisions attesting to the following:[48]

- "IN MAKING AN INVESTMENT DECISION," investors had to "RELY ON THEIR OWN EXAMINATION" of "THE MERITS AND RISKS INVOLVED."

---

[45] JPMS_00017108.

[46] A "target $50.0 million liquid net worth" was permitted "for capital appreciation with speculation accounts."

[47] In addition to being offered to MPV clients who met those criteria, the Jawbone Series 6 investment was also offered to qualified DGF I investors who wished to add to their Jawbone exposure.

[48] Ex. 4 (Offering Memo); Ex. 5 (Subscription Agreement).

- Investors had "*not* relied upon any representations made by, or other information (whether oral or written) furnished by or on behalf of," JPMS or any other J.P. Morgan entity, "other than as set forth in the Offering Documents."

- Investors had "sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of" investing in Jawbone.

- Investors had in fact conducted their own evaluation and, to their "*full satisfaction*," they had "been given the opportunity" to "obtain" the "information" they deemed "necessary to evaluate the merits and risks of an investment."

- Investors had reviewed all of the risks set forth in the "Risk Factors" section of the Confidential Offering Memorandum for the investment, including the following: (i) any investment in Jawbone "involves a *high degree of risk*," "will be *highly speculative*," and "may result in the loss of" his "entire investment," (ii) Jawbone "is *cash flow negative*," and (iii) Jawbone faced "*intense competition* from other functional companies with greater financial and technical resources."

## IV.   MATTSON STUDIED THE JAWBONE OPPORTUNITY AND DECIDED TO INVEST

Mattson was shown the Jawbone investment opportunity and ultimately chose to invest.  The evidence demonstrates that, before he did so: (i) Mattson agreed to MPV's terms, including its condition that he perform his own due diligence; (ii) Mattson in fact performed his own due diligence, including by directly accessing Jawbone's confidential Data Room and participating in a call with Jawbone CEO Hosain Rahman; (iii) Mattson negotiated with JPMS about fees, and successfully persuaded JPMS to cut its placement agent fee by 50% for his benefit; and (iv) Mattson perceived Jawbone to be a risky investment, but proceeded to invest in it anyway.

### A.   Mattson Reviewed The Documents In Jawbone's Data Room And Saw That Jawbone Had Experienced Tremendous Growth In 2013 and Q1 2014

Consistent with his commitment to perform his own independent due diligence, after Mattson was told about Jawbone (and before he chose to invest), he signed a NDA with Jawbone and was given direct personal access to the confidential Jawbone Data Room.  Jawbone hired a private equity consulting firm called Code Advisors LLC ("Code Advisors") to set up the Jawbone Data Room.  The

record shows that Mattson had a personalized conference call with Code Advisors Partner Will Hawthorne on May 16, 2014.

Moreover, records produced by Code Advisors establish that Mattson reviewed most, if not all, of the Jawbone Data Room documents multiple times:[49]

| Date | User Name | User Email | IP Address | Action | Affected | Size (kB) | Parent Folder |
|---|---|---|---|---|---|---|---|
| 5/16/2014 12:34 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Company Intro 041714.pdf | 16429.28 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/16/2014 12:37 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Company Intro 041714.pdf | 16429.28 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/16/2014 12:40 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Internet of You - 041714.pdf | 63203.84 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/16/2014 12:51 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Financial Update 2014-04-29.pdf | 2148.49 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/16/2014 12:53 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Financial Model Summary 2014-04-30.pdf | 888.77 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/16/2014 12:54 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Series 6 Pro Forma Cap Table 2014-04-30.xlsx | 18.07 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/16/2014 12:55 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone IP Overview 043014.pdf | 8365.48 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/16/2014 12:56 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Go to Market - 05-08-2014.pdf | 15731.27 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/16/2014 12:56 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Company Overview - 05-08-2014.pdf | 9091.46 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/16/2014 12:56 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Rizvi Traverse Signed Term Sheet 2014-01-07.PDF | 373.21 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/16/2014 12:58 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Fundraise History 2014-05-14.pdf | 84.92 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/16/2014 12:59 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone valuation analysis 2014-05-14.pdf | 266.06 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/19/2014 7:15 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Company Intro 041714.pdf | 16429.28 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/19/2014 7:20 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Company Overview - 05-08-2014.pdf | 9091.46 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/19/2014 7:50 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Rizvi Traverse Signed Term Sheet 2014-01-07.PDF | 373.21 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/19/2014 7:51 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone valuation analysis 2014-05-14.pdf | 266.06 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/19/2014 8:09 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone valuation analysis 2014-05-14.pdf | 266.06 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/19/2014 8:10 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Go to Market - 05-08-2014.pdf | 15731.27 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/19/2014 8:10 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Go to Market - 05-08-2014.pdf | 15731.27 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/19/2014 8:11 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Fundraise History 2014-05-14.pdf | 84.92 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/19/2014 8:11 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Financial Model Summary 2014-04-30.pdf | 888.77 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/19/2014 8:11 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Series 6 Pro Forma Cap Table 2014-04-30.xlsx | 18.07 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/19/2014 8:12 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Financial Model Summary 2014-04-30.pdf | 888.77 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/31/2014 17:56 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Company Overview - 05-08-2014.pdf | 9091.46 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/31/2014 18:04 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Go to Market - 05-08-2014.pdf | 15731.27 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/31/2014 18:06 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone valuation analysis 2014-05-14.pdf | 266.06 | /Jawbone - Series 6 Phase 2 Diligence |
| 5/31/2014 18:08 | gnmattson | george.mattson323@gmail.com | 73.179.57. | Previewed | Jawbone Financial Model Summary 2014-04-30.pdf | 888.77 | /Jawbone - Series 6 Phase 2 Diligence |

Mattson saw in the Data Room documents, which were located in Code Advisor's Series 6 "Diligence" parent folder, that Jawbone had experienced explosive growth in 2013. Jawbone's revenues from sales of its UP fitness trackers, referred to by Jawbone as "Wellness revenue," grew dramatically:[50]

> - Wellness revenue increased from $8m in 2012 to $149m in 2013, a 19x increase

That increase in sales of Jawbone's flagship UP product reflected a growth rate of +1,692% in 2013.

The documents Mattson reviewed in the Jawbone Data Room further showed that Jawbone's dramatic growth had continued into the first quarter of 2014:[51]

---

[49] CODEADVISORS_00001-CODEADVISORS_00002.
[50] CODEADVISORS_00043.
[51] CODEADVISORS_00014.



While the above data reflects growth of +90% in overall revenues in Q1 2014 (compared to Q1 2013), Mattson further saw that growth in Wellness revenues, in particular in Q1 2014 (compared to Q1 2013), was an even more dramatic +225%:[52]



In addition to studying the materials in the Jawbone Data Room, Mattson also attended multiple conference calls with Jawbone's CEO Hosain Rahman, including one "on or about May 8 or 9, 2014."[53]

As he confirmed when he agreed to the Big Boy provisions, Mattson was fully capable of understanding the materials in the Jawbone Data Room.  Not only is Mattson a former Co-Head of the Global Industrials Group at Goldman Sachs's Investment Bank, he also currently (i) serves on the Board of Directors of Delta Airlines, and (ii) is a Strategic Investor and Industry Advisor with Star Mountain Capital, a highly-regarded private equity firm focusing on U.S. companies.

---

[52] CODEADVISORS_00040.
[53] Claimants' July 25, 2018 Responses and Objections to Respondent's Second Requests for Information at 2.

**B.      Mattson Requested And Received A 50% Discount On JPMS's Placement Agent Fee**

After he had accessed Jawbone's Data Room and attended a call with Jawbone's CEO, Mattson asked JPMS what the fees would be if he invested:[54]

> -----Original Message-----
> From: George Mattson [mailto:george.mattson323@gmail.com]
> Sent: Monday, May 19, 2014 2:56 PM
> To: Abouzied, Jasmine C
> Subject:
>
> on the morgan private ventures deal i am looking at, are there any fees being borne by me as an investor?
>
>
> Sent from my iPad

Compared to private equity funds, MPV investments charged substantially lower fees because, among other things, MPV investments were (i) in single companies/opportunities, rather than in a collection of companies/opportunities, and (ii) MPV clients agreed to do their own independent due diligence for each deal.  For example, the fees for Mattson's Jawbone investment were less than *half* the fees for DGF I.[55]

Despite the fact that MPV fees already were far lower than fees for private funds, Mattson pressed for even lower fees.  Ultimately, JPMS agreed to discount its placement agent fee for Mattson by 50%—to $5,000 total.  This was a one-time exception made for Mattson and not given to any other investor.[56]

**C.      Mattson Asked JPMS To Allow Him To Invest Less Than The $1 Million Minimum**

Mattson also wanted special treatment with respect to the investment minimum.  Among other things, after initially subscribing to invest $1 million in Jawbone (the minimum amount permitted), Mattson asked JPMS if he instead could invest only $500,000.  Specifically, on May 27, 2014, Mattson filled out and signed two Subscription Agreements, subscribing for a total investment of $1 million in

---

[54] JPMS_00016791.
[55] *See* JPMS_00017097-JPMS_00017098.
[56] JPMS_00000181.

Jawbone: $500,000 in his personal account, and $500,000 through the personal investment vehicle he had set up.[57]  However, as confirmed in contemporaneous e-mails, Mattson called JPMS the *next day* (*i.e.*, on May 28, 2014) and asked if it would make yet another special exception for him and allow him to invest only $500,000, half the minimum investment amount.[58]  The hearing evidence will establish that Mattson asked for this special exception because, while he speculated that Jawbone might ride its explosive growth to a highly profitable IPO, he also recognized that investing in Jawbone was extremely risky—just as the Offering Documents warned him.

This further special exception was not made, and Mattson chose to proceed to invest $1 million.

## V.   THE SERIES 6 FINANCING CLOSED WITH $179 MILLION RAISED

The 2014 equity financing in which Mattson invested, which was referred to as the "Series 6" financing in the Offering Documents, closed on the substantial number of its investments in June 2014.[59]  The record shows that Jawbone raised $179 million in the Series 6 round, from investors including Andreessen Horowitz, BlackRock, Khosla, Rizvi, Sequoia, and JPMIM's DGF I fund.[60]

With the Series 6 financing, DGF I's total investment in Jawbone exceeded $115.5 million, including investments in the Series 1, 2, 5, 5A and 6 financings.[61]  Certain JPMIM employees also invested additional sums in Jawbone (including in Series 6) through a fund set up for that purpose.[62]

The hearing evidence will show that, as of June 2014, Jawbone was particularly popular among both MPV investors as well as among existing DGF I investors.  Existing DGF I investors, who already had exposure to Jawbone, were offered the opportunity to add to their individual exposure to Jawbone by co-investing additional sums alongside DGF I.  In total, 12 DGF I investors made such an

---

[57] *See, e.g.*, Ex. 5 (Subscription Agreement).
[58] JPMS_00012903.
[59] As explained in detail in the Offering Documents, the "Initial Closing" took place in March 2014, with several additional closings taking place as additional investors put more money in.  *See, e.g.*, JPMS_00001831-JPMS_00001865; JPMS_00001615-JPMS_00001620.
[60] *See* JPMC_0000110-JPMC_0000156; JPMS_00004279.
[61] *See* JPMS_00012450.
[62] *See* JPMC_00000147.

investment, for a total of $15 million.[63]  At the same time, 20 MPV investors—including Mattson, as

well as 19 other MPV investors—invested a total of $45 million in Jawbone in the Series 6 round.[64]

The following diagram illustrates the participants in the Series 6 round.  As shown below, the

12 DGF I co-investors and the 20 MPV investors all became limited partners of Digital Growth Co-

Investment 2, L.P. (*i.e.*, the Partnership, indicated below as "Co-Invest Partnership").  In doing so,

those DGF I co-investors and MPV investors all signed contracts directly with the Partnership.  As

indicated in blue below, Mr. Unrein and his team at JPMIM/PEG served as investment advisor to both

DGF and also to the Partnership.  And as indicated below in dotted line, JPMS's role was that of a

placement agent who introduced MPV clients to the Jawbone investment opportunity.  Finally, Code

Advisors was hired by Jawbone and acted as another placement agent, one which—among other

things—set up the Jawbone Data Room for use by potential investors:



---

[63] *See* JPMS_00012449.
[64] *Id.*

## VI.   JAWBONE'S UP FITNESS TRACKER LAGGED BEHIND THE COMPETITION AND MATTSON'S INVESTMENT FLOUNDERED

Unfortunately, Jawbone's big bet on its UP fitness tracker ultimately failed.  The record evidence conclusively establishes that intense competition, including from existing competitors like FitBit and new competitors like Apple, led to Jawbone's demise.

### A.   Apple Announced The Apple Watch In September 2014—Three Months After Mattson's Investment

Mattson subscribed for his Jawbone investment in May 2014 and transferred his $1 million to the Partnership in June 2014.  Three months later, in September 2014, a significant new competitor entered the wearables market when Apple unveiled a new product called the Apple Watch:[65]

> **PRESS RELEASE**
> SEPTEMBER 9, 2014
>
> # Apple Unveils Apple Watch —Apple's Most Personal Device Ever

According to Apple's September 2014 press release, the Apple Watch would hit stores in 2015.  The Apple Watch in fact went on sale in U.S. stores in April 2015.

### B.   Jawbone Announced The UP3 In November 2014 But The UP3 Did Not Ship Until April 2015

In his SoC, Mattson attempts to blame Jawbone's demise on minor events which clearly did not destroy Jawbone.  For example, Mattson complains that, "[j]ust months after the capital raise, Jawbone announced that its UP3 would not ship by year-end as previously promised due to a 'sealing problem.'"[66]  But the evidence confirms that the UP3's shipping delay did not cause Jawbone's demise.

Throughout 2014, Jawbone sold multiple versions of its UP fitness tracker, including the UP and the UP24.  On November 4, 2014, Jawbone announced that it would be releasing a new fitness

---

[65] *See* Apple, "Apple Unveils Apple Watch—Apple's Most Personal Device Ever" (Sept. 9, 2014), https://www.apple.com/newsroom/2014/09/09Apple-Unveils-Apple-Watch-Apples-Most-Personal-Device-Ever.
[66] SoC at 7.

tracker called the UP3.[67]  In its November 2014 press release, Jawbone stated that it expected to ship the UP3 "this year"—in other words, by December 2014, in time for the holidays.[68]

Jawbone, however, failed to ship the UP3 until April 2015.  As Jawbone explained in its subsequent press release, that four-month delay occurred because "as [Jawbone] began to scale [its] manufacturing process" for "mass production" of the UP3, it experienced difficulties in "achieving the level of water resistance" (*i.e.*, "sealing") that was desired for the product.[69]

Mattson, however, cannot blame Jawbone's demise on this four-month delay as there is no evidence that establishes (or even suggests) that this four-month shipping delay for a single product in Jawbone's UP fitness tracker line caused Jawbone's demise.  Instead, Jawbone continued selling its multiple UP fitness trackers through 2017.

**C.    Jawbone Raised Approximately $500 Million After Series 6—Leading Commentators To Call Its Ultimate Demise "Death By Overfunding"**

Mattson also attempts to blame Jawbone's demise on Rizvi's decision to invest $25 million in Series 6, and not to exercise its option to invest an additional $150 million.[70]  Once again, however, the evidence refutes this assertion.

Rizvi invested $25 million in the Series 6 round's Initial Closing, which occurred on March 28, 2014.[71]  Rizvi then had until September 28, 2014 (*i.e.*, six months after the Initial Closing) to exercise its $150 million option.[72]  Rizvi chose not to exercise that option, and thus limited its investment to $25 million.

---

[67] Jawbone, "Jawbone Introduces UP3," (Nov. 4, 2014).
[68] *Id.*
[69] Jawbone, "Jawbone Announces UP3 Shipping Dates," (Apr. 9, 2015).
[70] *See* SoC at 7.
[71] *See* Ex. 7 (Stock Purchase Agreement) at JPMS_00001832-33.
[72] *See id.* at JPMS_00001863.  At the hearing, Claimants will not present any evidence as to why Rizvi chose not to exercise its option:  Claimants have not identified any witnesses with knowledge about Rizvi's decision (such as any current or former Rizvi employees), nor did they obtain any documents at all from Rizvi during discovery.  For the same reason, Claimants also have no evidence as to why Rizvi's Term Sheet with Jawbone (Ex. 6) provided for a 180-day period during which Rizvi could exercise its option.  As to the latter issue, the evidence of record suggests two things.  First, it suggests that Rizvi negotiated the Term Sheet with Jawbone in late 2013 because the Term Sheet was signed by Rizvi and Jawbone in January 2014.  Second, the evidence suggests that Rizvi may have negotiated for a 180-day time period to exercise its option because (i) Rizvi was a large investor in Twitter, (ii) Twitter went public in late 2013, and (iii) Rizvi's shares in Twitter (which were valued at over $3 billion as of the date of Twitter's IPO) were subject to a 180-day lock-up

Rizvi's decision not to exercise its option, however, hardly led to Jawbone's demise.  Jawbone raised hundreds of millions of dollars from investors after September 2014, including (i) an additional $300 million from BlackRock in 2015, and (ii) approximately $165 million in a round led by the Kuwait Investment Authority in 2016.   In fact, following Jawbone's ultimate liquidation, numerous publications reported that Jawbone's demise was a case of "death by overfunding."[73]

### D.   Mattson Himself Sought To Invest More Money In Jawbone In August 2015—And Continued To Do So Until October 2016

In fact, even *Mattson himself* subscribed to invest more money in Jawbone after September 2014.  Specifically, in August 2015—months *after* Mattson learned that (i) Rizvi had not exercised its $150 million option and (ii) the UP3 had experienced "sealing" problems in late 2014—Mattson subscribed to invest another $166,669 in Jawbone's Series 8 round.[74]  While investing in Series 8 would have entitled Mattson to certain liquidation preferences, his decision to invest additional money in Jawbone via Series 8 made economic sense only if he believed the company would survive.  Mattson's e-mails confirm that he continued to believe that he should invest in Series 8 *as late as October 2016*.[75]

### E.   Consumer Demand For The UP3 Lagged In The Wake Of Fierce Competition From FitBit And Apple

Despite its access to substantial additional capital after Series 6, Jawbone failed to make the UP fitness tracker a success.  Numerous articles have been written about Jawbone's failure, many of which discuss factors such as intense competition from FitBit (which ultimately came to dominate the market

---

period.  *See* Crain's Detroit Business, "Twitter IPO instant value for Rizvi" (Nov. 10, 2013), http://www.crainsdetroit.com/article/20131110/NEWS/311109965/twitter-ipo-instant-value-for-rizvi.    Accordingly, Rizvi may have negotiated for a 180-day period because it may have intended to use its Twitter profits in connection with its Jawbone investment.

[73] *See, e.g.*, Reuters, "Jawbone's demise a case of 'death by overfunding' in Silicon Valley" (July 10, 2017), https://www.reuters.com/article/us-jawbone-failure/jawbones-demise-a-case-of-death-by-overfunding-in-silicon-valley-idUSKBN19V0BS; Business Insider, "Silicon Valley's 'death by overfunding' spreads as another unicorn collapses" (July 11, 2017), https://www.businessinsider.com/silicon-valley-jawbone-liquidation-overfunding-2017-7.

[74] JPMS_00013515.

[75] *See* JPMS_00000950.  Mattson transferred the $1,166,669.00 he subscribed to invest in Series 8 to the Partnership in August 2015.  *See* JPMS_00013515.  JPMIM, as the Partnership's investment manager, ultimately chose not to fund the Series investment, and returned the funds to investors (including Mattson) in March 2017.  *See* JPMS_00015879.

in 2015 and 2016) and Apple (which dominates the market today).[76]  Contrary to Mattson's claims in this arbitration, none of those articles suggest that Jawbone failed because of Rizvi's failure to exercise its $150 million option, or because of the UP3's four-month shipping delay in late 2014.  Nor do any of those articles claim that investors should have—or even *could* have—foreseen Jawbone's demise as early as May 2014, when the MPV Screening Committee approved Jawbone to be shown to MPV investors—and when Mattson did his own extensive due diligence on Jawbone.

Instead, most industry commentators agree that Jawbone's UP had market-leading features, such as one of the first wrist-born accelerometers on the market, and its sleek, Yves-Behar designed wristband.  But, despite its sleek exterior, Jawbone's UP failed to impress consumers as much as FitBit's cheaper trackers and Apple's even more impressive Apple Watch:



| JAWBONE UP3 (2015) | FITBIT CHARGE (2015) | APPLE WATCH (2015) |
|---|---|---|
| $179 | $96 | $399 |

**VII.   MATTSON CONSIDERED "POSSIBLE LITIGATION" AGAINST RIZVI TO RECOVER HIS LOSSES**

---

[76] *See, e.g.*, The Conversation, "What Jawbone's demise can teach the fitness wearable market" (July 13, 2017), http://theconversation.com/what-jawbones-demise-can-teach-the-fitness-wearable-market-80901;  Wall Street Journal, "Jawbone Lays Off 15% of Employees Amid Heated Rivalry in Wearables" (Nov. 20, 2015), https://blogs.wsj.com/venturecapital/2015/11/20/jawbone-lays-off-15-of-employees-amid-heated-rivalry-in-wearables/; Business Insider, "A timeline of how the Apple Watch was created" (Mar. 9, 2015), https://www.businessinsider.com/a-timeline-of-how-the-apple-watch-was-created-2015-3.

As Jawbone failed, Mattson's investment was ultimately marked to $0.  The record establishes that Mattson initially wanted to sue Rizvi to recover his losses—specifically, Mattson wanted JPMIM/PEG, in its capacity as the Partnership's investment manager, to have the Partnership initiate litigation against Rizvi.  For example, JPMS records establish that, during a conference call held in March 2017, Mattson asked JPMIM/PEG and JPMS to look into "possible litigation" against Rizvi.[77]

Then, on April 7, 2017, Mattson attended a conference call with an in-house lawyer employed by non-party J.P. Morgan Asset Management.  The e-mail sent by that in-house lawyer to Mattson following their conversation confirms that the purpose of the call was to further discuss Mattson's desire to sue Rizvi.  Among other things, the e-mail confirms that, during the call, it was explained to Mattson that the Partnership had no basis to sue Rizvi because the Offering Documents—including both the Series 6 Term Sheet and the Series 6 Stock Purchase Agreement—plainly stated that Rizvi was required to invest only $25 million, not $175 million.[78]

## VIII.   MATTSON CONTINUES TO BLAME RIZVI AND OTHER NON-PARTIES—BUT SUED JPMS

Unable to initiate litigation against Rizvi, Mattson proceeded to sue JPMS instead, filing his SoC on July 27, 2017.  In his SoC, Mattson continues to blame Rizvi's failure to exercise its $150 million option as one of the alleged reasons his investment failed.  In addition, in both his SoC and his discovery responses, Mattson also blames multiple other non-parties to this arbitration (*i.e.*, parties other than JPMS) for his investment's failure.  For example, Mattson identifies JPMIM/PEG (specifically, Mr. Unrein) and Jawbone itself (specifically, Jawbone's "senior management," including its CEO, Hosain Rahman) as parties who allegedly engaged in the "misconduct alleged in the Statement of Claim."[79]

Despite those allegations, Mattson chose to sue only JPMS in order to improperly secure a litigation advantage.  Specifically, as JPMS explained in its opposition to Mattson's attempt to

---

[77] JPMS_00016598.
[78] *See* JPMS_00002500.
[79] SoC at 3; Claimants' Apr. 17, 2017 Responses and Objections to Respondent's Requests for Information at 4.

subpoena JPMIM and other non-party witnesses to attend the upcoming hearing, Mattson's Subscription Agreement contains choice-of-law, choice-of-forum, fee-shifting, and jury-waiver provisions that are favorable to JPMIM and which Mattson sought to avoid by suing JPMS instead.

Likewise, Mattson could not sue Jawbone because, among other things, it is presently in liquidation proceedings.  Nor could he sue Rizvi:  Rizvi did not breach any of its commitments in the Offering Documents, and Mattson's discovery responses establish that he never once communicated with Rizvi about Jawbone.  For those reasons, Mattson chose to sue only JPMS.

<div align="center">

**ARGUMENT**

</div>

Mattson's SoC asserts essentially two categories of claims: (i) fraud claims and (ii) negligence claims.  The record and the law decisively refute all of Mattson's claims.

## I.    THE EVIDENCE REFUTES MATTSON'S FRAUD CLAIMS

The bulk of Mattson's claims are fraud claims, including claims for "common law fraud" and alleged violations of "the antifraud provisions of the federal securities laws."[80]   Each of these fraud claims requires that Mattson prove certain elements, including:

- Falsity—*i.e.*, that JPMS made a false statement to Mattson;

- Intent—*i.e.*, that JPMS made the false statement with the intent to deceive Mattson;

- Reasonable Reliance—*i.e.*, that Mattson reasonably relied on the false statement; and

- Causation—*i.e.*, that Mattson's reliance on the false statement is what, in fact, caused his damages.[81]

While the law requires that Mattson prove all of these elements, the record establishes that he cannot prove any one of them.

---

[80] SoC at 8, 13.
[81] *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

**A.     The Alleged Misrepresentations Are All Refuted By The Plain Terms Of The Offering Documents**

All of the misrepresentations alleged by Mattson are directly refuted by the Offering Documents.  In his signed Subscription Agreements, Mattson swore "under penalty of perjury" that he (i) had reviewed the Offering Documents, (ii) had performed his own due diligence on the risks disclosed in them, and (iii) was not relying on "any statements" by anyone at JPMS, "other than as set forth in the Offering Documents."[82]

In his SoC, Mattson alleges that JPMS made six purported verbal misrepresentations to him.  But, as discussed above and as shown in **Exhibit 1** hereto (JPMS's one-page chart juxtaposing each of Mattson's alleged misrepresentations with the corresponding provisions of the Offering Documents), the Offering Documents, and the Big Boy provisions therein, refute each of Mattson's alleged misrepresentations.

This evidence—*i.e.*, the terms of the Offering Documents, and the fact that Mattson swore in writing that he had reviewed them and was not relying on any statements outside of them—is, by itself, fatal to all of Mattson's claims.  Given the terms of the Offering Documents, Mattson cannot establish *any* reliance on any alleged verbal statements by JPMS, much less the "reasonable reliance" he is required to prove.

Indeed, courts routinely enforce contractual provisions like the Big Boy provisions at issue here, and reject purported fraud claims like Mattson's as a matter of law.  For example, in a recent case brought by a sophisticated plaintiff seeking to shift his investment losses onto the defendant-placement agent, the federal district court—upon considering the plaintiff's (i) investment "knowledge and expertise," and (ii) execution of a "'big boy' agreement" that it would "'rely[] exclusively' on its own due diligence" in deciding to invest—granted summary judgment in favor of the defendant-placement agent because, it observed, "[t]o allow [plaintiff] to proceed any further . . . would upset the risk

---

[82] Ex. 5 (Subscription Agreement) at JPMS_00002362-JPMS_00002363, JPMS_00002367.

allocation the parties bargained for."[83]  JPMS respectfully submits that Mattson likewise should be held to the terms of the Subscription Agreements that he signed, and is not entitled to any bailout from JPMS.

**B.     Mattson Cannot Even Articulate, Much Less Prove, Fraudulent Intent Because JPMS Had No Incentive To Steer Him Into Any Flawed Investments—And Multiple JPMorgan Entities Lost Millions Of Dollars When Jawbone Failed**

Mattson's fraud claims fail for the additional reason that Mattson cannot prove that JPMS had any fraudulent intent.  According to Mattson's discovery responses, the only JPMS employee who made any alleged misrepresentations to Mattson was Ms. Abouzied.

As a threshold matter, there will be no evidence at trial that Ms. Abouzied ever made any of the alleged misrepresentations to Mattson.  To the contrary, the evidence refutes that allegation, including record evidence that:[84]

- Mattson affirmed in writing that he had not relied on any statements by any JPMS employees; and

- Mattson was introduced to the Jawbone investment in early May 2014 and ultimately subscribed to invest $1 million on May 27, 2014.  During those few weeks, Mattson and Ms. Abouzied exchanged multiple e-mails.  Those e-mails demonstrate that Ms. Abouzied never made any substantive comments to Mattson about Jawbone.  To the contrary, she repeatedly put him in touch with Jawbone and Code Advisors so that Mattson could make his own evaluation.

In any case, Ms. Abouzied had no incentive to make any misrepresentations to Mattson, such as any commission from Mattson's decision to invest in Jawbone.  Ms. Abouzied is a salaried employee who does not receive commissions.  Tellingly, Mattson's SoC fails to allege *any* incentive for Ms.

---

[83] *In re Nat'l Century Finan. Enters., Inc. Invest. Litig.*, 905 F. Supp. 2d 814, 826 (S.D. Ohio 2012), *aff'd Pharos Cap. Partners v. Deloitte & Touche*, 535 Fed. App'x 522 (6th Cir. 2013); *see also Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 724 (7th Cir. 2008) (explaining that "no-reliance clauses are called 'big boy' clauses (as in 'we're big boys and can look after ourselves')," and generally enforced where "the signatory knew what he was doing"); *RSG, Inc. v. Sidump'r Trailer Co., Inc.*, No. 06 Civ. 509, 2011 WL 98310, at *4, *15 (D. Neb. Jan. 10, 2011) ("The court first finds that the 'no reliance,'" or "Big Boy" provision," is "enforceable.").

[84] Not only will there be no evidence that any such misrepresentations were made, it is well-settled that "mere puffery or sales talk is insufficient" as a matter of law "to sustain an allegation of . . . fraud."  *Lawrie v. Ginn Dev. Co., LLC*, 656 Fed. App'x 464, 468 (11th Cir. 2016) (citation omitted); *see also Aprigliano v. Am. Honda Motor Co., Inc.*, 979 F. Spp. 2d 1331, 1341 (S.D. Fla. 2013) ("statements of opinion and sales talk . . . are merely aspirational" and "not actionable") (quotation marks and citation omitted).

Abouzied to defraud him, and Mattson will have no such evidence at trial. Instead, Mattson simply wants his money back—and he is willing to make spurious claims about Rizvi's obligations, as well as bogus fraud claims about Ms. Abouzied, in order to get it.[85]

## II.   MATTSON'S NEGLIGENCE CLAIMS ARE REFUTED BY THE EVIDENCE AND LEGALLY BARRED

Mattson alleges that JPMS was negligent because it failed to conduct adequate due diligence on Jawbone. But Mattson's negligence claims likewise are barred by both the applicable law and the evidence of record, including (i) Mattson's written agreement that he would do his own independent due diligence and not rely on JPMS (or any other JPMorgan entity) to do due diligence for him; and (ii) the fact that Jawbone failed due to market forces, the principal risk that Mattson willingly undertook in making his investment.

### A.   Mattson Cannot Blame JPMS For Jawbone's Failure To Successfully Compete Against FitBit And Apple

As a threshold matter, even putting aside the fact that Mattson agreed in writing to the Big Boy provisions, Mattson's negligence claims all fail for the simple reason that Jawbone's demise resulted from lagging consumer demand for the UP fitness tracker—not from any fraud or other misconduct at Jawbone that could have been identified by reasonable due diligence. Given that causal reality, Mattson's negligence claims are barred because intense competition was the principal risk that investors like Mattson knowingly agreed to take when they invested in Jawbone.

It is settled law that investors cannot maintain a lawsuit when known or disclosed risks of their investment materialize:

> **The gravamen of plaintiffs' claim is that the prospectuses did not fully disclose the risks for potential investors. . . . This claim cannot withstand even casual scrutiny.** . . . [The] prospectuses stated in bold type that "The purchase of shares

---

[85] JPMS is the only respondent in this arbitration. Nevertheless, the evidence establishes that no other JPMorgan entity had any incentive to defraud Mattson, either. To the contrary, JPMorgan entities lost millions of dollars when Jawbone failed. JPMIM, for example, lost millions of dollars in both (i) lost fees and (ii) co-invested funds that its employees had invested in Jawbone. *See* JPMS_00012450. And Jawbone's CEO defaulted on a $16 million loan from JPMorgan Chase Bank, N.A., forcing that JPMorgan entity to file foreclosure proceedings. *See JP Morgan Chase Bank, N.A. v. Hosain Rahman*, 16 Civ. 35 (D. Montana).

offered hereby is subject to certain risks. . . . There followed in the body of the prospectuses seven and one-half pages specifying various "Risk Factors" to which the value of the offered shares was subject.[86]

Reasonable due diligence (whether performed by Mattson or by JPMS) is intended not to ensure that an investment will be *profitable*, but rather to ensure that the investment is what it purports to be.[87] Here, according to Mattson's own allegations, the Jawbone investment was precisely what it purported to be: a "highly speculative," "venture capital" investment in a company operating in a "highly competitive" market that made a big bet on a single product that faced "significant" "operational" and "manufacturing risks."[88]  Thus, the fact that Jawbone's failure was caused by lagging consumer demand for the UP is, by itself, reason to reject Mattson's negligence claims.[89]

### B.  Mattson Cannot Use FINRA Notice 10-22 To Avoid The Big Boy Provisions Because JPMS Did Not "Recommend" Jawbone To MPV Investors

The Panel also should reject Mattson's negligence claims for a second threshold reason:  the parties here specifically agreed in the Big Boy provisions that *Mattson* was responsible for doing due diligence on Jawbone, and that Mattson was *not* relying on JPMS (or any other J.P. Morgan entity) to do so.  Mattson now seeks to avoid his obligations by arguing that, despite the parties' agreement, JPMS still was required to do due diligence anyway pursuant to FINRA Notice 10-22.  But Mattson's argument is glaringly contrary to the record—including the plain terms of Notice 10-22 itself.

#### 1.  It Is Settled Law That Notice 10-22 Applies Only When A Broker-Dealer "Recommends" A Security—And That Investors Cannot Use Notice 10-22 To Avoid Big Boy Provisions

---

[86] *In re RAC Mortg. Inv. Corp. Secs. Litig.*, 765 F. Supp. 860, 864 (D. Md. 1991); *see also, e.g.*, *Repub. Bank & Trust Co. v. Bear Stearns*, 683 F.3d 239, 261-62 (6th Cir. 2012) (dismissing negligent misrepresentation and other claims where "offering documents disclosed th[e] risks" of the transaction).

[87] *See, e.g.*, *University Hill Found. v. Goldman, Sachs & Co.*, 422 F. Supp. 879, 895 (S.D.N.Y. 1976); *see also Marini v. Adamo*, 995 F. Supp. 2d 155, 186 (E.D.N.Y. 2014).

[88] Ex. 7 (Offering Memo) at JPMS_00003017, JPMS_00003039.

[89] While Mattson now argues that Jawbone failed because of Rizvi's failure to exercise its $150 million option and/or because of a 4-month delay in shipping the UP3, those risks were disclosed to Mattson as well.  The Offering Documents plainly state that Rizvi was obligated to invest only $25 million, not $175 million, and that Rizvi might "not intend" to exercise its $150 million option.  Likewise, while the UP3's four-month shipping delay plainly did not lead to Jawbone's demise, the Offering Documents plainly warned investors that Jawbone might experience "delays" due to "substantial manufacturing" and "operational" risks.

Notice 10-22 provides that a broker-dealer has a duty "to conduct a reasonable investigation of securities that it *recommends*."[90]  By its plain terms, Notice 10-22 does not apply where, as here, there has been no recommendation because the investor instead agrees to make his or her own independent decision about whether to invest.[91]

As established by decades of FINRA, SEC, and federal court precedent, "[t]he determination of the existence of a recommendation has always been based on the facts and circumstances of the particular case," and "[a]n important factor in this regard is whether—given its content, context and manner of presentation—a particular communication from a firm or associated person reasonably would be viewed as a *suggestion that the customer take action or refrain from taking action* regarding a security or investment strategy."[92]  In other words, "'[r]ecommendation' is defined to mean '*encouraging the particular customer(s) to purchase a security*,' such as by *sending or 'pushing' specific investment suggestions*."[93]

Critically, where sophisticated investors specifically disclaim reliance on any recommendation by a broker-dealer and agree to perform their own due diligence, they cannot subsequently use Notice 10-22 to avoid their agreement after their risky investments fail.  For example, in a recent decision from the Southern District of New York, the court confirmed that there was no "recommendation," and thus no duty under Notice 10-22, where the customer "clearly and unambiguously disclaim[ed]" reliance on the broker with respect to the investment at issue, as Mattson did here.[94]  In doing so, the court squarely rejected the plaintiff's attempt to transform the "broker's mere participation in a private placement," for which it served as a placement agent (as JPMS did here), into a recommendation for which the broker could be held liable "as an insurer" of the customer's entire investment loss.[95]

---

[90] Ex. 8 (Notice 10-22) at 1.
[91] *Id.*
[92] FINRA Notice to Members 11-02 ("Know Your Customer and Suitability:  SEC Approves Consolidated FINRA Rules Governing Know-Your-Customer and Suitability Obligations") at 2-3.
[93] *BNP Paribas*, 866 F. Supp. 2d at 267 (quoting NASD Notice to Members 01-23 ("Online Suitability") at 2).
[94] *Id.* at 267, 270.
[95] *Id.* at 268.

### 2. JPMS Did Not Recommend Jawbone To Mattson—And Mattson Confirmed That Fact In Writing When He Agreed To The Big Boy Provisions

Applying the applicable law here leaves no doubt that JPMS did not "recommend" Jawbone to Mattson or any other MPV investor.  To the contrary, the "facts and circumstances" clearly establish that JPMS acted as a placement agent who introduced MPV investors to Jawbone but pointedly did *not* make any recommendation about it.  Instead, as Mattson and the 19 other sophisticated MPV investors who chose to invest in Jawbone all confirmed in writing:

- Investors had "*not* relied upon any representations made by, or other information (whether oral or written) furnished by or on behalf of," JPMS or any other J.P. Morgan entity, "other than as set forth in the Offering Documents."

- "IN MAKING AN INVESTMENT DECISION," investors would "RELY ON THEIR OWN EXAMINATION" of "THE MERITS AND RISKS INVOLVED."

Mattson now seeks to disavow the written commitments that he made.  But Notice 10-22 does not exist to provide ultra-high-net-worth, ultra-sophisticated investors with a means to avoid their promises.  Mattson agreed in writing that he was doing his own evaluation of Jawbone and that he was not relying on "*any* representations" by JPMS, much less on any "recommendation."  Accordingly, Notice 10-22 is inapplicable as a matter of law and Mattson should be held to his word.

### C. Although Notice 10-22 Is Inapplicable, The Evidence Demonstrates That JPMS's Investigation Of Jawbone More Than Satisfied Notice 10-22

Finally, while Notice 10-22 is inapplicable, the record evidence demonstrates that the investigation JPMS performed before the MPV Screening Committee approved Jawbone to be shown to MPV investors more than satisfied Notice 10-22's requirements.

### 1. Notice 10-22 Establishes That What Constitutes A "Reasonable Investigation" Is "Based Upon The Facts And Circumstances"

Notice 10-22 provides that what constitutes a "reasonable investigation" depends on the facts and circumstances:

*There are no iron clad rules as to what a broker must do to meet his responsibility. . . .*

34

Each BD must make a determination of the scope of its investigation based upon the facts and circumstances."[96]

It is for this reason that Notice 10-22 cautions members against "mechanical reliance upon a single checklist" and instead instructs that the "investigation . . . be tailored" to the specific circumstances of the transaction.[97]

For example, Notice 10-22 explains that "a more thorough investigation is required for securities issued by smaller companies of recent origin"—which was certainly not the case for Jawbone, a company that, as of 2014, had been in business for 15 years, 450 employees spread across five countries, and a $3.2 billion valuation.[98]   Another factor is "whether the offerees are retail investors" or instead "more sophisticated," a spectrum on which Mattson certainly fell on the extreme end in terms of his sophistication and his direct access to Jawbone's CEO and its confidential Data Room.[99]  Here, one of the central facts concerning the reasonableness of JPMS's investigation was, of course, the terms of the Offering Documents—which provided that JPMS's role in the transaction was that of "placement agent," specified that Mattson had agreed to perform his own independent due diligence on Jawbone, and described the investment at length as being a "highly speculative" venture capital investment subject to numerous risks.

Likewise, Notice 10-22 does not mandate any specific procedure for documenting the investigation conducted.[100]   Rather, the Notice explains that, depending on the circumstances,

---

[96] Ex. 8 (Notice 10-22) at 3 (quoting *University Hill*, 422 F. Supp. at 898).

[97] *Id.* at 8.  To that end, Notice 10-22 observes that "[c]ourts have found that the amount and nature of the investigation required depends, among other factors, upon the nature of the recommendation, the role of the broker in the transaction, its knowledge of and relationship to the issuer, and the size and stability of the issuer." *Id.* (citing *Hanly v. SEC*, 415 F.2d 589, 595-96 (2d Cir. 1969); *University Hill*, 422 F. Supp. at 898).

[98] Ex. 8 (Notice 10-22) at 8 (quoting *Hanly*, 415 F.2d at 595-96).

[99] *Id.* at 1.  Of course, "the presence of any 'red flags'" might warrant "further inquiry." *Id.* at 6; *see id.* at n.12.  Courts have defined "red flags" for purposes of the antifraud provisions of the securities laws as factors "indicative of fraud" which are "recklessly disregarded." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 645 Fed. App'x 72, 74 (2d Cir. 2016).   Courts have also specifically held that factors from which it can be "reasonably concluded" that an issuer is "precisely what [it] presented [itself] as" are "not 'red flags' at all."  *In re Longtop Finan. Techs. Ltd. Secs. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012).  Mattson fails to identify any red flags in his SoC, nor will he produce any evidence of any red flags at trial.  To the contrary, while numerous articles have been written about Jawbone's demise, none of have noted the presence of any red flags.

[100] *See* Ex. 8 (Notice 10-22) at 7.

documentation "may include" items such as "descriptions of the meetings that were conducted," "the date such events occurred," and "the individuals who attended the meetings or conducted the reviews."[101]  This again follows from the case law on which Notice 10-22 relies.[102]

### 2. The MPV Screening Committee's Review Of Jawbone More Than Satisfied Notice 10-22's Requirements

Although Notice 10-22 is inapplicable, the MPV Screening Committee's review of Jawbone in April and May 2014, assisted by multiple JPMS Due Diligence analysts, constituted more than a reasonable investigation given the facts and circumstances.  Among other things, and as discussed at length above (*supra* pages 8, 12-16):

- The MPV Screening Committee only approved investments from known and trusted sources.  Here, JPMIM/PEG, the sponsor of the Jawbone investment, was a known and trusted source that (i) had substantial experience investing in Jawbone through the DGF fund that JPMIM/PEG managed, (ii) JPMS had worked with for years, and (iii) JPMS had done substantial due diligence on, including in May 2014 (*i.e.*, in connection with the launch of DGF II).

- In addition to JPMIM/PEG, Jawbone also had other substantial investors, including some of the world's leading venture capital firms.  Several of those VC firms would be investing in Series 6, together with DGF I and with prospective MPV investors, including: Andreesen Horowitz, Sequoia Capital, Khosla Ventures, Rizvi, and BlackRock.  Andreesen Horowitz in particular was not only a leading VC firm—it was also a firm that JPMIM/PEG had successfully worked with for years.

- JPMS's Due Diligence analysts reviewed hundreds of pages of materials about Jawbone and held multiple conference calls with JPMIM/PEG.  Those same analysts then attended the MPV Screening Committee's meetings and assisted the Committee in its review.

- Among the salient facts that the JPMS Due Diligence analysts and the MPV Screening Committee had to consider were that (i) Jawbone had successfully brought two prior products (Bluetooth headsets and Bluetooth speakers) to market; (ii) Jawbone had industry-leading engineers on its team and top executives (including Marissa Mayer) on its Board; and (iii) Jawbone had experienced substantial growth in 2013 and Q1 2014, particularly in its UP fitness tracker sales.

- Another salient fact the JPMS Due Diligence analysts and MPV Screening Committee were entitled to rely upon was the content of the Offering Documents.

---

[101]  *Id.*

[102]  *See, e.g.*, *University Hill*, 422 F. Supp. at 901 (explaining that the law does not, for example, necessarily require "a single comprehensive written evaluation").

36

As discussed at length above, those documents plainly stated that investing in Jawbone was "highly speculative" and fraught with risks.

Of course, yet another salient fact the JPMS Due Diligence analysts and MPV Screening Committee were entitled to rely upon was the fact that this investment was being offered only to MPV investors—and those investors all had specifically agreed to do their own independent due diligence, and to not rely upon JPMS (or any other J.P. Morgan entity) to do it for them.

**III.     MATTSON'S REMAINING CLAIMS ARE LEGALLY BARRED**

Finally, Mattson asserts claims for "respondeat superior," "breach of fiduciary duty," violations of "FINRA Rules," and "failure to supervise." These claims are duplicative of his fraud and negligence claims, and fail for the same reasons.[103]

## CONCLUSION

For the foregoing reasons, as well as from the evidence to be presented at the hearing, Mattson's claims should be denied in full.

Dated: August 28, 2018

                                   **DONTZIN NAGY & FLEISSIG LLP**

                              By:   Tibor L. Nagy, Jr.
                                    Anuja D. Thatte
                                    980 Madison Avenue
                                    New York, NY 10075
                                    Tel: (212) 717-2900

                                    *Counsel for Respondent J.P. Morgan Securities LLC*

---

[103] For example, Mattson's fiduciary duty claim is barred by the Big Boy provisions, which disclaim any reliance on JPMS in connection with his Jawbone investment. *See BNP Paribas*, 866 F. Supp. 2d at 269-70 (enforcing Big Boy provision and rejecting breach of fiduciary duty claim); *see also, e.g., Lamm v. State Street Bank & Trust*, 749 F.3d 938, 943, 950 (11th Cir. 2014) (no fiduciary duty where contract "impos[ed] limited obligations on the parties" and provided "that [defendant] would have no decisionmaking role over [plaintiff's] investments"); *Curry v. TD Ameritrade*, No. 14 Civ. 1361, 2015 WL 11251449 (N.D. Ga. June 30, 2015) (rejecting fiduciary duty claim in light of parties' agreement that plaintiff alone was "responsible for determining the nature, potential value and suitability" of the investment and that defendant was not providing "any advice or guidance" on the subject).

LIST OF EXHIBITS TO
J.P. MORGAN SECURITIES LLC'S PRE-HEARING BRIEF

| No. | Document |
|-----|----------|
| 1. | Chart of Alleged Misrepresentations vs. Actual Provisions In The Offering Documents |
| 2. | Timeline Of Key Events |
| 3. | Glossary of Terms Used In This Brief—And Likely To Be Used At The Hearing |
| 4. | Confidential Offering Memorandum for Digital Growth Co-Investment 2, L.P.[*] |
| 5. | Subscription Booklet for Digital Growth Co-Investment 2, L.P. |
| 6. | Confidential Memorandum of Terms Between Rizvi And AliphCom/Jawbone |
| 7. | AliphCom/Jawbone Series 6 Preferred Stock Purchase Agreement[†] |
| 8. | FINRA Notice to Members 10-22 |

CONTAINS CONFIDENTIAL INFORMATION

---

[*] Due to length, JPMS has omitted Exhibit A to this document, which contains certain notices pertinent to residents of jurisdictions outside of the United States.

[†] Due to length, JPMS has omitted certain reports appended to this document, including approximately 215 pages of reports concerning Jawbone's intellectual property (primarily voluminous patent reports).

# EXHIBIT W

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

GEORGE MATTSON AND GNM ICBC,
LLC,

        Petitioners,

v.                                    CASE NO.:

J.P. MORGAN SECURITIES, LLC,

        Respondent.

## AFFIDAVIT OF GEORGE MATTSON

STATE OF FLORIDA     )
PALM BEACH COUNTY  )

      Comes now George Mattson and states as follows:

1.

      This Affidavit is presented in connection with Petitioners George Mattson and GNM

ICBC, LLC's Application and Motion to Vacate Arbitration Award in the above-styled case.

2.

      I am over eighteen years of age and a resident of Florida.  I make this Affidavit based

upon my personal knowledge of the facts set forth herein, and am competent to testify

concerning these facts.

3.

      On September 19, 2018, during the FINRA arbitration styled *George Mattson and GNM*

*ICBC, LLC v. J.P. Morgan Securities, LLC*, Financial Industry Regulatory Authority ("FINRA"),

arbitration case number 17-01969, I was seated in close proximity to Arbitrator Daniel Joseph

Chiodo.  During my counsel's examination of JPMS's due diligence witness, Joshua Helfat,

Arbitrator Chiodo exclaimed "I don't know how much more of this I can stand."  I notified my

1

counsel of this statement at the time.   Thereafter, the Arbitrators refused to hear the testimony of my expert witness pertaining to industry standards relating to FINRA broker-dealers performing due diligence on private investments.

<div align="center">4.</div>

This Affidavit is made voluntarily.  Before signing this, I was given the opportunity to change and correct it.  I have made all changes necessary to make this a true statement describing my own knowledge.

I verify under penalty of perjury that the foregoing is true and correct.

This 31st day of October, 2018.

<div align="right">
_____

George Mattson
</div>

Sworn to before me
this 31 day of _October_ 2018



Notary Public

LISA S. PETERSEN
MY COMMISSION # FF 933795
EXPIRES: January 14, 2020
Bonded Thru Notary Public Underwriters

<div align="right">2</div>